'07 CIV 7762

JUDGE PRESKA

320-07PJG/MAM/BGC
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiffs
80 Pine Street
New York, NY  10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Manuel A. Molina (MM 1017)
Barbara G. Carnevale (BC 1651)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

OCEAN TRADE S.A.;
PANAPORT SHIPPING S.A.;
PILLSBURG NAVIGATION S.A.; and,
STERLING NAVIGATION S.A.

                    Plaintiffs,

     -against-

CHARALAMBOS ZIOGAS a/k/a BABIS ZIOGAS
a/k/a BABIS O. ZIOGAS, an individual;
MARITIME FINANCIAL SERVICE CORP.
n/k/a MFS SHIPMANAGEMENT CORP.;
PEGASUS SHIPHOLDINGS CORP.;
EAST WEST MARITIME INVESTMENT LTD.;
DAISY SHIPPING LTD.;
ELLIE SHIPPING LTD.;
HARMONY SHIPPING LTD.;
OCEAN PHOENIX SHIPPING LTD.;
ASIAN FRIENDSHIP SHIPPING LTD;
ASIAN UNITY SHIPPING LTD.; and,
OLYMPIAN GODDESS SHIPPING LTD.;

                  Defendants.
------------------------------------------------------------x

07 CIV ____ (__)

**VERIFIED COMPLAINT**



RECEIVED
AUG 3 1 2007
U.S.D.C. S.D. N.Y.
CASHIERS

     Plaintiffs, by their attorneys Freehill, Hogan & Mahar, LLP, as and for their

Verified Complaint against the named Defendants, allege upon information and belief as

follows:

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a certain maritime joint venture contractual relationship and the fiduciary duties which were owed by the Defendant CHARALAMBOS ZIOGAS under that relationship to the Plaintiffs. This is also a claim involving a maritime fraud under which the Defendants, individually and collectively, defrauded the Plaintiffs of certain property, including: (i) options on certain ocean going vessels and (ii) revenue generated from the charter earnings of other ocean going vessels owned by Plaintiffs, which property should have inured to the benefit of the Plaintiffs. As such, this case falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, and/or the Court's supplemental jurisdiction pursuant to 28 U.S.C. §1367.

**The Parties:**

**(i)     The Plaintiffs**

2.     At all times material hereto, the Plaintiff OCEAN TRADE S.A. (hereinafter "OCEAN TRADE") was and still is a foreign business entity duly organized and existing under the laws of Liberia which was engaged, *inter alia*, in the ownership and chartering of vessels engaged in world-wide trade.

3.     At all times material hereto, Plaintiff OCEAN TRADE's business operations were conducted from the Athens offices of Cardiff Marine Inc. ("Cardiff"), a recognized and established Greek ship management company which currently manages approximately 60 ships, and whose offices have been located since 1998 at The Omega Building, 80 Kifissias Ave., GR 151 25, Athens, Greece.

4.     Cardiff was founded by Mr. George Economou ("Mr. Economou") in about 1992.

5.     At all times material hereto, Mr. Economou was the principal investor in the Plaintiff OCEAN TRADE, such investment being made through a Liberian corporation called Maryport Navigation Corp. ("Maryport"), which in turn held all the issued shares of the Plaintiff OCEAN TRADE.

6.     At all times material hereto, the remaining Plaintiffs, PANAPORT SHIPPING S.A., PILLSBURG NAVIGATION S.A. and STERLING NAVIGATION S.A. were and still are foreign business entities duly organized and existing under the laws of Panama, each of which was a wholly owned subsidiary of the Plaintiff OCEAN TRADE.

7.     The Plaintiff subsidiaries identified in paragraph 6 above were the registered owners of the vessels KOWHIA, OCEAN REYNA and OCEAN LEO, respectively, which formed part of the OCEAN TRADE fleet of vessels, and for the sake of clarity, will hereinafter be referred to as the "Ocean Trade Owners" throughout the balance of this Complaint.

**(ii)     The Defendants**

8.     At all times material hereto, the Defendant CHARALAMBOS ZIOGAS, also known as BABIS O. ZIOGAS and/or BABIS ZIOGAS (hereinafter "ZIOGAS"), was and still is a Greek citizen presently residing in Athens, Greece.

9.     At all times material hereto, the Defendant MARITIME FINANCIAL SERVICE CORP. ("MFSC"), now known as MFS SHIPMANAGEMENT CORP.

("MFS SHIPMANAGEMENT"), was and is a foreign business entity organized under the laws of Liberia.

10.    Since 2005, MFS SHIPMANAGEMENT has been the corporate vehicle through which the Defendant ZIOGAS has managed the ocean going vessels over which ZIOGAS wrongfully gained title and possession by virtue of the conduct detailed more fully in the body of this Complaint, which entity lacks any true and distinct corporate existence apart from ZIOGAS, and which was and still is operated and controlled by ZIOGAS from an address at 6th Floor, 24 Kanari Street, Kolonaki Square, 106 74, Athens Greece.

11.    At all times material hereto, the Defendants EAST WEST MARITIME INVESTMENTS LTD. ("EWMI") and PEGASUS SHIPHOLDINGS CORP. ("PEGASUS") were and still are foreign business entities organized under the laws of The Marshall Islands and Liberia, respectively, which were created and utilized by the Defendant ZIOGAS as the corporate vehicles through which ZIOGAS arranged for the transfer of assets/funds wrongfully garnered by ZIOGAS through the conduct detailed more fully in this Complaint, each of which lacks any true and distinct corporate existence apart from ZIOGAS, and both of which are operated by ZIOGAS from his current corporate management entity MFS SHIPMANAGEMENT at the same address noted in paragraph 10 above.

12.    At all times material hereto, the Defendants DAISY SHIPPING LTD., ELLIE SHIPPING LTD., HARMONY SHIPPING LTD., OCEAN PHOENIX SHIPPING LTD., ASIAN FRIENDSHIP SHIPPING LTD., ASIAN UNITY SHIPPING LTD. and OLYMPIC GODDESS SHIPPING LTD. were and still are foreign business

entities organized under the laws of The Marshall Islands, which were formed by and utilized by the Defendant ZIOGAS as the individual corporate-owning vehicles into which he placed the ownership of the ocean going vessels which ZIOGAS wrongfully garnered by virtue of the conduct detailed more fully in this Complaint, each of which lacks any true and distinct corporate existence apart from ZIOGAS, and which were and still are operated by ZIOGAS from the address noted in paragraph 10 above.

13.    At all times material hereto, the Defendant ZIOGAS was and still is in complete and total managerial control of the corporate defendants identified in the caption, the latter of which lack true corporate independence and over which ZIOGAS maintains dominion and control and are utilized as vehicles through which he conducts business without due regard to corporate formalities or corporate separateness.

14.    As outlined more fully below, the Defendant ZIOGAS created, dominated and controlled the other Defendant corporate entities in a manner which gives rise to a claim of fraud on behalf of all the Plaintiffs, and concomitant liability against each of the other corporate Defendants as the alter-egos of and instrumentalities of ZIOGAS, who formed and maintained the other Defendant corporations, *inter alia*, without adequate capitalization, without attention to corporate formalities, with overlap of directors and shareholders, with operations and management being controlled from the same offices, with all managerial authority resting with ZIOGAS, and which Defendants were utilized by ZIOGAS to receive and transfer assets without adequate consideration as between themselves, and were utilized by ZIOGAS to extend and receive corporate cross-guarantees without an arm's length basis, all of which furthered a common scheme orchestrated and controlled by ZIOGAS under which he deprived the Plaintiffs of assets

in excess of $90 million, and transferred those assets into the names of the various corporate Defendants.

**General Background to the Relationship between Mr. Economou and ZIOGAS leading up to the OCEAN TRADE Joint Venture.**

15.    As outlined above, Mr. George Economou was the principal investor in the Plaintiff OCEAN TRADE and (through the Plaintiff OCEAN TRADE) the Ocean Trade Owners. (See ¶ 3-7, *infra*.)

16.    Mr Economou was acquainted with the Defendant ZIOGAS from the early 1980's, having worked in the New York shipping industry. (See Ex. 2 at pp 1-2, copy of ZIOGAS' CV obtained from the website of Defendant MFS SHIPMANAGEMENT which outlines the various maritime positions held by ZIOGAS in New York in the 1980 - 90's.)

17.    During this time, ZIOGAS had formed a ship-owning company called Bulk Ocean Services which eventually failed. Following the failure of that corporation, ZIOGAS returned to Greece in or about 1996 and sought to re-establish himself in the shipping industry.

18.    Upon his return to Greece, the Defendant ZIOGAS approached Mr. Economou due to their earlier friendship and sought his assistance.

19.    In an effort to assist an old friend, Mr. Economou agreed to provide ZIOGAS with a desk and access to the other business facilities at Cardiff's offices. It was the plan of ZIOGAS that he would attempt to develop maritime business which might be of interest to, *inter alia*, Mr. Economou, with ZIOGAS then operating or managing that new business.

20.    It was agreed that this common or joint venture would focus on maritime related business activity.

21.    Under this cooperative/joint venture arrangement, ZIOGAS was provided with a desk at the Cardiff's offices in Athens in about April 1996, the general business facilities at Cardiff, and thereafter endeavored to find maritime business opportunities which might be of interest to Mr. Economou and others.

22.    Among the business identified by ZIOGAS was the acquisition of several vessels and their charter to a Japanese company called INTER PACIFIC LINES CO. LTD. (hereinafter "IPL").

23.    The Plaintiff OCEAN TRADE was the principal corporate vehicle through which the business with IPL was to be conducted, its role being the sole shareholder and owner of the Ocean Trade Owners (i.e. the remaining Plaintiffs) who acted in the capacity as the individual owning companies who purchased, *inter alia*, certain vessels and then chartered them out to IPL.

24.    Specifically, and during the period 1996-97, OCEAN TRADE acquired six vessels and then chartered them to IPL controlled subsidiary corporations under long-term bareboat charters which ranged between 4 and 10 years.

25.    The actual acquisition of the vessels was arranged by ZIOGAS who was acting as the manager and agent of the joint venture, with the actual purchases being made by wholly owned subsidiary corporations of the Plaintiff OCEAN TRADE (i.e. the other three plaintiffs identified above as the Ocean Trade Owners).

26.    More specifically, the Plaintiff PANAPORT SHIPPING purchased the M/V KOWHAI and then chartered it to an IPL subsidiary in April 1997, the Plaintiff

PILLSBURG NAVIGATION purchased the M/V OCEAN REYNA and chartered it to an IPL subsidiary in December 1997, and the Plaintiff STERLING NAVIGATION purchased the M/V OCEAN LEO and similarly chartered it to an IPL subsidiary also in December 1997.

27.    Copies of the three charter parties from the three Ocean Trade Owners to the three IPL subsidiary corporations are annexed hereto as Ex. 1.

28.    The management and day-to-day operation of the OCEAN TRADE venture was entrusted by OCEAN TRADE (and Mr. Economou) to ZIOGAS, the latter who acted as agent for the joint venture, but on all matters of significance, ZIOGAS understood and was obliged to consult with Mr. Economou, and/or Mr. Ioannidis, the General Manager of Cardiff, before any managerial decision of consequence was taken.

29.    Once a particular matter had been discussed and a decision taken, ZIOGAS would then be empowered to implement that decision as directed by Mr. Economou and/or Mr. Ioannidis.

30.    In about 2000, ZIOGAS opted to establish a separate office in Athens, which he ran under the banner MARITIME FINANCIAL SERVICES CORPORATION. In accordance with the established arrangements for the OCEAN TRADE venture, ZIOGAS continued to handle all matters relating to the day-to-day operation of the OCEAN TRADE venture including the management of the three long-term charter parties to the IPL subsidiary corporations described in paragraphs 26-27 above, and which were still being performed.

**During 2000, IPL runs into Financial Difficulty and Cannot Meet its Full Charter Obligation to the Ocean Trade Owners**

31.    As outlined above, OCEAN TRADE, and the Ocean Trade Owners had entered into long-term charter parties with three IPL subsidiary corporations, as charterers, under which the charterers had monthly obligations to pay hire to the Ocean Trade Owners.

32.    ZIOGAS was managing these charter contracts.

33.    During the period 2000 – 2001, IPL and its subsidiary corporations fell progressively behind in the payment of the charter hire owed to OCEAN TRADE and the Ocean Trade Owners.

34.    As of December 2001, the situation had become critical in that charter hire in excess of $2.5 million was outstanding.

35.    To further complicate the matters, the Japanese entity which had been acting as the technical manager of the vessels for IPL - a company by the name of Keymax Maritime Co. Ltd. ("KEYMAX") - itself claimed that it was owed yet a further $1.5 million in respect to various ship operating expenses, docking costs, etc., which were also the responsibility of IPL and its subsidiary chartering entities.

36.    There were close connections between IPL and KEYMAX, with the two corporations sharing the same offices in Tokyo, and many of the officers of KEYMAX were former employees of IPL.

37.    In sum, therefore, by December 2001, there was an accrued total debt of approximately $4 million owed by IPL and its subsidiary corporations in respect to the three vessels owned by the Ocean Trade Owners.

38.    With the absence of timely hire payments from its charterers, the Plaintiff OCEAN TRADE and the Ocean Trade Owners had to arrange an additional source of funds to meet the commitments to the banks holding the mortgages on the vessels.

39.    Since ZIOGAS claimed to have no monies and not to be able to contribute to the funding of the losses incurred by the Ocean Trade venture, Mr. Economou, through a separate corporate entity, arranged for a private loan to infuse the OCEAN TRADE venture with the requisite cash necessary to maintain viability during this period when the charterers were regularly defaulting in the payment of the charter hire.

40.    ZIOGAS contributed nothing to the funding needed to maintain the viability of the OCEAN TRADE venture.

**Negotiations with IPL for a Commercial Workout of IPL's Breach/Non-Payment of Hire due under the Long Term Charters.**

41.    As a consequence of IPL's failure to pay the charter hire, Mr Economou and ZIOGAS, on behalf of OCEAN TRADE and the Ocean Trade Owners, initiated negotiations with IPL for a commercial workout of the situation.

42.    Throughout 2001, there were extensive correspondence and negotiations between ZIOGAS and IPL in an effort to solve the problem created by IPL's financial difficulties and the charter hire arrears, and on occasion, Mr. Economou participated in these discussions.

43.    Toward the end of those negotiations in November 2001, KEYMAX also became directly involved in the efforts to find a solution to the problem.

44.    During this period of time, IPL had sub-let the vessels on time charter terms to established Japanese shipping operators.

45.    However, the revenue and earnings from these sub-charterers were not being utilized exclusively to satisfy the hire payments owed to OCEAN TRADE and the Ocean Trade Owners, nor the operating expenses, docking costs, etc. owed to KEYMAX, but instead some of it was being utilized to satisfy other IPL trade debt incurred in connection with other ships and ventures in which IPL was engaged.

46.    One of the main concerns voiced by OCEAN TRADE and the Ocean Trade Owners, in respect to its willingness to enter into a commercial workout, was the need to put in place a mechanism by which the earnings from these sub-charterers would be used exclusively for paying the charter hire owed to OCEAN TRADE and the Ocean Trade Owners, as well as the ship operating expenses, docking costs, etc. owed to KEYMAX.

47.    The solution finally agreed with IPL and KEYMAX was that KEYMAX would receive all payments from the sub-charterers and would henceforth operate the vessels for the Ocean Trade Owners on what is referred to in the industry as an "open account" basis, under which KEYMAX would use the earnings from the sub-charterers to pay only the operating expenses and trade debt incurred by the vessels, with the residual being paid to the Ocean Trade Owners, in lieu of IPL and the IPL subsidiary corporations paying the hire.

48.    Before IPL would agree to pass control of the sub-time charter income stream to KEYMAX, however, IPL demanded that OCEAN TRADE and the Ocean Trade Owners make a series of one-off payments to IPL totaling US$300,000 over a period of six months from January 2002 to June 2002 (i.e. US$70,000 per month in

January and February, US$60,000 in March, US$40,000 in April, and US$30,000 per month in May and June).

49.    In addition, KEYMAX also demanded as part of the workout agreement that part of the future sub-time charter income stream from the sub-charterers be used to pay the accrued ship operating expenses, docking costs, etc. owed by IPL to KEYMAX.

50.    In this respect, it was eventually agreed that KEYMAX would be allowed to pay to itself a total of US$1,034,000 from the future sub-time charter income of the three vessels over a period of 4½ years, commencing in December 2001 (see Clause 4 of the KEYMAX Master Agreement, Ex. 2 at p. 10).

51.    While the agreement to have KEYMAX collect the sub-time charter hire from the sub-charterers addressed OCEAN TRADE's concerns that IPL should no longer have access to those funds and thus the ability to satisfy other debts incurred by IPL that were unconnected to the vessels, it did not solve the problem of the outstanding hire which was otherwise owed to OCEAN TRADE and the Ocean Trade Owners which totaled approximately US$2.5 million as of December 2001.

52.    In addition, and in part because of the requirement to make the payments to IPL and KEYMAX (as detailed in paragraphs 48-50 above) from the future sub-time charter income stream, there was always likely to be an ongoing shortfall in the payment of hire and little likelihood that this income stream would ever account for the then outstanding hire of some $2.5 million which was due and owing to OCEAN TRADE and the Ocean Trade Owners.

53.    As some measure of compensation for the unpaid hire, and for giving up the entitlement to receive the full hire due from IPL and the IPL subsidiary corporations,

it was proposed that IPL would agree to extend to OCEAN TRADE and the Ocean Trade Owners an asset in the form of shares in, or an option to purchase on potentially favorable terms (depending on market conditions) vessels owned by IPL (or IPL subsidiaries).

54.    Such proposal was first discussed in January 2001 and such discussions continued throughout calendar year 2001 with various alternative arrangements considered by the parties.

55.    By the end of 2001, the plan settled upon by OCEAN TRADE, IPL and KEYMAX, was that KEYMAX would arrange for purchase options in favor of OCEAN TRADE in respect of six vessels on the terms set out at Clause 7 of what later was referred to as the KEYMAX Master Agreement, and undertook to supply OCEAN TRADE with the proper consent of the registered owners of those six vessels.

56.    Of the six vessels, three had at one time belonged to IPL (the OCEAN DAISY, OCEAN ELLIE and OCEAN SAMPAGUITA), two belonged to KEYMAX (the OCEAN HARMONY and OCEAN PHOENIX) and one vessel (the SOUTHERN ODYSSEY) belonged to a third party owner.

57.    As stated in Clause 7 of the KEYMAX Master Agreement, the giving of these purchase options was in consideration and recognition of the fact that OCEAN TRADE and the Ocean Trade Owners had lost substantial sums during earlier trading of the OCEAN TRADE vessels and were due compensation in the context of this commercial workout.

58.    These negotiations were being handled mainly by ZIOGAS through 2001, and ZIOGAS in turn was reporting these developments to Mr. Economou and/or Mr.

Ioannidis.

59.    As noted above, the agreement, as negotiated in December of 2001, provided that KEYMAX would give purchase options on the following six vessels: OCEAN DAISY, OCEAN SAMPAGUITA, OCEAN ELLIE, OCEAN PHOENIX, OCEAN HARMONY and SOUTHERN ODYSSEY (hereinafter referred to as "the Option Ships") in recognition of OCEAN TRADE's and the Ocean Trade Owners' losses in the form of unpaid charter hire during earlier trading of the OCEAN TRADE vessels.

60.    The work-out agreement was to be memorialized in two separate documents, one agreement referred to as the IPL Master Agreement which contained the terms between the Plaintiffs and IPL, and a separate agreement called the KEYMAX Master Agreement, which contained the terms of the agreement under which KEYMAX would collect the sub-charter hire; make various payments from that hire (including payments to itself totaling US$1,034,000); be appointed by the Ocean Trade Owners as the technical managers of the OCEAN TRADE vessels (and be paid management fees of US$6,000 per month per vessel under such management agreements); and arrange for the options to be issued. (See, Ex. 2 at pp. 8-17 including email dated December 21, 2001 from ZIOGAS to Mr. Economou providing copies of the "final agreements".)

61.    In late December 2006, ZIOGAS signed the IPL and KEYMAX Master Agreements on behalf of OCEAN TRADE and the Ocean Trade Owners, as did IPL and KEYMAX.

62.    Initially, in early January 2002, ZIOGAS told Mr. Economou that the agreements had been finalized and signed. However, ZIOGAS never provided Mr. Economou or Cardiff with copies of the signed agreements.

63.     During the ensuing months, and in response to the repeated inquiries from Mr. Economou as to the status of the agreements, ZIOGAS then denied that the agreements had ever been finalized/executed.

64.     In July, 2002, Mr. Economou bought out any interest ZIOGAS and/or his Liberian corporation (Maritime Financial Holdings Services Corp.) had in the OCEAN TRADE joint venture in exchange for payment of $75,000.

65.     From that point forward, ZIOGAS had no status or authority to speak or act on behalf of OCEAN TRADE or the Ocean Trade Owners, and all commercial activity on their behalf was transferred to Cardiff and entrusted to Mr. Economou and Mr. Ioannidis.

66.     During the last 5½ years since January 2002, ZIOGAS has steadfastly maintained that the KEYMAX Master Agreement had never been finalized/executed.

67.     ZIOGAS and KEYMAX maintained that the KEYMAX Master Agreement had never been finalized/executed, notwithstanding that all the terms of the agreement reached by the parties in December 2001 for the commercial workout were implemented with the exception of the giving of the purchase options provided for in clause 7 of the KEYMAX Master Agreement.

68.     Since IPL and KEYMAX refused to acknowledge that the IPL and KEYMAX Master Agreements had been signed, and as the Plaintiffs were unable to prove otherwise, the Plaintiffs pursued a claim against IPL in England and South Africa for the outstanding hire but the litigations were eventually terminated as a consequence of IPL's application to the Japanese Courts to be declared bankrupt.

**Disclosure of Documents in July 2007 Reveals ZIOGAS' Breach and Fraud.**

69.    In early July 2007, certain documents were provided to the Plaintiffs which revealed, for the first time, the truth about what had taken place in connection with the commercial workout negotiated at the end of 2001, the execution of the KEYMAX Master Agreement, and the manipulation of the purchase options which, it was revealed, ZIOGAS had maneuvered into the name of corporations he controlled.

70.    As outlined more fully below, the KEYMAX Master Agreement had in fact been executed on or about December 31, 2001 in the form previously agreed, the agreement being signed by ZIOGAS on behalf of OCEAN TRADE and the Ocean Trade Owners.

71.    The finalization and execution of the KEYMAX Master Agreement was kept secret from OCEAN TRADE, the Ocean Trade Owners and Mr. Economou by ZIOGAS, who later fraudulently and wrongfully arranged for the purchase options to be re-issued by KEYMAX in favor of ZIOGAS' private Liberian shell corporation MARITIME FINANCIAL HOLDINGS SERVICES CORP. ("MFHSC"), and later were exercised in respect of four of the Option Ships for his own benefit at a point in time where the four vessels were worth significantly more than the purchase option price.

72.    First, and contrary to ZIOGAS' representations to the contrary, the KEYMAX Master Agreement was executed on December 31, 2001, and, as originally agreed, had provided for the purchase options in favor of OCEAN TRADE.

73.    Copies of the executed KEYMAX Master Agreement, duly signed by the president of KEYMAX, as well as the IPL Master Agreement and the attendant fax/email exchange between KEYMAX and ZIOGAS dated December 31, 2001 confirming

execution of the two agreements by ZIOGAS on behalf of OCEAN TRADE and the Ocean Trade Owners, and the anticipated implementation of them are annexed hereto as Ex. 2 at pp 23-33.

74.    Of particular relevance to this suit is the agreement in Clause 7 of the KEYMAX Master Agreement (Ex. 2 at p. 29) under which KEYMAX gave to OCEAN TRADE purchase options in respect of six vessels in recognition that OCEAN TRADE and the Ocean Trade Owners had lost substantial amounts during the earlier trading of the OCEAN TRADE vessels.

75.    Subsequent to the execution of the KEYMAX Master Agreement, in about March/April of 2002, ZIOGAS persuaded KEYMAX to enter into two new agreements that separated out the purchase options from the other terms of the KEYMAX Master Agreement and created two documents, one embodying the workout without reference to the options (called the Settlement Agreement), and the second reflecting the purchase options only (called the Options Agreement).

76.    Having effectively kept OCEAN TRADE, Mr. Economou and Cardiff in the dark with respect to the finalization of these workout agreements, and not having had to disclose the signed documents, ZIOGAS saw an opportunity to garner for himself the purchase options by changing the identity of the beneficiary during the negotiations with KEYMAX to separate the KEYMAX Master Agreement into two parts.

77.    During this very period, Mr. Economou had been making inquiries of ZIOGAS as to the position of the purchase options.

78.    ZIOGAS reiterated to Mr. Economou in late March 2002 that the purchase options agreement had not been finalized, and told Mr. Economou that shortly he would

be visiting KEYMAX and IPL in Japan at which time he would discuss the issue with them.

79.    The statements by ZIOGAS prompted Mr. Economou to send a fax directly to IPL and KEYMAX on March 29, 2002 (See, Ex. 2 at p. 46) in which he stated:

> "Mr. Babis Ziogas is coming to Japan next week to … and also to implement the option agreements for the purchase of the vessels which should be made in the name of Ocean Trade."

80.    ZIOGAS did in fact travel to Japan in early April, but he conducted no negotiations with respect to the issuance of the options – as that had already been finalized – but instead orchestrated an adjustment of the identity of the beneficiary of those options, which involved the KEYMAX Master Agreement being carved into two separate documents, the Options Agreement and the Settlement Agreement.

81.    In violation of his duties as an agent and fiduciary to OCEAN TRADE and the Ocean Trade Owners, ZIOGAS inserted the name of his private Liberian shell corporation MFHSC as the beneficiary of the six purchase options, even though these purchase options were rightfully the property of the Plaintiff OCEAN TRADE. (See, Ex. 2 at pp 50-55).

82.    Otherwise, the terms of the purchase options were effectively identical to those originally set forth in Clause 7 of the KEYMAX Master Agreement which provided for the options to go to the benefit of OCEAN TRADE.

83.    In May of 2002, Mr. Economou was in Japan on other business and took the opportunity to meet with KEYMAX and IPL to discuss the various open issues regarding the Ocean Trade venture, and the status of the purchase options which, based upon what ZIOGAS had told him, he understood to be not finalized and not signed.

84.    In advance of that meeting, ZIOGAS laid the groundwork for the maintenance of the subterfuge by transmitting an email to Mr. Fordyce, his main contact at KEYMAX, on May 7, 2002 stating the following regarding the anticipated visit by Mr. Economou.

> "Economou visit:  He knows the following:
>
> (d) For the options (O. Phoenix, etc.) [a reference to the option vessels].  I told him that although we talked and drafted options documents last December, we never finalized them. . . ."

(See, Ex. 2 at p. 59 at ¶1-d).

85.    During the meeting with Mr. Economou, and as per ZIOGAS' orchestration, IPL and KEYMAX adopted the same position – namely, that the terms of the purchase options had never been finalized and no agreement had been signed, all of which was false.

86.    As outlined above, and as of May 2002, not only had the KEYMAX Master Agreement been signed, but ZIOGAS had already negotiated and signed with KEYMAX two new substitute agreements under which the beneficiary of the options was now held by ZIOGAS in the form of his Liberian shell MFHSC.

87.    In a subsequent June 10, 2002 fax from Mr. Economou to KEYMAX and IPL (See, Ex. 2 at pp. 60-62), Mr. Economou queried KEYMAX and IPL in respect of various deductions that had been made from the time charter income and quoted extensively from the December 27, 2001 draft of the KEYMAX Master Agreement, a copy of which he had been provided with by ZIOGAS.

88.   In commenting on Mr. Economou's inquiry, ZIOGAS confirmed in an email dated June 12, 2002 to Mr. Fordyce of KEYMAX that he was maintaining the subterfuge:

> For your information, I never gave to Cardiff a signed copy of the KEYMAX/IPL Agreement, but I told him that we have a gentleman's agreement on the lines of the draft he is quoting in his letter. This gives an extra leverage for you and me to run this deal....

(See, Ex. 2 at p. 63).

89.   As outlined above, ZIOGAS ceased to be involved with the OCEAN TRADE venture from July 2002.

90.   Shortly after ZIOGAS' involvement with OCEAN TRADE came to an end, Cardiff assumed the role as manager for OCEAN TRADE and took over from ZIOGAS the day–to–day communications with KEYMAX. Although ZIOGAS was to have no further involvement, he continued to manipulate the situation, and in an email he sent to Mr. Fordyce on July 26, 2002 at KEYMAX, he reassured Fordyce that even though Cardiff was taking over the management, Cardiff (and Mr. Economou) did not know that the KEYMAX Master Agreement had been signed:

> As Keymax correctly points out it has no direct relationship with Cardiff and it is important for them to maintain this to collect their outstandings. The reason for this advantageous set up is my good work and foresight to keep the agreement signed with OCEAN TRADE out of the hands of Cardiff. This there would be no problems in maintaining the current situation.

(See, Ex. 2 at pp 68-69).

91.   This email confirms ZIOGAS' continued involvement in the scheme, and notes that even though Cardiff was now assuming the role of manager for OCEAN TRADE, his prior "good work" and "foresight" in keeping the signed KEYMAX Master

Agreement out of Cardiff's hands had resulted in Cardiff having no knowledge of the agreement and thus enabled ZIOGAS to profit from the purchase options given by KEYMAX pursuant to the agreement.

92.    Subsequent to the departure of ZIOGAS from OCEAN TRADE, Cardiff sent a number of messages to Mr. Fordyce at KEYMAX, trying to establish what had transpired, and what matters previously had been agreed by ZIOGAS on behalf of OCEAN TRADE and the Ocean Trade Owners.

93.    In an email transmitted on September 5, 2002, Mr. Fordyce communicated with Cardiff explaining the "position" insofar as the status of the workout agreements were concerned and attached to that a bogus and inaccurate document intended to further mislead Cardiff and Mr. Economou as to the truth of what had taken place.

94.    In the email, Fordyce states "I attach a copy of what was mutually agreed both at the end of December and subsequently." (See, Ex. 2 at pp 72-76).

95.    The attachment to that email was a document entitled "Understanding between IPL and Ocean Trade" which was said to be a record of what was agreed by the parties in late December and subsequently varied in May, 2002.

96.    Maintaining the subterfuge, however, Mr. Fordyce did not reveal at the time what he and ZIOGAS and others had been keeping secret from OCEAN TRADE and Mr. Economou – that is, that the KEYMAX Master Agreement had in fact been signed on December 31, 2001, as well as the IPL Master Agreement, and that the KEYMAX Master Agreement had subsequently been amended such that the beneficiary was now in favor of ZIOGAS' Liberian captive, MFHSC, in place of OCEAN TRADE.

97.    In 2005, ZIOGAS then signed a further master agreement between KEYMAX, EAST WEST MARITIME INVESTMENT LTD. ("EWMI"), a separate ZIOGAS' shell corporation, and MFSC (as it was then called) ("the EWMI Master Agreement"). (See, Ex. 2 at pp 132-146, copy of EWMI Master Agreement.)

98.    Under that new EWMI Master Agreement, EWMI subsidiary corporations, including Defendants DAISY SHIPPING LTD., ELLIE SHIPPING LTD., HARMONY SHIPPING LTD., and OCEAN PHOENIX SHIPPING LTD., were identified as the bareboat charterers who would subsequently take title of the Options Ships, including the OCEAN DAISY, OCEAN ELLIE, OCEAN HARMONY and OCEAN PHOENIX, respectively, with the transfer of title to coincide with the end of the term of the charters. (See, Ex. 2 at pp 147-86, copies of the bareboat and purchase agreements with the individual ZIOGAS shell owning corporations.)

99.    The underlying basis for the EWMI Master Agreement and the bareboat charter hire purchase agreements issued thereunder was the option clause as originally set forth in the KEYMAX Master Agreement that ZIOGAS and others had kept secret from OCEAN TRADE since January 2002.

100.    By misleading OCEAN TRADE, Mr. Economou (and others) with respect to the existence of the signed KEYMAX Master Agreement, and by procuring the subsequent issuance of the separate Options Agreement in favor of MFHSC in place of OCEAN TRADE, ZIOGAS breached his fiduciary duties and obligations as an agent, manager and de facto director of OCEAN TRADE.

101.    The conduct, as described above, further constituted a separate fraud on OCEAN TRADE, as well as a conversion of property, and concomitantly established a

constructive trust of all of those assets, and the fruits of those assets for the benefit of OCEAN TRADE.

102.    The subsequent conduct of the Defendants ZIOGAS, EWMI, MFSC, DAISY SHIPPING LTD., ELLIE SHIPPING LTD., HARMONY SHIPPING LTD., and OCEAN PHOENIX SHIPPING LTD. in entering into the EWMI Master Agreement, and the bareboat charter hire purchase agreements issued thereunder was a further fraud and/or a continuation of the fraudulent scheme by which the Defendants deprived OCEAN TRADE of its entitlement to the purchase options and (through the exercise of the purchase options) its entitlement to the Option Ships, as well as an extension of the breaches of contract and fiduciary obligations and the conversion and constructive trust.

103.    Unbeknownst to the Plaintiffs and Mr. Economou, in July and October of 2005, ZIOGAS, acting through his several corporate owning shell corporations, including Defendants DAISY SHIPPING LTD., ELLIE SHIPPING LTD., HARMONY SHIPPING LTD., and OCEAN PHOENIX SHIPPING LTD., executed Memoranda of Agreement with Keymax subsidiaries for the sale and purchase and delivery of the vessels OCEAN DAISY, OCEAN ELLIE, OCEAN HARMONY and OCEAN PHOENIX, respectively.

104.    This constituted a further fraud and/or a continuation of the fraudulent scheme by which the Defendants deprived OCEAN TRADE of their entitlement to the purchase options and (through the exercise of the purchase options) their entitlement to the Option Ships, as well as an extension of the breaches of contract and fiduciary obligations and the conversion and constructive trust.

105.    Upon delivery of the vessels between August and December 2005 to the ZIOGAS shell corporations identified in paragraph 103 above, the fraudulent scheme,

breach and conversion by the Defendants first commenced in/about January – April 2002 was now complete as the Defendants had effectively exercised the purchase options that belonged to OCEAN TRADE.

106.    The Defendant ZIOGAS, together with the other defendants identified in the Complaint and controlled by ZIOGAS were parties to the scheme which garnered ownership of the four Option Ships.

107.    In addition, and with the equity ZIOGAS obtained by virtue of the ability to exercise options at prices set in 2001 in a market which had risen significantly by 2005, ZIOGAS was able, through cross collaterization and cross pledge agreements, to purchase yet additional vessels including the ASIAN FRIENDSHIP (in November 2006), SIDER UNITY (in January 2007) and OLYMPIAN GODDESS (in January 2006), again through Marshall Island captive shell corporations the Defendants ASIAN FRIENDSHIP SHIPPING LTD., ASIAN UNITY SHIPPING LTD. and OLYMPIAN GODDESS SHIPPING LTD., respectively.

108.    Those three additional ships, purchased by deploying the benefit of the equity from the four Option Ships which should have inured to the benefit of the Plaintiffs, represent further elements in the fraud, breach and constructive trust and as a consequence, the owning entities, as similar shell corporations which lack any true corporate existence and are mere instrumentalities of ZIOGAS are similarly exposed for the damages and fraud orchestrated by ZIOGAS.

109.    In May, 2007, ZIOGAS, through his corporate owning shell entities, contracted to sell the four Option Ships for a total sum of $84 million.

110.    Based upon the difference between the sums due under the 2005 MOAs and the EWMI Master Agreement and the sums agreed to be paid and/or now paid in connection with the sale of these Option Ships, the total net capital profit to inure to ZIOGAS and his shell-owning companies is $59.525 million.

111.    Specifically, the former OCEAN PHOENIX which was sold and delivered to FreeSeas Inc. at Rotterdam on July 3, 2007 yielded a capital profit of $17,400,000 being the difference between the sale price of $25,250,000 and the amounts paid under the 2005 MOA and the EWMI Master Agreement of $7,850,000.

112.    With respect to the OCEAN ELLIE, the vessel was sold and delivered on July 6, 2007 yielding a capital profit of $12,475,000 based upon the difference between the sale price of $17 million and the amounts paid under the MOA and EWMI Master Agreement of $4,525,000.

113.    The contracts to sell the OCEAN HARMONY and the OCEAN DAISY are said to have been cancelled, but based upon the stated contract prices, separate capital profits of $18,700,000 and $10,950,000 would have resulted based upon a similar calculation computing the difference between the sale prices for each ship and the amounts paid under the 2005 MOAs and the EWMI Master Agreement, respectively.

114.    Thus, had the sale of all four vessels proceeded, ZIOGAS and his shell-owning companies would have garnered capital profits of $59,525,000 from their breach and fraud as aforesaid.

115.    Since May, 2007, however, there has been a significant increase of charter rates earned by bulk vessels thereby increasing the value of the OCEAN HARMONY

and the OCEAN DAISY beyond that which would have been paid by FreeSeas Inc. had the scheduled sale of those two vessels gone through.

116.    Based upon the current valuation of the vessels, capital profits have been realized by ZIOGAS and his owning shell corporations HARMONY SHIPPING LTD. and DAISY SHIPPING LTD., with respect to the OCEAN HARMONY and OCEAN DAISY, of $22,950,000 and $10,975,000.

117.    Therefore, and based upon the capital profit realized on the actual sale transaction of the OCEAN PHOENIX and the OCEAN ELLIE ($29,875,000) and the capital profit based upon the current valuations of the OCEAN HARMONY and the OCEAN DAISY ($33,925,000), a total capital profit has been realized by ZIOGAS and the shell-owning defendants of $63,800,000.

118.    In addition to the capital profits as set forth above, ZIOGAS and his shell-owning companies have made substantial trading profits during the period from their ownership of the four Option Ships based upon the difference between the daily time charter income earned by equivalent vessels and the estimated daily operating expenses.

119.    For the vessels OCEAN HARMONY and OCEAN PHOENIX, the equivalent time charter daily income would have run from $18,750 to $22,000 for the period 2005 – 2007.

120.    For the vessel OCEAN ELLIE, the time charter daily income would have been $15,750 to $18,000 for the same period, and with respect to the OCEAN DAISY, it was $11,500 - $14,000.  Deducting the brokerage commissions which would be due on that income as well as the daily operating expenses including crew wages, stores, spares, lubes, insurance, and maintenance costs of $3,400 on the OCEAN HARMONY and

OCEAN PHOENIX, $2,900 on the OCEAN ELLIE and $2,400 on the OCEAN DAISY, and deducting further the cost of borrowing at LIBOR plus 2%, ZIOGAS and his shell-owning companies profited at a level of $30.6 million during the period between their taking title to the four Option Ships and the present/date of sale.

121.    In sum, therefore, and as a consequence of the breach and fraud as described above, ZIOGAS and the other corporate-shell defendants have reaped a total benefit of $94.4 million.

**Separate Frauds Perpetrated by ZIOGAS during his Tenure as Agent for OCEAN TRADE**

**(i)    Inflated Management Fee – Diversion of Hire $126,000**

122.    As a result of the documents recently made available to Plaintiffs, additional breaches of ZIOGAS' duties as an agent and fiduciary, and fraud have been revealed regarding a series of schemes by which ZIOGAS diverted charter hire that should have been paid to the Ocean Trade Owners to himself.

123.    As outlined above, in view of the default by IPL in the payment of hire, an agreement was reached pursuant to which KEYMAX would receive the payment of all sub-time charter hire from the sub-charterers of the three OCEAN TRADE vessels, and also assumed the role as technical manager.

124.    In exchange for these services, KEYMAX was to receive a monthly management fee of $6,000 per vessel which was to be deducted from the revenue being paid by the sub-charterers to KEYMAX.

125.    Unbeknownst to OCEAN TRADE and Mr. Economou, the $6,000 figure included a $1,500 per month per vessel "commission" to be paid to ZIOGAS at an

Athens based private bank account maintained in the name of another captive Liberian corporation controlled by ZIOGAS – namely the Defendant PEGASUS.

126.    PEGASUS was a corporate entity formed and controlled by ZIOGAS.

127.    This "commission" of $1,500 per month on the three OCEAN TRADE vessels, resulted in a monthly diversion of what would otherwise have been hire paid to OCEAN TRADE, but instead, it was diverted and deposited directly into PEGASUS account at Citibank on Syngrou Avenue, Account No. 0503344483.

128.    This monthly diversion of hire continued until May 2004.

129.    Based upon the foregoing, ZIOGAS, via his corporate shell entity PEGASUS, received total diverted hire payments of $126,000 in this secret transaction about which OCEAN TRADE and the Ocean Trade Owners were never informed. This resulted in a reduction in hire paid to the Ocean Trade Owners by virtue of overpayment to KEYMAX on its management fee and wrongful diversion to ZIOGAS and PEGASUS of what would have effectively been hire.

130.    The payment continued even beyond ZIOGAS' termination of involvement in the OCEAN TRADE venture in July, 2002 until about May, 2004.

**(ii)    Inflated Commission - Diversion of Charter Hire Paid to PEGASUS $140,000.**

131.    Apart from the foregoing diversion of hire, the documents recently provided reveal yet further items of fraud in respect to the diversion of hire which should have been paid to the Ocean Trade Owners.

132.    As is the case with most charter parties, the charter parties for the three OCEAN TRADE vessels included commissions to be paid to, among others, London Shipbrokers Simpson, Spence & Young, and so-called "address commission" of 1.25%

paid to (and deducted by) IPL, and finally a 2.5% address commission on the bareboat hire paid to OCEAN TRADE.

133.    In effect, therefore, the total commissions payable on the hire paid during the three bareboat charters was 5%, but the net commission for OCEAN TRADE's account was 2.5%.

134.    As outlined above, from the period January 2002, and owing to IPL's defaults, the three OCEAN TRADE vessels were operated on an "open account" basis under which the sub-charterers made their time charter hire payments directly to KEYMAX.

135.    As a consequence of this change, new arrangements for the payment of brokerage and commissions were discussed by ZIOGAS with Mr. Fordyce.

136.    The exchanges went on for some time, and at the conclusion of these exchanges it was agreed between ZIOGAS and Mr. Fordyce that IPL would receive an address commission of 3.5% on all time charter hire payments made by the sub-charterers to KEYMAX, and that IPL and KEYMAX would retain 2.5% and transfer the remaining 1% to PEGASUS.

137.    Therefore, yet a further secret diversion of hire was being paid to PEGASUS during the balance of the term of the three charters unbeknownst to OCEAN TRADE, the Ocean Trade Owners, or Mr. Economou.

138.    Accordingly, the diversion of 1% of the charter hire in the form of a fictitious and inflated commission paid by KEYMAX to PEGASUS had the effect of reducing the net charter hire paid for the operation of the vessels in the amount of $140,000, and was not a "commission" of any manner or form, but rather an illegal and

fraudulent diversion of hire, the arrangement of which constituted a breach of ZIOGAS'

fiduciary obligations to OCEAN TRADE and the Ocean Trade Owners.

139.  By virtue of the foregoing, and as nearly as can be estimated, the

Defendant ZIOGAS, individually, and the other corporate Defendants identified above,

as the instrumentalities and alter egos of ZIOGAS, are liable to the Plaintiffs jointly and

severally for:

(i)  $29,875,000 representing the capital profit actually earned by ZIOGAS and his corporate shell-owning corporations OCEAN PHOENIX SHIPPING LTD. and ELLIE SHIPPING LTD. on the exercise of the fraudulent purchase options in respect of the OCEAN PHOENIX and OCEAN ELLIE, as outlined in paragraphs 111-112 above;

(ii)  $33,925,000 representing the estimated capital profit that ZIOGAS and his corporate shell-owning corporations HARMONY SHIPPING LTD. and DAISY SHIPPING LTD. have made from the exercise of the fraudulent purchase options in respect of the OCEAN HARMONY and OCEAN DAISY, as outlined in paragraphs 113-116 above;

(iii)  $30,600,000 in trading profits from the chartering of the vessels between the time at which title to the vessels was transferred to ZIOGAS and his corporate shell-owning entities and the time of the sale of the vessels OCEAN PHOENIX and OCEAN ELLIE and the present with respect to the OCEAN HARMONY and the OCEAN DAISY, as outlined in paragraphs 118-120 above.

(iv)  $190,500 for diversion of hire in respect to the artificially inflated management fees and secret payments to PEGASUS, as outlined in paragraphs 120-130 above;

(v)  $140,000 for diversion of hire in respect to the inflated commission and secret payments to PEGASUS, as outlined in paragraphs 131-138 above;

(vi)  Interest computed on the sums identified above for a period from the point where the funds should have been paid to the Plaintiffs in the case of items (iv) – (v) and the point where Plaintiff would have realized the capital profit/earned the additional trading profit on items (i) – (iii), through a period two years hence (estimated time of the completion of this case), which is computed at an average rate of 6% for the period in the sum of $13,200,000;

(vii)    Attorneys' fees and costs;

(viii)    Punitive Damages, in an amount to be determined by the Court.

140.    To the extent that the substantive aspects of this matter are or should be determined in another forum, or if it is eventually determined that the substantive aspects must be determined in another forum, Plaintiffs reserve their rights to so litigate and prosecute their claims in such forum and this action shall be for the purpose of securing and compelling the Defendants' appearance in that forum and for security for the claims as outlined above and for enforcement of any judgment which may ultimately be entered thereon.

WHEREFORE, Plaintiffs pray:

a.    That process in due form of law according to the practice of this Court may issue against Defendants citing them to appear and answer the foregoing, failing which a default will be taken against them for the principal amount of the claims as identified above, plus punitive damages, interest, costs and attorneys' fees;

b.    That if the Defendants cannot be found within this District pursuant to Supplemental Rule B, all tangible or intangible property of the Defendants or any number of them, as described herein, up to and including the individual sum of $107,930,500 identified in Paragraph 139 above be restrained and attached, including, but not limited to any cash, funds, credits, debts, wire transfers, accounts, letters of credit, freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due, held or being transferred to or for the benefit of the Defendants at, moving

through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein, including any prospective purchasers of the remaining two Option Ships ;

c.  That a judgment be entered in favor of the Plaintiffs and against the Defendants jointly and severally adjudging them liable for the damages as aforesaid;

d.  To the extent the substantive aspects of this matter are determined in another forum that this Court retain jurisdiction over any assets seized as a consequence of any order of attachment issued herein for purposes of later execution; and

e.  That the Plaintiffs have such other, further and different relief as this Court may deem just and proper in the premises including an appropriate award of attorneys' fees, costs and punitive damages in an amount to be determined by the Court.

Dated: New York, New York
      August 31, 2007

                FREEHILL HOGAN & MAHAR, LLP
                Attorneys for Plaintiffs

                By: _____
                   Peter J. Gutowski (PG 2200)
                   Manuel A. Molina (MM 1017)
                   80 Pine Street
                   New York, NY  10005
                   (212) 425-1900
                   (212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York   )
                    ) ss.:
County of New York  )

Manuel A. Molina, being duly sworn, deposes and says:

1.      I am an attorney with the law firm of Freehill Hogan & Mahar, LLP, attorneys for the Plaintiffs in this action.  I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications from our clients and documents provided by our clients regarding these claims.

3.      The reason this verification is made by an attorney and not by the Plaintiffs is because the Plaintiffs are foreign entities, none of whose officers are presently within the State of New York.

_____
Manuel A. Molina

Sworn to before me this
31 day of August, 2007

_____
NOTARY PUBLIC

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO46-1178
Qualified in Queens County
Certified in New York County
Commission Expires Dec. 31, 2010

NYDOCS1/289234.1                    33