# EX. 2

## CURRICULUM VITAE

# DR. BABIS O. ZIOGAS

### PERSONAL DATA

Born November 7th , 1955 Greek citizen
1986-1989 Bahamas, Nassau Resident
1990-1997 United States, New York Resident
1998-currently Resident of Athens, Greece

### CONTACT

48, Patriarhou Ioakim Str., $3^d$ floor
Tel: +30-210-72 57 090
Fax: +30-210-72 57 098
E-mail: mfsc@aias.gr
Mobile Greece: +30 69 44 66 70 90

### PROFESSIONAL EXPERIENCE

MARITIME FINANCIAL SERVICES CORPORATION,
Athens, Greece,
Managing Director, 1995 – Current

OCEAN TRADE SA,
Athens, Greece,
Managing Director, 1995-2002

SSYMFS GLOBAL MARITIME FUND,
Registered in Bermuda,
Executive Vice President, Chief Trader 1999-2001

BULK OCEAN SERVICES CORPORATION,
President, 1989-1992, New York, New York

KENSINGTON SECURITIES, INC., NASD Broker-Dealer
New York, New York,
President, Registered Principal (series 7 and 24) 1985-1989

INTERNATIONAL MARINE INVESTORS & MANAGEMENT CORPORATION,
New York, New York,
President, 1984-1989

OMI CORPORATION (ex-OGDEN MARINE, INC),
New York, New York,
Assistant to Chairman, 1981-1984

MASSACHUSETTS INSTITUTE OF TECHNOLOGY,
Cambridge, Massachusetts,
Research Assistant-Visiting Lecturer, 1978-1981

**ACHIEVEMENTS**

- Realized for institutional, US and Offshore investors of US$50m equity, annualized returns of 35% for a period of 6 years during the 80s, by investing in tankers and dry bulk carriers.
- Created for US investors tax-advantaged investments with foreign flag vessels, delivering tax benefits and high cash returns.
- In the middle of the Asian financial crisis of 1998 structured, invested and managed a multi-national sale-leaseback transaction of $100m which still runs successfully.
- Offered to Offshore investors the opportunity to participate in an Offshore fund with superior returns and to be supported in their investment decisions with the latest direct access technology.

**EDUCATION**

MASSACHUSETTS INSTITUTE OF TECHNOLOGY
Cambridge, Massachusetts,
Ph. D. in Transportation Management received in 1981
Specialization in Management Science and Transportation Economics

NATIONAL TECHNICAL UNIVERSITY OF ATHENS
Athens, Greece
Diploma in Naval Architecture and Marine Engineering received in 1978
Specialization in Ship Design and Free Surface Hydrodynamics

**PUBLICATIONS**

INTERFACES March-April 1991
"A Buy-Low, Sell-High Investment Methodology.
The Case of Bulk Shipping"

MANAGEMENT SCIENCE December 1985
"A Tactical Decision Algorithm for the Optimal
Dispatching Of Oil Spill Cleanup Equipment"

May 2003

## MEMORANDUM OF AGREEMENT AND RECORD

**Between**

A)  1) MARITIME FINANCIAL HOLDINGS SERVICES CORP. of Liberia ("MFHSC") represented by Dr. Charalambos Ziogas, and

2) Dr. CHARALAMBOS ZIOGAS (son of Odysseas) of Varnavas Community, GR-190 14 Kapandriti, Attica, Greece ("Mr. Ziogas").

**And**

B)  MARYPORT NAVIGATION CORP. of Liberia ("Maryport") represented by its attorney in fact, Mr. Paul Herring, a London Solicitor.

WHEREAS MFHSC and Maryport wish to terminate a joint venture which both parties (and the investors represented by each one of above parties) have been pursuing through OCEAN TRADE S.A. of Liberia and the effective shareholding control by the latter of the registered owners of the Panamanian flag vessels

1) M.V. KOWHAI
2) M.V. OCEAN LEO and
3) M.V. OCEAN REYNA

(hereinafter sometimes called "the Vessels").

The Vessels are subject to mortgages in favour of financing banks (hereinafter sometimes called "the Lending Banks").

WHEREAS under above mentioned joint venture OCEAN TRADE S.A. also retains shareholding control over the registered owners of the Panamanian flag vessels

1) M.V. OCEAN FOREST (sold July 2000)
2) M.V. OCEAN DIAMOND (sold December 1999)
3) M.V. OCEAN TRADE (sold October 1999) ;

however these last three vessels were each and all sold at a loss to their respective owners;

WHEREAS the parties find it expedient and fair and reasonable to allow one another the option of buying out the interest, if any, of each other in the joint venture mentioned above.

1

504D.021D.01

3

**IN THE PREMISES IT WAS RESOLVED AND AGREED AS FOLLOWS:**

A)    MFHSC shall be the first one to have the option to buy out any and all interest (whether past, present or future) of Maryport in OCEAN TRADE S.A. and in each one of above mentioned three (3) registered owners which the latter controls under following conditions:

    a)    MFHSC shall arrange for the prior payment of the 100% of a several and joint debt of itself and of each one of the registered owners to DECARCO INTERNATIONAL COMPANY LIMITED (hereinafter sometimes called "Decarco") under a written loan agreement dated 3rd March 1999; the amount of principal of this loan (inclusive of contractual interest and expenses) amounts on October 19th, 2001 to U.S. Dollars 2,576,059.-

    b)    This amount to be increased with any further payments if any made by Decargo either to the Lending Banks or for the Vessels' expenses guarantee fees, management or other fees after October 19th, 2001 and/or in cash to Mr. Ziogas and until full payment the said indebtedness to be increased prorata by an annual interest rate of 15% from October 19th, 2001; interest is to be compounded on an annual basis stating March 1st, 2001.

    c)    MFHSC and/or Mr. Ziogas shall arrange for the prior release of Mr. G. Economou as personal guarantor from the bank-mortgages of the three (3) vessels concerned (M.V. KOWHAI, M.V. OCEAN LEO and M.V. OCEAN REYNA) the release of DRYTANK S.A. from a guarantee in connection with the finance of M.V. OCEAN LEO by ING Bank and the release of the 2nd mortgage on M.T. "SAETTA" by Allfirst Bank. Up and until such releases (which can be produced by MFHSC at anytime until the maturity of above mentioned loans from ING Bank and Allfirst Bank) of Mr G. Economou as personal guarantor, of DRYTANK S.A. as corporate guarantor and of the 2nd mortgage on M.T. "SAETTA" provided that all other payments have been effected by a third investor, the following five conditions shall apply:

    Firstly :    Any shares of the registered owners of the Vessels shall remain pledged to the (respective) Lending Banks.

    Secondly :    Mr G. Economou care of and at the risk of Mr. Ziogas shall receive indemnification letters from an acceptable to him person , the text of which to be as Attachment A(1+2). The following persons are considered acceptable : Moulopoulos Kostas, Mylonas Spyros, Koustas Ioannis and Christodoulatos Gerassimos or another person of similar status.

2

4

504DA021001

Thirdly :    An amount of USD 200,000 shall be paid to CARDIFF MARINE INC. who shall receive on behalf of the personal and corporate guarantors so that any shortfall in payments due to Allfirst Bank for the existing loans of "OCEAN REYNA" and "KOWHAI" to be promptly met upon written notice to him by the Lending Bank by drawing from this amount; similarly an amount of USD 100,000 to be paid to CARDIFF MARINE INC. so that any shortfall in payments due to ING Bank by the owners of M.V. OCEAN LEO to be promptly met; in all instances payments by CARDIFF MARINE INC. under this Agreement shall not exceed the amount of available funds as defined above.

Any balances remaining in above accounts when all releases mentioned in para A (c) are completed, should be forwarded to MFHSC/Mr. B.Ziogas and/or his investors.

Fourthly :    Should the above funds not be enough and should there be a delay of more than 15 (fifteen) calendar days of the owners and/or MFHSC and/or the new investors in meeting a payment either scheduled or required under any applicable loan agreement to be made to any of the Lending Banks for the 3 vessels, namely "OCEAN LEO", "OCEAN REYNA" and "KOWHAI" and/or a declaration by any of the Lending Banks of any of above banking loans into default then MFHSC and Mr. Ziogas and/or any third party investor shall be in default under this Agreement too, provided they have been notified in writing at least 7 (seven) days prior such occurrence.

Fifthly :    Pending the repayment of above mentioned Bank Loans or any prior release of the persons and mortgage mentioned hereinabove under A(b) all shares of OCEAN TRADE S.A. of Liberia which shall be issued in bearer form shall be placed in escrow with the London firm of Solicitors INCE & CO. (Attn: Mr. Paul Herring).

By this instrument the parties to this Agreement irrevocably instruct above escrow agents to release these shares to either (a) Messrs MHFSC represented by Dr. B. Ziogas and/or his investors upon either full repayment of the abovementioned two Bank Loans or upon any earlier release of Mr. G. Economou, DRYTANK S.A. and of a mortage on M.T. SABITA, or (b) to Messrs Maryport Navigation Inc. represented by any attorney at law of DEVERAKIS LAW OFFICE upon any of the above mentioned Bank Loans being declared in default by any of the respective Banks or upon the owners failing to pay the Lending Banks for a period in excess of fifteen (15) days as noted above and in line with

3

clause A (c) fourth and the indemnification letters are
returned marked null and void.

d)    Above payments (under letter a) and releases (or the five conditions met
under letter b) are effected and completed from the date hereof until the
30th day of June 2002 whilst written notice thereof shall be given by
MFHSC to Maryport latest three (3) business days prior to expiry of
above option.


**ALTERNATIVELY**

B)    Maryport shall be the second one to have the option to buy out any and all
interest (whether past, present or future) of MFHSC in OCEAN TRADE S.A.
and in each one of above mentioned three (3) registered owners which the latter
controls under the following conditions:

a)    Maryport arranges for the settlement of 100% of the debt of the registered
owners to DECARCO INTERNATIONAL COMPANY LIMITED.

b)    Maryport pays Mr. Zioges a total amount of USD 75,000;

c)    Such payments are effected until July 31st 2002 whilst written notice
thereof is given by Maryport to MFHSC/Mr. Zioges.

All notices between the parties in connection with any and all matters anyhow dealt
with or anyhow relating to this contract shall be sent in writing to either party as
follows:

a)    all notices to Maryport c/o CARDIFF MARINE INC., Athens office, Omega
Bldg, 80, Kifissias Ave, 151 25 Amaroussion, Athens, Greece, telefax nr.
8090305, and

b)    all notices to MFHSC c/o Dr. Charalambos Zioges, MFHSC, 10, Varnavas
Community, GR- 190 14 Kapadriti, Attica, Greece, telefax nr. 0295 97818, e-
mail: bzioges@otenet.gr.


This Agreement shall be governed by English law and all disputes or claims, if any,
arising out of it or in connection with it shall be resolved exclusively by arbitration.
The parties agree and irrevocably submit any and all such disputes to London
Arbitration in the U.K. The London Maritime Arbitration Association Rules shall
govern any and all arbitration proceedings.

4

For purposes of notices and legal proceedings (a) Maryport hereby irrevocably appoint Mr. Paul Herring and/or Mr. Nicholas Shepherd both of INCE & CO., Knollys House, 11 Byward Street, London EC3R 5EN, U.K., telefax nr. +44 - 207- 6233225, as its agent in London and (b) MFHSC (and Mr. Charalambos Ziogas personally) hereby irrevocably appoint OSI INVESTMENTS LTD (Atta: Mr. Emmanuel Kyprios) and/or Mr. Emmanuel Kyprios both of Richmond House, 28, Roedean Crescent, London SW15 5JU, telefax nr. +44 - 208 - 3922140 as their London agent.

All parties may nominate a substitute agent for service in London; however such appointment shall become effective only five (5) business days after written notice to all the other parties.

This ...19th... day of October 2001.

The parties to the Agreement

Dr. Charalambos Ziogas
for MFHSC and personally

Paul Herring
Attorney -in- fact

5

7

504D.021001

wTELiX 5.67 ** Message printout ** Printed:27/12/01 14:04:23 by:

TF*IIM 337C9-00 2712 1325                    ZIOGAS    P OCEAN VSLS
|==============================================================
|FROM: "mfsc" <mfsc@aias.gr>
|DATE: Thu, 27 Dec 2001 13:27:39 +0200
|SUBJECT: FW: Final Ocean Trade/Keymax/IPL agreements


George,Aris/Babis

For your file please find what I sent to our Japanese friends ye
with the attachments of the final agreements which are much impr


-----Original Message-----
From: mfsc [mailto:mfsc@aias.gr]
Sent: Thursday, December 27, 2001 3:23 AM
To: n_kayahara@imk.co.jp; s_iwai@imk.co.jp
Cc: t_fordyce@imk.co.jp; s_noguchi@imk.co.jp
Subject: Final Ocean Trade/Keymax/IPL agreements


Dear Kayahara-san and Iwai-san,

After many telephone conversations and e-mails over Christmas holidays
I believe that we all reached our limits.
I would hope that the attached Agreements will be signed today and IPL
will transfer their last part hire payment of $60,000 on accounty of Ocean
Leo
and Keymax will take over control and management of the time-charters
cash-flow as
stipulated in the Agreements.

Very reluctantly we accomodated IPL with their extaordinary high cash
requests.
In our effort to minimize the cash-flow problems that it creates us ,at the
suggestion of Tony and my agreement,
we stretched out the repayment of the settled amounts to Keymax without
discounting the agreed amounts.
We only reduced slightly the purchase options.
e also gave up our rights on the proceeds of the Exceed2.

In addition to our debts from IPL of $2.5m so far, we agreed to further
payments of $1.3m
to IPL and Keymax from the Ocean Trade vessels (if agreements are signed
today) and $950,000 from the IPL vessels (if the options are exercised).

If we had gone for bankruptcy of IPL we would not have to lose $4.75m even
if charters were cancelled.
So far this business has been very bad for us and if it wasnot for the hope
to do some future profitable business with Keymax and for my intervention;
IPL and its directors would have had very rough times , if the current
controlling shareholders of Ocean Trade have chosen to be litigious.
I hope Iwai-san can appreciate the huge extent of Ocean Trade generosity
and by signing promptly the agreement, close once and for all this chapter
with IPL,
so that Ocean Trade can start a new chapter with Keymax on a
healthy,positive basis.

8

ooking forward to our cooperation with Keymax and turning these huge
of red ink to some even modest profits.

send to my private fax +30-295029417 the signed Agreements and your
confirmation. If there is any problem please call me at +30-944667090.

MESSAGE ADDRESSEES
: ;
GEORGE ECONOMOU <economou@hol.gr>
Cc: <finance@cardiff.gr>;

=== MESSAGE INFORMATION: [size: 96030 bytes] [3] [M]
|ATTACH    DOC    FN=OT_IPL_FINAL_MASTER_AGREEMENT.DOC           39 KB 3 B654
|ATTACH    DOC    FN=OT_KEYMAX_MASTER_FINAL__AGREEMENT.DOC       49 KB 3 7E11
|=== END

**9**

## MASTER AGREEMENT

**BETWEEN**

A)   the parties of the first part:

    a)   PILLSBURG NAVIGATION S.A. of Panama, owners of the Panamanian flag vessel "OCEAN REYNA".

    b)   STERLING NAVIGATION S.A. of Panama, owners of the Panamanian flag vessel "OCEAN LEO".

    c)   PANAPORT SHIPPING S.A. of Panama, owners of the Panamanian flag vessel "KOWHAI".

    (each one and all of these owners hereinafter called the "Ocean Trade Owners" and each and all above vessels hereinafter called "Ocean Trade Owned Vessels");

    d)   OCEAN TRADE S.A. of Liberia ("Ocean Trade"), the beneficial owner of the "Ocean Trade Owners";

**AND**

B)   INTER PACIFIC LINES CO., LTD. ("IPL"), of 6F Toranomon 33 Mori Building, 3-8-21 Toranomon, Minato-Ku, Tokyo, a Japanese Company.

WHEREAS IPL, through its subsidiary Panamanian companies, is the Charterer of the Ocean Trade Owned Vessels on long term Bareboat Charters (the "Bareboat Charters") from the "Ocean Trade Owners", and has chartered the vessels, in its own name as Owners, under period time-charters (the "Time-Charters") to Japanese Charterers (Eastern Car Liner Ltd., for "Ocean Leo" and "Ocean Reyna" and Nissui Shipping Corp. (now renamed Tokyo Reefer Chartering) for "Kowhai") (the "Time-Charterers"); and

WHEREAS, despite continuing to receive time-charter hires, IPL has been unable to pay the full bareboat hire payments due to the Ocean Trade Owners since February 2000 and now owes to all the Ocean Trade Owners collectively about US$2,500,000, and has also incurred outstanding debts to the vessels' managers (the "Managers"); and

WHEREAS the Managers are willing to take over, in place of IPL, as Owners of the Ocean Trade Owned Vessels in the Time-Charters and offer to Ocean Trade exactly back-to-back time-charter parties on the same basis as the Time-Charters, arrange with the Time-Charterers for proper Time-Charters addenda to be drawn, and immediately from the date of signature of this agreement to make alternative arrangements with IPL whereby the hires under the Time-Charters are paid to a bank account under the control of the Managers without any deductions; and

WHEREAS IPL is willing to allow such take-over and agrees to immediate handover of the control of the bank accounts where Time-Charterers pay hire ; and

WHEREAS Ocean and the Ocean Trade Owners are willing to accommodate the above arrangements;                                        **10**

IN THE PREMISES and against the mutual consideration agreed to be exchanged by the parties to this agreement, IT IS HEREBY AGREED THAT:

1) IPL will immediately take all necessary actions to obtain the agreement of the Time-Charterers to allowing the Managers to take over from IPL as owners in the Time-Charters, and IPL consents to such takeover, but in all cases IPL agrees to immediately handover to Managers the ownership and control of the current bank accounts where hires from Time-Charters are received with proper written notices given to SMBC and ORIX simultaneously with signing this Agreement.

2) Even if the agreement of the Time-Charterers cannot be obtained, hire payments under the Time-Charters will continue being paid to a bank account under the control of the Managers without any deductions, and IPL consents and takes all necessary steps to implement such change.

3) Provided that the Managers have taken over as owners in the Time-Charters, or have commenced and continue to receive hire in their bank account for immediate transfer to Ocean Trade, in case they only receive the hire but do not take over as owners, and all time-charter income starting December 27th, 2001 is paid only for direct expenses of Ocean Trade, and no breach is caused by IPL or the Managers of any term or condition of this and any relevant Agreements, the Ocean Trade Owners and Ocean Trade will give up any and all potential claims against IPL, arising out of the Bareboat Charters. Otherwise Ocean Trade maintains all its rights against IPL and any other applicable parties for amounts due to it.

4) Provided that IPL paid on December 27th, 2001 to Ocean Trade on account of the Ocean Leo bareboat hire and complied and continues to comply with the terms of this Agreement, Ocean Trade will pay to IPL the sum of US$70,000 monthly in January and February 2002, $60,000 and $40,000 in March and April 2002 respectively to cover a portion of IPL's expenses. Upon agreement of Hiroshi Iwai and Babis Ziogas a final amount of $30,000 monthly will be paid in May and June 2002.

5) This Agreement is to become effective and binding upon its signature by the parties to it. All provisions in it for action by third or related parties to be implemented as soon as possible, but in any event latest so that hire payments due after December 27th, 2001 under the Time-Charters become payable to a bank account under the control of the Managers.

6) English law for all disputes or claims, if any, shall be governing this Agreement. Any disputes arising out of it or in connection with it shall be resolved exclusively by arbitration. The parties agree and irrevocably also submit any and all such disputes to London Arbitration in the U.K. The London Maritime Arbitration Association Rules shall govern any and all arbitration proceedings. Any bankruptcy filings in Japan or elsewhere initiated by IPL shall be done strictly in consultation and after taking into consideration and without causing any damages to Ocean Trade's interests.



11



7) For purposes of notices and legal proceedings (a) Ocean Trade S.A. and related to it parties irrevocably appoint Ince & Co, solicitors, as their agent in London and (b) IPL hereby irrevocably appoint (. .......) London, as their London agent

All parties may nominate a substitute agent for service in London; however such appointment shall become effective only five (5) business days after written notice to the other parties.

This 22nd day of December 2001

A. For and on behalf of

1. PILLSBURG NAVIGATION S.A
2. STERLING NAVIGATION S.A.
3. PANAPORT SHIPPING S.A.

By    :
Title : Director

4. For and on behalf of
OCEAN TRADE S.A.

By   :
Title: Director

B. For and on behalf of
INTER PACIFIC LINES CO., LTD.

By   :
Title: Director

1 2

## MASTER AGREEMENT

**BETWEEN**

A) The parties of the first part:

    a)  PILLSBURG NAVIGATION S.A. of Panama, owners of the Panamanian flag vessel "OCEAN REYNA".

    b)  STERLING NAVIGATION S.A. of Panama, owners of the Panamanian flag vessel "OCEAN LEO".

    c)  PANAPORT SHIPPING S.A. of Panama, owners of the Panamanian flag vessel "KOWHAI".

    (each one and all of these owners hereinafter called the "Ocean Trade Owners" and each and all above vessels hereinafter called "Ocean Trade Owned Vessels")

    d)  OCEAN TRADE S.A. of Liberia ("Ocean Trade")

**AND**

B) KEYMAX MARITIME CO., LTD. ("Keymax"), of 6F Toranomon 33 Mori Building, 3-8-21 Toranomon, Minato-Ku, Tokyo, a Japanese Company.

WHEREAS the Ocean Trade Owners currently have the Ocean Trade Owned Vessels on long term Bareboat Charters (the "Bareboat Charters") to Japanese Charterers (the "Original Charterers") and the Original Charterers have sub-chartered out these vessels, in their own name as Owners, under period time-charters (the "Time-Charters") to other Japanese Charterers (Eastern Car Liner Ltd., for "Ocean Leo" and "Ocean Reyna" and Nissui Shipping Corp. (now renamed Tokyo Reefer Chartering) for "Kowhai") (the "Time-Charterers"); and

WHEREAS the Original Charterers have incurred outstanding debts to Keymax and its associated company, MK Shipmanagement Co., Ltd., of the same address, relating to unpaid management costs for these vessels, in the case of "Ocean Reyna" US$140,894.80, "Ocean Leo" US$426,543.33 and "Kowhai" US$325,239.35 and Ocean Trade is willing to accept liability for a fraction of such outstanding debts under certain terms and conditions as described below (the "Outstanding Debts"); and

WHEREAS the Original Charterers also owe an outstanding amount of about US$534,000 to various dockyards for docking and associated costs (the "Docking Costs") related to the Ocean Trade Owned Vessels; and

WHEREAS Keymax is willing to take over, in place of the Original Charterers, as Owners of the Ocean Trade Owned Vessels in the Time-charters and offer to Ocean Trade exactly back-to-back time-charter parties on the same basis as the Time-Charters without any deductions and agrees that all receivables due to the Original Charterers, if any, to be paid to the Ocean Trade Owners, provided approval is obtained from the Time-Charterers, but in all case pursuant to immediate arrangements made only with the Original Charterers, and provided the Ocean Trade Owners agree to accept liability for payment of a settled amount fraction of Outstanding Debts and Docking Costs to Keymax as described below; and

**1 3**

02-MAY-2004 13:37    FROM:THE PORCH HOUSE - SH 44 01342 825 347    TO:0207622225    P:37

WHEREAS, Ocean Trade (which is the beneficial Owner of the Ocean Trade Owners) and the Ocean Trade Owners are willing to accommodate Keymax in their above wishes;

IN THE PREMISES and against the mutual consideration agreed to be exchanged by the parties to this agreement, IT IS HEREBY AGREED THAT:

1) Keymax will take all necessary actions together with the Original Charterers to obtain the agreement of the Time-Charterers to Keymax taking over from the Original Charterers as owners in the Time-Charters and sign, only after Ocean Trade's written approval, proper Time-Charter Parties addenda but in all cases and irrespectively of such addenda signed they undertake to:

2) Commencing immediately after signing this Agreement by fax, collect hires under the Time-Charters in their own account; deduct operational expenses, according to the attached budgets, and the figure referred to in Para. 4 below, and pay the remaining balance to a bank account or accounts to be nominated by the Ocean Trade Owners. All details of the accounts where Time-Charter hire will be received will be disclosed to Ocean Trade simultaneously with signing this Agreement.

3) If the takeover envisaged in Para. 1 above cannot proceed for any reason, then Keymax will arrange with Original Charterers that hire payments under the Time-Charters will be made to a bank account controlled by Keymax, whereafter Keymax will deduct management costs, according to the attached budgets and management agreements, and pay immediately upon receipt the remaining balance to a bank account or accounts to be nominated by the Ocean Trade Owners. If any monthly payments are not made to Ocean Trade Owners or Ocean Trade strictly as per provisions of this Agreement then the balance of Outstanding Debt will be deemed eliminated whilst Ocean Trade shall maintain rights of full recovery of any missing payments and/or funds from Keymax or any other accountable party. Keymax also undertakes not to make or negotiate any amendments, accept deductions or termination of the Time-Charters from the text of the current Time-Charters as hereby attached with all their addenda (Appendix 1). Ocean Trade will pay any brokerage commissions disclosed in the Time-Charters payable to non-affiliated companies of Keymax.

4) If either arrangement (as per Para. 2 or Para. 3 above) comes into effect, the Ocean Trade Owners will also repay to Keymax, as a full settlement:

   (a) 56% (US$500,000) of the Outstanding Debts, in 12 equal monthly payments of US$12,500, commencing in December 2001, followed by 42 equal monthly payments of US$8,333, commencing in December 2002; and

   (b) 100% of the Docking Costs of US$534,000, in 16 equal monthly payments of US$33,375 commencing in December 2001.

Repayment of the Outstanding Debts and Docking Costs should be amortised by the time of redelivery of the last of the Ocean Trade Owned Vessels from the Time-Charters, but if any balance remains due to Keymax at the time of redelivery of the last vessel, the same shall be settled in cash at that time.

14

5) The technical management of the vessels will remain with Keymax throughout the remaining period of the Time-Charters, as per attached Management Agreements (Appendix 2) between Keymax and the Ocean Trade Owners. Ocean Trade will have the option to terminate the Management Agreements at any time, upon giving reasonable notice, in which case they shall pay the remaining amount of the settled Outstanding Debts and Docking Costs prior to termination of management of the final vessel.

6) During the currency of this Agreement Ocean Trade will endeavor to assist with marketing of the Keymax services and attracting clients for Keymax, for a fee of 25% of the agreed gross fees.

7) i) Recognising that Ocean Trade has lost substantial amounts during earlier trading of the Ocean Trade Owned Vessels, Keymax will give Ocean Trade the following purchase options and they undertake to supply Ocean Trade with the proper consent of the registered owners of the relevant vessels within 30 days from the date of this Agreement signing:

a) M.V. "Ocean Daisy"
At a price equating to the outstanding bank debt remaining on the vessel under the Loan Agreement with Orix Corporation or its subsidiary plus US$100,000, and less any dividends received by Keymax plus an amount relating to the Second Mortgage in favour of The Sakura Bank Ltd. as presented in Appendix 3.

b) M.V. "Ocean Sampaguita"
At a price equating to the outstanding bank debt remaining on the vessel under the Loan Agreement with Orix Corporation or its subsidiary plus US$150,000, and less any dividends received by Keymax as presented in Appendix 3.

c) M.V. "Ocean Ellie".
At a price equating to the outstanding bank debt remaining on the vessel under the Loan Agreement with the Sumitomo Mitsui Banking Corporation or its subsidiary plus US$650,000 andless any dividends received by Keymax as presented in Appendix 3.

d) M.V. "Ocean Phoenix" and "Ocean Harmony"
At a price equating to the outstanding bank debt remaining on the vessel under the Loan Agreement with Orix or its subsidiary plus an amount equivalent to the penalty to be paid for early termination of the Loan Agreement as presented in Appendix 3.

e) M.V. Southern Odyssey

At a price equating to the best available option from the registered owners of this vessel plus $55,000

1 5



- The above options (or any of them) may be exercised at any time during the 4-year period commencing from the date of this Agreement (except for "Ocean Sampaguita", and "Ocean Phoenix" for which see ii) below) upon receipt of written notice of the exercise of such purchase option(s) by Ocean Trade, Keymax will arrange delivery of the vessel(s) as promptly as possible, on normal and straightforward Japanese sale terms, with transfer of the attached time-charters. In case of time-charter transfer, Keymax will maintain technical management and time-charters will be executed on 'back-to-back' basis.

ii)     In the case of "Ocean Sampaguita", "Ocean Phoenix" and "Ocean Harmony" the option may be exercised respectively only in the 12, 36 and 36 month period commencing from the date of this Agreement, and for the 12 month period thereafter Keymax will give Ocean Trade first refusal to buy the vessel at whatever price and on whatever terms they can obtain from a third bona fide party buyer on the open market.

8)     This Agreement is to become effective and binding upon its signature by the parties to it. All provisions in it for action by third or related parties to be implemented as soon as possible, but hire payments will start with payments due after December 27th, 2001, and repayment of the Outstanding Debts and Docking Costs will start in December 2001.

9)     This Agreement shall be governed by English law and all disputes or claims, if any, arising out of it or in connection with it shall be resolved exclusively by arbitration. The parties agree and irrevocably also submit any and all such disputes to London Arbitration in the U.K. The London Maritime Arbitration Association Rules shall govern any and all arbitration proceedings.

10)    For purposes of notices and legal proceedings (a) Ocean Trade S.A. and related to it parties irrevocably appoint Ince Co solicitors, as their agent in London and (b) Keymax hereby irrevocably appoint (. .......) London, as their London agent.

       Both parties may nominate a substitute agent for service in London; however such appointment shall become effective only five (5) business days after written notice to the other parties.



This 27th day of December 2001

A. For and on behalf of

1. PILLSBURG NAVIGATION S.A
2. STERLING NAVIGATION S.A.
3. PANAPORT SHIPPING S.A.

By :
Title : Director

4. For and on behalf of
OCEAN TRADE S.A.

By :
Title: Director

B. For and on behalf of
KEYMAX MARITIME CO., LTD.

By :
Title: Director

17



Maritime Financial Services Holdings Corporation is looking for an up
to 50% shareholder and co-manager of a Panama corporation called Ocean
Trade SA owner of a project involving 3 modern vessels initially, to be
expanded to 9 in total when option on 6 more vessels currently
processed by MFSHC are exercised. All 9 vessels are currently in long-
term time-charters and technical management arrangements with first
class Japanese companies, which will continue.

As one can see from the 3 last years financial statements Ocean Trade
collected an EBITDA of $2.7-$3.7M. We went through the 1998 crisis
without any deductions. Going forward, the proposed deal is structured
in two parts:


1. The ownership of 3 vessels historically owned by Ocean Trade i.e.
KOWHAI, OCEAN LEO, OCEAN REYNA (see attached descriptions) on bareboat
charters with Interpacific Lines, Co., Ltd. "IPL".
As you can see from financial statements in 1999 we received $3.7m, in
2000 $3.2m, and in 2001(fye October30) $2.7m
Since January 1st, 2002 we have the full benefit of the original time-
charters between IPL, and Eastern Car Lines and Tokyo Reefers (ex-
Nissui Shipping) which started 5 years ago, with Keymax the technical
manager since the beginning, collecting the hires and disbursing them
immediately to owners Ocean Trade exactly on back-to-back terms, in
other words Keymax collects time-charter income from ECL and Tokyo
Reefers, deducts their opex and an allowance for past unpaid and future
dry dockings as agreed and below described and transfer to Ocean Trade
the balance. In 2002, which is the year with the worst cash flow due to
repayment of accumulated dry dockings and a 10% hires reduction from
ECL, which will be repaid at a later time, still we expect to collect
$2.7m but next years this figure will improve substantially.
   As long as Ocean Trade meets the payments to its banks, it keeps the
difference, which all will be divided to shareholders.
Since the current charters are for above market rates, it is imperative
to keep the same managers that have been managing the vessels from the
beginning, but take full control of the cash flow and the commercial
and financial decisions. Nevertheless management agreements can be
terminated at any time with full repayment of out standings to
managers. It is not likely to carry-on western style management cheaper
than Keymax.

   Pro forma cash flow projections for 3 first vessels:


Income (in'000s) Net of commissions, 355 days per year

|        | 2002    | 2003    | 2004    | 2005    | 2006    | 2007    |
|--------|---------|---------|---------|---------|---------|---------|
| Kowhai | $2,300  | $2,300  | $2,400  | $2,400  | $2,400  | $2,400  |
| Leo    | $2,050  | $2,150  | $2,200  | $2,200  | $2,200  | $2,200  |
| Reyna  | $1,550  | $1,150  | $1,650  | $1,650  | $1,650  | $1,650  |
|        | $5,900  | $6,100  | $6,250  | $6,250  | $6,250  | $6,250  |

OPEX (in '000s) includes all fees and commissions

| | | | | | | |
|---|---|---|---|---|---|---|
| Kowhai | $1,050 | $1,075 | $1,100 | $1,125 | $1,150 | $1,175 |
| Leo | $ 750 | $ 775 | $ 800 | $ 825 | $ 850 | $ 875 |
| Reyna | $ 740 | $ 760 | $ 780 | $ 800 | $ 820 | $ 840 |
| | $2,540 | $2,610 | $2,680 | $2,750 | $2,820 | $2,890 |

Dry dockings actual cash payments & outstanding debts repayment as agreed with Keymax and IPL

| | | | | | | |
|---|---|---|---|---|---|---|
| | $ 600 | $ 300 | $ 200 | $ 200 | $ 125 | $ 100 |
| EBITDA | $2,760 | $3,190 | $3,370 | $3,300 | $3,305 | $3,260 |
| Bank Principal Amortization $12,560,000 (Dec 31st, 2001) | $2,342 | $2,342 | $2,342 | $2,342 | $2,342 | $850 |
| Interest 3.5% | $ 398 | $ 314 | $ 235 | $ 153 | $ 71 | $ 7 |
| Net cash flow Divided 50/50 | $20 | $534 | $793 | $805 | $892 | $2,403 |
| Sale proceeds Or 6 years NPV | | | | | | $13,600 |
| Trading profits ie 6 X $2m plus $2.5m scrap | | | | | | |
| Dividends to new Shareholder (3,000) | 0 | $267 | $397 | $402 | $446 | $8,000 |

The expected IRR is 20%, a great number in the current environment.
Risk is minimal.

## 3. OPTIONS

Ocean Trade received for its $2.5m outstanding debt options to purchase 6 modern vessels most of them with charters to first class companies anytime during the next 4 years. Our options strike prices are for the vessels bank debt, in most cases in Yen, and already due to the Yen decline, options are worth currently about $4.85m. As the shipping markets improve and/or the Yen weakens these options maybe worth in the next 2 years more than $10m.

We believe that these deals are excellent and we can make an excellent profit on them if we purchase these vessels and operate them for the long term, in addition to their current equity.

We offer a shareholding interest for up to 50% in these options for cash payment of $1.5m and the future equity contributions to acquire these vessels. The shareholders will jointly decide to flip or operate these vessels giving each other first refusal right if disagreement arises.

The joint company will need an additional $4m, if it is to buy all of them with aggressive financing which will include some sellers credit.

LIST OF OPTIONS (Option prices and market values as of February 2002)
----------

| Vessel name Option Price | Type | Year | Time-charter | DWT |
|---|---|---|---|---|
| 1.Sampaguita | HeavyLift | 1991 | ECL $4,300/d | 6,923 |
| $2,850,000 reduced $25,000 monthly vs current market value $3.5m | | | | |
| 2.Southern Odyssey | Logger | 2000 | Ven.Steel$3,750/d | 7,362 |
| $5,600,000 reduced with Yen decline vs current market value $6.5m | | | | |
| 3.Ocean Daisy | Bulk Carrier | 1994 | Daiichi $5,500/d | 14,152 |
| $7,000,000 reduced $60,000 monthly  vs current market value $7.0m | | | | |
| 4.Ocean Ellie | Bulk Carrier | 1996 | Daiichi $6,000/d | 17,386 |
| $7,700,000 reduced $67,000 monthly vs current market value | | | | $9.0m |
| 5.Ocean Harmony | Bulk Carrier | 1996 | NYK $6,500/d | 23,524 |
| $10,300,000 reduced with Yen decline and $78,000/mo | | | | |
| vs current market value | | | | $11m |
| 6.Ocean Phoenix | Bulk carrier | 1995 | NYK $6,500/d | 24,318 |
| $8,950,000 reduced $80,000/mo and with Yen decline | | | | |
| vs current market value | | | | $10.25m |

The total value of the options currently is $4.85m, so the offered price of $1.5m for 50% reflects a 60% discount.

## 4. BANK FINANCING FOR OPTIONS EXERCISE

The 3 Ocean Trade owned vessels are currently financed at Libor plus 1 ¼-1½ %.
There is a personal guarantor who is willing to remain (he is the selling shareholder)
with the support of an indemnity letter from the new shareholder. Effectively the new
Shareholder has the option either to continue contributing his share of cash-flow deficits
or loose his shares. The entire deal is structured as an option of 6 years with substantial
cash distributions along the way. We have 2 major European banks lined up for
refinancing of the 3 vessels and financing of the options if we do not flip them.
We believe the ideal time to do that is at the beginning of 2003 when more equity
will have accumulated in the close 2002 accounts and refinancing will require less cash.

| Vessel | OptionPrices | MarketValue | Bank & Seller's finance | Term Years | AnnualAmort |
|---|---|---|---|---|---|
| Sampaguita | $2,600,000 | $3,500,000 | $2,600,000 | 8 | $300,000 |
| SouthernOdyssey | $5,100,000 | $6,500,000 | $4,900,000 | 13 | $360,000 |
| OceanDaisy | $6,300,000 | $7,000,000 | $5,600,000 | 10 | $540,000 |
| OceanEllie | $7,000,000 | $9,000,000 | $6,750,000 | 11 | $600,000 |
| OceanHarmonie | $8,500,000 | $10,500,000 | $8,000,000 | 11 | $700,000 |
| OceanPhoenix | $7,400,000 | $9,750,000 | $7,250,000 | 10 | $700,000 |
|  | 36,900 | 46 ^25 | 35.1 | | |

The above option prices assume Yen/USD 150, if different the purchase prices of
S.Odyssey, O.Harmonie and O.Phoenix should be adjusted accordingly.
Under the above scenario, which assumes debt arranged at 75% of market values, the
cash required will be $1,800,000.

Assuming that the 3 already owned vessels have repaid their bank loan to $10m while
their market values are collectively $16m then a 75% refinance will raise $12m sufficient
to fund the cash required for exercising all options.

Following the above assumptions and the vessels current time-charters we construct the
Following 13 years proforma cashflow.

Pro forma cash flow projections for the second 6 vessels:

Income (in'000s) Net of commissions, 355 days per year

|                | 2003    | 2004    | 2005    | 2006    | 2007    | 2008    | 2009    | 2010    |
|----------------|---------|---------|---------|---------|---------|---------|---------|---------|
| Sampaguita     | $1,490  | $1,350  | $1,400  | $1,450  | $1,450  | $1,450  | $1,450  | $1,450  |
| South.Odyssey  | $1,300  | $1,350  | $1,400  | $1,450  | $1,450  | $1,450  | $1,450  | $1,450  |
| O.Daisy        | $1,850  | $1,850  | $1,850  | $1,650  | $1,650  | $1,650  | $1,650  | $1,650  |
| O.Ellie        | $2,000  | $2,000  | $2,000  | $2,000  | $2,000  | $2,000  | $2,000  | $2,000  |
| O.Harmony      | $2,200  | $2,300  | $2,300  | $2,300  | $2,300  | $2,300  | $2,300  | $2,300  |
| O.Phoenix      | $2,200  | $2,300  | $2,300  | $2,300  | $2,300  | $2,300  | $2,300  | $2,300  |
|                | $11,040 | $11,150 | $11,250 | $11,150 | $11,150 | $11,150 | $11,150 | $11,150 |

OPEX (in '000s) includes all fees and commissions

|                | 2003   | 2004   | 2005   | 2006   | 2007   | 2008    | 2009    | 2010    |
|----------------|--------|--------|--------|--------|--------|---------|---------|---------|
| Sampaguita     | $760   | $780   | $800   | $820   | $840   | $860    | $880    | $900    |
| South.Odyssey  | $760   | $780   | $800   | $820   | $840   | $860    | $880    | $900    |
| O.Daisy        | $850   | $870   | $890   | $910   | $930   | $950    | $970    | $990    |
| O.Ellie        | $850   | $870   | $890   | $910   | $930   | $950    | $970    | $990    |
| O.Harmony      | $900   | $920   | $940   | $960   | $980   | $1,000  | $1,020  | $1,040  |
| O.Phoenix      | $900   | $920   | $940   | $960   | $980   | $1,000  | $1,020  | $1,040  |
|                | $5,020 | $5,140 | $5,260 | $5,380 | $5,500 | $5,620  | $5,740  | $5,860  |

Dry dockings actual cash payments as agreed with Keymax

|                | $500    | $520    | $540    | $560    | $580    | $600    | $620    | $640    |
|----------------|---------|---------|---------|---------|---------|---------|---------|---------|
| EBITDA         | $5,520  | $5,490  | $5,450  | $5,210  | $5,070  | $4,930  | $4,790  | $4,650  |

Bank Principal
Amortization $3,200   $3,200   $3,200   $3,200   $3,200   $3,200   $3,200   $3,200
$35,100,000
(Dec 31ˢᵗ, 2002)
Interest 4% $1,340   $1,212   $1,084   $956   $828   $700   $572   $444

| Net cash flow | $980 | $1,178 | $1,166 | $1,054 | $1,042 | $1,030 | $1,018 | $1,006 |

Divided 50/50
Sale proceeds Or 8 years NPV                                              $25,000
Trading profits ie 8 X $4m plus $5m scrap
Dividends to new    Shareholder
.  (2,500)  $490  $589   $583      $527  $521  $515   $509   $503
                                                                        $12,500
Proforma IRR in excess of 27% ,a very high number for such a long period of time.

The described scenario is the worst case since it does not factor any rates increases.
On historical basis this type of vessels earned for long periods $7-9,000/d, which means
additional profits of $2-3m/year

06 May 2004 11:05    Marine Law                08704602020              P.3

14/04 '04 WED 22:30 FAX                                              ☒005

## MASTER AGREEMENT

BETWEEN

A) the parties of the first part:

    a)   PILLSBURG NAVIGATION S.A. of Panama, owners of the Panamanian flag vessel "OCEAN REYNA".

    b)   STERLING NAVIGATION S.A. of Panama, owners of the Panamanian flag vessel "OCEAN LEO".

    c)   PANAPORT SHIPPING S.A. of Panama, owners of the Panamanian flag vessel "KOWHAI".

        (each one and all of these owners hereinafter called the "Ocean Trade Owners" and each and all above vessels hereinafter called "Ocean Trade Owned Vessels");

    d)   OCEAN TRADE S.A. of Liberia ("Ocean Trade"), the beneficial owner of the "Ocean Trade Owners";

    AND

B) INTER PACIFIC LINES CO., LTD. ("IPL"), of 6F Toranomon 33 Mori Building, 3-8-21 Toranomon, Minato-Ku, Tokyo, a Japanese Company.

WHEREAS IPL, through its subsidiary Panamanian companies, is the Charterer of the Ocean Trade Owned Vessels on long term Bareboat Charters (the "Bareboat Charters") from the "Ocean Trade Owners", and has chartered the vessels, in its own name as Owners, under period time-charters (the "Time-Charters") to Japanese Charterers (Eastern Car Liner Ltd., for "Ocean Leo" and "Ocean Reyna" and Nissui Shipping Corp. (now renamed Tokyo Reefer Chartering) for "Kowhai" (the "Time-Charterers"); and

WHEREAS, despite continuing to receive time-charter hires, IPL has been unable to pay the full bareboat hire payments due to the Ocean Trade Owners since February 2000 and now owes to all the Ocean Trade Owners collectively about US$2,500,000, and has also incurred outstanding debts to the vessels' managers (the "Managers"); and

WHEREAS the Managers are willing to take over, in place of IPL, as Owners of the Ocean Trade Owned Vessels in the Time-Charters and offer to Ocean Trade exactly back-to-back time-charter parties on the same basis as the Time-Charters, arrange with the Time-Charterers for proper Time-Charters addenda to be drawn, and immediately from the date of signature of this agreement to make alternative arrangements with IPL whereby the hires under the Time-Charters are paid to a bank account under the control of the Managers without any deductions; and

WHEREAS IPL is willing to allow such take-over and agrees to immediate handover of the control of the bank accounts where Time-Charterers pay hire ; and

WHEREAS Ocean and the Ocean Trade Owners are willing to accommodate the above arrangements;

1

IN THE PREMISES and against the mutual consideration agreed to be exchanged by the parties to this agreement, IT IS HEREBY AGREED THAT:

1) IPL will immediately take all necessary actions to obtain the agreement of the Time-Charterers to allowing the Managers to take over from IPL as owners in the Time-Charters, and IPL consents to such takeover, but in all cases IPL agrees to immediately handover to Managers the ownership and control of the current bank accounts where hires from Time-Charters are received with proper written notices given to SMBC and ORIX simultaneously with signing this Agreement.

2) Even if the agreement of the Time-Charterers cannot be obtained, hire payments under the Time-Charters will continue being paid to a bank account under the control of the Managers without any deductions, and IPL consents and takes all necessary steps to implement such change.

3) Provided that the Managers have taken over as owners in the Time-Charters, or have commenced and continue to receive hire in their bank account for immediate transfer to Ocean Trade, in case they only receive the hire but do not take over as owners, and all time-charter income starting December 27th, 2001 is paid only for direct expenses of Ocean Trade, and no breach is caused by IPL or the Managers of any term or condition of this and any relevant Agreements, the Ocean Trade Owners and Ocean Trade will give up any and all potential claims against IPL, arising out of the Bareboat Charters. Otherwise Ocean Trade maintains all its rights against IPL and any other applicable parties for amounts due to it.

4) Provided that IPL paid on December 27th, 2001 to Ocean Trade on account of the Ocean Leo bareboat hire and complied and continues to comply with the terms of this Agreement, Ocean Trade will pay to IPL the sum of US$70,000 monthly in January and February 2002, $60,000 and $40,000 in March and April 2002 respectively to cover a portion of IPL's expenses. Upon agreement of Hiroshi Iwai and Babis Zlogas a final amount of $30,000 monthly will be paid in May and June 2002.

5) This Agreement is to become effective and binding upon its signature by the parties to it. All provisions in it for action by third or related parties to be implemented as soon as possible, but in any event latest so that hire payments due after December 27th, 2001 under the Time-Charters become payable to a bank account under the control of the Managers.

6) English law for all disputes or claims, if any, shall be governing this Agreement. Any disputes arising out of it or in connection with it shall be resolved exclusively by arbitration. The parties agree and irrevocably also submit any and all such disputes to London Arbitration in the U.K. The London Maritime Arbitration Association Rules shall govern any and all arbitration proceedings. Any bankruptcy filings in Japan or elsewhere initiated by IPL shall be done strictly in consultation and after taking into consideration and without causing any damages to Ocean Trade's interests.





2

06 May 2004 11:05    Marine Law                    08704602020              P.5

14/04 '04 WED 22:31 FAX                                              ☑005

7) For purposes of notices and legal proceedings (a) Ocean Trade S.A. and related to it parties irrevocably appoint Ince & Co, solicitors, as their agent in London and (b) IPL hereby irrevocably appoint Simpson, Spence & Young, as their London agent

All parties may nominate a substitute agent for service in London; however such appointment shall become effective only five (5) business days after written notice to the other parties.

This 22nd day of December 2001

A. For and on behalf of

1. PILLSBURG NAVIGATION S.A
2. STERLING NAVIGATION S.A.
3. PANAPORT SHIPPING S.A.

By
Title.: Attorney-in-fact

4. For and on behalf of
OCEAN TRADE S.A.

By
Title: Attorney-in-fact

B. For and on behalf of
INTER PACIFIC LINES CO., LTD.

By:
Title: Attorney-in-fact

3

**KEYMAX** ..aritime Co., Ltd.

TORANOMON 33 MORI BLDG.
8-21, TORANOMON 3-CHOME, MINATO-KU, TOKYO 105-001, JAPAN
TEL 03-3459-6151 FAX 03-3459-6155 TELEX 242-4113 KIKUYO J

# FAX MESSAGE

6
PAGE (INCLUDING THIS COVER PAGE)

DATE  01/12/31
REF.   :

TO     :   Ocean Trade
ATTN :    Mr. Ziogas
RE.    :      The Master Agreement

Attached herewith a copy of the Keymax's Master Agreement duly signed by our president, Mr. Kayahara.

Brgds.


S. Iwai

## MASTER AGREEMENT

**BETWEEN**

A) The parties of the first part:

    a)    PILLSBURG NAVIGATION S.A. of Panama, owners of the Panamanian flag vessel "OCEAN REYNA".

    b)    STERLING NAVIGATION S.A. of Panama, owners of the Panamanian flag vessel "OCEAN LEO".

    c)    PANAPORT SHIPPING S.A. of Panama, owners of the Panamanian flag vessel "KOWHAI".

        (each one and all of these owners hereinafter called the "Ocean Trade Owners" and each and all above vessels hereinafter called "Ocean Trade Owned Vessels")

    d)    OCEAN TRADE S.A. of Liberia ("Ocean Trade")

**AND**

B) KEYMAX MARITIME CO., LTD. ("Keymax"), of 6F Toranomon 33 Mori Building, 3-8-21 Toranomon, Minato-Ku, Tokyo, a Japanese Company.

WHEREAS the Ocean Trade Owners currently have the Ocean Trade Owned Vessels on long term Bareboat Charters (the "Bareboat Charters") to Japanese Charterers (the "Original Charterers") and the Original Charterers have sub-chartered out these vessels, in their own name as Owners, under period time-charters (the "Time-Charters") to other Japanese Charterers (Eastern Car Liner Ltd., for "Ocean Leo" and "Ocean Reyna" and Nissui Shipping Corp. (now renamed Tokyo Reefer Chartering) for "Kowhai") (the "Time-Charterers"); and

WHEREAS the Original Charterers have incurred outstanding debts to Keymax and its associated company, MK Shipmanagement Co., Ltd., of the same address, relating to unpaid management costs for these vessels, in the case of "Ocean Reyna" US$140,894.80, "Ocean Leo" US$426,543.33 and "Kowhai" US$325,239.35 and Ocean Trade is willing to accept liability for a fraction of such outstanding debts under certain terms and conditions as described below (the "Outstanding Debts"); and

WHEREAS the Original Charterers also owe an outstanding amount of about US$534,000 to various dockyards for docking and associated costs (the "Docking Costs") related to the Ocean Trade Owned Vessels; and

WHEREAS Keymax is willing to take over, in place of the Original Charterers, as Owners of the Ocean Trade Owned Vessels in the Time-charters and offer to Ocean Trade exactly back-to-back time-charter parties on the same basis as the Time-Charters without any deductions and agree that all receivables due to the Original Charterers, if any, to be paid to the Ocean Trade Owners, provided approval is obtained from the Time-Charterers, but in all case pursuant to immediate arrangements made only with the Original Charterers, and provided the Ocean Trade Owners agree to accept liability for payment of a settled amount fraction of Outstanding Debts and Docking Costs to Keymax as described below; and

**2 7**

1

WHEREAS Ocean Trade (which is the beneficial Owner of the Ocean Trade Owners) and the Ocean Trade Owners are willing to accommodate Keymax in their above wishes;

IN THE PREMISES and against the mutual consideration agreed to be exchanged by the parties to this agreement, IT IS HEREBY AGREED THAT:

1) Keymax will take all necessary actions together with the Original Charterers to obtain the agreement of the Time-Charterers to Keymax taking over from the Original Charterers as owners in the Time-Charters and sign, only after Ocean Trade's written approval, proper Time-Charter Parties addenda but in all cases and irrespectively of such addenda signed they undertake to:

2) Commencing immediately after signing this Agreement by fax, collect hires under the Time-Charters in their own account; deduct operational expenses, according to the attached budgets, and the figure referred to in Para. 4 below, and pay the remaining balance to a bank account or accounts to be nominated by the Ocean Trade Owners. All details of the accounts where Time-Charter hire will be received will be disclosed to Ocean Trade simultaneously with signing this Agreement.

3) If the takeover envisaged in Para. 1 above cannot proceed for any reason, then Keymax will arrange with Original Charterers that hire payments under the Time-Charters will be made to a bank account controlled by Keymax, whereafter Keymax will deduct management costs, according to the attached budgets and management agreements, and pay immediately upon receipt the remaining balance to a bank account or accounts to be nominated by the Ocean Trade Owners. If any monthly payments are not made to Ocean Trade Owners or Ocean Trade strictly as per provisions of this Agreement then the balance of Outstanding Debt will be deemed eliminated whilst Ocean Trade shall maintain rights of full recovery of any missing payments and/or funds from Keymax or any other accountable party. Keymax also undertakes not to make or negotiate any amendments, accept deductions or termination of the Time-Charters from the text of the current Time-Charters as hereby attached with all their addenda (Appendix 1). Ocean Trade will pay any brokerage commissions disclosed in the Time-Charters payable to non-affiliated companies of Keymax.

4) If either arrangement (as per Para. 2 or Para. 3 above) comes into effect, the Ocean Trade Owners will also repay to Keymax, as a full settlement:

   (a) 56% (US$500,000) of the Outstanding Debts, in 12 equal monthly payments of US$12,500, commencing in December 2001, followed by 42 equal monthly payments of US$8,333, commencing in December 2002; and

   (b) 100% of the Docking Costs of US$534,000, in 16 equal monthly payments of US$33,375 commencing in December 2001.

Repayment of the Outstanding Debts and Docking Costs should be amortised by the time of redelivery of the last of the Ocean Trade Owned Vessels from the Time-Charters, but if any balance remains due to Keymax at the time of redelivery of the last vessel, the same shall be settled in cash at that time.

2 8

2

5) The technical management of the vessels will remain with Keymax throughout the remaining period of the Time-Charters, as per attached Management Agreements (Appendix 2) between Keymax and the Ocean Trade Owners. Ocean Trade will have the option to terminate the Management Agreements at any time, upon giving reasonable notice, in which case they shall pay the remaining amount of the settled Outstanding Debts and Docking Costs prior to termination of management of the final vessel.

6) During the currency of this Agreement Ocean Trade will endeavor to assist with marketing of the Keymax services and attracting clients for Keymax, for a fee of 25% of the agreed gross fees.

7) i) Recognising that Ocean Trade has lost substantial amounts during earlier trading of the Ocean Trade Owned Vessels, Keymax will give Ocean Trade the following purchase options and they undertake to supply Ocean Trade with the proper consent of the registered owners of the relevant vessels within 30 days from the date of this Agreement signing:

a) **M.V. "Ocean Daisy"**
At a price equating to the outstanding bank debt remaining on the vessel under the Loan Agreement with Orix Corporation or its subsidiary plus US$100,000, and less any dividends received by Keymax plus an amount relating to the Second Mortgage in favour of Sumitomo Mitsui Banking Corporation as presented in Appendix 3.

b) **M.V. "Ocean Sampaguita"**
At a price equating to the outstanding bank debt remaining on the vessel under the Loan Agreement with Orix Corporation or its subsidiary plus US$150,000, and less any dividends received by Keymax as presented in Appendix 3.

c) **M.V. "Ocean Ellie"**
At a price equating to the outstanding bank debt remaining on the vessel under the Loan Agreement with the Sumitomo Mitsui Banking Corporation or its subsidiary plus US$650,000 and less any dividends received by Keymax as presented in Appendix 3.

d) **M.V. "Ocean Phoenix" and "Ocean Harmony"**
At a price equating to the outstanding bank debt remaining on the vessel under the Loan Agreement with Sumitomo Mitsui Banking Corporation plus an amount equivalent to the penalty to be paid for early termination of the Loan Agreement as presented in Appendix 3.

e) **M.V. Southern Odyssey**

At a price equating to the best available option from the registered owners of this vessel plus $55,000

29

- The above options (or any of them) may be exercised at any time during the 4-year period commencing from the date of this Agreement (except for "Ocean Sampaguita", and "Ocean Phoenix" and "Ocean Harmony" for which see ii) below) upon receipt of written notice of the exercise of such purchase option(s) by Ocean Trade, Keymax will arrange delivery of the vessel(s) as promptly as possible, on normal and straightforward Japanese sale terms, with transfer of the attached time-charters. In case of time-charter transfer, Keymax will maintain technical management and time-charters will be executed on 'back-to-back' basis.

ii)    In the case of "Ocean Daisy", "Ocean Sampaguita", "Ocean Phoenix" and "Ocean Harmony" the option may be exercised respectively only in the 21, 12, 36 and 36 month period commencing from the date of this Agreement, and for the 12 month period thereafter Keymax will give Ocean Trade first refusal to buy such vessels at whatever price and on whatever terms they can obtain from a third bona fide party buyer on the open market. The option for the "Ocean Ellie" cannot be exercised for the first 12 months.

8)    This Agreement is to become effective and binding upon its signature by the parties to it. All provisions in it for action by third or related parties to be implemented as soon as possible, but hire payments will start with payments due after December 27th, 2001, and repayment of the Outstanding Debts and Docking Costs will start in December 2001.

9)    This Agreement shall be governed by English law and all disputes or claims, if any, arising out of it or in connection with it shall be resolved exclusively by arbitration. The parties agree and irrevocably also submit any and all such disputes to London Arbitration in the U.K. The London Maritime Arbitration Association Rules shall govern any and all arbitration proceedings.

10)    For purposes of notices and legal proceedings (a) Ocean Trade S.A. and related to it parties irrevocably appoint Ince Co solicitors, as their agent in London and (b) Keymax hereby irrevocably appoint (. .......) London, as their London agent.

Both parties may nominate a substitute agent for service in London; however such appointment shall become effective only five (5) business days after written notice to the other parties.

This 31st day of December 2001

A.  For and on behalf of

1.  PILLSBURG NAVIGATION S.A
2.  STERLING NAVIGATION S.A.
3.  PANAPORT SHIPPING S.A.

_____
By  :
Title : Director

4.  For and on behalf of
OCEAN TRADE S.A.

_____
By  :
Title: Director

B. For and on behalf of
KEYMAX MARITIME CO., LTD.

_____
By  : *NOBUO   KAGAHARA*
Title: Director

3 1

Subject: IPL/KEYMAX/OCEANTRADE signed agreements
Date: Mon, 31 Dec 2001 18:34:07 +0200
From: "mfsc" <mfsc@aias.gr>
  To: <s_iwai@imk.co.jp>
  CC: <t_fordyce@imk.co.jp>

Dear Mr. S.Iwai,

Thank you very much for the signed agreement by Kayahara-san
which was well received today and your kind email.

I faxed back signed both agreements to your office.

I am looking forward working with you and Tony implemented these agreements.
I am waiting on Wednesday upon your opening the breakdown of hires received
and payments to be made as per agreements.

Tony needs to prepare proper Addenda to the agreements with the information exchanged
upon his return.

On this point I would like to clarify that the management fee should be $6,000/mo/vessel
with a simple brokerage agreement drawn between Keymax and my personal company
POSEIDON SHIPHOLDINGS SA which will be collecting the $1,500/mo/vessel as agreed.
Same for any other business that we will conclude with Keymax as per the 25% of gross
fee agreed.Please prepare a simple brokerage agreement. Ocean Trade will
remain a strictly shipowning company.

We are now working to finalize the buyout of Economou/Cardifff by end of January.
I will plan a trip to Tokyo immediately after finalization of the buyout
pursuant my option.
I am very excited to work with the professional,dynamic team of Keymax and not only hope
but I am confident that 2002 would mark the beginning of a mutually
productive and profitable relationship.


Best Regards, many thanks to all of you for your cooperation
and my best wishes for 2002  personally,your family and your business.

Babis Ziogas

**Tony Fordyce**

| | |
|---|---|
| From: | "mfsc" <mfsc@aias.gr> |
| To: | <t_fordyce@imk.co.jp> |
| Sent: | Monday, 14 January 2002 8:29 AM |
| Attach: | OT Keymax MasterFinal4 Agreement.doc; OT Keymax Final Agreement.doc |
| Subject: | Keymax various matters |

Tony/Babis

Following our telephone discussions and your last email I comment as follows:

1. Awaiting the final management Agreements.

2. Commission agreement is fine. So, please have it signed and send it over.

3. Noted upcoming O. Leo dry-docking. Please do the best to minimise cost and offhire. Keep us posted for time and place of dry-docking.

4. We can discuss all that during my visit in Tokyo in February.

5. Kowhai offhire is a big problem. Let us work a compromise among IPL/Keymax/OT.

6-7. Please make these changes in the management contracts.

8. Receivables are an important issue. Please notice that is an important part of the agreements to pass them over to OT. If Charterers do not pay we have something to ask back when market improves. We have not seen any other addenda to the c/ps after our visit to Tokyo last February.

9. I am referring to the banks that receive the Kowhai, O. Reyna and O. Leo hires.

10. Please keep us updated with any new marketing material.

11. I attach to this message the breakdown of the Keymax agreement to 2 parts. It does not change anything and Economou is aware of the change. I want to have the maximum flexibility to be able to exercise the options and not to be restricted to Ocean Trade which will be myself and Spiros Milonas.

Please attend to all documents ASAP since we need them to close the refinancing with Milonas, which should take place within January.

Best regards
Babis

## Tony Fordyce

**From:** "mfsc" <mfsc@aias.gr>
**To:** <t_fordyce@imk.co.jp>
**Sent:** Thursday, 17 January 2002 8:31 PM
**Subject:** Various matters

Tony/Babis

Thanks for last.

1.Pegasus is a Liberian corporation.Thank you for transfer. let me know when is done.

2.We need to conclude the Kowhai offhire issue. I suggest that Keymax finances the balance
   of $79,000 ( please send us an exact copy of offhire statement) after the $40,000 IPL
   contribution as follows. In January from the O.Leo hire $29,000 is deducted. Then starting in
   ʼil and for 5 months they deduct $10,000 per month. The reason for this plan is that in February
   and March we have very high deductions as it is and offhire may hit us as well due to the O.Leo dd.

3.For the reworked Keymax agreement into two , we only need to add in the options agreement the name _ ,
   of OceanTrade and add it as signatory.Then it is fully bullet-proof for all parties involved.

4. Awaiting the management agreements.We need to prepare time-charter parties between Keymax
   and the owners. Simply we take the time-charters and we change names. We need to add then as one addendum
   the Master agreement between Ocean Trade and Keymax. What does Keymax think on that?

5.There is no way we are going to agree on split rates for the Kowhai since it will destroy our cash-flow
   and it was never discussed before.Letus try for the best.

Best RGDS
Babis

Page 1 of 1

# Tony Fordyce

| | |
|---|---|
| **From:** | <info@mfsexchange.com> |
| **To:** | <t_fordyce@lmk.co.jp> |
| **Cc:** | <mfsc@alas.gr> |
| **Sent:** | Wednesday, 13 March 2002 2:50 AM |
| **Subject:** | Kowhai et als |

Tony/Babis

1. Kowhai
   Can we get 47.5c for first year and market rate but
minimum 45c for second year? This is important to swallow
the low rate. What is the structure/agreement with the 5c
address commission for the next year. Can this be used
somehow to get the 47.5c rate? It is important to get this
new charter with the registered owner.
2. I can come to Tokyo April 7-11 if this is OK.
3. You received today a letter from Economou. My comments to
this letter is that Economou is trying to get from for his
share in the 3 vessels deal $3m cash which is absolutely
crazy. I can offer him only $2m so now is exercisiong
pressure on me. Until June 30th I have full authority to
trade the 3 vessels. ~~I have kept him posted for our deal~~
~~which has never appear to become public. I told him that these~~
~~transactions I have traded until now. We can discuss this~~
~~when we meet in Tokyo so you understand the world of~~
~~Babis the way I operate with respect to Economou.~~
To avoid complications you may copy him for the 3 vessels
but not for the options.
I hope with your assistance as I assisted you for IPL we
will get rid Economou over the next 2-3 months and we can
work smoothly together.

Best Regards
Babis

03/13/2002

I have kept him posted for our deal which he approved but for the options I told him that this is not with Ocean Trade but with MFS.  We can discuss this when I come to Tokyo but I strongly believe that the work I do is for my benefit and Keymax and not for Economou.

6518578

## Tony Fordyce

**From:** "mfsc" <mfsc@alas.gr>
**To:** <t_fordyce@imk.co.jp>
**Sent:** Thursday, 21 March 2002 4:48 PM
**Subject:** Various

Tony/Babis

1. Can you reserve Tokyo Prince Hotel for me from Sunday 31st to Friday April 6th (6 nights)?
2. Can you fax us the cover page of each vessel as well, so that we can see what money you sent to each vessel?
3. Opex for Hamlet and Ophelia are very high for ITF and non-ITF. Is this guaranteed cost or just budgeted?
   Have you checked with Fairmont Vancouver for their current costs? I wouldnot mind Fairmont continuing management
   with Keymax supervision.
4. I am waiting to get Economou approval for Kowhai rates but 2 years is imperative.

Best Regards
babis

03/22/2002



**発信：営業企画部**

# Memo

提供：　栢原社長

作成：　営業企画部　岩井

回覧先：

日付：　02/03/22

件名：　KOWHAI/OCEAN REYNA/OCEAN LEO BAREBOAT 3船



---

### BABIS 氏の GENERAL PLAN

現在、BAREBOAT 3船は ECONOMOU 氏と BABIS 氏の共有である。BABIS 氏の計画は
BAREBOAT 3船の ECONOMOU 氏保有分を買い上げると同時に、旧 IPL 船と一部 KEYMAX
船を買船し、欧米の富豪投資家や銀行を巻き込み全船をまとめてファイナンスし、そして所有・
売船にて利ざやを稼ぐことにある。

また、長期的視野に立ち、当社との関係を強化し、当社所有船・関係船の買船や、新造船建
造を計るものである。また、自身で仕組む船やヨーロッパ船主の管理を当社に委託し、仲介
手数料を稼ぐことも計画にある。

### MASTER AGREEMENT のポイント

- CHARTER PARTY の変更
  3船の C/P を EOL/NISSUI・IPL から ECL/NISSUI・KEYMAX へ変更する努力をする。
  もし、それが出来ない場合は、備船料の振り込みを KEYMAX 銀行口座に直接するよう備
  船社に働きかける。（備船料直接振り込みの手配は済んでいる）

- 管理費未払額の確認
  OCEAN REYNA・US$140,849.80
  OCEAN LEO・US$426,543.33
  KOWHAI・US$325,239.35
  DRY DOCK・US$534,000.00

- 未払額の確定と支払方法
  Reyna/Leo/Kowhai の総額 US$892,632.48 を US$500,000.00 にディスカウントした上で、
  まず US$12,500 を 12 回そして US$8,000 を 42 回に分割し、月賦にて支払う。

  DRY DOCK の US$534,000 については、16回の均等(US$33,375)に分割し、月賦にて支
  払う。

  支払い開始は2002年1月末日よりとし、備船料との相殺をもって支払いとする。中途売
  船となる場合は、売船時現金一括精算とする。

1

38

- 本船の MANAGEMENT
  本船の MANAGEMENT は KEYMAX が行う。MANAGEMENT 契約は SHIPMAN にて別途契約。管理費は4半期ごとの実費精算とする。管理手数料は NET US$4,500/MONTH とする。提示予算額は添付参照。

  管理費支払は2002年1月末よりとし、傭船料との相殺をもって支払いとする。

- PURCHASE OPTION
  OCEAN DAISY ・ 残債 ＋US$100,000 JAN/2002 ・ SEP 2004
  OCEAN SAMPAGUITA ・ 残債 ＋US$150,000 JAN/2002 ・ JAN/2003
  OCEAN ELLIE ・ 残債 ＋US$650,000 JAN/2003 - JAN/2006
  OCEAN HARMONY ・ 残債 ＋ ローン解約金 JAN/2002 ・ JAN/2005
  OCEAN PHOENIX ・残債 ＋ ローン解約金 JAN/2002 ・ JAN/2005
  SOUTHERN ODYSSEY ・ BEST PRICE + US$50,000
  * *PURCHASE OPTION についてはパートナーである ECONOMOU には秘密にしてあるとのこと。*

## 現時点に於けるいくつかの問題点

- 傭船契約の切り替え
  BAREBOAT3船の RE-FINANCE をするには IPL C/P から KEYMAX C/P に切り替えることが絶対条件になってくるとのこと。(その他、OCEAN DAISY や OCEAN ELLIE を買船する場合も同様)

  以下は C/P 切り替えに関する問題点。

  OCEAN LEO/REYNA ~ ECL
  契約レートがマーケットレートを大幅に上回っている現状では、C/P 切り替えはレート値下げにつながる。特に OCEAN LEO につきましては契約レートと ECL が望むレートに DAILY US$1,000 程度の開きがある。但し、BABIS 氏は多少に値下がりはやむ得ないと認識をしてるとのこと。

  KOWHAI ・ TOKYO REEFER
  傭船契約期間は今年6月に終了。現在2年間の延長を交渉中で、ほぼ決定しそう。傭船切り替えに関する、実務上の問題は余りないのでは。

- トニーの扱い
  本件に関する仲介者としてトニーを EXCLUSIVE にアポイントしたいとのこと。トニーのコストについては、BABIS 氏と当社にて折半するとの申し出が BABIS 氏よりある。

● IPL
ECL/IPL 傭船契約の SIDE AGREEMENT として OCEAN LEO の ECL の買い取り条項問題や為替調整の問題がまだ PENDING として残っている。(これらの問題は BABIS 氏は知らない)無論、これらはあくまで ECL/IPL 間ならびに IPL/BABIS の問題であり、当社は無関係とするが、いずれにせよこれら未決問題がある限り、当社としては傭船契約切り替えの動きは取りづらいし、また切り替えのイニシアティブは IPL にとってもらいたい。

以上

添付： 船舶管理費
STATEMENT OF ACCOUNT

Dispatch: Business planning Dept.

Memo

To: President Kashiwabara

Preparation: Iwai, Business planning Dept.

Circulated to:

Date: 02/03/22

Re: KOWHAI/OCEAN REYNA/OCEAN LEO BAREBOAT 3 VESSELS

---

General Plan by Mr. Babis

The 3 bareboat chartered vessels are now owned jointly by Mr. Economou and Mr. Babis. In order to earn a profit margin by owning and selling of the vessels Mr. Babis plans to purchase the Mr. Economou's ownership of the 3 bareboat chartered vessels and at the same time the vessels owned by former IPL and some vessels by Keymax and to involve rich investors and banks in Europe and the USA in financing the all vessels.

In addition, he thinks to strengthen the relationship with us on a long term basis by purchasing the vessels owned by or associated with us or building new vessels. And he also plans to earn a brokerage commission by entrusting to us the management of the vessels operated by him or owned by European shipowners.

Points of Master Agreement

* Change of Charter Party

   An effort is made to change the charterparty for the 3 vessels from ECL/NISSUI ·

   IPL to ECL/NISSUI · KEYMAX. The charters are required to remit the hire directly

   to the bank account of Keymax when that change is not made. (Arrangement for

   direct remittance of hire has been made).


* Confirmation of outstanding management expenses

   OCEAN REYNA  ·  US$140,849.80

   OCEAN LEO ·  US$426,543.33

   KOWHAI ·  US$325,239.35

   DRY DOCK ·  US$534,000.00


* Decision on unpaid amount and way of payment

   The total amount of US$892,632.48 for Reyna/Leo/Kowhai is reduced to

   US$500,000.00, which is paid in 12 monthly installments of US$12,500 each and in

   42 monthly installments of US$8,000 each.


   US$ 534,000 for dry dock is paid by 16 equal monthly installments ( of US$33,375).

   The payment starts at the end of January in 2002, which is set-off from the hire.

   When the vessels are sold in the middle, a lump-sum payment is made in cash

then.

\* Management of the vessel

The management of the vessel is conducted by Keymax. The management contract is differently entered into by Shipman. The management expenses are settled at cost at each quarter of the year. The commission on management is US$4,500/month net. For the proposed budget, please see attached.

The payment of management costs begins at the end of January, which is set-off from the hire.

\* PURCHASE OPTION

OCEAN DAISY · remaining debts + US$100,000 JAN/2002 · SEP 2004

OCEAN SAMPAGUITA · remaining debts + US$150,000 JAN/2002 · JAN/2003

OCEAN ELLIE · remaining debts + US$650,000 JAN/2003-JAN/2006

OCEAN HARMONY · remaining debts + loan cancellation money JAN/2002 · JAN/2005

OCEAN PHOENIX · remaining debts + loan cancellation money JAN/2002 · JAN/2005

SOUTHERN ODYSSEY · BEST PRICE + US$50,000

★ It is told that the purchase option has been kept secret from partner Economou.

43

<u>Some problems at the moment</u>

\* Change of charterparty

For re-financing of the 3 bareboat chartered vessels it is the absolute condition that IPL C/P is changed to KEYMAX C/P (In addition, that is true when the Ocean Daisy or the Ocean Ellie is purchased)

Problems with change of C/P

OCEAN LEO/REYNA-ECL

The change of c/p leads to the reduction of rate as the contract rate exceeds by far the market rate at present. Especially in the case of the Ocean Leo there is the difference of US$1,000 per day between the contract rate and the rate required by ECL. However, it is told that Mr. Babis appreciates that he has no choice but accept a slight reduction.

KOWHAI · TOKYO REEFER

The period of charterparty will come to an end in this coming June. We are now talking about a two years extension, which seems to be almost decided. There would be little problem with the change of charter in business.

\* How to deal with Tony                                    44

Mr. Babis would like to appoint exclusively Tony as a broker in this case. He has put forward the proposal to us that Tony's costs be incurred equally both by him and Keymax.

\* IPL

The problem of the terms on purchase by ECL of the Ocean Leo in the side agreement of the charterparty between ECL and IPL and the one of adjustment of exchange have been left pending (Mr. Babis does not know those problems). Although they are doubtlessly the problems between ECL and IPL or between IPL and Babis, with which Keymax has no connection, Keymax any way has difficulties, while those outstanding problems have been remained, in trying to change the charterparties and would like IPL to initiate the change.

Concluded

Attachment:   Management expenses of the vessel

STATEMENT OF ACCOUNT

45

30/05   02 SAT 11:12 FAX                                                                    @001



# CARDIFF MARINE INC.

OMEGA BUILDING
80, Kifisias Avenue,
GR-151 25 Amroussion, GREECE
Phone:  (010) 80.90.400
Fax:    (010) 80.90.405
Telex:  215976 CARD GR, 215977CARD GR,
        215978CARD GR, 215979 CARD GR
e-mail: cardiff@hol.gr

To  : Inter Pacific Lines Co. Ltd
      Attention : Mr G. Iwai
                  Mr T. Fordyce
      Keymax Management Ltd.
      Attention : Mr N. Knyahara
                  Mr S.  Iwai                                      March 29th,2002
cc  :  Mr Babis Ziogas

Dear Sirs,

Further to our letter of March 12th, please note the following :

1) We agree on  entering into a charter party between the  registered  owners  of the mv
   "Kowhai"  and  Nissui at the net rate of 46cents per cubic ft for one  year as a direct
   continuation of the current charter. We would also be agreeable to a  net  rate for the
   2nd year of 48 cents per cubic foot . It goes without saying  that the charter party will
   be between Nissui and the registered owners of the vessel.
2) We are also agreeable to reduce the charter rate on the mv "Ocean Reyna" by USD ˜˜
   per day provided that a new charter party is signed between ECL and the regist
   owners of mv "Ocean Reyna".
3) We are also agreeable to reduce the charter rate on the mv "Ocean Leo" by USD ˜˜
   per day provided that a new charter party is signed between ECL and the registered
   owners of mv "Ocean  Leo".  It should be pointed out here that the reduction  so far
   requested by the charterers is out of the question and under no circumstances are we
   to enter into any discussions unless the charterers become realistic in their requests.

Mr Babis Ziogas is coming to Japan next week to expedite the  execution of these agreements
and also  to implement  the option agreements for the purchase of the vessels which should be
made  in the name of Ocean Trade S.A.

Please note  that  any deviation  from what we have pinpointed above  can not be made
without our prior express approval.

Best Regards,

George Economou

**4 6**

/

**Private and Confidential Memo**                                    Dated: 4th April 2002

From: B. Ziogas

To: H. Iwai/N. Kayahara/S. Iwai/T. Fordyce

**Things to be done by July 2002**

1.  a) Amend the **O. Reyna** and **O. Leo** Charters to have addenda stating that the registered owners of the vessels are the C/P Owners, for the least penalty possible.

    b) Reconcile accounts with the Charterers i) Yen reduction for O. Leo against rate reduction repayment (ii) rate reduction for O. Reyna repayment.

2.  Finalise the **Kowhai** C/P extension.

3.  Finalise discussions on **broking** with SSY and other parties.

4.  Purchase **Southern Odyssey** for $5.4/5.5 mill cash (basis ¥133/US$1) less 1% commission to Keymax, 1% to MFSC, against 3 years charter to Keymax at $3,350/3,450/3,550 daily net. Delivery June/July 2002. MOA price to be $7 mill. Finance by European bank.

5.  Purchase **O. Sampaguita** for $2.55 mill cash (Orix loan plus $150,000 for Keymax), less 1% commission to Keymax, 1% to MFSC, against 2 years charter to Keymax at $3,350/3,450 net. Delivery June/July 2002. MOA price $3.75 mill. Finance by European bank.

6.  Purchase **O. Daisy** on a BBHP basis as follows:

    Current registered owners bareboat the vessel to a Liberian company nominated by MFSC. The rate of bareboat charter hire is equal to both Orix & SMBC loan obligations that this vessel has, i.e. in case of June/July 2002 closing:

    Orix loan (+ Keymax $100,000): $6.14 m; monthly $42,000, interest 4% $20,400

    SMBC loan                    ¥70 m;  monthly ¥1m,     interest 4% ¥233,000
                      @¥133 =                  $7,518                  $1,754

    Total: US$71,672/month, according to loan formulae.

    Opex, including DD: $2,300 daily or $70,000/month

    Charter to Daiichi until 9/2004 at $11.75/LT/cal month: $166,286/month

    BB Charterers' obligation to purchase the vessel at the end of the bareboat charter for $5.3 mill.

7.  Purchase **O. Ellie** on a BBHP basis as follows:

    Current registered owners bareboat the vessel to a Liberian company nominated by MFSC. The rate of bareboat charter hire is equal to the SMBC loan obligation, i.e. in case of June/July 2002 closing:

    Keymax spreads their $650,000 receivable over 3 vessels (O. Ellie, O. Harmony and O. Phoenix) at $216,000 each, repaid over the life of the charters.

SMBC loan (basis July): $7.1m; monthly  $66,667
                                  interest 7.7%  $45,500
                                  Keymax       $ 4,500

Total:                              $116,600/month

Opex, including DD:        $2,300 daily or $67,000/month

Charter to Daiichi          $6,000/daily: $182,000/month

BB Charterers' obligation to purchase the vessel at the end of the bareboat charter for the loan balance of $3.9 mill.

8. Purchase **O. Phoenix** and **O. Harmony** on a BBHP basis as follows:

Current registered owners bareboat the vessel to 2 Liberian companies nominated by MFSC. The rate of bareboat charter hires are equal to the SMBC loan obligations, i.e. in case of June/July 2002 closing:

¥1,131,525,000 + ¥1,319,900,000 = ¥2,451,425,000  = $18,431,676 (@¥133/$1)

Monthly payments (¥31,725,000+¥29,550,000/3 x 133) = $153,571

Monthly interest @4.1375%                    = $ 66,315

Total                                        = $219,886

Opex including DD: 2 x $3,150/dly x 30.4      = $188,480

Keymax payments                              = $  9,000

Grand total                                  = $417,366

Assuming we can extend the NYK charters to 3 years at US$6,300/6,450/6,600, the monthly income will be $383,040.

9. With Orix we can do new deals with Handymax/Panamax vessels, chartered to Japanese Charterers and 80% finance from Orix.

## SUMMARY OF BAREBOAT/HP RATIONALE:

We will have a single account for the hires and payments to Keymax. In total O. Daisy, O. Ellie, O. Phoenix and O. Harmony will have income of $731,326 monthly, opex of $325,480 and bareboat payments of $408,158, roughly breaking even during the first year, and creating positive cash-flow in later years.

a) Keymax will avoid any tax problems, since the economic interest beneficiary party truly resides offshore.

b) MFSC will have the vessels in its balance sheet and will be more able to refinance them after 1-2 years, without unnecessary capital commitments to its banks.

c) We do not need to go to SMBC for negotiations regarding pre-payment.

d) IPL will have time to negotiate with SMBC settlement of its corporate loan and avoid rehabilitation.

e) We do not need to ask Daiichi for an immediate change of ownership, although for safety purposes it is better to have the single purpose registered owner company as the time-charter owner, not IPL.

4 8

Mr. Babis Ziogas

Ocean Trade S.A.,

Akti Miaouli 35-39, Office 501

Piraeus,

Greece, 18535                                        11th April 2002


### M.V. "Ocean Trade" Agreements

Dear Babis,

Please find enclosed one set of original agreements, comprising the Settlement Agreement, the Options Agreement and the Commission Agreement between Ocean Trade and Keymax, also the Management Agreements for 'Kowhai', 'Ocean Reyna' and 'Ocean Leo'.


Best regards,

Tony Fordyce


Encl.