### Second Original

<u>MASTER AGREEMENT</u>

It is agreed as of the 24th day of June 2003 between (A) EAST-WEST MARITIME INVESTMENTS, LTD., of Majuro, Republic of the Marshall Islands, a Marshall Islands corporation ("EWMI") and its 100% shareholder MARITIME FINANCIAL SERVICES CORPORATION of Majuro, Republic of the Marshall Islands, a Marshall Islands corporation ("MFSC") and (B) KEYMAX MARITIME Co., Ltd., of 6F Toranomon 33 Mori Building, 3-8-21 Toranomon, Minato-Ku, Tokyo, Japan, a Japanese Corporation ("Keymax") as follows:

WHEREAS,

A.   KEYMAX, through its senior executives and subsidiary owning companies (the "Owners"), is the beneficial owner of the following vessels (the "Vessels"):

> M.V. "Ocean Daisy" built 1994, single-deck bulk carrier of 14,379 metric tons deadweight, 8,417 GT, registered under the Cyprus flag;

> M.V. "Ocean Ellie" built 1996, single-deck bulk carrier of 17,386 metric tons deadweight, 10,421 GT, registered under the Cyprus flag;

> M.V. "Mermaid Dream" built 1998, single-deck bulk carrier of 47,245 metric tons deadweight, 25,969 GT registered under the Panama flag,

> M.V. "Ocean Phoenix" built 1995, single-deck Bulk carrier of 24,318 metric tons deadweight, 15,737 GT registered under the Panama flag; and

> M.V. "Ocean Harmony" built 1996, single-deck Bulk-carrier of 23,524 metric tons deadweight, 14,754 GT registered under the Panama flag.

B.   KEYMAX, through MK Ship Management Ltd. (the "Manager"), manages the Vessels;

C.   The Vessels are subject to and operating under the following time charter parties (the "Existing Charters");

**132**

(a) Ocean Daisy: period, 10 years 10/9/1994 -10/9/2004, Charterer Daiichi Chuo Kisen Kaisha ("Daiichi"); owner, Inter Pacific Lines Co., Ltd. ("IPL"); rate/ month US$11.75 per cargo carrying capacity of 14,125L/T until September 2003, thereafter minimum US$11.50; followed by with 3 years extension with same charterers at a minimum rate guaranteed by KEYMAX of $4,300/day. Brokerage commission 1.25% to SK Shipping;

(b) Ocean Daisy: period, 10 years 9/9/1994-9/9/2004 back-to-back charterer, IPL; owner, Pacifictrail Shipping; rate/ month US$11.75 per cargo carrying capacity of 14,125L/T to September 2003, thereafter minimum US$11.50; followed by with 3 years extension with same charterers at a minimum rate guaranteed by KEYMAX of $4,300/day.

(c) Ocean Ellie: period, 10 years 8/11/1996-8/11/2006; Charterer, Daiichi; owner, IPL; rate/day $6,000, adjusted to $5,800/day from 2/11/2003 and extended at market rate from 8/11/2006 for 1/1/1 additional years, at Charterers option, with owners right to cancel at any time upon sale of the vessel at 3 months notice; brokerage commission, 1.25% to SK Shipping;

(d) Ocean Ellie: period, 10 years 8/11/1996-8/11/2006; back-to-back charterer, IPL; owner, Ocean Ellie Shipholding; rate/day $6,000 adjusted to $5,800/d from April 1st, 2003;

(e) Mermaid Dream: period 2 years (Charterers' option 3rd year) from about March 2003 to March 2006; charterer Norden; owner, Mermaid Dream Shipholding SA; Rate/day $8,300/8,550/9,250; brokerage 3.75%

(f) Ocean Phoenix: period, 1 year

- **133**

2

9/22/2002- 9/22/2003; charterer NYK; owner, Ocean Phoenix Navigation SA; rate/day $5,750 but with Keymax guaranteeing and paying until the end of the period $6,000/d net.

(g) Ocean Harmony: period, 1 year 1/2/2003- 1/2/2004; Charterer Inui Shipping; owner Ocean Harmony Shipholding SA; rate/day $5,400/day but with Keymax guaranteeing and paying $5,700/d net until the end of the period.

D.   KEYMAX has in place financing arrangements for each Vessel, the present status of which as of June 1, 2003 are as follows (the "Existing Loans");

### Ocean Ellie

| | |
|---|---|
| Borrower | – Ocean Ellie Shipholding Ltd. |
| Lender | – Sumitomo Mitsui Banking Corp. |
| Original term | – 10 years |
| Balance Term | – to August 2006 |
| Original Loan | – $11,500,000 |
| Balance Loan | – $6,350,000 |
| Interest Rate | – 6% fixed |
| Monthly Principal | – $72,159 |
| Balloon payment | – $3,650,000 |

### Ocean Daisy

| | |
|---|---|
| (1) Borrower | – Pacifictrail Shipping Ltd. |
| Lender | – Orix Gaitana Overseas Carriers Inc. |
| Original Term | – 10 years |
| Balance term | – to August 2004 |
| Original Loan | – $12,860,000 |
| Balance Loan | – $5,628,536 |
| Interest Rate | – LIBOR + 2% |
| Monthly Principal | – $58,000 up to November, 2003, and thereafter US$50,000 |
| Balloon Payment | – $4,832,282 |

| | |
|---|---|
| (2) Borrower | – IPL |
| Lender | – Sumitomo Mitsui Banking Corp. |
| Original Term | – 10 years |
| Balance term | – to August 2004 |
| Original Loan | – JPY150,000,000 |

134

```
Balance Loan      - JPY 62,534,000
Interest Rate     - 3.075% fixed
Monthly Principal - JPY 833,000
Balloon Payment   - JPY 50,040,000
```

### Mermaid Dream

```
Borrower          - Mermaid Dream Shipholding SA
Lender            - Sumitomo Mitsui Banking Corp.
Original Term     - 10 years
Balance Term      - to February 2008
Original Loan     - JPY 2,350,000,000
Balance Loan      - JPY 1,588,750,000
Interest Rate     - TIBOR + 1.75% floating
Monthly Principal - JPY 12,083,333
Balloon Payment   - JPY 936,250,000
```

### Ocean Phoenix

```
Borrower          - Ocean Phoenix Navigation SA
Lender            - Sumitomo Mitsui Banking Corp.
Original Term     - 10 years
Balance Term      - to August 2005
Original Loan     - JPY 2,115,000,000
Balance Loan      - JPY 1,131,525,000
Interest Rate     - 3.78% fixed
Monthly Principal - JPY 10,575,000
Balloon Payment   - JPY 877,725,000
```

### Ocean Harmony

```
Borrower          - Ocean Harmony Shipholding SA
Lender            - Sumitomo Mitsui Banking Corp.
Original Term     - 10 years
Balance Term      - to August 2006
Original Loan     - JPY 1,970,000,000
Balance Loan      - JPY 1,201,700,000
Interest Rate     - 4.315% fixed
Monthly Principal - JPY  9,850,000
Balloon Payment   - JPY 847,000,000
```

Upon delivery to the Buyers Owners will procure bank statements or other bank documentation showing the outstanding loan obligations and the amortization schedules, and vessels' Registry liens certificates showing the current bank loans as the only liens.

E.    EWMI, through its subsidiaries, desires to purchase and KEYMAX ,and the Owners are willing to sell the

Vessels on the basis of a) Bareboat Charter Hire/Purchase agreements b) secondary assignments of Existing Charters and future charters to EWMI during the currency of this Agreement and c) management agreements with KEYMAX during the time charter periods specified in this agreement;

NOW, THEREFORE, the parties hereto agree as follows:

1.  KEYMAX will cause the Owners to enter into Bareboat Charter Hire/Purchase agreements for each vessel with EWMI nominated companies (the "Buyers") on the basis of the BARECON 89 Standard Bareboat Charter, with suitable/logical amendments as attached in Schedule 2. KEYMAX will cause the Owners to observe and perform each and every obligation on their part in the Bareboat Charter Hire/Purchase Agreements to be performed and observed and guarantees the observance and performance of the Owners of their obligations under the Bareboat Charter Hire/Purchase Agreements. Keymax and EWMI'S nominated companies, in their relative capacities under the BCHP, shall (a) agree that the Existing Charters shall be assumed by the companies nominated by EWMI, as the case may be and under the terms of the BCHP, and (b) such nominated companies, Keymax and EWMI shall not do any act, deed or omission that may have as a result prejudice or endanger to the validity or continuing effect of the Existing Charters, under their own terms.

2.  The period of each Bareboat Charter Hire/Purchase agreement shall be the same as the remaining balance of each Existing Loan period as the same are extended in accordance with Clause 5 and the payments hereunder shall be equal to the Loan payments.

3.  In addition to the Bareboat hire, EWMI will make a non-refundable payment to KEYMAX of the sum of US$2,200,000 (United States Dollars Two million two hundred thousand), allocated on a per vessel basis as follows: US$300,000 for the OCEAN ELLIE, US$300,000 for the OCEAN DAISY, US$1,000,000 for the MERMAID DREAM, $300,000 for the OCEAN PHOENIX and $300,000 for the OCEAN HARMONY. The amount of US$2,200,000 shall be paid as follows:

    a) US$650,000 upon signing this Master Agreement with its receipt acknowledged hereby;



**136**

5

b) US$600,000 by August 29th, 2003;

c) US$600,000 by September 30th, 2003; and

d) US$350,000 by December 31st, 2003.

The last 3 payments will be paid with an annual interest of 6% since July 4th, 2003 up to the date actually received by KEYMAX.

4.    KEYMAX undertakes and guarantees subject to the terms of Cl.5 below that (i) the interest rate on the OCEAN ELLIE Existing Loan will not exceed six (6%) percent per annum and KEYMAX will make best effort to further reduce this rate (ii) it will observe and perform and insure that the Borrowers observe and perform all the terms and conditions of the Existing Loans at no extra cost to EWMI (iii) it will maintain and remain responsible for and insure that the Borrowers maintain and remain responsible for any cash collateral accounts required by the Lenders under the Existing Loans.

5.    KEYMAX undertakes to use its best efforts exactly as if it had remained economic beneficiary of the OCEAN DAISY to apply for an extension of the OCEAN DAISY Existing Loan of at least three (3) years on the same terms and conditions. In the event KEYMAX is able to obtain an extension of the OCEAN DAISY Existing Loan in terms accepted by EWMI, EWMI agrees to pay one hundred percent (100%) percent of any required prepayment and legal fees.

6. (a) Provided that the Buyers have paid all sums due under the Bareboat Charter Hire/Purchase agreements and Management Agreements and any balloon payments due under the Existing Loans, at the expiration of the each Bareboat Charter Hire/Purchase agreement period the Vessels will become the property of the Buyers without any further payments. The Vessels will be delivered to the Buyers pursuant to the terms of the NIPPONSALE 1993 Memorandum of Agreement, the form of which is attached hereto as Schedule D, with suitable/logical amendments. Keymax and EWMI shall appoint and hereby appoint Mr. Charalambos Ziogas, in his personal capacity, of 48 Patriarchou Ioakim Str., Athens, 106 76 Greece, tel.:+30 210 7257090, fax:+30 210 7257098, e-mail:mfsc@aias.gr , as an Escrow Agent (herein called the "Escrow Agent" )



and Keymax and EWMI by joint and irrevocable instructions shall deposit with the Escrow Agent the following documents (herein called the "Escrow Documents"):

   (i)   Signed but undated Bill of Sale covering the Vessels, such Bill of Sale to be executed in accordance with the terms and conditions of the corresponding MOAs. The Escrow Agreement shall have the power in accordance with the present Agreement, to date the Bills of Sale;

   (ii)   Executed Second priority preferred mortgages covering the Vessels in four counterparts for each of the Vessels, which mortgages the Escrow Agent shall hold in escrow without registering same with the appropriate Ship Mortgage Registry (hereinafter called the "Equitable Mortgages").

The Escrow Agent, by written instructions of either of the contracting parties hereto, shall date and deliver to EWMI, or to its authorized representative, the Bills of Sale for the Vessels, upon production of the following documents: (aa) Proof of payment of any and all sums, inclusive the balloon payment under the relative Loan Agreement, as referred to in Schedule 2; (bb) Proof of payment of any and all sums of money due to MK Ship Management Ltd., as per the relative invoices, issued under the applicable management agreements; (cc) Proof of consent issued by EWMI or the Buyers for the cancellation of the second priority preferred mortgages.

The Escrow Agent shall have to nominate an Alternative Escrow Agent, subject to the approval of KEYMAX, to have the same obligations as the Escrow Agent, should the Escrow Agent not be in a position to carry out his/her duties.

(b)  Notwithstanding the foregoing, at any time during the Bareboat Charter Hire/Purchase agreement periods, the Buyers may purchase any or all of the Vessels by paying to KEYMAX the outstanding balance of the amounts shown on Schedule 2 plus any penalties payable in connection with the early termination of the Existing Loans (exact amounts to be advised by KEYMAX at any time upon the request of EWMI).

**138**

(c) Amounts payable upon any conversion of a loan with a floating rate from Japanese Yen to U.S. Dollars in excess of one (1%) percent of the outstanding balance of the relevant Existing Loan (except for the case of "Mermaid Dream", which to advised later) shall be for the account of KEYMAX except in case of "Ocean Ellie", for which the exact prepayment amount as required under the Ocean Ellie Existing Loan will be advised by KEYMAX as soon as possible after the closing.

(d) Provided none of the documents involved requires the signature or other involvement of the Lender, Keymax will deliver at the closing of the transaction a Second Assignment to the benefit of EWMI of all cash collateral accounts pertaining the Vessels "Ocean Ellie", "Ocean Phoenix", "Ocean Harmony" and "Mermaid Dream" as a security for the case that there will be no Second Mortgage Registration because of any reasons, other than the fault or omission of EWMI; such security to be held by EWMI for any breach of the Master Agreement.  The security thereof shall be released to Keymax in case any of the Vessels involved is sold and transferred to the Buyers and/or the relevant vessel Second Mortgage has been registered.  The cash collateral accounts' balances and account details are as follows:

As of 28th Feb 2003 (except in the case of "Ocean Ellie" which was as of 31st January 2003):

Ocean Phoenix
Sumitomo Mitsui Banking Corporation.
A/c no.: 6504374-2 (JPY) Yen116,639,309
          8603323 (Us$) US$3,447.79
A/c: Keymax Maritime Co., Ltd.

Ocean Harmony
Sumitomo Mitsui Banking Corporation
A/c no.: 6504374-2 (JPY) Yen127,085,533
          8603323 (US$) US$174,889.81
A/c: Keymax Maritime Co., Ltd.

Mermaid Dream
Sumitomo Mitsui Banking Corporation
A/c No.: 101420 (JPY) Yen55,031,759
          267921 (US$) US$273,545.54
A/c: Mermaid Dream Shipholding S.A.

Ocean Ellie
Sumitomo Mitsui Banking Corporation



A/c No.: 0209379 (US$) US$203,105.25
A/c: Ocean Ellie Shipholding Limited

(e) EWMI and MFSC jointly and severally guarantee that upon termination of the Bareboat Charter Hire/Purchase will pay the outstanding balances of the Existing Loans and take delivery of the vessels lien free.

7. (a) Simultaneously with entering into the Bareboat Charter Hire/Purchase agreements:

(i) KEYMAX will provide secondary assignments of the benefit and burden of the Existing Charters in favour of EWMI, with KEYMAX receiving 2.5% commission on the hire under the Existing Charters (a), (c)and (e) ,and all future charters for all the vessels (only excluding the current charter periods for Ocean Phoenix and Ocean Harmony) provided that such future charters are entered and agreed through Keymax; and

(ii) Keymax and the Buyers will enter into management agreements as per Schedule 1 with the Managers (with the exception of the Ocean Ellie for which they will enter into management agreement with the Buyers' company International Maritime Advisors & Management Corp. and back-to-back sub-management agreement with the Managers, specifying that the escalation of the budget for any one year, including the monthly management fees, shall not exceed an average of two (2%) percent per annum above the figures for the initial year, unless EWMI otherwise agrees, which agreement shall not be unreasonably withheld. The form of management agreement is attached hereto as Schedule 1. The actual monthly disbursements are to be sent to Charalambos Ziogas at the address specified in the Management Agreement no later than 15th day of the following month.

(b) Additionally, in relation to the management agreements:

i) Keymax, as the Managers, hereby waives its right to arrest or place a lien on the Vessels or any of them for unpaid bills, including its own fees and expenses, before and after the commencement of this Agreement

9

**140**

(except for non-payment of Management fees properly payable to the Managers by EWMI or its subsidiaries, as Owners. If there is any dispute about whether such Management fees are properly payable or not, then the Owners should pay the disputed amount of fees into an escrow account, pending resolution of the dispute as provided for under this Agreement, in which case the Managers undertake not to arrest the Vessel/s).

ii) All costs of and associated with the Dry-docking carried out for "Mermaid Dream" at Pasir Gudang from 16th to 23rd March 2003 and for the "Ocean Phoenix" at Kanda Shipbuilding Co., Ltd., from 20th to 25th June 2003, will be paid by the Managers, who guarantee that the Vessel(s) will not be arrested or have a lien placed on it/them in connection with any unpaid bills or other claims arising out of these Dry-dockings.

8. As security for the performance of its obligations under this Agreement KEYMAX will arrange for and/or provide the following to EWMI:

(i) A secondary pledge of the shares of the Owning companies, secondary irrevocable stock powers and secondary assignments by KEYMAX of the Vessels' earnings as per Schedules 4a, 4b and 5;

(ii) The personal representations of the shareholders of the Owners as per Schedule 3 to the effect that:

a) There are no liens on the vessels and that no additional liens will be placed (other than second mortgages in favour of EWMI)

b) The information given herein regarding charters and loans is correct.

c) The charters and loans referred to herein will not be amended without EWMI's prior written consent.

d) Keymax/Owners will not sell any of the vessels to any parties than EWMI or its nominees without EWMI's prior written consent.

e) Keymax will arrange the new (2nd) insurance policies referred to in Clause 13 below.



141

   f) Keymax will arrange to execute but not register the Second Mortgages in favour of EWMI for "Mermaid Dream", "Ocean Phoenix" and "Ocean Harmony"; however, such mortgages to be delivered to the Escrow Agent.

   g) Keymax will pay to EWMI their proportion of any total loss insurance proceeds on Ocean Daisy and Ocean Ellie, until the second insurance policies are taken out, as referred to in Clause 13 below.

(ii)   Irrevocable Undertaking by Keymax until the expiration of the Existing Loan periods, to transfer the balance of all charter hire received after service of the Existing Loans to the nominated by EWMI account for all vessels with the exception of Ocean Ellie.

9.   EWMI agrees to pay to KEYMAX the monthly budgeted operating expenses (as shown in Schedule 1) out of the charter hire payments made to the EWMI account. As concerns the management of the cash flow:

   a) As concerns the Vessel OCEAN ELLIE, KEYMAX shall deliver to EWMI evidence of payments of principal and interest incurred under the Existing Loans for the relevant repayment period, all statements of hire payments received, the Lender's statements of the relevant accounts and statements of the US $51,000 of management payments made. Within three (5) business days of receiving these statements KEYMAX shall remit to EWMI any surplus or EWMI shall remit to KEYMAX the amount necessary to cover any deficit.

   b) As concerns the Vessels OCEAN DAISY, OCEAN PHOENIX, OCEAN HARMONY and MERMAID DREAM, all funds remaining after payment of any amounts authorized under the loan agreements will be transferred to the EWMI bank account referenced in Clause 8(ii) and EWMI will remit to KEYMAX the amount owed under management agreements.

   c) EWMI shall receive monthly copies from KEYMAX of all bank statements which KEYMAX receives with detail on loan balances, interest payments, principal payments and any other amounts payable under the loan agreements and charter hires.



**142**

10. KEYMAX, as an inducement for EWMI to enter into this Agreement, represents and warrants as follows:

    (i)    The Existing Charters are valid and enforceable, are now in full force and there is no default there under by either party thereto;

    (ii)   The details of the Existing Charters set forth in Recital C are true and correct;

    (iii)  The making and performance of this Master Agreement and the transactions contemplated herein will not result in a breach of, violate or constitute a default under the Existing Charters;

    (iv)   The details of the Existing Loans set forth are true and correct and Schedule 2 accurately reflects the repayment schedules of the Existing Loans;

    (v)   The Borrowers are not in default under the Existing Loans and the making and performance of this Master Agreement and the transactions contemplated herein will not result in a breach of, violate or constitute a default under the Existing Loans.

11. The commencement date for the Bareboat Charter Hire/Purchase agreements and new Time Charter Party Agreements shall be August 1st 2003.

12. a) Before, at or at a subsequent time to be agreed between the partied, KEYMAX agrees to provide EWMI with the "Due Diligence" documentation listed in Schedule 12 hereto, also any other documentation EWMI may reasonably request in connection with this Agreement and the transactions set forth herein and resolutions of the shareholders of the Owners approving and consenting to the transactions contemplated in this Agreement as per Schedule 12.

    b) At the time of closing KEYMAX agrees to provide EWMI with the "Closing Documents" listed in Schedule 13 hereto.

13. All the Vessels will be insured for a minimum of 150% of their Existing Loan balances at the Buyers' cost. Total loss proceeds shall be apportioned as follows: to the Lenders the amounts required to pay

**143**

off the Existing Loan balances (i.e. 100%), and, of the remaining 50%, 80% to EWMI and 20% to KEYMAX. KEYMAX will arrange second insurance policies (the 'Second Policies') covering Total Loss only, the benefit of which policies will be assigned to the Buyers. If the amount of the benefit under the Second Policies is not sufficient to give the Buyers a share in Total Loss insurance proceeds in the proportion agreed above, then Keymax will pay the shortfall to the Buyers from their share of insurance proceeds under the Original Policies. For Ocean Ellie and Ocean Daisy, the Second Policies will only come into effect from July 18th 2003, and KEYMAX hereby guarantee to pay to the Buyers 80% of the excess over the amounts payable to the Lenders in case of a Total Loss prior to that date.

14. KEYMAX hereby agrees and undertakes to indemnify and hold harmless EWMI, its successors and assigns, and the Buyers, their successors and assigns, from and against all liabilities, losses, damages, obligations, charges, costs, expenses including reasonable attorneys' fees, and from and against all claims, demands and suits, arising out, caused by or resulting from this Agreement being a breach of or violating or constituting a default under the Existing Loans and Existing Charters.

15. EWMI undertakes and agrees that, while the Existing Loans are outstanding, it shall not independently communicate with or contact the Lenders to discuss the Vessels or the Existing Loans without KEYMAX's prior consent, provided that EWMI may contact the Lenders during this period for any other purpose or to discuss any other matter, and provided further that in the event that KEYMAX fails to initiate negotiations with the Lenders to refinance the Existing Loans at least three (3) months prior to the maturity date of each Existing Loan and to provide EWMI with written confirmation of these refinancing negotiations, EWMI shall then be entitled to initiate refinancing negotiations with the Lenders.

16. This Agreement shall be governed by English law and all disputes or claims, if any, arising out of it or in connection with it shall be resolved exclusively by arbitration. The parties irrevocably agree to submit any and all such disputes to London Arbitration in the U.K. The London Maritime

**144**

Arbitration Association Rules shall govern any and all arbitration proceedings.

17.    It is a condition of this Agreement and EWMI guarantee that MFSC shall remain at least a 50% (fifty percent) shareholder in EWMI and that Charalambos Ziogas shall retain a majority shareholding in MFSC for the duration of this Agreement.

18.    This Agreement and all other related agreements referred to herein and all negotiations leading up to the conclusion thereof shall be kept strictly Private and Confidential between the parties.

19.    In case there is any discrepancy or inconsistency between the terms of this Agreement and the terms of any of the other agreements referred to herein, the terms of this Agreement shall prevail.

20.    For purposes of notices and legal proceedings (a) EWMI and its related parties irrevocably appoint Simpson, Spence & Young; Attn. John Welham, as their agent in London and (b) KEYMAX hereby irrevocably appoint Simpson, Spence & Young Att. James Tribe, as their London agent.

Both parties may nominate a substitute agent for service in London, however, such appointment shall become effective only five (5) business days after written notice to the other parties.

IN WITNESS WHEREOF the parties have signed this Agreement the day and year first above written.

(A)    For and on behalf of

EAST- WEST MARITIME INVESTMENTS,LTD.

By: _____

Name: _____ CHARALAMBOS ZIOGAS

Title: _____ DIRECTOR

For and on behalf of
MARITIME FINANCIAL SERVICES CORPORATION

By: _____

Name: _____ CHARALAMBOS ZIOGAS

Title:    DIRECTOR

(B)    For and on behalf of
KEYMAX MARITIME CO., LTD.

By:

Name: SABURO IWAI
Title: DIRECTOR

## ACKNOWLEDGEMENT AND UNDERTAKING BY THE ESCROW AGENT

The undersigned CHARALAMBOS ZIOGAS of 48 Patriarchou Ioakim Str., Athens, 106 76 Greece, tel.:+30 210 7257090, fax:+30 210 7257098, e-mail:mfsc@aias.gr, acknowledge and accept my appointment as ESCROW AGENT for the above referred to contracting parties in accordance with Section § 6(a) of the above signed Master Agreement dated as of June 24th, 2003 and, hereby, confirm to carry out my duties in good faith and to the best of my abilities and comply with any and all obligations of mine arising out of my appointment as Escrow Agent, in accordance with said above Master Agreement and on receipt of the Escrow Documents, I shall confirm in writing the contract parties and their lawyers about the deposit to me of such Escrow Documents.

Dated: June 24th, 2003

CHARALAMBOS ZIOGAS

**146**

15

**Second   Original**

| 1. Shipbroker | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)<br>STANDARD BAREBOAT CHARTER<br>CODE NAME: "BARECON 89"   PART I |
|---|---|

**2. Place and date**
24th June 2003

| 3. Owners/Place of business<br><br>Ocean Harmony Shipholding S.A.<br>c/o Keymax Maritime Co., Ltd.,<br>Toranomon 33 Mori Building,<br>3-8-21 Toranomon,<br>Minato-ku, Tokyo, Japan 105-0001 | 4. Bareboat charterers (Charterers)/Place of business<br><br>Harmony Shipping, Ltd., of Majuro, Republic of the Marshall Islands |
|---|---|

**5. Vessel's name, Call Sign and Flag (Cl. 9(c))**

M.V. "OCEAN HARMONY" Panama Flag
Call Sign 3FRX6

| 6. Type of Vessel<br>Bulk Carrier | 7. GRT/NRT<br>14,754/7,920 GT/NT |
|---|---|
| 8. When/Where built<br>1996; Salki Shipyard | 9. Total DWT (abt.) in metric tons on summer freeboard<br><br>23,524 MT |
| 10. Class (Cl. 9)<br>NK MS* (Bulk Carrier) MNS* | 11. Date of last special survey by the Vessel's classification society |

**12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 14)**

See Clause 29

| 13. Port or Place of delivery (Cl. 2)<br><br>Wherever the vessel is, at sea or in port, at the time of closing. | 14. Time for delivery (Cl. 3)<br>1st June 2003 | 15. Cancelling date (Cl. 4)<br>30th June 2003 |
|---|---|---|
| | 16. Port or Place of redelivery (Cl. 14)<br><br>Wherever the vessel is, at sea or in port, at the end of the Charter period. | |
| 17. Running days' notice if other than stated in Cl. 3<br><br>Owners to keep Charterers closely advised of vessel's movements prior to delivery | 18. Frequency of dry-docking if other than stated in Cl. 9(f)<br><br>See Clause 9. | |

**19. Trading Limits (Cl. 5)**
Consistent with the vessel's time-charter commitments and obligations; currently under time-charter to Inui Shipping.

| 20. Charter period<br><br>Coterminous with the Owners' mortgage loans including any extension or refinancing of such loans. | 21. Charter hire (Cl. 10)<br><br>In accordance with Clause 27 |
|---|---|
| 22. Rate of interest payable acc. to Cl. 10(f) and, if applicable, acc. to PART IV<br><br>None | 23. Currency and method of payment (Cl. 10)<br><br>See Clauses 27 and 28 |

(continue

(continued)                              "BARECON 89" Standard Bareboat Charter

| 24. Place of payment; also state beneficiary and bank account (Cl. 10)<br><br>See Clause 28 | 25. Bank guarantee/bond (sum and place) (Cl. 22) (optional)<br><br>None |
|---|---|
| 26. Mortgage(s), if any, (state whether Cl. 11(a) or (b) applies; if 11(b) applies state date of Deed(s) of Covenant and name of Mortgagee(s)/Place of business) (Cl. 11)<br><br>First Mortgage in favour of Sumitomo Mitsui Banking Corporation.<br>Clause 11 (b) applies. | 27. Insurance (marine and war risks) (state value acc. to Cl. 12(f) or, if applicable, acc. to Cl. 13(k)) (also state if Cl. 13 applies)<br><br>In accordance with the Management Agreement between Charterers and MK Ship Management Ltd., dated 24th June 2003. |
| 28. Additional insurance cover, if any, for Owners' account limited to (Cl. 12(b)) or, if applicable, (Cl. 13(g)) | 29. Additional insurance cover, if any, for Charterers' account limited to (Cl. 12(b)) or, if applicable, (Cl. 13(g))<br><br>N/A |
| 30. Latent defects (only to be filled in if period other than stated in Cl. 2)<br><br>See Clause 2 | 31. War cancellation (indicate countries agreed) (Cl. 24)<br><br>N/A |
| 32. Brokerage commission and to whom payable (Cl. 25) | |
| 33. Law and arbitration (state 26.1., 26.2., or 26.3. of Cl. 26 as agreed; if 26.3. agreed, also state place of arbitration) (Cl. 26)<br><br>English Law - Arbitration London | 34. Number of additional clauses covering special provisions, if agreed |
| 35. Newbuilding Vessel (indicate with "yes" or "no" whether Part III applies)    (optional) | 36. Name of place of Builders (only to be filled in if Part III applies) |
| 37. Vessel's Yard Building No. (only to be filled in if Part III applies) | 38. Date of Building Contract (only to be filled in if Part III applies) |
| 39. Hire/Purchase agreement (indicate with "yes" or "no" whether Part IV applies)    (optional)<br>No. | 40. Bareboat Charter Registry (indicate with "yes" or "no" whether Part V applies)    (optional)<br>No. |
| 41. Flag and Country of the Bareboat Charter Registry (only to be filled in if Part V applies) | 42. Country of the Underlying Registry (only to be filled in if Part V applies) |

PREAMBLE. - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and shall only form part of this Charter if expressly agreed and stated in Boxes 35, 39 and 40. If PART III and/or PART IV and/or PART V apply, it is further mutually agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners)<br><br>*K. Tsurunaga*<br>*Director* | Signature (Charterers)<br><br>EVRIPIDIS GRECIADIS<br>SECRETARY |
|---|---|

Printed by The BIMCO Charter Party Editor

148

## PART II
## "BARECON 89" Standard Bareboat Charter

**Definitions**
In this Charter, the following terms shall have the meanings hereby assigned
to them:
"The Owners" shall mean the person or company registered as Owners of the
Vessel.
"The Charterers" shall mean the Bareboat charterers and shall not be
construed to mean a time charterer or a voyage charterer.

**2. Delivery (not applicable to newbuilding vessels)**
The Vessel shall be delivered and taken over by the Charterers at the port or
place indicated in Box 13, ~~in such ready berth as the Charterers may direct~~.
The Owners shall before and at the time of delivery exercise due diligence to
make the Vessel seaworthy and in every respect ready in hull, machinery and
equipment for service under this Charter. The Vessel shall be properly
documented at time of delivery.
The delivery to the Charterers of the Vessel and the taking over of the Vessel
by the Charterers shall constitute a full performance by the Owners of all the
Owners' obligations under Clause 2, and thereafter the Charterers shall not
be entitled to make or assert any claim against the Owners on account of any
conditions, representations or warranties expressed or implied with respect
to the Vessel but the Owners shall be responsible for repairs or renewals
occasioned by latent defects in the Vessel, her machinery or appurtenances,
existing at the time of delivery under the Charter, provided such defects have
manifested themselves within 18 months after delivery unless otherwise
provided in Box 30.

**3. Time for Delivery (not applicable to newbuilding vessels)**
The Vessel to be delivered not before the date indicated in Box 14 unless with
the Charterers' consent.
Unless otherwise agreed in Box 17, the Owners to give the Charterers not less
than 30 running days' preliminary and not less than 14 days' definite notice of
the date on which the Vessel is expected to be ready for delivery.
The Owners to keep the Charterers closely advised of possible changes in the
Vessel's position.

**4. Cancelling (not applicable to newbuilding vessels)**
Should the Vessel not be delivered latest by the cancelling date indicated in
Box 15, the Charterers to have the option of cancelling this Charter without
prejudice to any claim the Charterers may otherwise have on the Owners
under the Charter.
If it appears that the Vessel will be delayed beyond the cancelling date, the
Owners shall, as soon as they are in a position to state with reasonable
certainty the day on which the Vessel should be ready, give notice thereof to
the Charterers asking whether they will exercise their option of cancelling,
and the option must then be declared within one hundred and sixty-eight
(168) hours of the receipt by the Charterers of such notice. If the Charterers
do not then exercise their option of cancelling, the seventh day after the
readiness date stated in the Owners' notice shall be regarded as a new
cancelling date for the purpose of this Clause.

**5. Trading Limits**
The Vessel shall be employed in lawful trades for the carriage of suitable
lawful merchandise within the trading limits indicated in Box 18.
The Charterers undertake not to employ the Vessel or suffer the Vessel to be
employed otherwise than in conformity with the terms of the instruments of
insurance (including any warranties expressed or implied therein) without
first obtaining the consent to such employment of the Insurers and complying
with such requirements as to extra premium or otherwise as the Insurers may
prescribe. If required, the Charterers shall keep the Owners and the
Mortgagees advised of the intended employment of the Vessel.
The Charterers also undertake not to employ the Vessel or suffer her
employment in any trade or business which is forbidden by the law of any flag
country to which the Vessel may sail or is otherwise illicit or in carrying illicit
or prohibited goods or in any manner whatsoever which may render her liable
to condemnation, destruction, seizure or confiscation.
Notwithstanding any other provisions contained in this Charter it is agreed
that nuclear fuels or radioactive products or waste are specifically excluded
from the cargo permitted to be loaded or carried under this Charter. This
exclusion does not apply to radio-isotopes used or intended to be used for
any industrial, commercial, agricultural, medical or scientific purposes
provided the Owners' prior approval has been obtained to loading thereof.

**6. Surveys (not applicable to newbuilding vessels)**
~~Survey on Delivery and Redelivery.~~ The Owners and Charterers shall each
~~appoint surveyors for the purpose of determining and agreeing in writing the~~
~~condition of the Vessel at the time of delivery and redelivery hereunder. The~~
~~Owners shall bear all expenses of the On-Survey including loss of time, if any,~~
~~and the Charterers shall bear all expenses of the Off-Survey including loss of~~
~~time, if any, at the rate of hire per day or pro rata, also including in each case~~
~~the cost of any docking and undocking, if required, in connection herewith.~~

**7. Inspection**
~~Inspection.~~ - The Owners shall have the right at any time to inspect or survey
the Vessel or instruct a duly authorised surveyor to carry out such survey on
their behalf to ascertain the condition of the Vessel and satisfy themselves
that the Vessel is being properly repaired and maintained. Inspection or
survey in dry-dock shall be made only when the Vessel shall be in dry-dock
for the Charterers' purpose. However, the Owners shall have the right to
require the Vessel to be dry-docked for inspection if the Charterers are not
docking but at normal classification intervals. The fees for such inspection or
survey shall in the event of the Vessel being found to be in the condition
provided in Clause 9 of this Charter be payable by the Owners and shall be
paid by the Charterers only in the event of the Vessel being found to require
repairs or maintenance in order to achieve the condition so provided. All time
taken in respect of inspection, survey or repairs shall count as time on hire
and shall form part of the Charter period.
The Charterers shall also permit the Owners to inspect the Vessel's log books
whenever requested and shall whenever required by the Owners furnish them
with full information regarding any casualties or other accidents or damage to
the Vessel. For the purpose of this Clause, the Charterers shall keep the
Owners advised of the intended employment of the Vessel.

**8.** ~~Inventories and Consumable Oil and Stores~~
~~A complete inventory of the Vessel's entire equipment, outfit, appliances and~~
~~of all consumable stores on board the Vessel shall be made by the Charterers~~
~~in conjunction with the Owners on delivery and again on redelivery of the~~
~~Vessel. The Charterers and the Owners, respectively, shall at the time of~~
~~delivery and redelivery take over and pay for all bunkers, lubricating oil, water~~
~~and unbroached provisions, paints, oils, ropes and other consumable stores~~
~~in the said Vessel at the then current market prices at the ports of delivery and~~
~~redelivery, respectively.~~

**9. Maintenance and Operation**
(a) The Vessel shall during the Charter period be in the full possession and at
the absolute disposal for all purposes of the Charterers and under their
complete control in every respect. The Charterers shall maintain the Vessel,
her machinery, boilers, appurtenances and spare parts in a good state of
repair, in efficient operating condition and in accordance with good
commercial maintenance practice and, except as provided for in Clause 13
(l), they shall keep the Vessel with unexpired classification of the class
indicated in Box 10 and with other required certificates in force at all times.
The Charterers to take immediate steps to have the necessary repairs done
within a reasonable time, ~~failing which the Owners shall have the right of~~
~~withdrawing the Vessel from the service of the Charterers without noting any~~
~~protest and without prejudice to any claim the Owners may otherwise have~~
~~against the Charterers under the Charter.~~
Unless otherwise agreed, in the event of any improvement, structural changes
or expensive new equipment becoming necessary for the continued
operation of the Vessel by reason of new class requirements or by
compulsory legislation costing more than 5 per cent of the Vessel's marine
insurance value as stated in Box 27, then to the extent, if any, to which the rate of
hire shall be varied and the ratio in which the cost of compliance shall be
shared between the parties concerned in order to achieve a reasonable
distribution thereof as between the Owners and the Charterers having regard,
inter alia, to the length of the period remaining under the Charter, shall in the
absence of agreement, be referred to arbitration according to Clause 26.
The Charterers are required to establish and maintain financial security or
responsibility in respect of oil or other pollution damage as required by any
government, including Federal, state or municipal or other division or
authority thereof, to enable the Vessel, without penalty or charge, lawfully to
enter, remain at, or leave any port, place, territorial or contiguous waters of
any country, state or municipality in performance of this Charter without any
delay. This obligation shall apply whether or not such requirements have
been lawfully imposed by such government or division or authority thereof.
The Charterers shall make and maintain all arrangements by bond or
otherwise as may be necessary to satisfy such requirements at the
Charterers' sole expense and the Charterers shall indemnify the Owners
against all consequences whatsoever (including loss of time) for any failure
or inability to do so.

~~TOVALOP SCHEME. (Applicable to all tank vessels only.)~~ ~~The Charterers~~

PART II

"BARECON 89" Standard Bareboat Charter

~~required to enter the Vessel under the TOVALOP SCHEME or under any~~ 143
~~similar compulsory scheme upon delivery under this Charter and to maintain~~ 144
~~her so during the currency of this Charter.~~ 145
(b) The Charterers shall at their own expense and by their own procurement 146
man, victual, navigate, operate, supply, fuel and repair the Vessel whenever 147
required during the Charter period and they shall pay all charges and 148
expenses of every kind and nature whatsoever incidental to their use and 149
operation of the Vessel under this Charter, including any foreign general 150
municipality and/or state taxes. The Master, officers and crew of the Vessel 151
shall be the servants of the Charterers for all purposes whatsoever, even if for 152
any reason appointed by the Owners. 153
Charterers shall comply with the regulations regarding officers and crew in 154
force in the country of the Vessel's flag or any other applicable law. 155
(c) During the currency of this Charter, the Vessel shall retain her present 156
name as indicated in Box 5 and shall remain under and fly the flag as 157
indicated in Box 5. Provided, however, that the Charterers shall have the 158
liberty to paint the Vessel in their own colours, install and display their funnel 159
insignia and fly their own house flag. Painting and re-painting, instatement and 160
re-instatement to be for the Charterers' account and time used thereby to 161
count as time on hire. 162
(d) The Charterers shall make no structural changes in the Vessel or changes 163
in the machinery, boilers, appurtenances or spare parts thereof without la 164
each instance first securing the Owners' approval thereof. If the Owners so 165
agree, the Charterers shall, if the Owners so require, restore the Vessel to its 166
former condition before the termination of the Charter. 167
(e) The Charterers shall have the use of all outfit, equipment, and appliances 168
on board the Vessel at the time of delivery, provided the same or their 169
substantial equivalent shall be returned to the Owners on redelivery in the 170
same good order and condition as when received, ordinary wear and tear 171
excepted. The Charterers shall from time to time during the Charter period 172
replace such items of equipment as shall be so damaged or worn as to be 173
unfit for use. The Charterers are to procure that all repairs to or replacement 174
of any damaged, worn or lost parts or equipment be effected in such manner 175
(both as regards workmanship and quality of materials) as not to diminish the 176
value of the Vessel. The Charterers have the right to fit additional equipment 177
at their expense and risk but the Charterers shall remove such equipment at 178
the end of the period if requested by the Owners. 179
Any equipment including radio equipment on hire on the Vessel at time of 180
delivery shall be kept and maintained by the Charterers and the Charterers 181
shall assume the obligations and liabilities of the Owners under any lease 182
contracts in connection therewith and shall reimburse the Owners for all 183
expenses incurred in connection therewith, also for any new equipment 184
required in order to comply with radio regulations. 185
(f) The Charterers shall dry-dock the Vessel and clean and paint her hull 186
underwater parts whenever the same may be necessary, but not less than 187
~~once~~ in every ~~eighteen~~ thirty calendar months after delivery unless otherwise 188
agreed in Box 18. 189

18. ~~Hire – amount and method of hire payment to be as per Schedule B~~ 190
(a) The Charterers shall pay to the Owners for the hire of the Vessel at the 191
~~lump-sum per calendar month rate stipulated in Schedule B as indicated in~~ 192
~~Box 21 commencing on and~~ 193
~~from the date and hour time of her delivery to the Charterers and at and after~~
~~the charter at the~~
~~agreed lump-sum rate for any part of a day month.~~ Hire to continue until the 194
~~time and~~
~~hour time when the Vessel is redelivered by the Charterers to her Owners.~~ 195
~~(b) Payment of Hire except for the first and last monthly Hire, if sub-clause (e)~~
~~of this Clause is applicable, shall be made in cash without discount every~~
~~month monthly in advance in US Dollars, on the first day of each month in~~ 198
~~the currency and in the~~
~~manner indicated in Box 21 and at the place mentioned in Box 24.~~ 199
~~(c) Payment of Hire for the first and last month's Hire if less than a full month~~ 200
~~shall be calculated proportionally according to the number of days in the~~ 201
~~particular calendar month and advance payment to be effected accordingly.~~ 202
~~(d) Should the Vessel be lost or missing, Hire to cease from the date and time~~ 203
~~when she was lost or last heard of. Any Hire paid in advance to be adjusted~~ 204
~~accordingly.~~ 205
(e) Time shall be of the essence in relation to payment of Hire hereunder. In 206
Default of payment beyond a period of seven running days after receipt by 207
Charterers of Owners' notice in writing, the Owners shall 208
have the right to withdraw the Vessel from the service of the Charterers 209
without acting any protest and without interference by any court or any other 210
formality whatsoever, and shall, without prejudice to any other claim the 211
Owners may otherwise have against the Charterers under the Charter, be 212
entitled to damages in respect of all costs and losses incurred as a result of

the Charterers' default and the ensuing withdrawal of the Vessel. 213
~~(i) Any delay in payment of Hire shall entitle the Owners to an interest at the~~ 214
~~rate per annum as agreed in Box 22. If Box 22 has not been filled in the current~~ 215
~~market rate in the country where the Owners have their Principal Place of~~ 216
~~Business shall apply.~~ 217

11. Mortgage 218
~~(a) Owners warrant that they have not effected any mortgage of the Vessel.~~ 219
~~(b)~~ The Vessel chartered under this Charter is financed by a mortgage 220
~~(stated in Schedule B herein.~~ 221
~~according to the Deed(s) of Covenant and to this Charter and as stated in~~
~~Box 28. By their counter-signature on the Deed(s) of Covenant, the~~ 222
Charterers undertake to have acquainted themselves with all terms, 223
~~conditions and provisions of the relevant said Deed(s) of Covenant. The~~ 224
Charterers
undertake that they will comply with all such instructions or directions in 225
regard to the employment, insurances, repairs and maintenance of the 226
Vessel, etc., as are laid down in the Deed(s) of Covenant or as may be 227
directed
from time to time during the currency of this Charter by the Mortgagee(s) in 228
conformity with the Deed(s) of Covenant. 229
(c) The Owners warrant that they have not effected any mortgage(s) other 230
than stated in Box 28 and that they will not effect any other mortgage(s) 231
without the prior consent of the Charterers. 232
~~*(Optional, Clauses 11(a) and 11(b) are alternatives; indicate alternative agreed~~ 233
~~in Box 28).~~ 234

12. Insurance and Repairs 235
(a) During the Charter period the Vessel shall be kept insured by the 236
Charterers at their expense against marine, war and Protection and Indemnity 237
risks in such form as the Owners shall in writing approve, which approval 238
shall not be unreasonably withheld. Such marine war and P. and I. 239
insurances shall be arranged by the Charterers to protect the interests of both 240
the Owners and the Charterers and mortgagees (if any), and the Charterers 241
shall be at liberty to protect under such insurances the interests of any 242
managers they may appoint. All insurance policies shall be in the joint names 243
of the Owners and the Charterers as their interests may appear. 244
If the Charterers fail to arrange and keep any of the insurances provided 245
for under the provisions of sub-clause (a) above in the manner described 246
therein, the Owners shall notify the Charterers whereupon the Charterers 247
~~shall rectify the position within seven running days, failing which Owners~~ 248
~~shall have the right to withdraw the Vessel from the service of the Charterers~~ 249
~~without prejudice to any claim the Owners may otherwise have against the~~ 250
~~Charterers.~~ 251
The Charterers shall, subject to the approval of the Owners and the 252
Underwriters, effect all insured repairs and shall undertake settlement of all 253
costs in connection with such repairs as well as insured charges, expenses 254
and liabilities (reimbursement to be secured by the Charterers from the 255
Underwriters) to the extent of coverage under the insurances herein provided 256
for. 257
The Charterers also to remain responsible for and to effect repairs and 258
settlement of costs and expenses incurred thereby in respect of all other 259
repairs not covered by the insurances and/or not exceeding any possible 260
franchise(s) or deductibles provided for in the insurances. 261
All time used for repairs under the provisions of sub-clause (a) of this Clause 262
and for repairs of latent defects according to Clause 2 above including any 263
deviation shall count as time on hire and shall form part of the Charter period. 264
(b) If the conditions of the above insurances permit additional insurances to be 265
placed by the parties, such cover shall be limited to the amount for each party 266
set out in Box 28 and Box 29, respectively. The Owners or the Charterers as 267
the case may be shall immediately furnish the other party with particulars of 268
any additional insurance effected, including copies of any cover notes or 269
policies and the written consent of the insurers of any such required 270
insurance in any case where the consent of such insurers is necessary. 271
(c) Should the Vessel become an actual, constructive, compromised or 272
agreed total loss under the insurances required under sub-clause (a) of 273
Clause 12, all insurance payments for such loss shall be paid to the Mort- 274
gagee, if any, in the manner described in the Deed(s) of Covenant, who shall 275
distribute the moneys between themselves, the Owners and the Charterers 276
according to their respective interests. The Charterers undertake to notify the 277
Owners and the Mortgagee, if any, of any occurrence in consequence of 278
which the Vessel is likely to become a Total Loss as defined in this Clause. 279
(d) If the Vessel becomes an actual, constructive, compromised or agreed 280
total loss under the insurances arranged by the Charterers in accordance 281
with sub-clause (a) of this Clause, this Charter shall terminate as of the date of 282
such loss. 283

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

## PART II
## "BARECON 89" Standard Bareboat Charter

(e) The Owners shall upon the request of the Charterers, promptly execute 284
such documents as may be required to enable the Charterers to abandon the 285
Vessel to insurers and claim a constructive total loss. 286

(f) For the purpose of insurance coverage against marine and war risks under 287
the provisions of sub-clause (a) of this Clause, the value of the Vessel is the 288
sum indicated in Box 27. 289

12. ~~Insurance, Repairs and Classification~~ 290
~~(Optional, only to apply if expressly agreed and stated in Box 27, in which event 291~~
~~Clause 13 shall be considered deleted).~~ 292
~~(a) During the Charter period the Vessel shall be kept insured by the Owners 293~~
~~at their expense against marine and war risks under the form of policy or 294~~
~~policies attached hereto. The Owners and/or insurers shall not have any right 295~~
~~of recovery or subrogation against the Charterers on account of loss of or any 296~~
~~damage to the Vessel or her machinery or appurtenances covered by such 297~~
~~insurance, or on account of payments made to discharge claims against or 298~~
~~liabilities of the Vessel or the Owners covered by such insurance. All 299~~
~~insurance policies shall be in the joint names of the Owners and the 300~~
~~Charterers as their interests may appear. 301~~
~~(b) During the Charter period the Vessel shall be kept insured by the 302~~
~~Charterers at their expense against Protection and Indemnity risks in such 303~~
~~form as the Owners shall in writing approve which approval shall not be 304~~
~~unreasonably withheld. If the Charterers fail to arrange and keep any of the 305~~
~~insurances provided for under the provisions of sub-clause (b) in the manner 306~~
~~described therein, the Owners shall notify the Charterers whereupon the 307~~
~~Charterers shall rectify the position within seven running days, failing which 308~~
~~the Owners shall have the right to withdraw the Vessel from the service of the 309~~
~~Charterers without prejudice to any claim the Owners may otherwise have 310~~
~~against the Charterers. 311~~
~~(c) In the event that any act or negligence of the Charterers shall vitiate any of 312~~
~~the insurance herein provided, the Charterers shall pay to the Owners all 313~~
~~losses and indemnify the Owners against all claims and demands which 314~~
~~would otherwise have been covered by such insurance. 315~~
~~(d) The Charterers shall, subject to the approval of the Owners or Owners' 316~~
~~Underwriters, effect all insured repairs, and the Charterers shall undertake 317~~
~~settlement of all miscellaneous expenses in connection with such repairs as 318~~
~~well as all insured charges, expenses and liabilities, to the extent of coverage 319~~
~~under the insurances provided for under the provisions of sub-clause (a) of 320~~
~~this Clause. The Charterers to be secured reimbursement through the 321~~
~~Owners' Underwriters for such expenditure upon presentation of accounts. 322~~
~~(e) The Charterers to remain responsible for and to effect repairs and 323~~
~~settlement of costs and expenses incurred thereby in respect of all other 324~~
~~repairs not covered by the insurances and/or not exceeding any claims 325~~
~~(franchise(s) or deductible provided for in the insurances. 326~~
~~(f) All time used for repairs under the provisions of sub-clause (d) and (e) of 327~~
~~this Clause and for repairs of latent defects according to Clause 2 above, 328~~
~~including any deviation, shall count as time on hire and shall form part of the 329~~
~~Charter period. 330~~
~~The Owners shall not be responsible for any expenses as are incident to the 331~~
~~use and operation of the Vessel for such time as may be required to make 332~~
~~such repairs. 333~~
~~(g) If the conditions of the above insurances permit additional insurance to be 334~~
~~placed by the parties such cover shall be limited to the amount for each party 335~~
~~set out in Box 28 and Box 29, respectively. The Owners or the Charterers as 336~~
~~the case may be shall immediately furnish the other party with particulars of 337~~
~~any additional insurance effected, including copies of any cover notes or 338~~
~~policies and the written consent of the insurers of any such required 339~~
~~insurance to any case where the consent of such insurers is necessary. 340~~
~~(h) Should the Vessel become an actual, constructive, compromised or 341~~
~~agreed total loss under the insurances required under sub-clause (a) of this 342~~
~~Clause all insurance payments for such loss shall be paid to the Owner, who 343~~
~~shall distribute the moneys between themselves and the Charterers 344~~
~~according to their respective interests. 345~~
~~(i) If the Vessel becomes an actual, constructive, compromised or agreed 346~~
~~total loss under the insurances arranged by the Charterers in accordance with 347~~
~~sub-clause (c) of this Clause, then Charter shall terminate as of the date of 348~~
~~such loss. 349~~
~~(j) The Charterers shall upon the request of the Owners, promptly execute 350~~
~~such documents as may be required to enable the Owners to abandon the 351~~
~~Vessel to insurers and claim a constructive total loss. 352~~
~~(k) For the purpose of insurance coverage against marine and war risks under 353~~
~~the provisions of sub-clause (a) of this Clause, the value of the Vessel is the 354~~
~~sum indicated in Box 27. 355~~
~~(l) Notwithstanding anything contained in Clause 9 (c), it is agreed that under 356~~
~~the provisions of Clause 13, if applicable, the Owners shall keep the Vessel 357~~
~~with unrepaired classification in force at all times during the Charter period. 358~~

14. ~~Redelivery~~ - see additional Clause 37 3
~~The Charterers shall at the expiration of the Charter period redeliver the~~ 3
~~Vessel at a safe and ice-free port or place as indicated in Box 15. The~~ 3
~~Charterers shall give the Owners not less than 30 running days' preliminary~~ 3
~~and not less than 14 days' definite notice of expected date, range or ports of~~ 3
~~redelivery or port or place of redelivery. Any changes thereafter in Vessel's~~ 3
~~position shall be notified immediately to the Owners.~~ 3
~~Should the Vessel be redelivered on a voyage by which the Charter period may~~ 3
~~be exceeded the Charterers to have the use of the Vessel to enable them to~~ 3
~~complete the voyage, provided it could be reasonably calculated that the~~ 3
~~voyage would allow redelivery about the time fixed for the termination of the~~ 3
~~Charter.~~ 3
~~The Vessel shall be redelivered to the Owners in the same or as good~~ 3
~~structure, state, condition and class as that in which she was delivered, fair~~ 3
~~wear and tear not affecting class excepted.~~ 3
~~The Vessel upon redelivery shall have her survey cycles up-to-date and class~~ 3
~~certificates valid for at least the number of months agreed in Box 42~~ 3

15. Non-Lien and Indemnity 3
The Charterers will not suffer, nor permit to be continued, any lien or 3
encumbrance incurred by them or their agents, which might have priority over 3
the title and interest of the Owners in the Vessel. 3
~~The Charterers further agree to fasten to the Vessel in a conspicuous place~~ 3
~~and to keep so fastened during the Charter period a notice reading as~~ 3
~~follows:~~ 3
~~"This Vessel is the property of (name of Owners). It is under charter to (name~~ 3
~~of Charterers) and by the name of the Charter Party neither the Charterers nor~~ 3
~~the Master have any right, power or authority to create, incur or permit to be~~ 3
~~imposed on the Vessel any lien whatsoever."~~ 3
The Charterers shall indemnify and hold the Owners harmless against any 3
lien of whatsoever nature arising upon the Vessel during the Charter period 3
while also in under her control of the Charterers, and against any claims 3
against the Owners arising out of or in relation to the operation of the Vessel 3
by the Charterers. Should the Vessel be arrested by reason of claims or liens 3
arising out of her operation hereunder by the Charterers, the Charterers shall 3
at their own expense take all reasonable steps to secure that within a 3
reasonable time the Vessel is released and at their own expense put up bail to 3
secure release of the Vessel. 3

16. Lien 3
The Owners to have a lien upon all cargoes and sub-freights belonging to the 3
Charterers and any Bill of Lading freight for all claims under this Charter, and 3
the Charterers to have a lien on the Vessel for all moneys paid in advance and 3
not earned, _any loss or damage caused by Owners' breach or default_ 4
_under this Charter._ 4

17. Salvage 4
All salvage and towage performed by the Vessel shall be for the Charterers' 4
benefit and the cost of repairing damage occasioned thereby shall be borne 4
by the Charterers. 4

18. Wreck Removal 4
In the event of the Vessel becoming a wreck or obstruction to navigation the 4
Charterers shall indemnify the Owners against any sums whatsoever which 4
the Owners shall become liable to pay and shall pay in consequence of the 4
Vessel becoming a wreck or obstruction to navigation. 4

19. General Average 4
General Average, if any, shall be adjusted according to the York-Antwerp 4
Rules 1974 or any subsequent modification thereof current at the time of the 4
casualty. 4
The Charter Hire not to contribute to General Average. 4

20. Assignment and Sub-Demise 4
The Charterers shall not assign this Charter nor sub-demise the Vessel 4
except with the prior consent in writing of the Owners which shall not be 4
unreasonably withheld and subject to such terms and conditions as the 4
Owners shall approve. 4

21. Bills of Lading 4
The Charterers are to procure that all Bills of Lading issued for carriage of 4
goods under this Charter shall contain a Paramount Clause incorporating any 4
legislation relating to Carrier's liability for cargo compulsorily applicable in 4
the trade; if no such legislation exists, the Bills of Lading shall incorporate the 4
British Carriage of Goods by Sea Act. The Bills of Lading shall also contain the 4

This statutory generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modifications being made to the preprinted text of this document, which at not clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

## PART II
## "BARECON 89" Standard Bareboat Charter

amended New Jason Clause and the Both-to-Blame Collision Clause.  426
The Charterers agree to indemnify the Owners against all consequences or  427
liabilities arising from the Master, officers or agents signing Bills of Lading or  428
other documents.  429

### 22. Bank Guarantee  430
~~The Charterers undertake to furnish, before delivery of the Vessel, a first class~~  431
~~bank guarantee or bond in the sum and at the place as indicated in Box 25 as~~  432
~~guarantee for full performance of their obligations under this Charter.~~  433
~~(Optional, only to apply if Box 25 filled in).~~  434

### 23. Requisition/Acquisition  435
(a) In the event of the Requisition for Hire of the Vessel by any governmental or  436
other competent authority (hereinafter referred to as "Requisition for Hire")  437
irrespective of the date during the Charter period when "Requisition for Hire"  438
may occur and irrespective of the length thereof and whether or not it be for  439
an indefinite or a limited period of time, and irrespective of whether it may or  440
will remain in force for the remainder of the Charter period, this Charter shall  441
not be deemed thereby or thereupon to be frustrated or otherwise terminated  442
and the Charterers shall continue to pay the stipulated hire in the manner  443
provided by this Charter until the time when the Charter would have  444
terminated pursuant to any of the provisions hereof always provided however  445
that in the event of "Requisition for Hire" any Requisition Hire or  446
compensation received or receivable by the Owners shall be payable to the  447
Charterers during the remainder of the Charter period or the period of the  448
"Requisition for Hire" whichever be the shorter.  449
The Hire under this Charter shall be payable to the Owners from the same time  450
as the Requisition Hire is payable to the Charterers.  451
(b) In the event of the Owners being deprived of their ownership in the Vessel  452
by any Compulsory Acquisition of the Vessel or requisition for title by any  453
governmental or other competent authority (hereinafter referred to as  454
"Compulsory Acquisition"), then, irrespective of the date during the Charter  455
period when "Compulsory Acquisition" may occur, this Charter shall be  456
deemed terminated as of the date of such "Compulsory Acquisition". In such  457
event Charter Hire to be considered as earned and to be paid up to the date  458
and time of such "Compulsory Acquisition".  459

### 24. War  460
(a) The Vessel unless the consent of the Owners be first obtained not to be  461
ordered nor continue to any place or on any voyage nor be used on any  462
service which will bring her within a zone which is dangerous as the result of  463
any actual or threatened act of war, war, hostilities, warlike operations, acts of  464
piracy or of hostility or malicious damage against this or any other vessel or  465
its cargo by any person, body or State whatsoever, revolution, civil war, civil  466
commotion or the operation of international law, nor be exposed in any way to  467
any risks or penalties whatsoever consequent upon the imposition of  468
Sanctions, nor carry any goods that may in any way expose her to any risks of  469
seizure, capture, penalties or any other interference of any kind whatsoever  470
by the belligerent or fighting powers or parties or by any Government or Ruler.  471
(b) The Vessel to have liberty to comply with any orders or directions as to  472
departure, arrival, routes, ports of call, stoppages, destination, delivery or in  473
any other way whatsoever given by the Government of the nation under  474
whose flag the Vessel sails or any other Government or any person (or body)  475
acting or purporting to act with the authority of such Government or by any  476
committee or person having under the terms of the war risks insurance on the  477
Vessel the right to give any such orders or directions.  478
~~(c) In the event of outbreak of war (whether there be a declaration of war or~~  479
~~not) between any two or more of the countries as stated in Box 31, both the~~  480
~~Owners and the Charterers shall have the right to cancel this Charter, and~~  481
~~whereupon the Charterers shall redeliver the Vessel to the Owners in~~  482
~~accordance with Clause 14. If she has cargo on board after discharge thereof~~  483
~~at destination, or if debarred under this Clause from reaching or entering it at~~  484
~~a near open and safe port as directed by the Owners, or if she has no cargo on~~  485
~~board, at the port at which she then is or if at sea at a near open and safe port~~  486
~~as directed by the Owners. In all cases hire shall continue to be paid in~~  487
~~accordance with clause 10 and except as aforesaid all other provisions of this~~  488
~~Charter shall apply until redelivery.~~  489

### 25. Commission  490
~~The Owners to pay a commission at the rate indicated in Box 32 to the Brokers~~  491
~~named in Box 32 on any Hire paid under this Charter but in no case less than is~~  492
~~necessary to cover the actual expenses of the Brokers and a reasonable fee~~  493
~~for their work. If the full Hire is not paid owing to breach of Charter by either of~~  494
~~the parties the party liable therefor to indemnify the Brokers against their loss~~  495
~~of commission.~~  496
~~Should the parties agree to cancel the Charter, the Owners to indemnify the~~  497

~~Brokers against any loss of commission but in such case the commission not~~  498
~~to exceed the brokerage on one year's hire.~~  499

### 26. Law and Arbitration  500
*) 26.1. This Charter shall be governed by English law and any dispute arising  501
out of this Charter shall be referred to arbitration in London, one arbitrator  502
being appointed by each party, in accordance with the Arbitration Acts 1950  503
and 1979 or any statutory modification or re-enactment thereof for the time  504
being in force. On the receipt by one party of the nomination in writing of the  505
other party's arbitrator, that party shall appoint their arbitrator within fourteen  506
days, failing which the decision of the single Arbitrator appointed shall apply.  507
If two Arbitrators properly appointed shall not agree they shall appoint an  508
umpire whose decision shall be final.  509
*) ~~26.2. Should any dispute arise out of this Charter, the matter in dispute shall~~  510
~~be referred to three persons at New York, one to be appointed by each of the~~  511
~~parties hereto, and the third by the two so chosen; their decision or that of any~~  512
~~two of them shall be final, and for purpose of enforcing any award, this~~  513
~~agreement may be made a rule of the Court.~~  514
~~The arbitrators shall be members of the Society of Maritime Arbitrators, Inc. of~~  515
~~New York and the proceedings shall be conducted in accordance with the~~  516
~~rules of the Society.~~  517
*) ~~26.3. Any dispute arising out of this Charter shall be referred to arbitration at~~  518
~~the place indicated in Box 33, subject to the law and procedure applicable~~  519
~~there.~~  520
~~26.4. If Box 33 in Part I is not filled in, sub-clause 26.1. of this Clause shall~~  521
~~apply.~~  522
*) ~~26.1., 26.2. and 26.3. are alternatives; indicate alternative agreed in Box 33.~~  523

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

## Bareboat Charter Party for M.V. "Ocean Harmony" dated 24th June 2003

### Additional Clauses

27. Further to Part I Box 21 and Part II Clause 10, the Charterers will pay charter hire to the Owners equivalent to the Owners' payments to their financers under the following Loan Agreement, for the current period of the Loan and as it may be further extended beyond the current loan period:

| | | |
|---|---|---|
| Borrower | - | Ocean Harmony Shipholding SA |
| Lender | - | Sumitomo Mitsui Banking Corp. |
| Original Term | - | 10 years |
| Balance Term | - | to August 2006 |
| Original Loan | - | JPY 1,970,000,000 |
| Balance Loan | - | JPY 1,201,700,000 |
| Interest Rate | - | 4.315% fixed |
| Monthly Principal | - | JPY 9,850,000 |
| Balloon Payment | - | JPY 847,000,000 |

28. Owners will send to Charterers latest by the 25th day of each month a summary of payments to be made relating to the Vessel, i.e. operating expenses, time-charter hire and loan repayments based on the above loans, and, latest by the 30th day of the same month, Charterers will remit to Owners the balance in their favour

29. Vessel's description
With reference to Part I Boxes 5 and 12, the vessel is further described as follows:

| | |
|---|---|
| Port of Registry | : Panama |
| Official No. | : 24380-97-A |
| LOA/Beam/Depth | : 154.35/26.00/13.35 m |
| Summer Draft | : 9.518m |
| Grain/Bale Capacity | : 1,089,368/1,062,766 cu ft. |
| Holds/Hatches | : 4/4 |
| Cargo gear | : 4/30t cranes |
| Main Engine | : 6UEC45LA |
| Speed/consumption | : 13 kt on 20 mt IFO + 1.2 mt MDO |

All figures 'about'

30. On expiration of this charter, together with payment of the last month's hire instalment, the Charterers will pay to the Owners the Balloon Amounts referred to in Clause 27 above and any other amounts outstanding and due to the Owners, and assume ownership of the Vessel. Delivery for sale of the Vessel will take place under the terms of a Memorandum of Agreement of even date, a copy of which is attached to this Charter, and in which the Owners are referred to as the Sellers and the Charterers as the Buyers.

## Bareboat Charter Party for M.V. "Ocean Harmony" dated 24th June 2003

### Additional Clauses

31. The Owners, their parent company, Keymax Maritime Co., Ltd., Tokyo, Japan ("Keymax"), the Charterers and their parent company, East West Maritime Investment Ltd., of Majuro, Republic of the Marshall Islands, in their relative capacities under this Charter party, agree (a) that the Existing Time-Charter to which the vessel is subject (the "Existing Charter") shall be assumed by the Charterers and (b) that the Owners, the Charterers, Keymax and EWMI shall not do any act, deed or omission that may result in prejudice or danger to the validity or continuing effect of the Existing Charter, under its own terms.

| | |
|---|---|
| 1. Shipbroker<br><br>**Second  Original** | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL (BIMCO)<br>STANDARD BAREBOAT CHARTER<br>CODE NAME: "BARECON 89"    PART I |
| | 2. Place and date<br>24th June 2003 |
| 3. Owners/Place of business<br><br>*Navigation*<br>Ocean Phoenix Shipholding S.A. *(signature)*<br>c/o Keymax Maritime Co., Ltd.,<br>Toranomon 33 Mori Building,<br>3-8-21 Toranomon,<br>Minato-ku, Tokyo, Japan 105-0001 | 4. Bareboat charterers (Charterers)/Place of business<br><br>Ocean Phoenix Shipping Ltd., of Majuro, Republic of the Marshall Islands |
| 5. Vessel's name, Call Sign and Flag (Cl. 9(c))<br><br>M.V. "OCEAN PHOENIX" Panama Flag<br>Call Sign 3FME5 | |
| 6. Type of Vessel<br>Bulk Carrier | 7. GRT/NRT<br>15,737/8,039 GT/NT |
| 8. When/Where built<br><br>1995; Shin Kurushima Dockyard | 9. Total DWT (abt.) in metric tons on summer freeboard<br><br>24,318 MT |
| 10. Class (Cl. 9)<br>NK MS* (Bulk Carrier) MNS* | 11. Date of last special survey by the Vessel's classification society |
| 12. Further particulars of Vessel (also indicate minimum number of months' validity of class certificates agreed acc. to Cl. 14)<br><br>See Clause 29 | |
| 13. Port or Place of delivery (Cl. 2)<br><br>Wherever the vessel is, at sea or in port, at the time of closing. | 14. Time for delivery (Cl. 3)<br>1st June 2003 |
| | 15. Cancelling date (Cl. 4)<br>30th June 2003 |
| | 16. Port or Place of redelivery (Cl. 14)<br><br>Wherever the vessel is, at sea or in port, at the end of the Charter period. |
| 17. Running days' notice if other than stated in Cl. 3<br><br>Owners to keep Charterers closely advised of vessel's movements prior to delivery | 18. Frequency of dry-docking  if other than stated in Cl. 9(f)<br><br>See Clause 9. |
| 19. Trading Limits (Cl. 5)<br><br>Consistent with the vessel's time-charter commitments and obligations; currently under time-charter to Nippon Yusen Kaisha. | |
| 20. Charter period<br><br>Coterminous with the Owners' mortgage loans including any extension or refinancing of such loans. | 21. Charter hire (Cl. 10)<br><br>In accordance with Clause 27 |
| 22. Rate of interest payable acc. to Cl. 10(f) and, if applicable, acc. to PART IV<br><br>None | 23. Currency and method of payment (Cl. 10)<br><br>See Clauses 27 and 28 |

*(continued)*

First issued by
The Baltic and International Maritime Council (BIMCO), Copenhagen
in 1974 as "Barecon 'A'" and "Barecon 'B'"
Revised and amalgamated 1989

Adopted by
the Documentary Committee of The
Japan Shipping Exchange, Inc., Tokyo

Copyright, published by
The Baltic and International Maritime Council
(BIMCO), Copenhagen, September 1989

Printed by The BIMCO Charter Party Editor

**155**

(continued)    "BARECON 89" Standard Bareboat Charter    PART I

| 24. Place of payment; also state beneficiary and bank account (Cl. 10)<br><br>See Clause 28 | 25. Bank guarantee/bond (sum and place) (Cl. 22) (optional)<br><br>None |
| --- | --- |
| 26. Mortgage(s), if any, (state whether Cl. 11(a) or (b) applies; if 11(b) applies state date of Deed(s) of Covenant and name of Mortgagee(s)Place of business) (Cl. 11)<br><br>First Mortgage in favour of Sumitomo Mitsui Banking Corporation. Clause 11 (b) applies. | 27. Insurance (marine and war risks) (state value acc. to Cl. 12(f) or, if applicable, acc. to Cl. 13(k)) (also state if Cl. 13 applies)<br><br>In accordance with the Management Agreement between Charterers and MK Ship Management Ltd., dated 24th June 2003. |
| 28. Additional insurance cover, if any, for Owners' account limited to (Cl. 12(b)) or, if applicable, (Cl. 13(g)) | 29. Additional insurance cover, if any, for Charterers' account limited to (Cl. 12(b)) or, if applicable, (Cl. 13(g))<br><br>N/A |
| 30. Latent defects (only to be filed in if period other than stated in Cl. 2)<br><br>See Clause 2 | 31. War cancellation (indicate countries agreed) (Cl. 24)<br><br>N/A |
| 32. Brokerage commission and to whom payable (Cl. 25) | |
| 33. Law and arbitration (state 26.1., 26.2., or 26.3. of Cl. 26 as agreed; if 26.3. agreed, also state place of arbitration) (Cl. 26)<br><br>English Law - Arbitration London | 34. Number of additional clauses covering special provisions, if agreed |
| 35. Newbuilding Vessel (indicate with "yes" or "no" whether Part III applies)    (optional) | 36. Name of place of Builders (only to be filed in if Part III applies) |
| 37. Vessel's Yard Building No. (only to be filled in if Part III applies) | 38. Date of Building Contract (only to be filled in if Part III applies) |
| 39. Hire/Purchase agreement (indicate with "yes" or "no" whether Part IV applies)    (optional)<br><br>No. | 40. Bareboat Charter Registry (indicate with "yes" or "no" whether Part V applies)    (optional)<br><br>No. |
| 41. Flag and Country of the Bareboat Charter Registry (only to be filled in if Part V applies) | 42. Country of the Underlying Registry (only to be filled in if Part V applies) |

PREAMBLE. - It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I and PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict but no further. It is further mutually agreed that PART III and/or PART IV and/or PART V shall only apply and shall only form part of this Charter if expressly agreed and stated in Boxes 35, 39 and 40. If PART III and/or PART IV and/or PART V apply, it is further mutually agreed that in the event of a conflict of conditions, the provisions of PART I and PART II shall prevail over those of PART III and/or PART IV and/or PART V to the extent of such conflict but no further.

| Signature (Owners)<br><br>*K. Tsurunaga*<br>*Director* | Signature (Charterers)<br><br>*Charalambos Ziogas*<br>*President* |
| --- | --- |

Printed by The BIMCO Charter Party Editor

## PART II
## "BARECON 89" Standard Bareboat Charter

1. Definitions
In this Charter, the following terms shall have the meanings hereby assigned
to them.
"The Owners" shall mean the person or company registered as Owners of the
Vessel.
"The Charterers" shall mean the Bareboat charterers and shall not be
construed to mean a time charterer or a voyage charterer.

2. Delivery (not applicable to newbuilding vessels)
The Vessel shall be delivered and taken over by the Charterers at the port or
place indicated in Box 13, in such ready berth as the Charterers may direct.
The Owners shall before and at the time of delivery exercise due diligence to
make the Vessel seaworthy and in every respect ready to hull, machinery and
equipment for service under this Charter. The Vessel shall be properly
documented at time of delivery.
The delivery to the Charterers of the Vessel and the taking over of the Vessel
by the Charterers shall constitute a full performance by the Owners of all the
Owners' obligations under Clause 2, and thereafter the Charterers shall not
be entitled to make or assert any claim against the Owners on account of any
conditions, representations or warranties expressed or implied with respect
to the Vessel but the Owners shall be responsible for repairs or renewals
occasioned by latent defects in the Vessel, her machinery or appurtenances,
existing at the time of delivery under the Charter, provided such defects have
manifested themselves within 18 months after delivery unless otherwise
provided in Box 30.

3. Time for Delivery (not applicable to newbuilding vessels)
The Vessel to be delivered not before the date indicated in Box 14 unless with
the Charterers' consent.
Unless otherwise agreed in Box 17, the Owners to give the Charterers not less
than 30 running days' preliminary and not less than 14 days' definite notice of
the date on which the Vessel is expected to be ready for delivery.
The Owners to keep the Charterers closely advised of possible changes in the
Vessel's position.

4. Cancelling (not applicable to newbuilding vessels)
Should the Vessel not be delivered latest by the cancelling date indicated in
Box 15, the Charterers to have the option of cancelling this Charter without
prejudice to any claim the Charterers may otherwise have on the Owners
under the Charter.
If it appears that the Vessel will be delayed beyond the cancelling date, the
Owners shall, as soon as they are in a position to state with reasonable
certainty the day on which the Vessel should be ready, give notice thereof to
the Charterers asking whether they will exercise their option of cancelling,
and the option must then be declared within one hundred and sixty-eight
(168) hours of the receipt by the Charterers of such notice. If the Charterers
do not then exercise their option of cancelling, the seventh day after the
readiness date stated in the Owners' notice shall be regarded as a new
cancelling date for the purpose of this Clause.

5. Trading Limits
The Vessel shall be employed in lawful trades for the carriage of suitable
lawful merchandise within the trading limits indicated in Box 19.
The Charterers undertake not to employ the Vessel or suffer the Vessel to be
employed otherwise than in conformity with the terms of the instruments of
insurance (including any warranties expressed or implied therein) without
first obtaining the consent to such employment of the Insurers and complying
with such requirements as to extra premium or otherwise as the Insurers may
prescribe. If required, the Charterers shall keep the Owners and the
Mortgagees advised of the intended employment of the Vessel.
The Charterers also undertake not to employ the Vessel or suffer her
employment in any trade or business which is forbidden by the law of any
country to which the Vessel may sail or is otherwise illicit or in carrying illicit
or prohibited goods or in any manner whatsoever which may render her liable
to condemnation, destruction, seizure or confiscation.
Notwithstanding any other provisions contained in this Charter it is agreed
that nuclear fuels or radioactive products or waste are specifically excluded
from the cargo permitted to be loaded or carried under this Charter. This
exclusion does not apply to radio-isotopes used or intended to be used for
any industrial, commercial, agricultural, medical or scientific purposes
provided the Owners' prior approval has been obtained to loading thereof.

6. Surveys (not applicable to newbuilding vessels)
Surveys on Delivery and Redelivery - The Owners and Charterers shall each
appoint surveyors for the purpose of determining and agreeing in writing the
condition of the Vessel at the time of delivery and redelivery hereunder. The
Owners shall bear all expenses of the On-Survey including loss of time, if any.
and the Charterers shall bear all expenses of the Off-Survey including loss of
time, if any at the rate of hire per day or pro rata, also including in each case
the cost of any docking and undocking, if coccasioned thereat.

7. Inspection
Inspection - The Owners shall have the right at any time to inspect or survey
the Vessel or instruct a duly authorised surveyor to carry out such survey on
their behalf to ascertain the condition of the Vessel and satisfy themselves
that the Vessel is being properly repaired and maintained. Inspection or
survey in dry-dock shall be made only when the Vessel shall be in dry-dock
for the Charterers' purpose. However, the Owners shall have the right to
require the Vessel to be dry-docked for inspection if the Charterers are not
docking her at normal classification intervals. The fees for such inspection or
survey shall in the event of the Vessel being found to be in the condition
provided in Clause 9 of this Charter be payable by the Owners and shall be
paid by the Charterers only if repairs or maintenance in order to achieve the
repairs or maintenance in order to achieve the condition so provided. All time
taken in respect of inspection, survey or repairs shall count as time on hire
and shall form part of the Charter period.
The Charterers shall also permit the Owners to inspect the Vessel's log books
whenever requested and shall whenever required by the Owners furnish them
with full information regarding any casualties or other accidents or damage to
the Vessel. For the purpose of this Clause, the Charterers shall keep the
Owners advised of the intended employment of the Vessel.

8. Inventories and Consumable Oil and Stores
A complete inventory of the Vessel's entire equipment, outfit, appliances and
of all consumable stores on board the Vessel shall be made by the Charterers
in conjunction with the Owners on delivery and again on redelivery of the
Vessel. The Charterers and the Owners, respectively, shall at the time of
delivery and redelivery take over and pay for all bunkers, lubricating oil, unused
and unbroached provisions, paints, oils, ropes and other consumable stores
in the said Vessel at the then current market prices at the ports of delivery and
redelivery, respectively.

9. Maintenance and Operation
(a) The Vessel shall during the Charter period be in the full possession and at the
absolute disposal for all purposes of the Charterers and under their full
complete control in every respect. The Charterers shall maintain the Vessel,
her machinery, boilers, appurtenances and spare parts in a good state of
repair, in efficient operating condition and in accordance with good
commercial maintenance practice and, except as provided for in Clause 13
(i), they shall keep the Vessel with unexpired classification of the class
indicated in Box 10 and with other required certificates in force at all times. The
The Charterers to take immediate steps to have the necessary repairs done
within a reasonable time, failing which the Owners shall have the right of
withdrawing the Vessel from the service of the Charterers without noting any
protest and without prejudice to any claim the Owners may otherwise have
against the Charterers under the Charter.
Unless otherwise agreed, in the event of any improvement, structural changes
or expensive new equipment becoming necessary for the continued
operation of the Vessel by reason of new class requirements or by
compulsory legislation costing more than 5 per cent. of the Vessel's marine
insurance value as stated in Box 27, then the extent, if any, to which the rate of
hire shall be varied and the ratio in which the cost of compliance shall be
shared between the parties concerned in order to achieve a reasonable
distribution thereof as between the Owners and the Charterers having regard
inter alia, to the length of the period remaining under the Charter, shall in the
absence of agreement, be referred to arbitration according to Clause 26.
The Charterers are required to establish and maintain financial security or
responsibility in respect of oil or other pollution damage as required by any
government, including Federal, state or municipal or other division or
authority thereof, to enable the Vessel, without penalty or charge, lawfully to
enter, remain at, or leave any port, place, territorial or contiguous waters of
any country, state or municipality in performance of this Charter without any
delay. This obligation shall apply whether or not such requirements have
been lawfully imposed by such government or division or authority thereof.
The Charterers shall make and maintain all arrangements by bond or
otherwise as may be necessary to satisfy such requirements at the
Charterers' sole expense and the Charterers shall indemnify the Owners
against all consequences whatsoever (including loss of time) for any failure
or inability to do so.
(TOVALOP SCHEME (Applicable to all tank vessels only). The Charterers are

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible, in event of any modifications being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss of damage caused as a result of discrepancies between the original BIMCO document and this document.

## PART II

## "BARECON 89" Standard Bareboat Charter

required to enter the Vessel under the TOWAGE SCHEME or under any 143
similar compulsory scheme upon delivery under this Charter and to re-assign 144
her-on during the currency of the Charter.

(b) The Charterers shall at their own expense and by their own procurement 145
man, victual, navigate, operate, supply, fuel and repair the Vessel whenever 147
required during the Charter period and they shall pay all charges and 148
expenses of every kind and nature whatsoever incidental to their use and 149
operation of the Vessel under this Charter, including any foreign general 150
municipality and/or state taxes. The Master, officers and crew of the Vessel 151
shall be the servants of the Charterers for all purposes whatsoever, even if for 152
any reason appointed by the Owners. 153
Charterers shall comply with the regulations regarding officers and crew in 154
force in the country of the Vessel's flag or any other applicable laws. 155
(c) During the currency of this Charter, the Vessel retain her present 155
name as indicated in Box 5 and shall remain under and fly the flag as 157
indicated in Box 5. Provided, however, that the Charterers shall have the 158
liberty to paint the Vessel in their own colours, install and display their funnel 159
insignia and fly their own house flag. Painting and re-painting, instalment and 160
re-instalment to be for the Charterers' account and time used thereby to 161
count as time on hire. 162
(d) The Charterers shall make no structural changes in the Vessel or changes 163
in the machinery, boilers, appurtenances or spare parts thereof without, in 164
each instance, first securing the Owners' approval thereof. If the Owners so 165
agree, the Charterers shall, if the Owners so require, restore the Vessel to its 166
former condition before the termination of the Charter. 167
(e) The Charterers shall have the use of all outfit, equipment, and appliances 168
on board the Vessel at the time of delivery, provided the same or their 169
substantial equivalent shall be returned to the Owners on redelivery in the 170
same good order and condition as when received, ordinary wear and tear 172
excepted. The Charterers shall from time to time during the Charter period 172
replace such items of equipment as shall be so damaged or worn as to be 173
unfit for use. The Charterers are to procure that all repairs to or replacement 174
of any damaged, worn or lost parts or equipment be effected in such manner 175
(both as regards workmanship and quality of materials) as not to diminish the 176
value of the Vessel. The Charterers have the right to fit additional equipment 177
at their expense and risk but the Charterers shall remove such equipment at 178
the end of the period if requested by the Owners. 179
Any equipment including radio equipment on hire on the Vessel at time of 180
delivery shall be kept and maintained by the Charterers and the Charterers 181
shall assume the obligations and liabilities of the Owners under any lease 182
contracts in connection therewith and shall reimburse the Owners for all 183
expenses incurred in connection therewith, also for any new equipment 184
required in order to comply with radio regulations. 185
(f) The Charterers shall dry-dock the Vessel and clean and paint her intra 186
underwater parts whenever the same may be necessary, but not less than 187
once in every eighteen thirty calendar months after delivery unless otherwise 188
agreed in Box 18. 189

12. Hire — amount and method of hire payment to be as per Schedule B 190
(a) The Charterers shall pay to the Owners for the hire of the Vessel at the 151
lump-sum-per-calendar-month rate stipulated in Schedule B-as-indicated-in- 192
Box 21 commencing on and 193
from the date and time of delivery to the Charterers and at and after 193
the thereafter at the 193
agreed lump-sum rate for any part of a day month. Hire to continue until the 194
time and 194
hour firm when the Vessel is redelivered by the Charterers to her Owners. 195
(b) Payment of Hire except for the first and last months Hire, if any clause (c) 196
of this Clause is applicable, shall be made in cash without discount every 197
month monthly in advance in US Dollars on the first day of each month in 198
the currency and to the 198
manner indicated in Box 22 and at the place mentioned in Box 21. 199
(c) Payment of Hire for the first and last month's Hire if less than a full month 200
shall be calculated proportionally according to the number of days in the 201
particular calendar month and advance payment to be effected accordingly. 202
(d) Should the Vessel be lost or missing, Hire to cease from the date and time 203
when the was lost or last heard of. Any Hire paid in advance to be adjusted 204
accordingly. 205
(e) Time shall be of the essence in relation to payment of Hire hereunder. In 206
default of payment beyond a period of seven running days after monies by 207
Charterers of Owners' notice in writing, the Owners shall 208
have the right to withdraw the Vessel from the service of the Charterers 209
without noting any protest and without interference by any court or any other 210
formality whatsoever, and shall without prejudice to any other claim the 211
Owners may otherwise have against the Charterers under the Charter, be 211
entitled to damages in respect of all costs and losses incurred as a result of 212

the Charterers' default and the ensuing withdrawal of the Vessel. 213
(f) Any delay in payment of Hire shall entitle the Owners to an interest at the 214
rate per annum as stipulated in Box 22. If this has not been filled in the current 215
market rate in the country where the Owners have their Principal Place of 216
Business shall apply. 217

11. Mortgage 218
(a) Owners warrant that they have not effected any mortgage of the Vessel. 219
(b) The Vessel chartered under this Charter is financed by a mortgage 220
according to the Deed(s) of Covenant as annexed to this Charter and as stated in 221
Box 28. By their counter-signature on the Deed(s) of Covenant, the 222
Charterers undertake to have acquainted themselves with the terms, 223
conditions and provisions of the relevant part Deed(s) of Covenant. The 224
Charterers 224
undertake that they will comply with all such instructions or directions in 225
regard to the employment, insurances, repairs and maintenance of the 226
Vessel, etc., as are laid down in the Deed(s) of Covenant or as may be 227
directed 227
from time to time during the currency of the Charter by the Mortgagee(s) in 228
conformity with the Deed(s) of Covenant. 229
(c) The Owners warrant that they have not effected any mortgage(s) other 230
than stated in Box 28 and that they will not effect any other mortgage(s) 231
without the prior consent of the Charterers. 232
(Optional, Clauses 11(a) and 11(b) are alternatives; indicate alternative agreed 233
in Box 28). 234

12. Insurance and Repairs 235
(a) During the Charter period the Vessel shall be kept insured by the 236
Charterers at their expense against marine, war and Protection and Indemnity 237
risks in such form as the Owners shall in writing approve, which approval 238
shall not be unreasonably withheld. Such insurance year and P. and I. 239
insurances shall be arranged by the Charterers to protect the interests of both 240
the Owners and the Charterers and mortgagees (if any) and the Charterers 241
shall be at liberty to protect under such insurances the interests of any 242
managers they may appoint. All insurance policies shall be in the joint names 243
of the Owners and the Charterers as their interests may appear. 244
If the Charterers fail to arrange and keep any of the insurances provided 245
for under the provisions of sub-clause (a) above in the manner described 246
therein, the Owners shall notify the Charterers whereupon the Charterers 247
shall rectify the position within seven running days, failing which Owners 248
shall have the right to withdraw the Vessel from the service of the Charterers 249
without prejudice to any claim the Owners may otherwise have against the 250
Charterers. 251
The Charterers shall, subject to the approval of the Owners and the 252
Underwriters, effect all insured repairs and shall undertake settlement of all 253
costs in connection with such repairs as well as insured charges, expenses 254
and liabilities (reimbursement to be secured by the Charterers from the 255
Underwriters) to the extent of coverage under the insurances herein provided 256
for. 257
The Charterers also to remain responsible for and to effect repairs and 258
settlement of costs and expenses incurred thereby in respect of all other 259
repairs not covered by the insurances and/or not exceeding any possible 260
franchise(s) or deductibles provided for in the insurances. 261
All time used for repairs under the provisions of sub-clause (a) of this Clause 262
and for repairs of latent defects according to Clause 2 above including any 263
deviation shall count as time on hire and shall form part of the Charter period. 264
(b) If the conditions of the above insurances permit additional insurance to be 265
placed by the parties, such cover shall be limited to the amount for each party 266
set out in Box 24 and Box 25, respectively. The Owners or the Charterers as 267
the case may be shall immediately furnish the other party with particulars of 268
any additional insurance effected, including copies of any cover notes or 269
policies and the written consent of the insurers of any such required 270
insurance in any case where the consent of such insurers is necessary. 271
(c) Should the Vessel become an actual, constructive, compromised or 272
agreed total loss under the insurances required under sub-clause (a) of 273
Clause 12, all insurance proceeds for such loss shall be paid to the Mort-274
gagee, if any, in the manner described in the Deed(s) of Covenant, who shall 275
distribute the moneys between themselves, the Owners and the Charterers 276
according to their respective interests. The Charterers undertake to notify the 277
Owners and the Mortgagee, if any, of any occurrences in consequence of 278
which the Vessel is likely to become a Total Loss as defined in this Clause. 279
(d) If the Vessel becomes an actual, constructive, compromised or agreed 280
total loss under the insurances arranged by the Charterers in accordance 281
with sub-clause (a) of this Clause, this Charter shall terminate as of the date of 282
such loss. 283

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assumes the responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

158

PART II
"BARECON 89" Standard Bareboat Charter

(e) The Owners shall upon the request of the Charterers, promptly execute 284
such documents as may be required to enable the Charterers to abandon the 285
Vessel to insurers and claim a constructive total loss. 286

(f) For the purpose of insurance coverage against marine and war risks under 287
the provisions of sub-clause (d) of this Clause, the value of the Vessel is the 288
sum indicated in Box 27. 289

13. ~~Insurance, Repairs and Classification~~ 290
~~(General - only to apply if expressly agreed and stated in Box 27, in which event 291~~
~~Clause 12 shall be considered deleted).~~ 292
~~(a) During the Charter period the Vessel shall be kept insured by the Owners 293~~
~~at their expense against marine and war risks under the form of policy or 294~~
~~policies attached hereto. The Owners and/or insurers shall not have any right 295~~
~~of recovery or subrogation against the Charterers on account of loss of or any 296~~
~~damage to the Vessel or her machinery or appurtenances covered by such 297~~
~~insurance, or on account of payments made to discharge claims against or 298~~
~~liabilities of the Vessel or the Owners covered by such insurance. All 299~~
~~insurance policies shall be in the joint names of the Owners and the 300~~
~~Charterers as their interests may appear. 301~~
~~(b) During the Charter period the Vessel shall be kept insured by the 302~~

15. Non-Lien and Indemnity
The Charterers will not suffer, nor permit to be continued, any lien
encumbrance incurred by them or their agents, which might have priority
the title and interest of the Owners in the Vessel.
~~The Charterers further agree to fasten to the Vessel in a conspicuous p~~
~~and to keep so fastened during the Charter period a notice reading~~
~~follows:~~
~~"This Vessel is the property of (name of Owners). It is under charter to (t~~
~~Charterers) and by the terms of the Charter Party neither the Charterers~~
~~the Master have any right, power or authority to create, incur or permit t~~
~~imposed on the Vessel any lien whatsoever."
The Charterers shall indemnify and hold the Owners harmless against
lien of whatsoever nature arising upon the Vessel during the Charter p
while she is under the control of the Charterers, and against any cl
against the Owners arising out of or in relation to the operation of the Ve
by the Charterers. Should the Vessel be arrested by reason of claims or
arising out of her operation hereunder by the Charterers, the Charterers
at their own expense take all reasonable steps to secure that wit
reasonable time the Vessel is released and at their own expense put up b
secure release of the Vessel.

16. Lien
The Owners to have a lien upon all cargoes and sub-freights belonging t
Charterers and any Bill of Lading freight for all claims under this Charter
the Charterers to have a lien on the Vessel for all moneys paid in advance
not earned. any loss or damage caused by Owners' breach or default
under this Charter.

17. Salvage
All salvage and towage performed by the Vessel shall be for the Charte
benefit and the cost of repairing damage occasioned thereby shall be
by the Charterers.

18. Wreck Removal
In the event of the Vessel becoming a wreck or obstruction to navigatio
Charterers shall indemnify the Owners against any sums whatsoever
the Owners shall become liable to pay and shall pay in consequence o
Vessel becoming a wreck or obstruction to navigation.

19. General Average
General Average, if any, shall be adjusted according to the York-An
Rules 1974 or any subsequent modification thereof current at the time o
casualty.
The Charter Hire not to contribute to General Average.

20. Assignment and Sub-Demise
The Charterers shall not assign this Charter nor sub-demise the V
except with the prior consent in writing of the Owners which shall n
unreasonably withheld and subject to such terms and conditions a
Owners shall approve.

21. Bills of Lading
The Charterers are to procure that all Bills of Lading issued for carri
goods under this Charter shall contain a Paramount Clause incorporati
legislation relating to Carrier's liability for cargo compulsorily applied
the trade; if no such legislation exists, the Bills of Lading shall incorpor
British Carriage of Goods by Sea Act. The Bills of Lading shall also conta

PART II
"BARECON 89" Standard Bareboat Charter

amended New Jason Clause and the Both-to-Blame Collision Clause.                    426
The Charterers agree to indemnify the Owners against all consequences    427
liabilities arising from the Master, officers or agents signing Bills of Lading or    428
other documents.                    429

22. Bank Guarantee                    430
The Charterers undertake to furnish, before delivery of the Vessel, a first class    431
bank guarantee or bond in the sum and at the place as indicated in Box 25 as    432
guarantee for full performance of their obligations under this Charter.    433
(Optional, only to apply if Box 25 filled in).    434

23. Requisition/Acquisition    435
(a) In the event of the Requisition for Hire of the Vessel by any governmental or    436
other competent authority (hereinafter referred to as "Requisition for Hire")    437
irrespective of the date during this Charter period when "Requisition for Hire"    438
may occur and irrespective of the length thereof and whether or not it be for    439
an indefinite or a limited period of time, and irrespective of whether it may or    440
will remain in force for the remainder of the Charter period, this Charter shall    441
not be deemed thereby or thereupon to be frustrated or otherwise terminated    442
and the Charterers shall continue to pay the stipulated hire in the manner    443
provided by this Charter until the time when the Charter would have    444
terminated pursuant to any of the provisions hereof always provided however    445
that in the event of "Requisition for Hire" any Requisition Hire or any    446
compensation received or receivable by the Owners shall be payable to the    447
Charterers during the remainder of the Charter period or the period of the    448
"Requisition for Hire" whichever be the shorter.    449
The Hire under this Charter shall be payable to the Owners from the same time    451
as the Requisition Hire is payable to the Charterers.    451
(b) In the event of the Owners being deprived of their ownership in the Vessel    452
by any Compulsory Acquisition of the Vessel or requisition for title by any    453
governmental or other competent authority (hereinafter referred to as    454
"Compulsory Acquisition"), then, irrespective of the date during the Charter    455
period when "Compulsory Acquisition" may occur, this Charter shall be    456
deemed terminated as of the date of such "Compulsory Acquisition". In such    457
event Charter Hire to be considered as earned and to be paid up to the date    458
and time of such "Compulsory Acquisition".    459

24. War    460
(a) The Vessel unless the consent of the Owners be first obtained not to be    461
ordered nor continue to any place or on any voyage nor be used on any    462
service which will bring her within a zone which is dangerous as the result of    463
any actual or threatened act of war, war, hostilities, warlike operations, acts of    464
piracy or of hostility or malicious damage against this or any other vessel or    465
its cargo by any person, body or State whatsoever, revolution, civil war, civil    466
commotion or the operation of international law, nor be exposed in any way to    467
any risks or penalties whatsoever consequent upon the imposition of    468
Sanctions, nor carry any goods that may in any way expose her to any risks of    469
seizure, capture, penalties or any other interference of any kind whatsoever    470
by the belligerent or fighting powers or parties or by any Government or Ruler,    471
(b) The Vessel to have liberty to comply with any orders or directions as to    472
departure, arrival, routes, ports of call, stoppages, destination, delivery or in    473
any other wise whatsoever given by the Government of the nation under    474
whose flag the Vessel sails or any other Government or any person (or body)    475
acting or purporting to act with the authority of such Government or by any    476
committee or person having under the terms of the war risks insurance on the    477
Vessel the right to give any such orders or directions.    478
(c) In the event of outbreak of war (whether there be a declaration of war or    479
not) between any two or more of the countries as stated in Box 31, both the    480
Owners and the Charterers shall have the right to cancel this Charter,    481
whereupon the Charterers shall redeliver the Vessel to the Owners in    482
accordance with Clause 14. If she has cargo on board after discharge thereof    483
at destination, or if debarred under this Clause from reaching or entering it at    484
a near open and safe port as directed by the Owners, or if she has no cargo on    485
board, at the port at which she then is or if at sea at a near open and safe port    486
as directed by the Owners. In all cases hire shall continue to be paid in    487
accordance with Clause 11 and except as aforesaid all other provisions of this    488
Charter shall apply until redelivery.    489

25. Commission    490
The Owners to pay a commission at the rate indicated in Box 32 to the Brokers    491
named in Box 32 on any Hire paid under this Charter but in no case less than is    492
necessary to cover the actual expenses of the Brokers and a reasonable fee    493
for their work. If the full Hire is not paid owing to breach of Charter by either of    494
the parties the party liable therefor to indemnify the Brokers against their loss    495
of commission.    496
Should the parties agree to cancel the Charter, the Owners to indemnify the    497

Brokers against any loss of commission but in such case the commission not    498
to exceed the brokerage on one year's hire.    499

26. Law and Arbitration    500
*) 26.1. This Charter shall be governed by English law and any dispute arising    501
out of this Charter shall be referred to arbitration in London, one arbitrator    502
being appointed by each party, in accordance with the Arbitration Acts 1950    503
and 1979 or any statutory modification or re-enactment thereof for the time    504
being in force. On the receipt by one party of the nomination in writing of the    505
other party's arbitrator, that party shall appoint their arbitrator within fourteen    506
days, failing which the decision of the single Arbitrator appointed shall apply.    507
If two Arbitrators properly appointed shall not agree they shall appoint an    508
umpire whose decision shall be final.    509
*) 26.2. Should any dispute arise out of this Charter, the matter in dispute shall    510
be referred to three persons at New York, one to be appointed by each of the    511
parties hereto, and the third by the two so chosen; their decision or that of any    512
two of them shall be final, and for purpose of enforcing any award, this    513
agreement may be made a rule of the Court.    514
The arbitrators shall be members of the Society of Maritime Arbitrators, Inc. of    515
New York and the proceedings shall be conducted in accordance with the    516
rules of the Society.    517
*) 26.3. Any dispute arising out of this Charter shall be referred to arbitration at    518
the place indicated in Box 33, subject to the law and procedures applicable    519
there.    520
26.4. If Box 33 in Part I is not filled in, sub-clause 26.1. of this Clause shall    521
apply.    522
*) 26.1., 26.2. and 26.3. are alternatives; indicate alternative agreed in Box 33    523

This computer generated form is printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original BIMCO approved document shall apply. BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original BIMCO document and this document.

**Bareboat Charter Party for M.V. "Ocean Phoenix" dated 24th June 2003**

**Additional Clauses**

27. Further to Part I Box 21 and Part II Clause 10, the Charterers will pay charter hire to the Owners equivalent to the Owners' payments to their financers under the following Loan Agreement, for the current period of the Loan and as it may be further extended beyond the current loan period:

| | | |
|---|---|---|
| Borrower | - | Ocean Phoenix Navigation S.A. |
| Lender | - | Sumitomo Mitsui Banking Corporation |
| Original term | - | 10 years |
| Balance Term | - | to August 2005 |
| Original Loan | - | JPY2,115,000,000 |
| Balance Loan | - | JPY 1,131,525,000 |
| Interest Rate | - | 3.78% fixed |
| Monthly Principal | - | JPY 10,575,000 |
| Balloon Payment | - | JPY 877,725,000 |

28. Owners will send to Charterers latest by the 25th day of each month a summary of payments to be made relating to the Vessel, i.e. operating expenses, time-charter hire and loan repayments based on the above loans, and, latest by the 30th day of the same month, Charterers will remit to Owners the balance in their favour

29. Vessel's description
With reference to Part I Boxes 5 and 12, the vessel is further described as follows:

| | |
|---|---|
| Port of Registry | : Panama |
| Official No. | : 22424-95-A |
| LOA/Beam/Depth | : 134.04/26.00/13.50 m |
| Summer Draft | : 9.729 m |
| Grain/Bale Capacity | : 1,071,834/1,059,695 cu ft. |
| Holds/Hatches | : 4/4 |
| Cargo gear | : 3/25 mt Cranes |
| Main Engine | : 6UEC45LA |
| Speed/consumption | : 13 knots on 20 mt IFO + 1.2 MT MDO |

All figures 'about'

30. On expiration of this charter, together with payment of the last month's hire instalment, the Charterers will pay to the Owners the Balloon Amounts referred to in Clause 27 above and any other amounts outstanding and due to the Owners, and assume ownership of the Vessel. Delivery for sale of the Vessel will take place under the terms of a Memorandum of Agreement of even date, a copy of which is attached to this Charter, and in which the Owners are referred to as the Sellers and the Charterers as the Buyers.

Bareboat Charter Party for M.V. "Ocean Phoenix" dated 24th June 2003

Additional Clauses

31. The Owners, their parent company, Keymax Maritime Co., Ltd., Tokyo, Japan ("Keymax"), the Charterers and their parent company, East West Maritime Investment Ltd., of Majuro, Republic of the Marshall Islands, in their relative capacities under this Charter party, agree (a) that the Existing Time-Charter to which the vessel is subject (the "Existing Charter") shall be assumed by the Charterers and (b) that the Owners, the Charterers, Keymax and EWMI shall not do any act, deed or omission that may result in prejudice or danger to the validity or continuing effect of the Existing Charter, under its own terms.

First Original

Issued   16/12/1965
Amended 13/7/1971
Amended 16/3/1977
Amended  9/9/1993

The Documentary Committee of The Japan Shipping Exchange, Inc.

# MEMORANDUM OF AGREEMENT
Code Name : NIPPONSALE 1993

Copyright
Published by
The Japan Shipping
Exchange, Inc

Date: 24th October 2005

IT IS THIS DAY MUTUALLY AGREED between the Sellers mentioned in (i) below ("the Sellers") and the Buyers mentioned in (ii) below ("the Buyers") that the Sellers shall sell and the Buyers shall buy the Vessel named in (iii) below with particulars mentioned in (iv) - (viii) below ("the Vessel"), which has been accepted by the Buyers ~~as a result of their superficial inspection of the Vessel as~~ ~~examination of her Class Records (this sale therefore being outright without further inspection, except as provided herein),~~ on the following terms and conditions:

(i)    Sellers: Ocean Harmony Shipholding S.A., of Panama

(ii)   Buyers: Harmony Shipping, Ltd., of The Marshall Islands

(iii)  Vessel's name: 'OCEAN HARMONY'

(iv)   Flag: Panama (v) Class: NK

(vi)   Built (year and builder's name): 1996: Saiki Shipyard Co., Ltd.

(vii)  Gross register tonnage: 14,754 (viii) Summer dead-weight tonnage: 23,524 metric tons.

## 1. PRICE

The Purchase Price of the Vessel shall be ¥ 928,200,000 (Japanese Yen Nine Hundred and Twenty Eight Million Two Hundred Thousand only) payable in cash.

## 2. PAYMENT

(a) ~~As security for the fulfilment of this Agreement, the Buyers shall pay a deposit of ten (10) per cent of the Purchase money to a bank nominated by the Sellers within three (3) banking days from the date of this Agreement in the names of the Sellers and the Buyers, which shall be paid to the Sellers as a part of the Purchase Money, is the same manner as the ninety (90) per cent of the Purchase Money hereunder. Any interest accrued on the deposit shall be for the Buyers' account and any bank charges on the deposit shall be borne equally by the Sellers and the Buyers.~~

(b) The Buyers shall remit the balance 100% of the Purchase Money by telegraphic transfer to their own account or a suspension account in the said a bank nominated by the Sellers latest 2 (two) ~~banking days prior to the expected date of delivery immediately after the Notice of Readiness for Delivery is tendered by the Sellers as per Clause 7 of this Agreement.~~ This balance Purchase Money shall be paid out to the Sellers together with the said ten (10) per cent deposit against the Protocol of Delivery and Acceptance being duly signed by the representatives of both parties at the time of delivery of the Vessel. Any bank fees charged for the holding and/or lifting funds and/or closing shall be equally shared between the Sellers and the Buyers.

## 3. DOCUMENTATION – see also Clause 22

~~At the time of delivery of the Vessel, the Sellers shall furnish the Buyers with the following documents:~~

(a) ~~the Bill of Sale, duly attested by a Notary Public, specifying that the Vessel is free from all debts, encumbrances and maritime liens;~~

(b) ~~a letter from the Sellers undertaking to supply a Deletion Certificate from the ............. Registry promptly after the Vessel's delivery; and~~

163

(c) such other documents as may be mutually agreed;

Closing and exchange of documents shall take place at the Sellers' nominated place in Japan.

## 4. DELIVERY TIME AND PLACE

(a) The Sellers shall deliver the Vessel to the Buyers safely afloat, free of cargo at/in around 15th November 2005, (and before _____ 2002, and not later than _____ 2002 ("the cancelling date"). In case for any reason beyond the control of the Buyers and Sellers the Vessel cannot be delivered at the above time, delivery shall take place on an alternative date acceptable to both SMPC, and the Buyers' Bank, Bank of Tokyo Mitsubishi but in any case latest by 30th November 2005.

(b) In the event that the Sellers fail to make the Vessel ready for delivery on or before the cancelling date, the Buyers shall have the option of maintaining or cancelling this Agreement, provided such option shall be declared in writing within forty eight (48) hours (Saturdays, Sundays and Holidays excepted) from the cancelling date. However, any delay not exceeding thirty (30) days caused by force majeure and/or repairs in order to pass the inspection under Clause 6 of this Agreement shall be accepted by the Buyers.

(c) The Sellers shall keep the Buyers informed of the Vessel's itinerary and give the Buyers thirty (30)/fifteen (15)/seven (7)/three (3) days notice of approximate expected place and date of readiness for delivery.

## 5. DELIVERY CONDITION

The Sellers shall deliver to the Buyers the Vessel substantially in the same "as is" condition as when the Vessel was inspected at the place mentioned in the preamble, fair wear and tear excepted, but with her present class maintained free from outstanding recommendations and average damage affecting her present class with all her class, national and international trading certificates, clean and valid at the time of delivery. In case any recommendations are placed on the Vessel prior to delivery, then the Vessel will be delivered with those recommendations.

## 6. DRYDOCKING – no Drydocking Class shall apply (but see also Clause 21)

For the inspection by the Classification Society mentioned in (a) of the preamble of the Vessel's bottom and other underwater parts below the summer load line ("bottom and other underwater parts"), the Sellers shall place the Vessel in drydock at the port of delivery or near thereto prior to delivery.

If the rudder, propeller, bottom or other underwater parts be found broken, damaged or defective so as to affect the Vessel's clean certificate of class, the same shall be made good at the Sellers' expense to the Classification Society's satisfaction so as to retain the Vessel's class without qualification.

While the Vessel is in drydock and if required by the Buyers or the Classification Society's surveyor, the tail end shaft shall be drawn, and should the same be condemned or found defective so as to affect the Vessel's clean certificate of class, it shall be removed or made good at the Sellers' expense to the Classification Society's satisfaction so as to retain the Vessel's class without qualification.

The cost of drawing and replacing the tail end shaft shall be borne by the Buyers unless the Classification Society requires the tail end shaft to be drawn, made good or renewed.

The expense of putting the Vessel in and taking her out of drydock and the drydock dues including the fee of the Classification Society's surveyor shall be paid by the Buyers unless the rudder, propeller, bottom, other underwater parts or tail end shaft be found broken, damaged or defective as aforesaid, in which case the Sellers shall pay these expenses.

The Sellers shall pay all costs of transporting the Vessel to the drydock and from the drydock to the place of delivery.

## 7. NOTICE OF READINESS AND LIQUIDATED DAMAGES

~~When the Vessel has been approved by the Classification Society's surveyor following the inspection stipulated in the preceding clause the Vessel shall be deemed ready for delivery and thereupon the Sellers shall tender to the Buyers a notice of readiness for delivery.~~

~~The Buyers shall take over the Vessel within three (3) banking days from the day of the receipt of such notice inclusive.~~

In the event of the Buyers not taking delivery of the vessel within the period by the latest date specified above the Buyers shall pay to the Sellers the sum of US$ 7,000 (United States Dollars Six Thousand) per day as liquidated damages until the Vessel is delivered, but such detention shall not exceed ten (10) days.

**8. FORCE MAJEURE**

Should the Vessel become an actual or constructive total loss before delivery or not be able to be delivered through outbreak of war, political reasons, restraint of Governments, Princes or People, or any other cause which either party hereto cannot prevent, this Agreement shall be deemed to be null and void, ~~and the deposit shall at once be returned to the Buyers~~ but the Buyers shall be compensated under Insurance provisions elsewhere.

**9. ALLOCATION OF RISK**

The Vessel with everything belonging to her shall be at the Sellers' risk and expense until she is delivered to the Buyers, and after the delivery of the Vessel in accordance with this Agreement the Sellers shall have no responsibility for any possible fault or deficiency of any description.

**10. BELONGINGS AND BUNKERS – see also Clause 17**

~~The Sellers shall deliver to the Buyers the vessel with everything belonging to her at the time of the superficial inspection mentioned in the preamble including all spare parts, stores and equipment, on board or in shore, used or unused except such things as are in the normal course of operations used during the period between the superficial inspection and delivery. Forwarding charges, if any, shall be for the Buyers' account.~~

~~The Buyers shall take over and pay the Sellers for remaining bunkers and unused lubricating oils at last purchased prices evidenced by supporting vouchers.~~ Bunkers belong to the Charterers and no payment shall be made at the time of delivery. ~~Payment under this Clause shall be made on or prior to delivery in the same currency as the Purchase Money.~~

The Sellers shall provide an inventory list for the Buyers at the time of delivery.

**11. EXCLUSIONS FROM THE SALE – see also Clause 17**

~~The Sellers have the right to take ashore crockery, plate, cutlery, linen and other articles bearing the Sellers' flag or name, provided they substitute for the same an adequate number of similar unmarked items. Books, executes and forms etc., exclusively for use on the Sellers' vessels, shall be taken ashore before delivery.~~

Personal effects of the Master, Officers and Crew including slop chest, ~~and~~ hired equipment and equipment belonging to the Managers are excluded from this sale ~~and shall be removed by the Sellers prior to delivery of the Vessel.~~ The Sellers are also to advise any hired equipment and equipment belonging to the Managers (Kerstax Maritime Co., Ltd./MK Shipmanagement Co., Ltd.) All such equipment shall remain on board the Vessel until termination of the Management Agreement between the Sellers and the Vessel's Managers.

**12. CHANGE OF NAME ETC.**

~~The Buyers undertake to change the name of the Vessel and alter the funnel markings upon delivery of the Vessel.~~

### 13. ENCUMBRANCES ETC.

The Sellers shall deliver to the Buyers the vessel free from all ~~debts~~ encumbrances and maritime liens and any other debts whatsoever, other than those which are the responsibility of the Buyers.

The Sellers hereby undertake to indemnify the Buyers against all consequences of claims made against the Vessel in respect of liabilities incurred prior to the time of delivery, except insofar as such claims are the responsibility of the Buyers.

### 14. DEFAULT AND COMPENSATION

Should the Buyers fail to fulfil this Agreement, the Sellers have the right to cancel the Agreement, ~~in which case the deposit shall be forfeited to the Sellers. If the deposit does not cover the Sellers' loss caused by the Buyers' non-fulfilment of this Agreement, the Sellers shall~~ and be entitled to claim further compensation from the Buyers for any loss and for all expenses.

If the Sellers should default in the delivery of the Vessel with everything belonging to her in the manner and within the time herein specified, ~~the deposit shall at once be returned to the Buyer and in addition~~ the Sellers shall, when such default is due to their negligent or intentional acts or omissions, make due compensation for loss caused by their non-fulfilment of this Agreement.

### 15. ARBITRATION

~~Any dispute arising out of this Agreement shall be submitted to arbitration held in Tokyo by the Tokyo Maritime Arbitration Commission ("TOMAC") of The Japan Shipping Exchange, Inc. in accordance with the rules of TOMAC and any amendments thereto, and the award given by the arbitrators shall be final and binding on both parties.~~ This Agreement shall be governed by and construed in accordance with English law and any dispute arising out of this Agreement shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force, one arbitrator being appointed by each party. On the receipt of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall apply. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.

The additional clauses from 16 to 23 shall be deemed to be fully incorporated in this Agreement.

IN WITNESS WHEREOF the Sellers and the Buyers have signed and executed TWO COPIES of this Agreement the day and year first above written.

THE SELLERS

Ocean Harmony Shipholding S.A.

By : STAVER FUNA
Title: ~~Director~~/Attorney-in-fact

THE BUYERS

Harmony Shipping, Ltd.

By : ✓ CHARM LNTOS 2.C GAP
Title: Director/Attorney-in-fact

## Additional Clauses to Memorandum of Agreement dated 24th October 2005

### M.V. "OCEAN HARMONY"

16. The Vessel's continuous Hull and Machinery survey cycles are to be up-to-date with no outstanding or extensions at the time of delivery.

17. The Vessel shall be delivered with everything belonging to her on board, ashore and on order, including stores, provisions, spare parts, lubricating oils, navigational aids and wireless station, used or unused. Forwarding charges, if any, shall be for the Buyers' account.

At the time of delivery the Sellers shall hand to the Buyers the Classification certificate(s) as well as all plans which are on board the Vessel. Other certificates which are on board the vessel shall also be handed over to the Buyers unless the Sellers are required to retain same in which case the Buyers to have the right to take copies. Other technical documentation which may be in the Sellers' possession shall be promptly forwarded to the Buyers at their expense, if they so request. The Sellers may keep the Vessel's logbooks but the Buyers shall have the right to take copies of the same.

18. The Sellers shall confirm in writing at the time of delivery that to the best of their knowledge the Vessel is not blacklisted by the Arab Boycott League in Damascus or any other government or organisation.

19. The Buyers shall have the right at their risk and expense to place onboard up to two (2) representatives for familiarisation purposes only without interference to the Vessel's operation for the duration of the Vessel's last voyage prior to delivery. The Buyers' representatives shall sign the usual indemnity forms.

20. The Vessel shall be delivered with holds in 'as is' condition.

21. No dry-docking clause shall apply, however the Buyers have the right, at their risk and expense, to conduct, prior to delivery, an underwater survey of vessel's bottom and underwater parts, in the presence of Class surveyor and the Buyers' and Sellers' representatives. If the Buyers elect to carry out such an inspection, the same is to be carried out as soon as practically possible after vessel arrives at the delivery port. The Sellers are not obliged to deviate the vessel to a suitable location for this purpose unless fully compensated therefor by the Buyers.

If any damage affecting the vessel's clean maintenance of Class be found to bottom or underwater parts, than the vessel is to be dry-docked in accordance with the terms of Cl.6 of the Nipponsale Form 1993, in which case the Buyers have the right to carry out their own minor works and paint vessel's bottom without interference to the Sellers' works, at the Buyers' time, risk and expense.

## Additional Clauses to Memorandum of Agreement dated 24th October 2005
### M.V. "OCEAN HARMONY"

In case the vessel is dry-docked, then the cancelling date is to be extended by the number of days used for the dry-docking, waiting time for dry-dock and deviation. If the Buyers' works are not completed by the time that the Sellers have completed their works in accordance with the agreed terms/conditions, then the Sellers have the right to tender notice of readiness in dry-dock and deliver the vessel; however, undocking costs always to be for the Sellers' account.

In case Class requires repairs to underwater parts but approves postponement of such repairs until the vessel's next scheduled dry-docking, then the Sellers have the option either to bear the actual direct repair costs incurred at the next dry-docking or to propose monetary settlement, which to be mutually agreed.

22. As soon as possible after execution of this Agreement, the Buyers shall provide a list of closing documents which are reasonably required and, after agreement by the Sellers, the same is to be attached to this Agreement as an Addendum.

23. This sale and all negotiations involved are to be kept strictly private and confidential between the parties directly involved.

168