# First Original

| | |
|---|---|
| Issued 16/12/1965<br>Amended 13/7/1971<br>Amended 16/3/1977<br>Amended 9/9/1993 | Copyright<br>Published by<br>The Japan Shipping<br>Exchange, Inc. |

The Documentary Committee of The Japan Shipping Exchange, Inc.

## MEMORANDUM OF AGREEMENT
### Code Name : NIPPONSALE 1993

Date: 6th July 2005

IT IS THIS DAY MUTUALLY AGREED between the Sellers mentioned in (i) below ("the Sellers") and the Buyers mentioned in (ii) below ("the Buyers") that the Sellers shall sell and the Buyers shall buy the Vessel named in (iii) below with particulars mentioned in (iv) - (viii) below ("the Vessel"), which has been accepted by the Buyers ~~as a result of their superficial inspection of the Vessel at~~ , and ~~examination of her Class Records (this sale~~ therefore being outright without further inspection, except as provided herein), on the following terms and conditions:

(i)    Sellers: Ocean Phoenix Navigation S.A., of Panama

(ii)   Buyers: Ocean Phoenix Shipping, Ltd., of The Marshall Islands

(iii)  Vessel's name: 'OCEAN PHOENIX'

(iv)  Flag: Panama (v) Class: NK

(vi)  Built (year and builder's name): 1995; Shin Kurushima Dockyard Co., Ltd.

(vii) Gross register tonnage: 15,737 (viii) Summer dead-weight tonnage: 24,318 metric tons.

## 1. PRICE

The Purchase Price of the Vessel shall be ¥846,000,000 (Japanese Yen Eight Hundred and Forty Six Million only) payable in cash.

## 2. PAYMENT

(a) ~~As security for the fulfilment of this Agreement, the Buyers shall pay a deposit of ten (10) per cent of the Purchase Money to a bank nominated by the Sellers within three (3) banking days from the date of this Agreement, in the names of the Sellers and the Buyers, which shall be paid to the Sellers as a part of the Purchase Money in the same manner as the ninety (90) per cent of the Purchase Money hereunder. Any interest earned on the deposit shall be for the Buyers' account and any bank charges on the deposit shall be borne equally by the Sellers and the Buyers.~~

(b) The Buyers shall remit ~~the balance~~ 100% of the Purchase Money by telegraphic transfer to their own account or a suspension account in ~~the said~~ a bank nominated by the Sellers latest 2 (two) banking days prior to the expected date of delivery ~~immediately after the Notice of Readiness for Delivery is tendered by the Sellers as per Clause 7 of this Agreement~~. This ~~balance~~ Purchase Money shall be paid out to the Sellers ~~together with the said ten (10) per cent deposit~~ against the Protocol of Delivery and Acceptance being duly signed by the representatives of both parties at the time of delivery of the Vessel. Any bank fees charged for the holding and/or closing shall be equally shared between the Sellers and the Buyers.

## 3. DOCUMENTATION – see also Clause 22

~~At the time of delivery of the Vessel the Sellers shall furnish the Buyers with the following documents:~~

~~(a) the Bill of Sale, duly attested by a Notary Public, specifying that the Vessel is free from all debts, encumbrances and maritime liens;~~

~~(b) a letter from the Sellers, undertaking to supply a Deletion Certificate from the .............. Registry promptly after the Vessel's delivery, and~~

169

~~(c) such other documents as may be mutually agreed.~~

Closing and exchange of documents shall take place at <u>the Sellers' nominated place in Japan</u>.

## 4. DELIVERY TIME AND PLACE

(a) The Sellers shall deliver the Vessel to the Buyers <u>safely afloat, free of cargo at/in her next port of call after completion of discharge on her current voyage to Recife, Brazil, or, if the next port cannot be reached by 31st August 2005, then at Recife, Brazil, by 31st August 2005 but not earlier than 23rd August and expected around 25th /30th August 2005, ~~(not before 2003, and not later than _____ 2003 ("the cancelling date")~~. In case for any reason beyond the control of the Buyers and Sellers the Vessel cannot be delivered within the above period, delivery shall take place on an alternative date acceptable to both the Sellers' Bank, Sumitomo Mitsui Banking Corporation, and Buyers' Bank, ABN-AMRO, but in any case latest by the end of the next voyage starting with loading after completion of discharge at Recife</u>

~~(b) In the event that the Sellers fail to make the Vessel ready for delivery on or before the cancelling date, the Buyers shall have the option of maintaining or cancelling this Agreement, provided such option shall be declared in writing within forty-eight (48) hours (Saturdays, Sundays and Holidays excepted) from the cancelling date. However, any delay not exceeding thirty (30) days caused by force majeure and/or repairs in order to pass the inspection under Clause 6 of this Agreement shall be accepted by the Buyers.~~

~~(c) The Sellers shall keep the Buyers informed of the Vessel's itinerary and give the Buyers thirty (30)/fifteen (15)/seven (7)/three (3) days notice of approximate expected place and date of readiness for delivery.~~

## 5. DELIVERY CONDITION

The Sellers shall deliver to the Buyers the Vessel ~~substantially in the same "as is"~~ condition ~~as when the Vessel was inspected at the place mentioned in the preamble, fair wear and tear excepted,~~ but <u>with her present class maintained ~~free from outstanding recommendations~~ with existing recommendation set out on 26th December 2003 (according to vessel's latest Survey Status)</u> and average damage affecting her present class with all her class, national and international trading certificates, clean and valid at the time of delivery. <u>In case any further recommendations are placed on the Vessel prior to delivery, then the Vessel will be delivered with those recommendations.</u>

## 6. DRYDOCKING – <u>no Drydocking Clause shall apply (but see also Clause 21)</u>

~~For the inspection by the Classification Society mentioned in (v) of the preamble of the Vessel's bottom and other underwater parts below the summer load line ("bottom and other underwater parts"), the Sellers shall place the Vessel in drydock at the port of delivery or near thereto prior to delivery.~~

~~If the rudder, propeller, bottom or other underwater parts be found broken, damaged or defective so as to affect the Vessel's clean certificate of class, the same shall be made good at the Sellers' expense to the Classification Society's satisfaction so as to retain the Vessel's class without qualification.~~

~~While the Vessel is in drydock and if required by the Buyers or the Classification Society's surveyor, the tail-end shaft shall be drawn, and should the same be condemned or found defective so as to affect the Vessel's clean certificate of class, it shall be renewed or made good at the Sellers' expense to the Classification Society's satisfaction so as to retain the Vessel's class without qualification.~~

~~The cost of drawing and replacing the tail and shaft shall be borne by the Buyers unless the Classification Society requires the tail and shaft to be drawn, made good or renewed.~~

~~The expense of putting the Vessel in and taking her out of drydock and the drydock dues including the fee of the Classification Society's surveyor shall be paid by the Buyers unless the rudder, propeller, bottom, other underwater parts or tail-end shaft be found broken, damaged or defective as aforesaid, in which case the Sellers shall pay these expenses.~~

*M.M. (A.R.)*

~~The Sellers shall pay all costs of transporting the Vessel to the drydock and from the drydock to the place of delivery.~~

## 7. NOTICE OF READINESS AND LIQUIDATED DAMAGES

~~When the Vessel has been approved by the Classification Society's surveyor following the inspection stipulated in the preceding clause the Vessel shall be deemed ready for delivery and thereupon the Sellers shall tender to the Buyers a notice of readiness for delivery.~~

~~The Buyers shall take over the Vessel within three (3) banking days from the day of the receipt of such notice inclusive.~~

In the event of the Buyers not taking delivery of the vessel ~~within the period~~ by the latest date specified above, the Buyers shall pay to the Sellers the sum of US$ 6,000 (United States Dollars Six Thousand) per day as liquidated damages until the Vessel is delivered, but such detention shall not exceed ten (10) days.

## 8. FORCE MAJEURE

Should the Vessel become an actual or constructive total loss before delivery or not be able to be delivered through outbreak of war, political reasons, restraint of Governments, Princes or People, or any other cause which either party hereto cannot prevent, this Agreement shall be deemed to be null and void, ~~and the deposit shall at once be returned to the Buyers~~, but the Buyers shall be compensated under Insurance provisions elsewhere.

## 9. ALLOCATION OF RISK

The Vessel with everything belonging to her shall be at the Sellers' risk and expense until she is delivered to the Buyers, and after the delivery of the Vessel in accordance with this Agreement the Sellers shall have no responsibility for any possible fault or deficiency of any description.

## 10. BELONGINGS AND BUNKERS – see also Clause 17

~~The Sellers shall deliver to the Buyers the vessel with everything belonging to her at the time of the superficial inspection mentioned in the preamble including all spare parts, stores and equipment, on board or on shore, used or unused, except such things as are in the normal course of operations used during the period between the superficial inspection and delivery. Forwarding charges, if any, shall be for the Buyers' account.~~

~~The Buyers shall take over and pay the Sellers for remaining bunkers and unused lubricating oils at last purchased prices evidenced by supporting vouchers.~~ Bunkers belong to the Charterers and no payment shall be made at the time of delivery. ~~Payment under this Clause shall be made on or prior to delivery in the same currency as the Purchase Money.~~

The Sellers shall provide an inventory list for the Buyers at the time of delivery.

## 11. EXCLUSIONS FROM THE SALE – see also Clause 17

~~The Sellers have the right to take ashore crockery, plate, cutlery, linen and other articles bearing the Sellers' flag or name, provided they substitute for the same an adequate number of similar unmarked items. Books, cassettes and forms etc, exclusively for use on the Sellers' vessels, shall be taken ashore before delivery.~~

Personal effects of the Master, Officers and Crew including slop chest, ~~and~~ hired equipment and equipment belonging to the Managers, are excluded from this sale and shall be removed by the Sellers prior to delivery of the Vessel. The Sellers are also to advise any hired equipment and equipment belonging to the Managers (Keymax (MK) Maritime Co.,Ltd. All such equipment shall remain on board the Vessel until termination of the Management Agreement between the Sellers and the Vessel's Managers.

**12. CHANGE OF NAME ETC.**

~~The Buyers undertake to change the name of the Vessel and alter the funnel markings upon delivery of the Vessel.~~

**13. ENCUMBRANCES ETC.**

The Sellers shall deliver to the Buyers the vessel free from all ~~debts,~~ encumbrances and maritime liens <u>and any other debts whatsoever, other than those which are the responsibility of the Buyers</u>.

The Sellers hereby undertake to indemnify the Buyers against all consequences of claims made against the Vessel in respect of liabilities incurred prior to the time of delivery, <u>except insofar as such claims are the responsibility of the Buyers</u>.

**14. DEFAULT AND COMPENSATION**

Should the Buyers fail to fulfil this Agreement, the Sellers have the right to cancel the Agreement, ~~in which case the deposit shall be forfeited to the Sellers. If the deposit does not cover the Sellers' loss caused by the Buyers' non-fulfilment of this Agreement, the Sellers shall~~ and be entitled to claim further compensation from the Buyers for any loss and for all expenses.

If the Sellers should default in the delivery of the Vessel with everything belonging to her in the manner and within the time herein specified, ~~the deposit shall at once be returned to the Buyer and in addition~~ the Sellers shall, when such default is due to their negligent or intentional acts or omissions, make due compensation for loss caused by their non-fulfilment of this Agreement.

**15. ARBITRATION**

~~Any dispute arising out of this Agreement shall be submitted to arbitration held in Tokyo by the Tokyo Maritime Arbitration Commission ("TOMAC") of The Japan Shipping Exchange, Inc. in accordance with the rules of TOMAC and any amendments thereto, and the award given by the arbitrators shall be final and binding on both parties.~~ <u>This Agreement shall be governed by and construed in accordance with English law and any dispute arising out of this Agreement shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force, one arbitrator being appointed by each party. On the receipt of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall apply. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.</u>

The additional clauses from 16 to <u>23</u> shall be deemed to be fully incorporated in this Agreement.

IN WITNESS WHEREOF the Sellers and the Buyers have signed and executed TWO COPIES of this Agreement the day and year first above written.

THE SELLERS

Ocean Phoenix Navigation S.A.

*M. Kayahara*

By : Noritake Kayahara
Title: Director/Attorney-in-fact

THE BUYERS

Ocean Phoenix Shipping, Ltd.

*Charalumbos Ziogas*

By :
Title: Director/Attorney-in-fact

172

<u>**Additional Clauses to Memorandum of Agreement dated 6th July 2005**</u>

<u>**M.V. "OCEAN PHOENIX"**</u>

16. The Vessel's continuous Hull and Machinery survey cycles are to be up-to-date with no outstanding or extensions at the time of delivery.

17. The Vessel shall be delivered with everything belonging to her on board, ashore and on order, including stores, provisions, spare parts, lubricating oils, navigational aids and wireless station, used or unused. Forwarding charges, if any, shall be for the Buyers' account.

   At the time of delivery the Sellers shall hand to the Buyers the Classification certificate(s) as well as all plans which are on board the Vessel. Other certificates which are on board the vessel shall also be handed over to the Buyers unless the Sellers are required to retain same in which case the Buyers to have the right to take copies. Other technical documentation which may be in the Sellers' possession shall be promptly forwarded to the Buyers at their expense, if they so request. The Sellers may keep the Vessel's logbooks but the Buyers shall have the right to take copies of the same.

18. The Sellers shall confirm in writing at the time of delivery that to the best of their knowledge the Vessel is not blacklisted by the Arab Boycott League in Damascus or any other government or organisation.

19. The Buyers shall have the right at their risk and expense to place onboard up to two (2) representatives for familiarisation purposes only without interference to the Vessel's operation for the duration of the Vessel's last voyage prior to delivery. The Buyers' representatives shall sign the usual indemnity forms.

20. The Vessel shall be delivered with holds in 'as is' condition.

21. No dry-docking clause shall apply, however the Buyers have the right, at their risk and expense, to conduct, prior to delivery, an underwater survey of vessel's bottom and underwater parts, in the presence of Class surveyor and the Buyers' and Sellers' representatives. If the Buyers elect to carry out such an inspection, the same is to be carried out as soon as practically possible after vessel arrives at the delivery port. The Sellers are not obliged to deviate the vessel to a suitable location for this purpose unless fully compensated therefor by the Buyers.

   If any damage affecting the vessel's clean maintenance of Class be found to bottom or underwater parts, then the vessel is to be dry-docked in accordance with the terms of CL.6 of the Nipponsale Form 1993, in which case the Buyers have the right to carry out their own minor works and paint vessel's bottom without interference to the Sellers' works, at the Buyers' time, risk and expense.

<u>**Additional Clauses to Memorandum of Agreement dated 6th July 2005**</u>
<u>**M.V. "OCEAN PHOENIX"**</u>

In case the vessel is dry-docked, then the cancelling date is to be extended by the number of days used for the dry-docking, waiting time for dry-dock and deviation. If the Buyers' works are not completed by the time that the Sellers have completed their works in accordance with the agreed terms/conditions, then the Sellers have the right to tender notice of readiness in dry-dock and deliver the vessel; however, undocking costs always to be for the Sellers' account.

In case Class requires repairs to underwater parts but approves postponement of such repairs until the vessel's next scheduled dry-docking, then the Sellers have the option either to bear the actual direct repair costs incurred at the next dry-docking or to propose monetary settlement, which to be mutually agreed.

22. As soon as possible after execution of this Agreement, the Buyers shall provide a list of closing documents which are reasonably required and, after agreement by the Sellers, the same is to be attached to this Agreement as an Addendum.

23. This sale and all negotiations involved are to be kept strictly private and confidential between the parties directly involved.

*m.v.*

**174**

First Original

| Issued 16/12/1965<br>Amended 12/ 7/1971<br>Amended 14/ 3/1977<br>Amended 15/ 8/1993 | The Documentary Committee of The Japan Shipping Exchange, Inc.<br>**MEMORANDUM OF AGREEMENT**<br>Code Name : NIPPONSALE 1993 | Copyright<br>Published by<br>The Japan Shipping<br>Exchange, Inc. |
|---|---|---|

Date: 24ᵗʰ October 2005

IT IS THIS DAY MUTUALLY AGREED between the Sellers mentioned in (i) below ("the Sellers") and the Buyers mentioned in (ii) below ("the Buyers") that the Sellers shall sell and the Buyers shall buy the Vessel named in (iii) below with particulars mentioned in (iv) – (viii) below ("the Vessel"), which has been accepted by the Buyers as a result of their superficial inspection of the Vessel at ———— and examination of her Class Records (this sale therefore being outright without further inspection, except as provided herein), on the following terms and conditions:

(i)     Sellers: Ocean Ellie Shipholding Limited, of Cyprus

(ii)    Buyers: Ocean Ellie Shipping, Ltd., of The Marshall Islands

(iii)   Vessel's name: 'OCEAN ELLIE'

(iv)    Flag: Cyprus (v) Class: NK

(vi)    Built (year and builder's name): 1996; Kherson Shipyard

(vii)   Gross register tonnage: 18,423  (viii) Summer dead-weight tonnage: 17,385 metric tons.

## 1. PRICE

The Purchase Price of the Vessel shall be US$4,225,000 (United States Dollars Four Million Two Hundred and Twenty Five Thousand only) payable in cash.

## 2. PAYMENT

(a) As security for the fulfilment of this Agreement, the Buyers shall pay a deposit of ten (10) per cent of the Purchase Money to a bank nominated by the Sellers within three (3) banking days from the date of this Agreement, in the names of the Sellers and the Buyers, which shall be paid to the Sellers as a part of the Purchase Money in the same manner as the ninety (90) per cent of the Purchase Money hereunder. Any interest earned on the deposit shall be for the Buyers' account and any bank charge on the deposit shall be borne equally by the Sellers and the Buyers.

(b) The Buyers shall remit the balance 100% of the Purchase Money by telegraphic transfer to their own account or a nomination account to the sold a bank nominated by the Sellers latest 2 (two) banking days prior to the expected date of delivery immediately after the Notice of Readiness for Delivery is tendered by the Sellers as per Clause 7 of this Agreement. This balance Purchase Money shall be paid out to the Sellers together with the said ten (10) per cent deposit against the Protocol of Delivery and Acceptance being duly signed by the representatives of both parties at the time of delivery of the Vessel. Any bank fees charged for the holding and/or lifting funds and/or closing shall be equally shared between the Sellers and the Buyers.

## 3. DOCUMENTATION – see also Clause 22

At the time of delivery of the Vessel, the Sellers shall furnish the Buyers with the following documents:

(a) the Bill of Sale, duly executed by a Notary Public, specifying that the Vessel is free from all debts, encumbrances and maritime liens;

(b) a letter from the Sellers undertaking to apply a Deletion Certificate from the ———— Registry promptly after the Vessel's delivery; and

1 7 5

(c) ~~such other documents as may be mutually agreed.~~

Closing and exchange of documents shall take place at ~~the Sellers' nominated place in Japan.~~

## 4. DELIVERY TIME AND PLACE

(a) The Sellers shall deliver the Vessel to the Buyers ~~safely afloat, free of cargo at/on around 15(h) November 2005, (not before~~ ——— 2005) and not later than ——— 2005 (the cancelling date). In case for any reason beyond the control of the Buyers and Sellers the Vessel cannot be delivered at the above time, delivery shall take place on an alternative date acceptable to both SMBC, and the Buyers' Bank, Bank of Tokyo Mitsubishi, but in any case latest by 30th November 2005.

(b) ~~In the event that the Sellers fail to make the Vessel ready for delivery on or before the cancelling date, the Buyers shall have the option of maintaining or cancelling this Agreement, provided such option shall be declared in writing within forty-eight (48) hours (Saturdays, Sundays and Holidays excepted) from the cancelling date. However, any delay not exceeding thirty (30) days caused by force majeure and/or repairs in order to pass the inspection under Clause 5 of this Agreement shall be accepted by the Buyers.~~

(c) ~~The Sellers shall keep the Buyers informed of the Vessel's itinerary and give the Buyers thirty (30)/fifteen (15)/seven (7)/three (3) days notice of approximate expected place and date of readiness for delivery.~~

## 5. DELIVERY CONDITION

The Sellers shall deliver to the Buyers the Vessel substantially in the same "as is" condition as when the Vessel was inspected at the place mentioned in the preamble, fair wear and tear excepted, but with her present class maintained free from outstanding recommendations and average damage affecting her present class with all her class, national and international trading certificates, clean and valid at the time of delivery. In case any recommendations are placed on the Vessel prior to delivery, then the Vessel will be delivered with those recommendations.

## 6. DRYDOCKING — no Drydocking Clause shall apply (but see also Clause 21)

~~For the inspection by the Classification Society mentioned in (c) of the preamble of the Vessel's bottom and other underwater parts below the summer load line ("bottom and other underwater parts"), the Sellers shall place the Vessel in drydock at the port of delivery or near thereto prior to delivery.~~

~~If the rudder, propeller, bottom or other underwater parts be found broken, damaged or defective so as to affect the Vessel's clean certificate of class, the same shall be made good to the Sellers' expense to the Classification Society's satisfaction so as to retain the Vessel's class without qualification.~~

~~While the Vessel is in drydock and if required by the Buyers or the Classification Society's surveyor, the tail end shaft shall be drawn, and should the same be condemned or found defective so as to affect the Vessel's class certificate of class, it shall be renewed or made good at the Sellers' expense to the Classification Society's satisfaction so as to retain the Vessel's class without qualification.~~

~~The cost of drawing and replacing the tail end shaft shall be borne by the Buyers unless the Classification Society requires the tail end shaft to be drawn, made good or renewed.~~

~~The expense of putting the Vessel in and taking her out of drydock and the drydock dues including the fee of the Classification Society's surveyor shall be paid by the Buyers unless the rudder, propeller, bottom, other underwater parts or tail end shall be found broken, damaged or defective as aforesaid, in which case the Sellers shall pay these expenses.~~

~~The Sellers shall pay all costs of transporting the Vessel to the drydock and from the drydock to the place of delivery.~~

## 7. NOTICE OF READINESS AND LIQUIDATED DAMAGES

~~When the Vessel has been approved by the Classification Society's surveyor following the inspection stipulated in the preceding clause, the Vessel shall be deemed ready for delivery and thereupon the Sellers shall tender to the Buyers a notice of readiness for delivery.~~

~~The Buyers shall take over the Vessel within three (3) banking days from the day of the receipt of such notice inclusive~~

In the event of the Buyers not taking delivery of the vessel within the period by the latest date specified above, the Buyers shall pay to the Sellers the sum of US$ 6,000 (United States Dollars Six Thousand) per day as liquidated damages until the Vessel is delivered, but such detention shall not exceed ten (10) days.

## 8. FORCE MAJEURE

Should the Vessel become an actual or constructive total loss before delivery or not be able to be delivered through outbreak of war, political reasons, restraint of Governments, Princes or People, or any other cause which either party hereto cannot prevent, this Agreement shall be deemed to be null and void, and the deposit shall as soon be returned to the Buyers, but the Buyers shall be compensated under insurance provisions elsewhere.

## 9. ALLOCATION OF RISK

The Vessel with everything belonging to her shall be at the Sellers' risk and expense until she is delivered to the Buyers, and after the delivery of the Vessel in accordance with this Agreement the Sellers shall have no responsibility for any possible fault or deficiency of any description.

## 10. BELONGINGS AND BUNKERS – see also Clause 17

~~The Sellers shall deliver to the Buyers the vessel with everything belonging to her at the time of the superficial inspection mentioned in the preamble including all spare parts, stores and equipment, on board or on shore, used or unused, except such things as are in the normal course of operations used during the period between the superficial inspection and delivery. Forwarding charges, if any, shall be for the Buyers' account.~~

~~The Buyers shall take over and pay the Sellers for remaining bunkers and unused lubricating oils at last purchased prices evidenced by supporting vouchers. Bunkers belong to the Charterers and no payment under this Clause shall be made at the time of delivery. Payment under this Clause shall be made on as prior to delivery, in the same currency as the Purchase Money.~~

The Sellers shall provide an inventory list for the Buyers at the time of delivery.

## 11. EXCLUSIONS FROM THE SALE – see also Clause 17

~~The Sellers have the right to take ashore crockery, plate, cutlery, linen and other articles bearing the Sellers' flag or name, provided they substitute for the same an adequate number of similar unmarked items. Decks, cassettes and forms etc., exclusively for use on the Sellers' vessels, shall be taken ashore before delivery.~~

Personal effects of the Master, Officers and Crew including slop chest, and hired equipment and equipment belonging to the Managers are excluded from this sale and shall be removed by the Sellers prior to delivery of the Vessel. The Sellers are also to advise any hired equipment and equipment belonging to the Managers (Krypnex Maritime Co.,Ltd/MK Shipmanagement Co., Ltd. All such equipment shall remain on board the Vessel until termination of the Management Agreement between the Sellers and the Vessel's Managers.

## 12. CHANGE OF NAME ETC.

~~The Buyers undertake to change the name of the Vessel and alter the funnel markings upon delivery of the Vessel.~~

**13. ENCUMBRANCES ETC.**

The Sellers shall deliver to the Buyers the vessel free from all debts, encumbrances and maritime liens and any other debts whatsoever, either than those which are the responsibility of the Buyers.

The Sellers hereby undertake to indemnify the Buyers against all consequences of claims made against the Vessel in respect of liabilities incurred prior to the time of delivery, except insofar as such claims are the responsibility of the Buyers.

**14. DEFAULT AND COMPENSATION**

Should the Buyers fail to fulfil this Agreement, the Sellers have the right to cancel the Agreement, in which case the deposit shall be forfeited to the Sellers. If the deposit does not cover the Sellers' loss caused by the Buyers' non-fulfilment of this Agreement the Sellers shall and be entitled to claim further compensation from the Buyers for any loss and for all expenses.

If the Sellers should default in the delivery of the Vessel with everything belonging to her in the manner and within the time herein specified, the deposit shall at once be returned to the Buyers and in addition the Sellers shall, when such default is due to their negligent or intentional acts or omissions, make due compensation for loss caused by their non-fulfilment of this Agreement.

**15. ARBITRATION**

Any dispute arising out of this Agreement shall be submitted to arbitration held in Tokyo by the Tokyo Maritime Arbitration Commission (TOMAC) of The Japan Shipping Exchange, Inc. in accordance with the rules of TOMAC and any amendments thereto, and the award given by the arbitrators shall be final and binding on both parties. This Agreement shall be governed by and construed in accordance with English law and any dispute arising out of this Agreement shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force, one arbitrator being appointed by each party. On the receipt of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall apply. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.

The additional clauses from 16 to 23 shall be deemed to be fully incorporated in this Agreement.

IN WITNESS WHEREOF the Sellers and the Buyers have signed and executed TWO COPIES of this Agreement the day and year first above written.

THE SELLERS

Ocean Elite Shipholding Limited

By : SAKURO IWAI
Title: Director/Attorney-In-fact

THE BUYERS

Ocean Elite Shipping, Ltd.

By :
Title: Director/Attorney-in-fact

Additional Clauses to Memorandum of Agreement dated 24th October 2005

M.V. "OCEAN ELLIE"

16. The Vessel's continuous Hull and Machinery survey cycles are to be up-to-date with no outstanding or extensions at the time of delivery.

17. The Vessel shall be delivered with everything belonging to her on board, ashore and on order, including stores, provisions, spare parts, lubricating oils, navigational aids and wireless station, used or unused. Forwarding charges, if any, shall be for the Buyers' account.

At the time of delivery the Sellers shall hand to the Buyers the Classification certificate(s) as well as all plans which are on board the Vessel. Other certificates which are on board the vessel shall also be handed over to the Buyers unless the Sellers are required to retain same in which case the Buyers to have the right to take copies. Other technical documentation which may be in the Sellers' possession shall be promptly forwarded to the Buyers at their expense, if they so request. The Sellers may keep the Vessel's logbooks but the Buyers shall have the right to take copies of the same.

18. The Sellers shall confirm in writing at the time of delivery that to the best of their knowledge the Vessel is not blacklisted by the Arab Boycott League in Damascus or any other government or organisation.

19. The Buyers shall have the right at their risk and expense to place onboard up to two (2) representatives for familiarisation purposes only without interference to the Vessel's operation for the duration of the Vessel's last voyage prior to delivery. The Buyers' representatives shall sign the usual indemnity forms.

20. The Vessel shall be delivered with holds in 'as is' condition.

21. No dry-docking clause shall apply, however the Buyers have the right, at their risk and expense, to conduct, prior to delivery, an underwater survey of vessel's bottom and underwater parts, in the presence of Class surveyor and the Buyers' and Sellers' representatives. If the Buyers elect to carry out such an inspection, the same is to be carried out as soon as practically possible after vessel arrives at the delivery port. The Sellers are not obliged to deviate the vessel to a suitable location for this purpose unless fully compensated therefor by the Buyers.

If any damage affecting the vessel's clean maintenance of Class be found to bottom or underwater parts, then the vessel is to be dry-docked in accordance with the terms of Cl.6 of the Nipponsale Form 1993, in which case the Buyers have the right to carry out their own minor works and paint vessel's bottom without interference to the Sellers' works, at the Buyers' time, risk and expense.

### Additional Clauses to Memorandum of Agreement dated 24th October 2005
### M.V. "OCEAN ELLIE"

In case the vessel is dry-docked, then the cancelling date is to be extended by the number of days used for the dry-docking, waiting time for dry-dock and deviation. If the Buyers' works are not completed by the time that the Sellers have completed their works in accordance with the agreed terms/conditions, then the Sellers have the right to tender notice of readiness in dry-dock and deliver the vessel; however, undocking costs always to be for the Sellers' account.

In case Class requires repairs to underwater parts but approves postponement of such repairs until the vessel's next scheduled dry-docking, then the Sellers have the option either to bear the actual direct repair costs incurred at the next dry-docking or to propose monetary settlement, which to be mutually agreed.

22. As soon as possible after execution of this Agreement, the Buyers shall provide a list of closing documents which are reasonably required and, after agreement by the Sellers, the same is to be attached to this Agreement as an Addendum.

23. This sale and all negotiations involved are to be kept strictly private and confidential between the parties directly involved.

180

First Original

| | | |
|---|---|---|
| Issued  16/12/1963<br>Amended 13/7/1971<br>Amended 16/1/1977<br>Amended 9/9/1993 | The Documentary Committee of The Japan Shipping Exchange, Inc.<br>**MEMORANDUM OF AGREEMENT**<br>Code Name ; NIPPONSALE 1993 | Copyright<br>Published by<br>The Japan Shipping<br>Exchange, Inc. |

Date: <u>24th October 2005</u>

IT IS THIS DAY MUTUALLY AGREED between the Sellers mentioned in (i) below ("the Sellers") and the Buyers mentioned in (ii) below ("the Buyers") that the Sellers shall sell and the Buyers shall buy the Vessel named in (iii) below with particulars mentioned in (iv) - (viii) below ("the Vessel"), which has been accepted by the Buyers ~~as a result of their superficial inspection of the Vessel at ――――――― and examination of her Class Records~~ (this sale therefore being outright without further inspection, except as provided herein), on the following terms and conditions:

(i)   Sellers: <u>Paci Setrali Shipping Limited, of Cyprus</u>

(ii)   Buyers: <u>Daisy Shipping, Ltd., of The Marshall Islands</u>

(iii)   Vessel's name: <u>'OCEAN DAISY'</u>

(iv)   Flag: <u>Cyprus</u> (v) Class: <u>NK</u>

(vi)   Built (year and builder's name): <u>1994; Shin Kurushima Dockyard Co., Ltd.</u>

(vii)   Gross register tonnage: <u>8,417</u>  (viii) Summer dead-weight tonnage: <u>14,379 metric tons.</u>

## 1.   PRICE

The Purchase Price of the Vessel shall be <u>¥449,031,762 (Japanese Yen Four Hundred and Forty Nine Million Thirty One Thousand Seven Hundred and Sixty Two only) payable in cash.</u>

## 2.   PAYMENT

(a) ~~As security for the fulfilment of this Agreement, the Buyers shall pay a deposit of ten (10) per cent of the Purchase money, to a bank nominated by the Sellers within three (3) banking days from the date of this Agreement, in the amount of the Sellers and the Buyers, which shall be paid to the Sellers as a part of the Purchase Money in the same manner as the ninety (90) per cent of the Purchase Money hereunder. Any interest earned on the deposit shall be for the Buyers' account and any bank charges on the deposit shall be borne equally by the Sellers and the Buyers.~~

(b) The Buyers shall remit ~~the balance~~ <u>100% of</u> the Purchase Money by telegraphic transfer to <u>their own account or a suspension account</u> in the said a bank <u>nominated by the Sellers</u> latest 2 (two) banking days prior to the expected date of delivery immediately after the Notice of Readiness for Delivery is tendered by the Sellers as per Clause 7 of this Agreement. This balance <u>Purchase Money</u> shall be paid out to the Sellers together with the said ten (10) per cent deposit against the Protocol of Delivery and Acceptance being duly signed by the representatives of both parties at the time of delivery of the Vessel. <u>Any bank fees charged for the holding and/or lifting funds and/or closing shall be equally shared between the Sellers and the Buyers.</u>

## 3.   DOCUMENTATION – see also Clause 22

~~At the time of delivery of the Vessel, the Sellers shall furnish the Buyers with the following documents:~~

(a) ~~the Bill of Sale, duly attested by a Notary Public, specifying that the Vessel is free from all debts, encumbrances and maritime liens;~~

(b) ~~a letter from the Sellers, undertaking to supply a Deletion Certificate from the ――――――― Registry promptly after the Vessel's delivery; and~~

181

(c) such other documents as may be mutually agreed.

Closing and exchange of documents shall take place at the Sellers' nominated place in Japan.

## 4. DELIVERY TIME AND PLACE

(a) The Sellers shall deliver the Vessel to the Buyers safely afloat, free of cargo at/in _____ expected around 8ᵗʰ December 2005, (but before _____ 2005 and not later than _____ 2005 ("the cancelling date"). In case for any reason beyond the control of the Buyers and Sellers the Vessel cannot be delivered at the above time, delivery shall take place on an alternative date acceptable to both ORIX Corp. and the Buyers' Bank, ABN-AMRO, but in any case latest by 15ᵗʰ December 2005.

(b) In the event that the Sellers fail to make the Vessel ready for delivery on or before the cancelling date, the Buyers shall have the option of maintaining or cancelling this Agreement, provided such option shall be declared in writing within forty-eight (48) hours (Saturdays, Sundays and Holidays excepted) from the cancelling date. However any delay not exceeding thirty (30) days caused by force majeure and/or repairs in order to pass the inspection under Clause 6 of this Agreement shall be accepted by the Buyers.

(c) The Sellers shall keep the Buyers informed of the Vessel's itinerary and give the Buyers thirty (30)/fifteen (15)/seven (7)/three (3) days notice of approximate expected place and date of readiness for delivery.

## 5. DELIVERY CONDITION

The Sellers shall deliver to the Buyers the Vessel substantially in the same "as is" condition as when the Vessel was inspected at the place mentioned in the preamble, fair wear and tear excepted but with her present class maintained free from outstanding recommendations and average damage affecting her present class with all her class, national and international trading certificates, clean and valid at the time of delivery. In case any recommendations are placed on the Vessel prior to delivery, then the Vessel will be delivered with these recommendations.

## 6. DRYDOCKING – no Drydocking Clause shall apply (but see also Clause 71)

For the inspection by the Classification Society mentioned in (v) of the preamble of the Vessel's bottom and other underwater parts below the summer load line ("bottom and other underwater parts"), the Sellers shall place the Vessel in drydock at the port of delivery or near thereto prior to delivery.

If the rudder, propeller, bottom or other underwater parts be found broken, damaged or defective so as to affect the Vessel's clean certificate of class, the same shall be made good at the Sellers' expense to the Classification Society's satisfaction so as to retain the Vessel's class without qualification.

While the Vessel is in drydock and if required by the Buyers or the Classification Society's surveyor, the tail end shaft shall be drawn, and should the same be condemned or found defective so as to affect the Vessel's clean certificate of class, it shall be renewed or made good at the Sellers' expense to the Classification Society's satisfaction so as to retain the Vessel's class without qualification.

The cost of drawing and replacing the tail end shaft shall be borne by the Buyers unless the Classification Society requires the tail end shaft to be drawn, made good or renewed.

The expense of putting the Vessel in and taking her out of drydock and the drydock dues including the fee of the Classification Society's surveyor shall be paid by the Buyers unless the rudder, propeller, bottom, other underwater parts or tail end shaft be found broken, damaged or defective as aforesaid, in which case the Sellers shall pay these expenses.

The Sellers shall pay all costs of transporting the Vessel to the drydock and from the drydock to the place of delivery.

## 7. NOTICE OF READINESS AND LIQUIDATED DAMAGES

183

~~When the Vessel has been approved by the Classification Society's surveyor following the inspection stipulated in the preceding clause the Vessel shall be deemed ready for delivery and thereupon the Sellers shall tender to the Buyers a notice of readiness for delivery.~~

~~The Buyers shall take over the Vessel within three (3) banking days from the day of the receipt of such notice inclusive.~~

In the event of the Buyers not taking delivery of the vessel ~~within the period~~ by the latest date specified above, the Buyers shall pay to the Sellers the sum of US$6,000 (United States Dollars Six Thousand) per day as liquidated damages until the Vessel is delivered, but such detention shall not exceed ten (10) days.

## 8. FORCE MAJEURE

Should the Vessel become an actual or constructive total loss before delivery or not be able to be delivered through outbreak of war, political reasons, restraint of Governments, Princes or People, or any other cause which either party hereto cannot prevent, this Agreement shall be deemed to be null and void, ~~and the deposit shall at once be returned to the Buyers,~~ but the Buyers shall be compensated under insurance provisions elsewhere.

## 9. ALLOCATION OF RISK

The Vessel with everything belonging to her shall be at the Sellers' risk and expense until she is delivered to the Buyers, and after the delivery of the Vessel in accordance with this Agreement the Sellers shall have no responsibility for any possible fault or deficiency of any description.

## 10. BELONGINGS AND BUNKERS – see also Clause 17

~~The Sellers shall deliver to the Buyers the vessel with everything belonging to her at the time of the superficial inspection mentioned in the preamble including all spare parts, stores and equipment, on board or on shore, used or unused, except such things as are in the actual course of operations used during the period between the superficial inspection and delivery, Forwarding charges, if any, shall be for the Buyers' account.~~

~~The Buyers shall take over and pay the Sellers for remaining bunkers and unused lubricating oils at last purchased price evidenced by supporting vouchers.~~ Bunkers belong to the Charterers and no payment shall be made at the time of delivery. Payment under this Clause shall be made on or prior ~~to delivery in the same currency as the Purchase Money.~~

The Sellers shall provide an inventory list for the Buyers at the time of delivery.

## 11. EXCLUSIONS FROM THE SALE – see also Clause 17

~~The Sellers have the right to take ashore crockery, plate, cutlery, linen and other articles bearing the Sellers' flag or name, provided they substitute for the same an adequate number of similar unmarked items. Books, drawings and forms etc. exclusively for use on the Sellers' vessels, shall be taken ashore before delivery.~~

Personal effects of the Master, Officers and Crew including slop chest, ~~and~~ hired equipment and equipment belonging to the Managers are excluded from this sale ~~and shall be removed by the Sellers prior to delivery of the Vessel.~~ The Sellers are also to advise any hired equipment and equipment belonging to the Managers (Kermas Maritime Co. Ltd./MK Shipmanagement (H.K.) Co., Ltd.) All such equipment shall remain on board the Vessel until termination of the Management Agreement between the Sellers and the Vessel's Managers.

## 12. CHANGE OF NAME ETC.

~~The Buyers undertake to change the name of the Vessel and alter the funnel markings upon delivery of the Vessel.~~

### 13. ENCUMBRANCES ETC.

The Sellers shall deliver to the Buyers the vessel free from all debts, encumbrances and maritime liens and any other debts whatsoever, other than those which are the responsibility of the Buyers.

The Sellers hereby undertake to indemnify the Buyers against all consequences of claims made against the Vessel in respect of liabilities incurred prior to the time of delivery, except insofar as such claims are the responsibility of the Buyers.

### 14. DEFAULT AND COMPENSATION

Should the Buyers fail to fulfil this Agreement, the Sellers have the right to cancel the Agreement, in which case the deposit shall be forfeited to the Sellers. If the deposit does not cover the Sellers' loss caused by the Buyers' non-fulfilment of this Agreement, the Sellers shall and be entitled to claim further compensation from the Buyers for any loss and for all expenses.

If the Sellers should default in the delivery of the Vessel with everything belonging to her in the manner and within the time herein specified, the deposit shall at once be returned to the Buyers and in addition the Sellers shall, when such default is due to their negligent or intentional acts or omissions, make due compensation for loss caused by their non-fulfilment of this Agreement.

### 15. ARBITRATION

Any dispute arising out of this Agreement shall be submitted to arbitration held in Tokyo by the Tokyo Maritime Arbitration Commission ("TOMAC") of The Japan Shipping Exchange, Inc. in accordance with the rules of TOMAC and any amendments thereto, and the award given by the arbitrators shall be final and binding on both parties. This Agreement shall be governed by and construed in accordance with English law and any dispute arising out of this Agreement shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force, one arbitrator being appointed by each party. On the receipt of the appellation in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall apply. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.

The additional clauses from 16 to 23 shall be deemed to be fully incorporated in this Agreement.

IN WITNESS WHEREOF the Sellers and the Buyers have signed and executed TWO COPIES of this Agreement the day and year first above written.

THE SELLERS
Pacifictrail Shipping Limited

By : SAKURA (wa)
Title: Director/Attorney-in-fact

THE BUYERS
Daisy Shipping, Ltd.

By :        CHANALAMP-S 2106 A3
Title: Director/Attorney-in-fact

184

### Additional Clauses to Memorandum of Agreement dated 24th October 2005

### M.V. "OCEAN DAISY"

16. The Vessel's continuous Hull and Machinery survey cycles are to be up-to-date with no outstanding or extensions at the time of delivery.

17. The Vessel shall be delivered with everything belonging to her on board, ashore and on order, including stores, provisions, spare parts, lubricating oils, navigational aids and wireless station, used or unused. Forwarding charges, if any, shall be for the Buyers' account.

    At the time of delivery the Sellers shall hand to the Buyers the Classification certificate(s) as well as all plans which are on board the Vessel. Other certificates which are on board the vessel shall also be handed over to the Buyers unless the Sellers are required to retain same in which case the Buyers to have the right to take copies. Other technical documentation which may be in the Sellers' possession shall be promptly forwarded to the Buyers at their expense, if they so request. The Sellers may keep the Vessel's logbooks but the Buyers shall have the right to take copies of the same.

18. The Sellers shall confirm in writing at the time of delivery that to the best of their knowledge the Vessel is not blacklisted by the Arab Boycott League in Damascus or any other government or organisation.

19. The Buyers shall have the right at their risk and expense to place onboard up to two (2) representatives for familiarisation purposes only without interference to the Vessel's operation for the duration of the Vessel's last voyage prior to delivery. The Buyers' representatives shall sign the usual indemnity forms.

20. The Vessel shall be delivered with holds in 'as is' condition.

21. No dry-docking clause shall apply, however the Buyers have the right, at their risk and expense, to conduct, prior to delivery, an underwater survey of vessel's bottom and underwater parts, in the presence of Class surveyor and the Buyers' and Sellers' representatives. If the Buyers elect to carry out such an inspection, the same is to be carried out as soon as practically possible after vessel arrives at the delivery port. The Sellers are not obliged to deviate the vessel to a suitable location for this purpose unless fully compensated therefor by the Buyers.

    If any damage affecting the vessel's clean maintenance of Class be found to bottom or underwater parts, then the vessel is to be dry-docked in accordance with the terms of CL6 of the Nipponsale Form 1993, in which case the Buyers have the right to carry out their own minor works and paint vessel's bottom without interference to the Sellers' works, at the Buyers' time, risk and expense.

185

<u>Additional Clauses to Memorandum of Agreement dated 24th October 2005</u>

<u>M.V. "OCEAN DAISY"</u>

In case the vessel is dry-docked, then the cancelling date is to be extended by the number of days used for the dry-docking, waiting time for dry-dock and deviation. If the Buyers' works are not completed by the time that the Sellers have completed their works in accordance with the agreed terms/conditions, then the Sellers have the right to tender notice of readiness in dry-dock and deliver the vessel; however, undocking costs always to be for the Sellers' account.

In case Class requires repairs to underwater parts but approves postponement of such repairs until the vessel's next scheduled dry-docking, then the Sellers have the option either to bear the actual direct repair costs incurred at the next dry-docking or to propose monetary settlement, which to be mutually agreed.

22. As soon as possible after execution of this Agreement, the Buyers shall provide a list of closing documents which are reasonably required and, after agreement by the Sellers, the same is to be attached to this Agreement as an Addendum.

23. This sale and all negotiations involved are to be kept strictly private and confidential between the parties directly involved.

186

Tradewinds (page 12)
11 May 2007

# Athens manager in win-win situation

Athens

Gillian Whittaker

Babis Ziogas-controlled MFS Shipmanagement of Athens looks to be the big winner from the split-up of former FreeSeas partners Ion Varouxakis and the Gourdomichalis brothers as both parties go for fleet expansions.

MFS has emerged as the seller of the four bulkers Nasdaq-listed FreeSeas announced this week it is acquiring for $114m, while George and Stathis Gourdomichalis's privately held company, G Bros, also recently bought a ship out of the MFS fleet for $17m.

FreeSeas says it is paying $47m for the 47,000-dwt *Free Jupiter* (ex-*Olympian Goddess*, built 2002), $25.25m for the 24,300-dwt *Free Hero* (ex-*Ocean Phoenix*, built 1995), $26.75m for the 23,500-dwt *Free Iris* (ex-*Ocean Harmony*, built 1996) and $15m for the *Free Gentleman* (ex-*Ocean Daisy*, built 1994).

Three of the four ships will operate under time charters, FreeSeas says, while the *Free Gentleman* will operate in the spot market. The sale by MFS to G Bros involved the 17,300-dwt *Ocean Ellie* (built 1996).

The sales leave MFS with four ships under management, the 52,000-dwt *Asian Friendship* (built 1993), 18,800-dwt *Asian Century* and *Asian Hope* (both built 2005) and 17,400-dwt *Sider Unity* (built 1995).

The *Asian Friendship* was acquired as the *Prex* in November 2006 for a reported $23.3m.

In the same month the *Sider Unity* was reported sold to Far Eastern interests for $11.7m.

187

**Nick Shepherd**

Subject: Freeseas

## Press Releases

**Freeseas Acquires Fleet of Four Modern Drybulk Carriers; Increases Fleet to Six Vessels
-Transaction to Triple DWT of Fleet, Lower Average Age from 24 to 15 Years-
-First Acquisition Under New Management and Shareholder Structure-**

**May 7, 2007** Piraeus, Greece - FreeSeas Inc. (NASDAQ: FREE, FREEW and FREEZ), a provider of seaborne transportation for dry bulk cargoes, announced today that it had agreed to purchase four second-hand drybulk carriers from non-affiliated parties for approximately US$114 million.

Of the four vessels, three will operate under fixed-rate period time charter contracts, and one will operate in the spot market. The M/V Free Hero will join the FreeSeas' fleet while serving an existing time charter at a gross rate of $14,500 until December of 2008 with an option until February 2009. For the M/V Free Jupiter and the M/V Free Iris, FreeSeas intends to enter into two to three year time charters that will commence upon delivery of these vessels to FreeSeas. The remaining vessel, the M/V Free Gentleman, will operate in the spot market.

The following table details the vessels acquired as part of the transaction announced today.

| Name | Class | DWT | Built | Flag | Purchase Price | Delivery Date | Employment |
|------|-------|-----|-------|------|----------------|---------------|------------|
| FREE JUPITER | Handymax | 47,777 | 2002 | Marshall Islands | US$47.00M | July/August 2007 | 3-year Time Charter Pending |
| FREE HERO | Handysize | 24,318 | 1995 | Marshall Islands | US$25.25M | June/July 2007 | Currently Fixed to 2-year Time Charter through Dec 08/Feb 09 |
| FREE IRIS | Handysize | 23,524 | 1996 | Marshall Islands | US$26.75M | July/August 2007 | 2-year Time Charter Pending |
| FREE GENTLEMAN | Handysize | 14,379 | 1994 | Marshall Islands | US$15.00M | June/July 2007 | Spot |

The Company believes that the current drybulk rate environment presents numerous opportunities for advantageous chartering and the establishment of long-term relationships with high-quality charterers. New charters should provide increased cash flow to finance future growth, including the acquisition of additional vessels, and working capital to move forward on the new corporate strategy initiated in January.

In aggregate, FreeSeas will add approximately 110,000 DWT to its fleet, more than tripling its current 50,000 DWT capacity to 160,000 DWT. Additionally, the average age of the fleet shall decrease considerably from 24 years to 15 years. FreeSeas' fleet will be enhanced in several categories, as indicated in the following chart.

|  | Pre-Acquisition | Post-Acquisition |
|--|-----------------|------------------|
| Number of Vessels | 2 | 6 |
| DWT | 50,000 | 160,000 |
| Avg. Age of Fleet | 24 years | 15 years |
| Est. Market Value of Fleet | $18 million | $132 million |
| Available days for hire | 710 | 2,130 |

To finance the acquisition of these vessels, FreeSeas has entered into agreements with several funding sources, as follows:

- Up to US$11million in balance sheet cash, including US$6.0 million from the recently closed sale of the M/V Free Fighter;
- US$89 million in acquisition debt: US$67 to US$68 million under a senior loan from HSH Nordbank and US$21.5 million in a junior loan from Bank of Tokyo Mitsubishi; and
- Up to US$14 million in the form of a new non-amortizing shareholder loan.

The shareholder loan will accrue 12.0% interest on a yearly and "pay-in-kind" basis and no cash payments will be due before the final settlement of the loan. Additionally, the Company will issue to the shareholder, FS Holdings Ltd., a company owned by members of the Restis family, 50,000 warrants exercisable at US$5.00 for every US$1.0 million drawn under the shareholder loan.

"With this important event, FreeSeas enters the next phase of its growth plan," said Mr. Ion Varouxakis, Chairman of the Board, President and Chief Executive Officer. "As we stated in January of this year, our recent management and shareholder realignment was geared primarily toward further expanding and modernizing our fleet. We believe this transaction clearly shows that we are executing on that strategy. Going forward, we will look to expand our presence in the drybulk sector and provide opportunities to increase shareholder value by securing employment for our vessels in the current high drybulk charter rate environment."

About FreeSeas Inc.

188

FreeSeas Inc. is a Marshall Islands corporation with principal offices in Piraeus, Greece. FreeSeas is engaged in the transportation of dry bulk cargoes through the ownership and operation of dry bulk carriers. Currently, it has a fleet of two Handysize vessels. FreeSeas' common stock and warrants trade on the NASDAQ Capital Market under the symbols FREE, FREEW and FREEZ, respectively. Risks and uncertainties are described in reports filed by FreeSeas Inc. with the US Securities and Exchange Commission, which can be obtained free of charge on the SEC's website at www.sec.gov. For more information about FreeSeas Inc. please go to our corporate website www.freeseas.gr.

Forward-Looking Statements
This press release contains forward-looking statements (as defined in Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended) concerning future events and the Company's growth strategy and measures to implement such strategy, including expected vessel acquisitions. Words such as "expects," "intends," "plans," "believes," "anticipates," "hopes," "estimates," and variations of such words and similar expressions are intended to identify forward-looking statements. Although the Company believes that the expectations reflected in such forward-looking statements are reasonable, no assurance can be given that such expectations will prove to be correct. These statements involve known and unknown risks and are based upon a number of assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which are beyond the control of the Company. Actual results may differ materially from those expressed or implied by such forward-looking statements. Factors that could cause actual results to differ materially include, but are not limited to, changes in the demand for dry bulk vessels; competitive factors in the market in which the Company operates; risks associated with operations outside the United States; and other factors listed from time to time in the Company's filings with the Securities and Exchange Commission. The Company expressly disclaims any obligation or undertaking to release publicly any updates or revisions to any forward-looking statements contained herein to reflect any change in the Company's expectations with respect thereto or any change in events, conditions or circumstances on which any statement is based.

For further information please contact:

Company Contact:
Ion Varouxakis
Chief Executive Officer
FreeSeas Inc.
89 Akti Miaouli Street
185 38 Piraeus, Greece
Tel: 011-30-210-45-28-770
Fax: 011-30-210-429-10-10
E-Mail: info@freeseas.gr
www.freeseas.gr

Investor Relations / Financial Media:
Thomas J. Rozycki, Jr.
Sr. Vice President
Cubitt Jacobs & Prosek Communications
350 Fifth Avenue – Suite 3901
New York, NY 10118, USA
Tel: +1.212.279.3115 x208
Fax: +1.212.279-3117
E-Mail: trozycki@cjpcom.com
www.cjpcom.com

Anthony Kandylidis
Drybulk S.A.
OMEGA BUILDING
80, Kifissias Av., GR-15125
Amaroussion Greece
Phone: +302108090506
Fax +302108090586
Mobile: +306944323939
E-mail: ak@cardiff.gr

189

19/07/2007

(INCE
&CO)

INTERNATIONAL
LAW FIRM

Cardiff Marine Inc
Omega Building
80 Kifissias Avenue
Amaroussion 151 25
Greece

International House
1 St Katharine's Way
London E1W 1UN
DX 1070 London City

Tel +44 20 7481 0010
Fax +44 20 7481 4968
www.incelaw.com

Attn: Mr George Economou/Mr Aris Ioannidis

Your Ref

Our Ref    NS/MH/8262/8648

19 July 2007

By E-mail

Dear Sirs

## Ocean Trade S.A. & Others v Babis Ziogas & Others

In light of recent developments in this matter we wanted to take this opportunity to let you have a
short opinion on the fiduciary duties and obligations of an agent to his principal under English law.

### Duties and obligations of the agent to the principal

In entering into a written or oral agency agreement, the law usually treats an agent as a fiduciary and
thus requires him to fulfil a range of duties which equity imposes on fiduciaries. The extent to which
these apply and the strength of their application vary according to the nature and circumstances of
the agency agreement. The fiduciary duties and obligations of an agent will generally include (but
are not necessarily limited to) the following:

- a duty to act loyally towards the company[1];

- a duty to act in good faith in the best interests of the company;

- a duty to keep and be prepared to render accounts of his dealings on behalf of his principal;

- a duty to subordinate his own interests to those of his principal;

- a duty to avoid conflicts of interest between the principal and other principals; and

- a duty to refrain from using his position as agent to acquire for himself property, contracts,
  business opportunities or other benefits which he ought (if acquiring them at all) to do so for
  his principal[2].

---

[1]    It goes without saying that an agent may not receive a bribe or secret commission. If he does so, the
       principal may claim the bribe in an action for money had and received or recover as damages in tort
       any loss he suffers as the result of entering into the transaction to which the bribe relates.

[2]    *Bristol and West Building Society v Mothew* [1998] Ch 1, per Millett LJ, at 18; *Bowstead and Reynolds* para 6-
       032 ff. Note, in this regard, that an agent's duty to produce accounts relating to the period of his agency

190



INTERNATIONAL
LAW FIRM

19 July 2007

While the law does allow various duties to be qualified or even excluded by agreement with the principal after full disclosure by the agent of all material facts, it is a fundamental rule under English law that an agent or other fiduciary cannot exclude liability for fraud or other wilful default.[3]

<u>What remedies are available to a principal for an agent's breach of duties/obligations?</u>

The remedies available to a principal for breach of an agent's contractual duties are the normal remedies available for breach of contract, including damages. The remedies for breach of fiduciary duty vary according to circumstances. They include personal remedies, such as an account and payment of monies received for the principal, compensation by way of equitable debt for loss caused to the principal, and confiscation of a bribe or secret commission received by the agent; and remedies for the enforcement of proprietary rights, such as a constructive trust of money or other assets received by the agent for himself which he should have received (if at all) for his principal, and the proceeds from the principal's property which the agent has misappropriated.

<u>Summary</u>

We trust that the above short opinion is of assistance. However, perhaps the best way to summarise the duties and obligations of a fiduciary under English law would be to quote the dictum of Millett LJ in *Bristol & West Building Society v. Mothew* [1998] Ch 1 at page 18:

> *"A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary".*

Yours faithfully,

Ince & Co

**191**

---

continues after the agency relationship has ended (*Yasuda Fire and Marine Insurance Co of Europe Ltd v Orion Marine Insurance Underwriting Agency Ltd*, n 15).

3    *HIH Casualty and General Insurance Ltd v Chase Manhattan Bank* [2003] 2 Lloyd's Rep 61.



POLES, TUBLIN, STRATAKIS, GONZALEZ & WEICHERT, LLP

*Established 1957*

July 19, 2007

46 Trinity Place
New York, NY 10006
Tel: (212) 943-0110
Fax: (212) 269-9875

127 East Mt. Pleasant Ave
Livingston, NJ 07039
Tel: (973) 992-3555
Fax: (973) 992-3597

5-7 Filellinon St.
Piraeus 18536 Greece
Tel: 011 30210 429 4200
Fax: 011 30210 429 4625

www.polestublin.com
reception@polestublin.com

Ince & Co.
International House
1 St. Katherine's Way
London E1W 1Ay
England

Attention: Nick Shepherd & Mark de la Haye, Esq.

Dear Mr. Shepherd & Mr. de la Haye:

You have asked us to explain the fiduciary obligations of a director of a corporation organized under the laws of the Republic of Liberia.

We have acted as advisers to you on matters of Liberian law, and, although not qualified in the laws of nor admitted to practice before the courts of the Republic of Liberia, we are familiar with and experienced in the company and contract laws of the Republic of Liberia. This opinion is limited to the law of Liberia as at the date hereof and is given on the basis that it will be governed by and construed in accordance with the law of the Republic of Liberia. We express no opinion about the laws of any other jurisdiction.

Directors, as well as officers, of Liberian corporations are obligated under Liberian corporate law to exercise their duties "in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions." (Section 6.14, Business Corporation Act)

Notwithstanding the foregoing, a director is protected from personal liability if the director acts in good faith reliance upon "the records of the corporation" or upon "information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation." (Section 6.14, Business Corporation Act)

Liberian law generally absolves corporate directors and officers of personal liability for corporate debts and obligations. (Section 2.6, Business Corporation Act). However, personal liability may be imposed upon a director in the following three instances:

(a) Any breach of the director's duty of loyalty to the corporation or its shareholders or members;

192

July 19, 2007
Page 2
Nick Shepherd & Mark de la Haye, Esq.

(b) Acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law;

(c) Any transaction from which the director derived an improper personal benefit. (Section 2.6, Business Corporation Law)

Furthermore, the personal liability imposed above applies not only to appointed directors, but to other persons who, (pursuant to the provisions of the company's Articles of Incorporation or registration), exercise or perform corporate powers "otherwise conferred or imposed upon the board of directors."

This opinion is strictly limited to the matters stated in it and does not apply by implication to any other matters.

Very truly yours,

POLES, TUBLIN, STRATAKIS, GONZALEZ & WEICHERT, LLP

*Poles Tublin Stratakis Gonzalez & Weichert, LLP*

JCS/jf

16-07-2007  20:43   FROM- SCORINIS LAW OFFICES          +30 210 4181822   T-836  P.001/003  F-997

# SCORINIS LAW OFFICES

67, IROON POLYTECHNIOU AVENUE
GR-185 36 PIRAEUS          GREECE

| | |
|---|---|
| Telephones | +30 210 418 18 18 |
| | +30 210 452 58 49 |
| Fax | +30 210 418 18 22 |
| E-mail | mail@scorinis.gr |

Nicholas G. Scorinis
F. Scorini - Papartigopoulou
George K. Papadopoulos
Dimitrios Th. Lais
George D. Pavis
John E. Vrellos
Asteria G. Bagouli
George P. Tranakidis
Maria G. Botsi
Evangelia S. Mitsou
George N. Scorinis
Evanthia N. Scorini
Dimitrios V. Karais

8262

Your Ref:

Our Ref:

19 July 2007

Ince & Co
International House
1 St Katharine's Way
London, E1W 1AY
England
Attn : Mr. Nick Shepherd

Dear Sirs,

### Re : Ocean Trade S.A. & Others y Babis Ziogas & Others

You have asked us to provide our advice upon potential claims in tort which may be governed by Greek law.

Your client is Ocean Trade S.A. of Liberia, who is presently involved in a dispute with its former manager/agent, Mr. Charalambos (Babis) Ziogas and various companies owned/controlled by him ("the Ziogas companies").

We understand from you that Mr. Ziogas negotiated and concluded on behalf of Ocean Trade an agreement with the Japanese company Keymax Maritime Co Ltd, under which Keymax had to arrange for purchase options to be issued by its subsidiaries / affiliates in favour of Ocean Trade in respect of 6 ships. You advise that Mr. Ziogas kept the existence of that agreement secret from other participants in Ocean Trade and later arranged for a new agreement with Keymax for purchase options to be issued in favour of a company owned / controlled by Mr. Ziogas. You

1

F:\WIN-DATA\LET\to\ince.doc\190707

19-07-2007   20:43    FROM- SCORINIS LAW OFFICES         +30 210 4191822        T-836   P.002/003   F-097

## SCORINIS LAW OFFICES

Page_____

Date_____

mentioned  that apparently all this was done at a time when Mr. Ziogas continued to act as the managing director of Ocean Trade. At a later stage, companies owned / controlled by Mr. Ziogas exercised the purchase options and then  became the registered owners of the vessels, having been the bareboat charterers before this.

On the assumption that the wrongful acts or omissions were committed in Greece, you have asked us to advise whether Ocean Trade has a cause of action under Greek law against the companies owned / controlled by Mr. Ziogas that became the bareboat charterers and then the registered owners of the Ocean Harmony, Ocean Phoenix, Ocean Daisy and Ocean Ellie.

### Our Advice

In accordance with article 26 of the Greek Civil Code *"obligations arising from tort are governed by the law of the country where the tort was committed"*. Additionally, article 914 of the above Code, which is the first article of a chapter titled "Torts", defines  the meaning of a tort as follows : *"A person who unlawfully and through his fault has caused prejudice to another shall be liable for compensation"*. The requirements for the application of the said article 914 are the following :

    a)  Unlawful  behaviour.

    b)  Fault. This includes both  intention and negligence, but one is sufficient.

    c)  Damages (Prejudice) and

    d)  A causation link exist between the unlawfulness/faulty behaviour

        and the damages.

In this case it goes without saying that Mr. Ziogas committed a tort against Ocean Trade because he did not disclose to them the option agreement he concluded following instructions and on their behalf, an omission which constitutes an undisputed breach of his duties to his principals and namely of his duty to inform them regarding the assignment that he undertook (article 718 of the Greek Civil Code) and of his duty to return whatever he acquired in executing such assignment (article 719 of the Greek Civil Code) . Further to the above, the Ziogas' Companies being aware of the said tort (since they are represented/controlled by Mr. Ziogas) either where used  in order that the latter  to become  the real owner of the vessels through the corporate veil of same or they (the Ziogas' companies) took advantages of this unlawful situation to become owners of the vessels. If the first case applies then Ocean Trade can ask for the lifting of the corporate veil of said companies in

2

P:\WIN-DATA\LET\stince.doc//190707

SCORINIS LAW OFFICES

Page._____
Date._____

order that the vessels to be considered as truly owned by Mr. Ziogas personally which may constitute ground for a claim going to the ownership of the vessels. The lifting of the corporate veil of the  Zlogas' companies can be grounded upon the article 281 of the Greek Civil Code prohibiting the abuse of rights including the use of the corporate veil of companies to try to protect against personal liability for the commission of torts. Should the second case apply then Ocean Trade has a claim for compensation against the Ziogas' companies because they harmed their interests in a fraudulent way against the good morals as provided in article 919 of the Greek Civil Code.

In view of the above, we are of the opinion that Ocean Trade in either of the above cases has a claim against the Ziogas' companies under Greek law if they intentionally deprived and/or they were used by Mr. Ziogas in order for  Ocean Trade to be deprived  of its contractual rights under the Keymax Master Agreement and the benefits thereunder.

## The obligations of an agent (fiduciary) under Greek law

Under article 718 of the Greek Civil Code the agent has an obligation to inform his principal in respect of the assignment he undertook and to give account to his principal after the carrying out of the mandate.

Under article 719 of the Greek Civil Code, the agent has an obligation to return to the principal whatever he has received for the execution of the mandate or [whatever] he has acquired in executing the mandate.

Also the Courts have held that the agent is obliged to carry out the matter assigned to him, in accordance with the instructions of his principal and if there are no such instructions, to do whatever the nature of the case and the interest of the principal imposes. Furthermore it is  accepted by the academics that the obligations of the agent is to carry out the assigned matter, in accordance with  good faith and the commercial ethics, as same are provided in articles 200 and 288 of the Greek Civil Code.

Yours faithfully

SCORINIS LAW OFFICES

3

F:\WIN-DATA\ET\letter2.doc//160707

# OKABE & YAMAGUCHI
### COUNSELLORS AT LAW

9TH FL., YOKOKAWA BLDG.
17-27, SHINKAWA 1-CHOME
CHUO-KU, TOKYO 104-0033

TEL  : +81 (3) 3555-7931
FAX  : +81 (3) 3555-7934
E-mail : hoklawj@olo.gr.jp
URL : http://www.olo.gr.jp

To: Ince & Co
International House
1 St Katharine's Way
London, E1 W 1AY
England
FAO: Mr Nick Shepherd

19 July 2007

Dear Sirs,

Re:   Ocean Trade S.A. & Others v Babis Ziogas & Others

You have asked us to let you have some advice upon potential claims in tort which may be governed by Japanese law.

Your client is Ocean Trade S.A. of Liberia, who is currently involved in a dispute with its former manager/agent, Mr Charalambos (Babis) Ziogas and various companies owned/controlled by him.

We understand from you that Mr Ziogas negotiated and concluded on behalf of Ocean Trade an agreement with Japanese company Keymax Maritime Co Ltd, under which Keymax to arrange for purchase options to be issued by its subsidiaries/affiliates in favour of Ocean Trade in respect of 6 ships. You advise that Mr Ziogas kept the existence of that agreement secret from other participants in Ocean Trade and later arranged a new agreement with Keymax for the right to the purchase options to be issued in favour of a company owned/ controlled by Mr Ziogas. Apparently all this was done at a time when Mr Ziogas continued to act as the managing director of Ocean Trade. At a later stage companies owned/controlled by Mr Ziogas exercised the purchase options and became the registered owners of the vessels, having been the bareboat charterers before this.

On the assumption that the wrongful acts or omissions were committed in Japan, you have asked us to advise whether Ocean Trade has a cause of action under Japanese law against the companies owned/controlled by Dr Ziogas that exercised the purchase options and became the bareboat charterers and later the registered owners of the Ocean Harmony, Ocean Phoenix, Ocean Daisy and Ocean Ellie.

| Attorney | | Marine Counsel | Claims Manager | |
|---|---|---|---|---|
| Hiroki Okabe | Takehiko Tozuka | Capt. Y. Uetani | Y. Yamada | **197** |
| Shuji Yamaguchi | Kanako Ohshima | Capt. O. Azuma | M. Suzuki | |
| Teishi Aizawa | Teruyuki Sago | | | |

# OKABE & YAMAGUCHI

### COUNSELLORS AT LAW

9TH FL., YOKOKAWA BLDG.
17-27, SHINKAWA 1-CHOME
CHUO-KU, TOKYO 104-0033

TEL  : +81 (3) 3555-7931
FAX  : +81 (3) 3555-7934
E-mail : hoklawj@olo.gr.jp
URL : http://www.olo.gr.jp

---

**Our Advice**

We think that a tort claim by Ocean Trade lies against the companies owned
/controlled by Mr. Ziogas ("the Ziogas companies") when they intentionally
deprived it of the contractual rights under the Keymax Master Agreement in
breach of the public order and good morals here in Japan in accordance with
Art.709 of Japanese Civil Code even though both parties involved are foreign
companies.

Article 709 (Unlawful act-compensation for damage):

"A person who violates intentionally or negligently the right of another is
bound to make compensation for damage arising therefrom"

In this case we think that a tort was committed against Ocean Trade by the Ziogas
companies based on Art.709. The Ziogas companies by entering into the bareboat
charter hire purchase agreements in accordance with terms of the EWMI Master
Agreement deprived Ocean Trade of its rights to the purchase options under the
Keymax Master Agreement. This was a violations of the rights of Ocean Trade
against the public order and good morals. A further violation of Ocean Trade's
rights occurred during the second half of 2005 when the Ziogas companies took
delivery of and became the owners of the Ocean Harmony, the Ocean Phoenix, the
Ocean Daisy and the Ocean Ellie pursuant to various Memorandum of Agreement, as
such actions deprived Ocean Trade of their rights to become the owners of the vessels
by exercising the purchase options that were to be issued to them in accordance with
the terms of the Keymax Master Agreement.

For the purposes of determining whether the acts of the Ziogas companies are against
the public order and good morals, and whether the Ziogas companies violated the
rights of Ocean Trade knowingly and intentionally, the companies will be regarded as
having the same knowledge as Mr Ziogas since he owned/controlled them and
therefore the companies will be considered to know what Mr Ziogas knew and to
know that the purchase options should have been issued in favour of  Ocean Trade in
accordance with the contract that had been concluded whilst Mr Ziogas was acting as
the manager and/or agent of Ocean Trade.

Yours faithfully,

Teishi Aizawa
Okabe & Yamaguchi

---

| Attorney | | Marine Counsel | Claims Manager | |
|---|---|---|---|---|
| Hiroki Okabe | Takchiko Tozuka | Capt. Y. Uctani | Y. Yamada | **1 9 8** |
| Shuji Yamaguchi | Kanako Ohshima | Capt. O. Azuma | M. Suzuki | |
| Teishi.Aizawa | Teruyuki Sago | | | |

To: Ince & Co
Attn: Mr Nick Shepherd


Re: MFS SHIPMANAGEMENT CORP (the "Company")

In accordance with your instructions, a trainee lawyer of our firm (Mrs Christina Tsakona) has carried out a search in relation to the above company on 17 July 2007 at 13.45 Greek time with the register of foreign companies, kept with the Greek Ministry of Mercantile Marine and she has found out the following:

1.- The Company was incorporated on 19 May 2003 initially under the name "Maritime Financial Services Corporation" in accordance with Marshall Islands law and on 20.1.2005 has obtained a permission from the Greek Authorities to open and operate an office in Greece under Law, known as 89.

2.- By a virtue of Minutes dated 20 June 2004, signed by Mr Charalambos Ziogas on behalf of the Company, it is stated that the Directors of the Company are:

  - Mr Charalambos Ziogas, President
  - Mrs Efthimia Zioga, Secretary/Treasurer

3.- By a virtue of Minutes dated 14 December 2004 both the above Directors of the Company appoint Mrs Efthimia Zioga as representative of the company in Greece.

4.- On 19 January 2006 the Company was renamed from "Maritime Financial Services Corporation" to "MFS SHIPMANAGEMENT CORP".

5.- By a virtue of Minutes dated 4 September 2006 Mrs Efthimia Zioga resigns as Director and so Mr Charalambos Ziogas becomes the sole Director of the Company. With the same Minutes Mrs Ekaterini Christelou is appointed as a new representative of the Company.

1 C:\Documents and Settings\castella\Local Settings\Temporary Internet Files\OLK45\ince.d

199

| | | | THE MFS SHIPS - COMMONALITY OF OWNERSHIP |
|---|---|---|---|
| **Number** | **Document** | **Date** | **Comments** |
| | | | **1 – 9. ASIAN CENTURY DOCUMENTS** |
| 1. | First Preferred Marshall Islands Vessel Mortgage for M/V "Asian Century" | 21 March 2006 | Signed by MFS's legal representative, Ekaterini Christellou, Asian Century Shipping's Attorney-in-Fact. |
| 2. | Loan Agreement for a Secured Loan Facility of up to US$17,500,000.00 between Bremer Landesbank (as Bank Mortgagee) and Asian Century Ltd (as Borrowers) | 28 February 2006 | See page 59, which states that notices, requests, demands or other communications if to be sent to any Security Party (defined as Borrowers and Corporate Guarantors, named as East-West Maritime Investments Ltd.), must be sent to MFS Shipmanagement Corp. in Greece, quoting the sole email address of Babis Ziogas (bziogas@m-fs.com). See also page 61, where this document is signed for and on behalf of Asian Century Shipping Ltd by Babis Ziogas pursuant to a Power of Attorney dated 21 February 2006 in the presence of Michael G. Alexiou, Asian Century's Attorney-at-Law. |
| 3. | First Priority Assignment of Insurances in respect of "Asian Century" | 21 March 2006 | No comment |
| 4. | First Priority Assignment of Earnings and Requisition Compensation in respect of motor vessel "Asian Century" | 21 March 2006 | No comment |
| 5. | Second Preferred Marshall Islands Vessel Mortgage in | 21 March 2006 | Signed by MFS's legal representative, Ekaterini Christellou, Asian Century's Attorney in-Fact, for and on behalf of Asian Century Ltd. |

1:03.5468.00 4853256

## THE MFS SHIPS - COMMONALITY OF OWNERSHIP

| Number | Document | Date | Comments |
|---|---|---|---|
| | respect of M/V "Asian Century" | | |
| 6. | Loan Agreement for a Secured Loan Facility of up to US$17,500,000.00 between Bremer Landesbank as Bank/Mortgagee and Asian Hope Shipping Ltd as Borrowers | 31 January 2006 | This Loan Agreement between the Bank and Asian Hope Shipping is attached as Exhibit No. 1 to the Second Preferred Mortgage of M/V "Asian Century" referred to above.  Asian Century Shipping Ltd is named, at page 5 of this document, as the "Collateral Owner", with the "Collateral Vessel" being the "Asian Century".

Again, see page 59, all notices etc to be sent to MFS Shipmanagement Corp. to Babis' personal email account.

See also page 61, where this Loan Agreement is signed by Babis Ziogas for and on behalf of Asian Hope Shipping Ltd. |
| 7. | Guarantee for a Secured Loan Facility of US$17,500,000.000 to "Asian Hope Shipping Ltd" made between Asian Century Shipping Ltd and Bremer Landesbank | 31 January 2006 | See page 3 where the "Guarantors" are named as East-West Maritime Investments Ltd of the Marshall Islands. Again, see page 14, notices etc to be sent to MFS Shipmanagement Corp are to be sent to Babis' personal email account.

See page 16 where this Agreement is signed by Babis for and on behalf of Asian Century Shipping. |
| 8. | Second Priority Assignment of Insurances in respect of motor vessel "Asian Century" between Asian | 21 March 2006 | This unsigned document appears as if it would have been signed by Ekaterini Christellou for and on behalf of Asian Century Shipping Ltd. |

2

1:53,840G,03-4033250

THE MFS SHIPS - COMMONALITY OF OWNERSHIP

| Number | Document | Date | Comments |
|---|---|---|---|
| | Century Ltd and Bremer Landesbank | | |
| 9. | Second Priority Assignment of Earnings and Requisition Compensation in respect of motor vessel "Asian Century" | 21 March 2006 | No comment. |
| | | | **10 – 13: ASIAN FRIENDSHIP DOCUMENTS** |
| 10. | First Preferred Marshall Islands mortgage in respect of m.v. "Asian Friendship" between Asian Friendship Shipping Ltd (as Owner) and HSH Nordbank AGN (as security trustee) | 17 November 2006 | See page 11, where the mortgage has been signed by Babis Ziogas under the words "this mortgage has been executed by the duly authorised Attorney-in-Fact of the Owner..." |
| 11. | Loan Agreement relating to a secured loan facility of up to US$67,730,000 between Ellie Shipping Ltd, Harmony Shipping Ltd, Olympian Goddess Shipping Ltd and Asian Friendship Shipping Ltd and Asian Unity Shipping Ltd (as joint and several borrowers) on the | 14 November 2006 | See page 2 where the "Approved Manager" is named as MFS Shipmanagement Corp. See page 4 where the "Corporate Guarantor" is East West Maritime Investments Ltd, which we know to be a Babis Ziogas owned/controlled entity. See page 74 where the address for all notices etc to the Borrowers (being Ellie Shipping Ltd, Harmony Shipping Ltd, Olympian Goddess Shipping Ltd, Asian Friendship Shipping Ltd and Asian Unity Shipping Ltd) is stated as c/o MFS |

3

1.0.3.0495.00.4.003258

## THE MFS SHIPS - COMMONALITY OF OWNERSHIP

| Number | Document | Date | Comments |
|---|---|---|---|
| | one hand and various banks as "Lenders" and "Swap Banks" and "Agent and as Security Trustee" | | Shipmanagement Corp. in Greece.<br><br>See, in particular, pages 91 to 94, being the "Execution Pages" which have been signed 5 times by Babis Ziogas on behalf of the Borrowers being the five "Shipping Ltd" companies listed above. |
| 12. | International Swaps and Derivatives Association Inc ("ISDA") Master Agreement between the Bank of Tokyo Mitsubishi Ltd on the one hand and Ellie Shipping Ltd, Harmony Shipping Ltd, and Olympian Goddess Shipping Ltd on the other hand | 1 November 2005 | See page 24 of this Agreement which is signed by Babis Ziogas for and on behalf of the "Shipping Ltd" companies, as an "Attorney-in-Fact".<br><br>The address for notices to the Shipping Ltd companies is given, at page 29, is c/o Maritime Financial Services Ltd in Greece.<br><br>At page 32 of this Agreement are further signatures by Babis Ziogas for and on behalf of Ellie Shipping Ltd, Harmony Shipping Ltd and Olympian Goddess Shipping Ltd. |
| 13. | Agency and Trust Deed relating to the security loan facility of up to US$67,730,000 | ... November 2006 | No comment. |
| | | | **14 – 19: ASIAN HOPE DOCUMENTS** |
| 14. | First Preferred Marshall Islands vessel mortgage for m/v "Asian Hope" between Asian Hope Shipping Ltd and Bremer Landesbank | 8 February 2006 | This mortgage is signed by Ekaterini Christellou as the Attorney-in-Fact of Asian Hope Shipping Ltd. |

4

1.03.0493.00 4833256

## THE MFS SHIPS - COMMONALITY OF OWNERSHIP

| Number | Document | Date | Comments |
|---|---|---|---|
| 15. | Loan Agreement for a secured loan facility of up to US$17,500,000 between Bremer Landesbank (as bank/mortgagee) and Asian Hope Shipping Ltd (as Borrowers) | 31 January 2006 | The "Collateral Owner" is stated as being Asian Century Shipping Ltd and the "Collateral Vessel" is "Asian Century". The "Corporate Guarantor" is stated, at page 6, to be each of (i) East-West Maritime Investments Ltd and (ii) the Collateral Owner. Again, all notices etc. if to be sent to any Security Party (Borrowers and Corporate Guarantors), must be sent to MFS Shipmanagement Corp and it specifically gives Babis's personal email address. This agreement is signed by Babis Ziogas (see page 61) for and on behalf of Asian Hope Shipping Ltd in the presence of Michael G. Alexiou. |
| 16. | First Priority Assignment of Insurances in respect of motor vessel "Asian Hope" between Asian Hope Shipping Ltd and Bremer Landesbank | 8 February 2006 | This document is unsigned but appears as if it would have been signed by Ekaterini Christellou. |
| 17. | First Priority Assignment of earnings and requisition compensation in respect of motor vessel "Asian Hope" | 8 February 2006 | No comment. |
| 18. | Second Preferred Marshall Isles vessel mortgage in | 15 March 2006 | This document is signed at page 17 by Ekaterini Christellou, Asian Hope Shipping's Attorney-in-Fact. |

5

1.03.A00.00 4533255

204

THE MFS SHIPS - COMMONALITY OF OWNERSHIP

| Number | Document | Date | Comments |
|---|---|---|---|
| | respect of M/V "Asian Hope" between Asian Hope Shipping Ltd and Bremer Landesbank | | |
| 19. | Loan Agreement for a secured loan facility of up to US$17,500,000 between Bremer Landesbank (as Bank/Mortgagee) and Asian Century Shipping Ltd (as Borrowers) | 28 February 2006 | The Borrower is Asian Century Shipping Ltd, whereas the "Collateral Owner" is stated at page 5 to be Asian Hope Shipping Ltd and the "Collateral Vessel" it is stated at page 5 to be "Asian Hope".

Furthermore, see page 6 where the "Corporate Guarantor" is stated to be "each of (i) East West Maritime Investment Ltd … and (ii) the "Collateral Owner".

Unfortunately, however, there does appear to be an error with the latter pages of this document in as far as it been 'chopped' after page 51. |
| | | | 20 – 23: OCEAN DAISY DOCUMENTS |
| 20. | First Preferred Ship Mortgage over M/V "Ocean Daisy" between Daisy Shipping Ltd and ABN Ambro Bank | 15 December 2005 | This document signed at page 29 by Babis Ziogas for and on behalf of Daisy Shipping Ltd. |
| 21. | Loan Agreement for a Secured Floating Interest Rate Loan Facility of up to US$16,500,000 between ABN Ambro Bank and Daisy | 22 August 2005 | "Corporation Guarantor" at page 3 is East West Maritime Investment Ltd.

Notices etc. that are to be sent of any of the Borrowers, the Guarantors, or the Commercial Manager are to be sent c/o Babis Ziogas. |

6

1.03.6496.00/483.3256

## THE MFS SHIPS - COMMONALITY OF OWNERSHIP

| Number | Document | Date | Comments |
|---|---|---|---|
| | Shipping Ltd and Ocean Phoenix Shipping Ltd | | The Loan Agreement was signed by Babis Ziogas for and on behalf of the First Borrower (Daisy Shipping Ltd) and the Second Borrower (Ocean Phoenix Shipping Ltd). |
| 22. | First Priority Assignment of Earnings and Requisition compensation in respect of Motor Vessel "Ocean Phoenix" between Ocean Phoenix Shipping Ltd and Bremer Landesbank | 31 January 2007 | This document is signed by Ekaterini Christellou |
| 23. | First Priority Assignment of Insurances in respect of motor vessel "Ocean Phoenix" between Ocean Phoenix Shipping Ltd and Bremer Landesbank between Ocean Phoenix Shipping Ltd and Bremer Landesbank | 31 January 2007 | This document is also signed by Ekaterini Christellou for and on behalf of Ocean Phoenix Shipping Ltd. |
| | | | **24 - 28: OCEAN ELLIE DOCUMENTS** |
| 24. | First Preferred Marshall Islands Mortgage in respect of M/V "Ocean Ellie" between Ellie Shipping Ltd (as Owner) and HSH | 15 November 2006 | Signed at page 11 by Ekaterini Christellou for and on behalf of Ellie Shipping Ltd |

7

| | | | THE MFS SHIPS - COMMONALITY OF OWNERSHIP |
|---|---|---|---|
| Number | Document | Date | Comments |
| | Nordbank (as Security Trustee) | | |
| 25. | Loan Agreement relating to Secured Loan Facility of up US$67,730,000 between, on the one hand, Ellie Shipping Ltd, Harmony Shipping Ltd, Olympian Goddess Ltd, Asian Friendship Shipping Ltd and Asian Unity Shipping Ltd (as Joint and Several Borrowers) and, on the other hand, various banks (as Lenders) Swap Banks, Agents and as Security Trustees) | 14 November 2006 | The "Approved Manager" is MFS Shipmanagement Corp. The "Corporate Guarantor" at is East West Maritime Investments Ltd.

The "Corporate Guarantor's Group" is stated to be the "Corporate Guarantor and its subsidiaries (whether direct or indirect) and including, but not limited to, the Borrowers) from time to time during the Security Period".

As per previous documents, all notices etc. to the Borrowers shall be sent to MFS Shipmanagement Corp.

Finally, see the execution pages (91 to 94) in which Babis Ziogas has signed for and on behalf of Ellie Shipping Ltd, Harmony Shipping Ltd, Olympic Goddess Shipping Ltd, Asian Friendship Shipping Ltd, and Asian Unity Shipping Ltd. |
| 26. | ISDA Master Agreement between Ellie Shipping Ltd, Harmony Shipping Ltd, Olympian Goddess Shipping Ltd, Asian Friendship Shipping Ltd and Asian Unity Shipping Ltd on the one hand and HSH and | 14 November 2006 | This document signed by Ekaterini Christellou for and on behalf of the Borrowers.

The Schedule to this Master Agreement states that notices or communications etc to party A (i.e. the Borrowers) should be sent to MFS Shipmanagement Corp and gives the email address as Legal@m-fs.com. |

8

207

1.07.B458.00 4833258

## THE MFS SHIPS - COMMONALITY OF OWNERSHIP

| Number | Document | Date | Comments |
|--------|----------|------|----------|
| | Nordbank on the other | | |
| 27. | ISDA Master Agreement between the bank of Tokyo-Mitsubishi on the one hand and Ellis Shipping Ltd, Harmony Shipping Ltd and Olympian Goddess Shipping Ltd on the other hand | 1 November 2005 | This document is signed by Babis Ziogas. |
| 28. | Agency and Trust Deed relating to a Secured Loan Facility of up to US$67,730,000 between Ellie Shipping Ltd, Harmony Shipping Ltd, Olympian Shipping Ltd, Olympian Goddess Shipping Ltd, Asian Friendship Shipping Ltd and Asian Unity Shipping Ltd (as joint and several borrowers) on the one hand, and various banks (as Lenders), Swap banks and Agents and Security Trustees) | ... November 2006 | No comment. |
| | | | 29 – 30: OCEAN HARMONY DOCUMENTS |
| 29. | First Preferred Marshall Islands Mortgage in respect | 15 November 2006 | No comment. |

9

1.01.04486.00 4633285

## THE MFS SHIPS - COMMONALITY OF OWNERSHIP

| Number | Document | Date | Comments |
|---|---|---|---|
| | of M/V "Ocean Harmony" between Harmony Shipping Ltd (as Owner) and HSH Nordbank AG (as Security Trustee) | | |
| 30. | Loan Agreement relating to a Secured Loan Facility of up to US$67,730,000 between Ellie Shipping Ltd, Harmony Shipping Ltd, Olympian Goddess Shipping Ltd, Asian Friendship Shipping Ltd and Asian Unity Shipping Ltd (as Joint and Several Borrowers) on the one hand, and various banks (as Lenders, Swap Banks, Agents and Security Trustees) on the other hand | 14 November 2006 | The same Loan Agreement that is referred to at 25 above, followed by the same ISDA Master Agreement dated 14 November 2006 as is referred to at 26 above, the same ISDA Master Agreement dated 1 November 2005 as is referred to at 27 above, and the same Agency and Trust Deed referred to at 28 above. Same comments apply. |
| | | | **31: OLYMPIAN GODDESS DOCUMENTS** |
| 31. | First Preferred Marshall Islands Mortgage in respect of M/V "Olympian Goddess" between Olympian Goddess | 15 November 2006 | Signed by Ekaterini Christellou for and on behalf of Olympian Goddess Shipping Ltd. This mortgage is then followed by the Loan Agreement referred to at 25 above, the ISDA Master Agreement at 26 above, the ISDA Master Agreement at 27 above, and the Agency and Trust Deed at 28 above. |

10

1:03.0465.00 4833258

# THE MFS SHIPS - COMMONALITY OF OWNERSHIP

| Number | Document | Date | Comments |
|---|---|---|---|
| | Shipping Ltd (as Owner) and HSH Nordbank AG (as Security Trustee) | | |
| | | | **32 – 33: OCEAN PHOENIX DOCUMENTS** |
| 32. | First Preferred Marshall Islands Vessels Mortgage in respect of M/V "Ocean Phoenix" between Ocean Phoenix Shipping Ltd and Bremer Landesbank | 31 January 2007 | Signed by Ekaterini Christellou for and on behalf of Ocean Phoenix Shipping Ltd. |
| 33. | First Preferred Marshall Islands Vessels Mortgage in respect of M/V "Ocean Phoenix" between Ocean Phoenix Shipping Ltd and Bremer Landesbank | 31 January 2007 | The "Corporate Guarantor" is "East-West Maritime Investments Ltd". The "Manager" is MFS Shipmanagement Corp. Notices etc. to any Security Parties to be sent to MFS Shipmanagement Corp in Greece to the personal email address of Babis Ziogas. This agreement is signed by Babis Ziogas for and on behalf of Ocean Phoenix Shipping Ltd. |
| | | | **34 - 35: SIDER UNITY DOCUMENTS** |
| 34. | First Preferred Marshall Islands Vessels Mortgage in | 15 November 2006 | This mortgage signed by Ekaterini Christellou for and on behalf of Asian Unity Shipping Ltd. This document is followed by the Loan Agreement referred to at |

11

1:03.6466.00 4333256

210

## THE MFS SHIPS - COMMONALITY OF OWNERSHIP

| Number | Document | Date | Comments |
|---|---|---|---|
| | respect of M/V "Sider Unity" between Asian Unity Shipping Ltd (as Owners) and HSH Nordbank AG (as Security Trustee) | | 25 above, the ISDA Master Agreement referred to at 26 above, the ISDA Master Agreement dated 1 November 2005 referred to at 27 above, and the Agency and Trust Deed referred to at 28 above. |
| 35. | Second Preferred Marshall Islands Mortgage in respect of M/V "Sider Unity" between Asian Unity Shipping Ltd (as Owner) and HSH Nordbank AG (as Mortgagee) | 4 June 2007 | This document is signed by Ekaterini Christellou for and on behalf of Asian Unity Shipping Ltd.<br><br>This document is followed by and unsigned and undated Guarantee Facility Agreement between Asian Unity Shipping Ltd (as Obligor) and HSH Nordbank AG (as Bank) which states that notices etc to the Obligor should be sent to MFS Shipmanagement Corp. |

211

12

1.03.8495.04-4833256