320-07PJG/JGMV
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OCEAN TRADE S.A.; et al.,

                Plaintiffs

-   against -

CHARALAMBOS ZIOGAS a/k/a
BABIS ZIOGAS a/k/a BABIS O.
ZIOGAS, an individual, et al.

                Defendants.

07 Civ. 7762 (LAP)

**DECLARATION OF**
**GEORGE ECONOMOU**

I, GEORGE ECONOMU, declare as follows:

      1.     I am Greek citizen, and was the principal investor in Ocean Trade S.A. ("Ocean Trade"), one of the plaintiffs in this action. The remaining plaintiffs, Panaport Shipping S.A., Pillsburg Navigation S.A., and Sterling Navigation S.A. (collectively "Ocean Trade Owners" or "Owners") were at all times wholly-owned subsidiaries of Ocean Trade. I submit this Declaration based upon my personal knowledge of the events and facts described below.

      2.     I understand that Defendants have filed a motion to vacate the attachment of funds in this lawsuit and to dismiss this suit, and I have reviewed the submissions filed in respect of that application, in particular, the Declaration of Mr. Ziogas.

      3.     I am aware that Mr. Ziogas has argued that the underlying dispute with Ocean Trade and the Owners is simply a demand for an accounting between him and me as purported investors and business partners. (*See* Ziogas Decl. ¶18).

      4.     I wholeheartedly disagree with Mr. Ziogas' characterization of the underlying dispute. As outlined more fully below, Mr. Ziogas was entrusted by Ocean Trade and Owners

with their day-to-day management and operation. He in fact described himself as the "Managing Director" of Ocean Trade, and. he was the individual who managed the long-term charter parties of the Ocean Trade Owners' vessels, from which the events giving rise to this suit stem. The current suit concerns efforts by corporate plaintiffs Ocean Trade and the Owners to recover their damages due to the breach of Mr. Ziogas' contractual and fiduciary duties as manager, the frauds he perpetrated on them in relation to hire owed on those long-term charters, and the conversion of Plaintiffs' propriety interests in other vessels in which Ocean Trade was granted options to purchase.

5.    This litigation is not a suit for an accounting, nor a suit regarding a dispute between Mr. Ziogas and me.

**Introduction**

6.    The facts and circumstances of the events leading to this suit are set forth in detail in the Verified Complaint filed by Plaintiffs, which I have reviewed and adopt as true.

7.    While I do not wish to recite the allegations in the Verified Complaint, I thought it would be useful to provide to the Court the background to the charter parties which are at issue, the role and actions of Mr. Ziogas as manager of Ocean Trade and Owners, and what Ocean Trade came to learn, much later, were the breaches of duty and frauds undertaken by Mr. Ziogas while he was manager.

8.    I have attempted to set forth the facts in chronological order but to the extent Ocean Trade did not become aware of the true facts until July 2007, some of the facts discussed below may seem slightly out of order.

1

**General Background to Maritime Venture Underlying the Current Dispute.**

9.        Ocean Trade is a Liberian corporation that was incorporated on 22 March 1990 and was used as the corporate vehicle to make various investments in shipping. My investment in Ocean Trade was held through a Liberian corporation called Maryport Navigation Corp. ("Maryport"), which in turn remained at all times the sole shareholder in Ocean Trade. From 1996 to 2000, Ocean Trade's business operations were conducted by Mr Ziogas from the Athens office of Cardiff Marine Inc. ("Cardiff"). In/about 2000 Mr Ziogas established his own office and ceased to work from Cardiff's premises.

10.        One of the ventures in which Ocean Trade participated involved the purchase, ownership and operation of six vessels in deals made with Inter-Pacific Lines Co. Ltd. of Tokyo, Japan ("IPL"). The six vessels and the sequence of the deals agreed between Ocean Trade and IPL consisted of the following:

     i.   The purchase and charter back of the M/V OCEAN FOREST in March 1996;

     ii.   The purchase and charter back of the M/V OCEAN TRADE in August 1996;

     iii.   The purchase and charter back of the M/V OCEAN DIAMOND in October 1996;

     iv.   The purchase and charter back of the M/V KOWHIA in April 1997;

     v.   The purchase and charter back of the M/V OCEAN REYNA in December 1997;

     vi.   The purchase and charter back of the M/V OCEAN LEO in December 1997.

11.        The deals were structured such that single-ship-owning subsidiaries of Ocean Trade purchased the vessels from IPL and then chartered those vessels back to IPL subsidiaries for long term periods, ranging from four to ten years. IPL would then arrange separate sub-charter employment for the vessels.

12.    Plaintiffs Panaport Shipping S.A., Pillsburg Navigation S.A., and Sterling Navigation S.A. were, respectively, the Ocean Trade subsidiaries who purchased the vessels KOWHIA, OCEAN REYNA and OCEAN LEO and chartered them back to IPL.  These three vessels will be referred to herein as the "Ocean Trade Vessels."  Copies of the charter parties between the Ocean Trade Owners and IPL were attached as Exhibit 1 to the Verified Complaint.

13.    The underlying dispute in the captioned New York action originates from the Ocean Trade charters to IPL, in particular, the three Ocean Trade Vessels which remained on charter to IPL in and around 2000/2001, when certain of the material events giving rise to the current dispute occurred.

**Mr. Ziogas' Participation in the Ocean Trade Venture With IPL.**

14.    The initial proposal to purchase and charter back these vessels to IPL was suggested by Mr. Ziogas.

15.    I have known Mr. Ziogas for more than 20 years, going back to the 1980s when we were both working in New York in the shipping industry.

16.    In the late 1980's, Mr. Ziogas had a business called Bulk Ocean Services Corp., which failed in the early 1990's.  Several years later Mr. Ziogas returned to Greece in/about 1995and sought to re-establish himself in the shipping industry.

17.    Upon his return to Greece, Mr. Ziogas approached me due to our earlier friendship and sought my assistance in re-establishing himself in this business.  His proposal was to seek out shipping business opportunities, put deals together, and then run the ventures on behalf of the participants.

18.    I agreed to assist him in this endeavor and provided him with certain resources, such as a place to run the business from the offices of Cardiff, and access to the company's

3

business facilities and resources. Mr. Ziogas used the office facilities at Cardiff for several years until about 2000 when he established a separate office in Athens, which he ran under the name of Maritime Financial Services Corporation ("MFS"), which later became known as MFS Shipmanagement Corp.

19.     I also agreed to consider making investments in shipping deals proposed by Mr. Ziogas, and it was agreed between Mr. Ziogas and me that any such venture would focus exclusively on maritime-related business activity including the ownership and employment of ocean-going vessels. As explained above, one of Mr. Ziogas' proposals was the purchase and charter back deals with IPL.

20.     There is a dispute between Mr. Ziogas and me as to whether Ocean Trade was a 50:50 venture between Maryport (the company through which I held my investment in Ocean Trade) and Maritime Financial Holdings Services Corp ("MFHSC") (his company). The details of that dispute are not relevant for purposes of this Declaration because (i) neither Maryport nor I am suing him in this litigation for issues related to that relationship; and (ii) it is not disputed is that Mr. Ziogas was the individual entrusted by Ocean Trade and Owners (corporate entities) with the management of the Ocean Trade venture, which was separate from his role in locating business opportunities, as described above.

21.     In his capacity as the day-to-day manager for the plaintiff Ocean Trade and its subsidiary Owners, Mr. Ziogas handled all the daily operations aspects of this business, which included the commercial management of the three Ocean Trade vessels, the management of the long term charter parties to IPL, and all related aspects of this ship owning and chartering operation.

4

22.    Mr. Ziogas describes himself in this capacity in his CV which states that he was the "Managing Director" of Ocean Trade from 1995 to 2002. (A copy of Mr. Ziogas' CV was attached as Exhibit 2 pp. 1-2 to the Verified Complaint). I think this is an accurate description of the duties that he performed, as he had the conduct of the day-to-day management of Ocean Trade, and he received compensation for his management role.

23.    Mr. Ziogas was also the principal point of contact with IPL on the charters, and later on with Keymax Maritime Co. Ltd. ("Keymax"), a company that had been appointed by IPL to act as technical and crewing managers for the IPL vessels, which included the Ocean Trade Vessels that were chartered to IPL.[1]

**IPL's Failure to Make Hire Payments to Ocean Trade and the Negotiations for a Workout.**

24.    As explained above, in and around 2000/2001, the Ocean Trade Vessels remained on charter to IPL and its subsidiary corporations.

25.    IPL had time sub-chartered the vessels to various first-class Japanese operators and these charters provided solid earnings for the vessels, but when these operators paid hire to IPL, IPL started to use those funds to satisfy business debts unconnected to the vessels, as IPL was experiencing financial difficulties. Consequently, during the period 2000-2001, IPL and its subsidiary corporations fell progressively behind in the payment of the charter hire owed to Ocean Trade and the Ocean Trade Owners. By early 2001, there was an accumulated deficit owed by the charterers to Ocean Trade and the Ocean Trade Owners of about US$1.3 million.

---

[1]For the Court's guidance, ship management is the business of manning, equipping, provisioning and maintaining a ship. It includes different types of management such as technical, commercial, and crew management. Technical management includes maintenance, repairs, dry-docking and technical upgrades; commercial management includes chartering, financing, insurance, and sale and purchase, and crew management includes the recruitment and employment of the officers and crew.

26.    The accumulated deficit under the charters was of considerable concern to Ocean Trade, because when hire payments were not made by IPL, Ocean Trade was without the resources to cover its obligations, including debt service on the mortgages against the three vessels.

27.    In an effort to find a solution to IPL's defaults in the payment of the hire due on the three vessels, Ocean Trade initiated negotiations with IPL for a commercial work out of the situation.  Throughout 2001, there were extensive correspondence and negotiations principally between Mr. Ziogas (on behalf of Ocean Trade and Owners) and IPL in an effort to find a way to solve the problems created by IPL's financial difficulties and the charter hire arrears.   On occasion I also participated in those discussions and correspondence, but most of the negotiations were conducted by Mr Ziogas as he was in charge of the day-to-day management of Ocean Trade and Owners, and was the main point of contact with IPL and Keymax.

28.    Toward the end of 2001, Keymax also became directly involved in the efforts to find a solution to the problem.  As explained above, Keymax was the technical and crewing manager for the vessels chartered to IPL, and IPL and Keymax had a corporate affiliation, and were operated from the same offices.

29.    Despite the negotiations through 2001, the situation continued to deteriorate and by the end of 2001, IPL owed outstanding charter hire to the Ocean Trade Owners of US$2.5 million.  In addition, Keymax claimed that they were owed approximately US$1.5 million from IPL for various management and drydocking costs.  Thus, by the end of 2001, there was an accrued debt of US$4 million owed by IPL in respect of the Ocean Trade Vessels and the situation was continuing to deteriorate.

30.    Throughout 2001, various proposals were made and considered in an effort to have IPL satisfy the outstanding hire due to the Ocean Trade Owners and to provide assurances for the payment of future hire due for the remaining period of the charters to IPL.

31.    I will not detail each of the proposals that were considered, but I do note that there were two important objectives for Ocean Trade and Owners from such negotiations.

32.    First, Ocean Trade wanted to ensure that the income being earned by the vessels on the time charters from IPL to the Japanese operators was transferred away from IPL's control to ensure that the income was allocated solely to these vessels. This was intended to avoid a repetition of the previous situation where IPL was using some of the earnings from the sub-charterers to meet losses that IPL was suffering on other business ventures unconnected to the three vessels.

33.    Secondly, Ocean Trade wanted to receive compensation for the hire not paid, in the form of shares in IPL ships or, as later discussed, purchase options in respect of ships within the IPL/Keymax fleet. This type of a workout proposal was first discussed as early as in January 2001, and the discussions continued throughout the 2001 calendar year, with various alternative arrangements considered by the parties. (*See* Ex. 2 at pp. pp. 8-17: copy of December 27, 2001, email with copies of agreements).

**The Agreements with IPL and Keymax**

34.    With respect to Ocean Trade's concern about future hire payments (*see* paragraphs 26-29 above), by the end of 2001, it was agreed by Ocean Trade, IPL and Keymax that the future time charter income from the sub-charters on the three vessels would be controlled by Keymax, such that Keymax would receive all payments from the sub-charterers and would henceforth operate the vessels on what is referred to in the industry as an "open account" basis.

7

Under this arrangement, Keymax received the earnings from the sub-charters and used those earning to first pay the operating expenses and trade debt incurred by the vessels (including a substantial proportion of the accrued management and drydocking costs owed by IPL to Keymax for the Ocean Trade Vessels). The residual was then to be remitted to Owners as payments against the hire. This arrangement commenced in January 2002 and continued until the eventual completion of the charters to IPL.

35.    With respect to Ocean Trade's concern about being compensated for the accrued but unpaid hire, the plan settled upon by Ocean Trade, IPL and Keymax was that Keymax would arrange for purchase options to be issued in favor of Ocean Trade in respect of six vessels, which options would serve as some measure of compensation for the unpaid hire due and as some consideration for the losses that Ocean Trade and Owners had suffered as a result of IPL's failure to perform their obligation under the charters of the Ocean Trade Vessels, and for giving up the entitlement to receive the full hire directly from IPL.

36.    The final terms of the tripartite arrangement between Ocean Trade, IPL and Keymax were negotiated in December 2001 and are recorded in two agreements that were later referred to as (i) the Keymax Master Agreement and (ii) the IPL Master Agreement. (Copies of those agreements were attached as Exhibit 2 at pp. 8-17 of the Verified Complaint.

37.    The Keymax Master Agreement provided at Clause 7 that:

> Recognizing that Ocean Trade have lost substantial amounts during earlier trading of the Ocean Trade Owned Vessels, Keymax will give Ocean Trade the following purchase options and they undertake to supply Ocean Trade with the proper consent of the registered owners of the relevant vessels within thirty (30) days from the date of this Agreement signing...

8

38.    There followed a list of six vessels in respect of which Ocean Trade was to be provided an option for purchase.

    i.    The OCEAN DAISY;

    ii.    The OCEAN SAMPAGUITA;

    iii.    The OCEAN ELLIE;

    iv.    The OCEAN PHOENIX;

    v.    The OCEAN HARMONY; and

    vi.    The SOUTHERN ODYESSY.

(For ease of reference, I will refer to these six vessels as the "Option Vessels" to distinguish them more easily from the three Ocean Trade Vessels chartered to IPL and on which IPL had failed to pay the hire.)

39.    As stated in Clause 7 in the Keymax Master Agreement, the giving of these purchase options was in consideration and recognition of the fact that Ocean Trade and Owners had lost substantial sums during earlier trading of the Ocean Trade Vessels and were owed past due hire in relation to the charter of the Ocean Trade Vessels.

**Signing of the Master Agreements & Deterioration of Relationship with Mr. Ziogas**

40.    As outlined above, Mr. Ziogas was acting as manager and agent for Ocean Trade and Owners, and it was in that capacity that he was handling these negotiations. By email dated 27 December 2001, he forwarded the latest drafts of the two agreements under cover of a message that stated "For your files please find what I sent to our Japanese friends yesterday with the attachments of the final agreements which are much improved." (Ex. 2 pp. 8-17: copy of email with agreements attached).

9

41.    As discussed more fully below, years later, I later came to learn that the IPL and Keymax Master Agreements were actually signed at the end of December 2001 by Mr. Ziogas (on behalf of Ocean Trade/the Owners), and also by representatives of IPL and Keymax. (*See* discussion at paragraphs 57 to 59 and Exhibit 2 to the Verified Complaint at pp. 23-33).

42.    Mr. Ziogas, however, never provided a copy of those executed agreements, but he did initially confirm verbally in early January 2002 that the two Master Agreements had been signed, and Ocean Trade had no reason to doubt that statement so it  proceeded on that basis and understanding for the next months.

43.    During this same time period (the first half of 2002), the relationship between Mr. Ziogas and Ocean Trade began to deteriorate and inquiries were made of Mr. Ziogas as to the status of the Keymax Master Agreement and the purchase options granted under that agreement.

44.    In March 2002, Mr. Ziogas stated that the Keymax Master Agreement had never been finalized and signed by Keymax, which was contrary to what he had said in January 2002, and advised that he would shortly be visiting Keymax (and IPL) in Japan at which time he would discuss the issue with them.

45.    Mr. Ziogas did in fact travel to Japan in/about early April 2002, but conducted no further negotiations with respect to the issuance of the Keymax Master Agreement and the purchase options in Ocean Trade's favor, as (unbeknownst to Ocean Trade) that agreement had been finalized and signed at the end of December 2001. As explained at paragraph 72 below, it has now emerged that at the meetings in early April 2002 Mr Ziogas negotiated a new agreement with Keymax that provided for the purchase options to be issued in favour of his private Liberian company, MFHSC.

46.    I also traveled to Japan in May 2002 on other business and took the opportunity to meet with IPL and Keymax to discuss the various open issues relating to the charters, including the status of the Keymax Master Agreement. During that meeting, IPL and Keymax likewise represented to me that the agreement had never been finalized and signed (all of which, I later learned was false).

47.    The relationship between Ocean Trade and Mr. Ziogas continued to deteriorate throughout the first half of 2002, and as of 17 July 2002, Mr. Ziogas (and his company MFHSC) ceased to have any involvement or interest in Ocean Trade or in the three vessels that remained on charter to IPL. IPL was notified of this in a letter from Cardiff Marine dated 24 July 2002, a copy of which is annexed at Ex. 2 p. 65. Cardiff assumed the role as manager for Ocean Trade and took over from Mr. Ziogas all the day-to-day aspects of this operation, including communications with Keymax and IPL.

48.    Throughout the summer and fall of 2002, Ocean Trade and Cardiff had repeated communications with IPL and Keymax about the status of the Keymax and IPL Master Agreements and sought copies of any agreements which had been finalized and/or the details of any such agreements. At that time, IPL and Keymax continued to deny that the Keymax and IPL Master Agreements had been signed.

49.    As a result of Mr. Ziogas' conduct and statements and those of IPL and Keymax throughout 2002, Ocean Trade did not know if the agreements had been signed or not.

**Proceedings Against IPL.**

50.    Since IPL and Keymax refused to acknowledge that the IPL and Keymax Master Agreements had been signed, and as Plaintiffs were unable to prove otherwise, Ocean Trade

11

pursued claims against IPL in England and South Africa for the outstanding hire which had not been satisfied since the agreements was supposedly never finalized.

51.    The proceedings in South Africa involved the arrest of the M/V OCEAN HARMONY (one of the option vessels listed in the Keymax Master Agreement) in May 2004. The ship arrest was effected under South Africa's "associate" ship arrest regime, on the basis that Mr Hiroshi Iwai, the controlling shareholder of IPL, also owned/controlled the OCEAN HARMONY.  The arrest had nothing to do with seeking to enforce the terms of the Keymax Master Agreement since, at that time, Ocean Trade had no evidence that the contract had been signed.

52.    Shortly after the arrest of the OCEAN HARMONY, Mr. Ziogas contacted me and we met at Cardiff's offices later the same day in May 2004.  He indicated that he was aware of the arrest of the OCEAN HARMONY and offered his services as an intermediary to resolve the dispute.

53.    In the course of the May 2004 meeting, I asked Mr. Ziogas about the Master Agreements.  He told me that only the IPL Master Agreement had been signed but not the Keymax Master Agreement - the one which included the purchase options in favor of Ocean Trade.

54.    The version of events told to me by Mr. Ziogas in May 2004 did not make much sense. The IPL Master Agreement was the one in which Owners gave up various rights against IPL under the charters for the Ocean Trade Vessels.  The compensation for doing so was recorded in the Keymax Master Agreement and included the purchase options.  This is clear from a reading of the two documents together and from the course of the negotiations that took place during 2001, particularly during December 2001.  The purchase options and other benefits

12

under the Keymax Master Agreement were the consideration for the rights that Owners gave up in the IPL Master Agreement. As such, it made no sense at all that the IPL Master Agreement would be signed and not the Keymax Master Agreement. Indeed, all the other terms of the agreements reached by the parties in December 2001 for the commercial workout were implemented, including the payment of hire to Keymax and the operation of the three Ocean Trade Vessels on an "open book" basis.

55.    Yet, Mr. Ziogas, IPL and Keymax maintained that the Keymax Master Agreement was never signed, and since Ocean Trade did not have a copy of the signed agreement, it had no proof it had been signed.

56.    The litigations commenced by Plaintiffs against IPL were not pursued as a consequence of IPL's bankruptcy filing.

**Ocean Trade Discovers the Truth About Mr. Ziogas' Mismanagement, Breach of His Duties and Frauds Committed on Ocean Trade.**

57.    In early July 2007, certain documents were provided to Plaintiffs which revealed, for the first time, the truth about what had taken place in connection with the commercial workout negotiated at the end of 2001 and the purchase options granted in the Keymax Master Agreement, and Plaintiffs came to learn that Mr. Ziogas's May 2004 explanation of what happened was false.

58.    A copy of the documents provided to Plaintiffs was attached as Exhibit 2 to the Verified Complaint, and reference to those documents is made by way of that Exhibit and the page number.

59.    These documents revealed that contrary to various statements made by Mr. Ziogas and others from 2002 through 2007, the Keymax Master Agreement was signed by the President

of Keymax, Mr. Kayahara, on behalf of Keymax on 31 December 2001 and by Mr. Ziogas on behalf of Ocean Trade and Owners on the same date. Attached to the Verified Complaint as Exhibit 2 at pp. 23-33 are copies of the Keymax Master Agreement duly signed by Mr Kayahara (as well as the signed IPL Master Agreement) and the attendant fax/email exchange between Keymax and Mr. Ziogas dated 31 December 2001 confirming execution of the two agreements by all parties. (At this time we do not have a copy of the Keymax Master Agreement duly signed by Mr Ziogas for Ocean Trade and Owners, but his email dated 31 December 2001 confirms that he was signing and faxing back both agreements, and we have a copy of the IPL Master Agreement duly signed by him. Since Mr Ziogas's email refers to signing and faxing back "both agreements", and as we have a copy of the IPL Master Agreement duly signed, it follows that Mr Ziogas must have signed the Keymax Master Agreement at that time, in accordance with the authority that he had received to do so.)

60.    Clause 7 of the signed Keymax Agreement provided for the purchase options of the six vessels in favor of Ocean Trade as described above in paragraph 38. (*See* also Verified Complaint Ex. 2 at p. 29).

61.    Mr. Ziogas' motivation in misleading Ocean Trade and Owners over the years was also revealed in the documents provided to Plaintiffs in July 2007, including emails that Mr. Ziogas sent to Mr Tony Fordyce of IPL during the course of 2002 (see below).

## Mr. Ziogas' Secret Dealings with IPL and His Breach of Duties Owed to Ocean Trade and Owners.

62.    Mr. Fordyce was the Chartering Manager of IPL and later became an employee/consultant of Keymax. He was the main point of contact for Mr. Ziogas when dealing with IPL and Keymax on matters relating to Ocean Trade and the Ocean Trade Vessels.

14

63.     As noted above, despite the fact that the Keymax Master Agreement had already been signed in December 2001, Mr. Ziogas (we later learned when we examined the documents provided in July 2007) sought to negotiate a a separation of certain parts of the Keymax Master Agreement such that the purchase options on the six ships would be recorded in a separate document.

64.     In furtherance of this effort, he sent an email to Mr. Fordyce on 14 January 2002 stating:

> I attach to this message the breakdown of the Keymax Agreement to 2 parts. It does not change anything and Economou is aware of the change. I want to have the maximum flexibility to be able to exercise the options and not be restricted to Ocean Trade which will be myself and Spyros Milonas.

(*See* Verified Complaint Ex. 2 at pp. 33: copy of the 14 January 2002 email).[2]

65.     In a further email dated 17 January 2002, Mr. Ziogas again addressed this effort to carve out the options into a separate document, advising Mr. Fordyce:

> For the re-worked Keymax Agreement into two, we only need to add in the Options Agreement the name of Ocean Trade and add it as signatory. Then it is fully bullet proof for all parties involved.

(*See* Exhibit 2, at pp. 34).

66.     Although Mr. Ziogas stated in his 14 January 2002 email that I was aware of the splitting of the Keymax Master Agreement into two parts, I was not.

67.     It is my reading of these emails that Mr. Ziogas wanted to separate the purchase options clause from the remaining terms embodied in the Keymax Master Agreement. I believe that he wanted to do this so that he would be able to show a separate Options Agreement to prospective investors, banks, etc., without disclosing the other parts of the Keymax Master Agreement.

---

[2] Mr. Spyros Milonas was a New York-based shipowner.

15

68.    I note that in January 2002, Mr. Ziogas had prepared a document for potential

investors in which he stated:

> Ocean Trade for its US$2.5m outstanding debt options to purchase 6
> modern vessels most of them with charters to first class companies any
> time during the next four years.  Our options strike price are for the
> vessels bank debt, in most cases in Yen and already due to the Yen
> decline, options are worth currently about US$4.85m.  As the shipping
> markets improve and/or the Yen weakens these options may be worth in
> the next tow years more than US$10m.

(See Ex. 2 at pp. 18-22: a copy of Mr. Ziogas' proposal).

69.    In/about March/April 2002, Mr Ziogas finally persuaded Keymax to split the

Keymax Master Agreement into two parts such that the purchase options would be separated

from the other terms. Two new documents were created, one embodying the workout without

reference to the purchase options (called the "Settlement Agreement") and the second reflecting

the purchase options only (called the "Options Agreement").

70.    In addition to splitting the Keymax Master Agreement into two parts, Mr. Ziogas

persuaded Keymax to make another very significant change with respect to the options – **Ocean

Trade was removed as the beneficiary** of the options and instead the name of Mr. Ziogas'

private Liberian corporation, MFHSC, was inserted as the beneficiary of the six purchase

options, even though these options were rightfully the property of Ocean Trade. (*See* Verified

Complaint Ex. 2 at pp. 50-55).

71.    The other terms of the Options Agreement were essentially the same as those of

Clause 7 of the Keymax Master Agreement, with the only material difference being the name of

the beneficiary of the options.

72.    As I explained above in paragraph 45, Mr. Ziogas traveled to Japan in April 2002

to visit IPL and Keymax while he was still acting as the Managing Director of Ocean Trade and

managed the operations of the Ocean Trade Owners. It appears that the terms for the new Options Agreement in the name of MFHSC were agreed upon at these meetings in Japan. (*See* Exhibit 2 at p 49: 11 April 2002 letter from Tony Fordyce referring to the original Options Agreement following Ziogas' Japanese trip).

73.    I note that all this occurred around the time in March/April 2002 when the relationship between Mr. Ziogas and Ocean Trade had started to deteriorate and also around the time when Mr. Ziogas told me that the purchase option agreements had not been signed, which was contrary to his earlier advices in January 2002. (*See* paragraphs 44 and 47 above).

74.    Ocean Trade and Owners were not told that the Keymax Master Agreement had been signed but was being replaced with new agreements under which the purchase options would be issued in favor of MFHSC. Mr Ziogas knew that Ocean Trade and Owners would not approve any such deal.

75.    Mr. Ziogas further perpetrated his subterfuge on Ocean Trade and Owners in May 2002 and persuaded IPL and Keymax to keep the signed Keymax Master Agreement and the new Options Agreement a secret.

76.    As I explained above, I traveled to Japan in May 2002 on other business and met with IPL and Keymax. Mr. Ziogas knew that this meeting was to take place, and in advance of that meeting, he laid the groundwork for the maintenance of the subterfuge he had visited upon Ocean Trade by transmitting an email to Mr. Fordyce on 2 May 2002 stating:

> Economou visit: He knows the following:
>
> (d) For the options (O. Phoenix, etc.) [a reference to the Option Vessels]. I told him that although we talked and drafted options documents last December, **we never finalized them**…

(*See* Verified Complaint Ex. 2 at p. 59 at ¶1-d, emphasis supplied). It's no wonder that IPL and Keymax told me then that the terms of the purchase options for Ocean Trade had not been finalized and that no agreements had been signed.

77.     Subsequently, on 10 June 2002, I sent a fax to Keymax and IPL in which I quoted from the drafts of the Keymax Master Agreement which I had seen on 27 December 2001, as discussed in paragraph 40 above. Mr. Ziogas sent an email to Mr. Fordyce on 12 June 2002 commenting on my fax and maintaining his subterfuge:

> For your information, I never gave to Cardiff a signed copy of the Keymax/IPL Agreement, but I told him that we have a gentleman's agreement on the lines of the draft he is quoting in his letter. This gives an extra leverage for you and me to run this deal...

(*See* Ex. 2 at p. 63).

78.     What was taking place during this period is apparent from a further email from Mr. Ziogas to Mr. Fordyce dated 19 June 2002 where Mr. Ziogas stated:

> ...If we work closely together as we have done so far we can limit Economou to Leo and hopefully in one year where liabilities have reduced we can buy this vessel as well. But you need to keep your cards close to your chest with him.

(*See* Ex. 2 at p. 64). The reference to "Leo" in this email was in my view to the vessel OCEAN LEO which was one of the Ocean Trade Vessels which had been chartered back to IPL.

79.     Even after Cardiff assumed the role as manager for Ocean Trade in July 2002, and although Mr. Ziogas was to have no further involvement, he continued to manipulate the situation. In an email he sent to Mr. Fordyce on 26 July, 2002, he reassured Mr Fordyce that even though Cardiff was taking over the management, Cardiff (and I) did not know that the Keymax Master Agreement had been signed:

> As Keymax correctly points out it has no direct relationship with Cardiff and it is important for them to maintain this to collect their outstandings. The reason for this advantageous set up is my good work and foresight to keep the agreement signed with Ocean Trade out of the hands of Cardiff. This there would be no problems in maintaining the current situation.

(*See* Ex. 2 at pp 68-69).

### **Mr. Ziogas Exercises the Purchase Options Through the Corporate Defendants.**

80.     To summarize briefly therefore, Ocean Trade learned in July 2007 that the Keymax Master Agreement granting the purchase options to Ocean Trade had been signed in December 2001, but Mr. Ziogas kept the signing a secret from Ocean Trade. He then persuaded Keymax to enter into a new Options Agreement which transferred the purchase options upon the Option Vessels from Ocean Trade to his company MFHSC. Consequently, as from April 2002, MFHSC held the options to purchase the six Option Vessels.

81.     All of this was kept a secret from Ocean Trade and not discovered until July 2007.[3]

82.     Ocean Trade also discovered from the documents it received in July 2007 that in/about June 2003 Mr. Ziogas further manipulated the situation and entered into another agreement with Keymax which, in effect, transferred the purchase options on four of the six Option Vessels to subsidiaries of a company called East West Maritime Investment Ltd. ("EWMI"). The parties to the resultant agreement dated 24 June 2003 were Keymax, MFS and EWMI ("the EWMI Master Agreement"). (*See* Verified Complaint Ex. 2 at pp. 132-146: copy of the EWMI Master Agreement)..

---

[3] The documents provided to Ocean Trade in 2007 also revealed other frauds and breaches of duty committed by Mr. Ziogas while he served as manager for Ocean Trade and Owners. These frauds and breaches of duty concerned the diversion of hire and kick-backs that Mr. Ziogas had diverted to his company, Pegasus Shipholdings Corp., during the charters of the Ocean Trade Vessels to IPL   The details of these acts are reflected in paragraphs 122-138 of the Verified Complaint, which I adopt herein.

83.    Mr. Ziogas' company MFS was described in the agreement as the "100% shareholder" of EWMI. (Ex. 2 p. 132). Addendum No. 1 to the EWMI Master Agreement records that EWMI and MFS are "both controlled by their majority shareholder Mr Charalambos Ziogas", and the agreement provided that MFS shall remain a majority shareholder in EWMI and Mr. Ziogas a majority shareholding in MFS for the duration of the agreement (Ex. 2 p. 145).

84.    Pursuant to the EWMI Master Agreement, EWMI subsidiary corporations, including the corporate defendants described herein, were identified as the bareboat charterers of four of the six Option Vessels[4] who would take title to those vessels at the conclusion of the bareboat charters as follows:

| **Option Vessel** | **Name of Defendant Who Was Identified as the Charterer and Who Would Take Title** |
|---|---|
| M/V OCEAN DAISY | Daisy Shipping Ltd. |
| M/V OCEAN ELLIE | Ellie Shipping Ltd. |
| M/V OCEAN PHOENIX | Ocean Phoenix Shipping Ltd. |
| M/V OCEAN HARMONY. | Harmony Shipping Ltd. |

(*See* Verified Complaint Ex. 2 at pp. 147-86: copies of the bareboat and purchase agreements with the individual Ziogas shell-owning companies).

85.    The underlying basis for the EWMI Master Agreement and the purchase agreements was the options clause originally set forth in the signed Keymax Master Agreement, which Mr. Ziogas had kept secret from Ocean Trade.

86.    In July and October 2005, Mr. Ziogas, acting through his several corporate owning shell entities, including the individual ship-owning defendants discussed above, executed Memoranda of Agreement with the Keymax subsidiaries, who had been the registered owners of the Option Vessels, for the sale, purchase and delivery of the Option Vessels to Defendants

---

[4] Two of the Option Vessels, namely the OCEAN SAMPAGUITA and the SOUTHERN ODYSSEY, had apparently been disposed of by Keymax and were no longer part of the purchase options under discussion.

Daisy Shipping, Ellie Shipping, Ocean Phoenix Shipping and Harmony Shipping, as outlined above. (*See, e.g.,* Verified Complaint Ex. 2 at pp. 147-86).

87.    Upon delivery of the Option Vessels between August and December 2005 to the Ziogas entities identified above, the fraudulent scheme, breach, conversion and theft by Mr. Ziogas that he first commenced in 2002 was now complete as he had effectively exercised the purchase options that belonged to Ocean Trade with respect to the Option Vessels.

**Mr. Ziogas Continues His Scheme by Using the Option Vessels to Acquire Other Vessels.**

88.    The market for vessels like the Option Vessels had significantly risen between December 2001 when the options price was initially agreed upon and the second half of 2005 when Mr. Ziogas exercised the options and purchased the Option Vessels.

89.    Mr. Ziogas was thus able to acquire assets which were rightfully the property of Ocean Trade in the form of the Option Vessels at prices significantly less than their market value in 2005. Because of this, he was essentially able to access the increased equity in the Option Vessels, and through cross-collateralization and cross pledge agreements, he purchased additional vessels through other Marshal Island companies of his.

90.    Specifically, he purchased (i) the ASIAN FRIENDSHIP in November 2006 through Asian Friendship Ltd., (ii) the SIDER UNITY in January 2007 through Asian Unity Shipping Ltd., and (iii) the OLYMPIAN GODDESS in/about January 2006 through Olympian Goddess Shipping Ltd.

**Mr. Ziogas Sells The Option Vessels.**

91.    In May 2007, Mr. Ziogas, through his various corporate shell entities, contracted to sell the four Option Vessels for a total sum of US$84 million.

92.    The sales of the OCEAN ELLIE and the OCEAN PHOENIX were completed, resulting in capital profits of $12,475,000.00 and $17,400,000.00, respectively.

93.    As of the filing of the Verified Complaint, I understood that the sales of the OCEAN HARMONY and OCEAN DAISY had been cancelled.

94.    However, since the filing of the Verified Complaint, Ocean Trade learned that the ownership of the OCEAN DAISY was on 28 September 2007 transferred to a company called Taiga Shipping S.A. and the vessel's name changed to M/V TAIGA.

95.    Ocean Trade has also learned that the ownership of the OCEAN HARMONY was on 28 September 2007 transferred to a company called Vostok Shipping and the vessel's name changed to M/V VOSTOK.

96.    Based upon the investigations commissioned by Plaintiffs' solicitors, Ince & Co, Ocean Trade believes that both Taiga Shipping and Vostok Shipping are entities that are ultimately controlled by Mr. Ziogas and that he maintains an interest in these two Option Vessels. (*See* Declaration of Nick Shepherd).

**Conclusion**

97.    At the risk of personalizing this Declaration, this case presents a significant disappointment to everyone involved with the Plaintiffs. Ocean Trade gave Mr. Ziogas the opportunity to rehabilitate his position in the shipping community and he utterly abused that privilege. He breached his contractual and fiduciary duties to the Plaintiffs and defrauded them out of the purchase options which they were to receive in lieu of hire due on the Ocean Trade Vessels.

I declare, under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: March 27, 2008 at St Barthelemy, French West Indies

GEORGE ECONOMOU

23