320-07PJG/GMV
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiffs
80 Pine Street
New York, NY 10005
Tel: (212) 425-1900
Fax: (212) 425-1901
Peter J. Gutowski (PG 2200)
Gina M. Venezia (GV1551)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OCEAN TRADE S.A., et al., | 07 Civ. 7762 (LAP) |
| Plaintiffs | |
| - against - | |
| CHARALAMBOS ZIOGAS a/k/a BABIS ZIOGAS a/k/a BABIS O. ZIOGAS, an individual, et al. | |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT AND VACATE MARITIME ATTACHMENT

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT IN OPPOSITION ................ 1

SUMMARY OF FACTS ....................................................................................... 3

    A.    The Parties ....................................................................................... 3

    B.    The Beginning of the Ocean Trade Operation ................................... 4

    C.    Ziogas Sets Up His Own Office – Maritime Financial
           Services Corporation ....................................................................... 5

    D.    IPL Charterers Fall Behind in Hire Payment ................................... 5

    E.    Ziogas Initiates and Concludes Negotiations in relation
           to the Charter of the Ocean Trade Vessels to Include the
           Grant of Purchase Options on Other Vessels from the
           IPL/Keymax Fleet in Exchange for the Outstanding Hire ................ 6

    F.    Ziogas Conceals Execution of Keymax Master Agreement
           and the IPL Master Agreement from the Ocean Trade Owners ........... 7

    G.    Ziogas Fades to Black, But with the Purchase Options
           Tucked Neatly in his Vest Pocket ..................................................... 8

    H.    Fast Forward to 2007 ....................................................................... 8

POINT I

    BURDENS IN A RULE E MOTION AND A MOTION TO DISMISS ......... 10

POINT II

    THIS COURT HAS ADMIRALTY TORT JURISDICTION
    FOR THE FRAUDS COMMITTED BY ZIOGAS BECAUSE
    THEY RELATE TO HIS MANIPULATION AND
    DIVERSION OF THE VESSEL'S EARNINGS ............................................. 12

A.  Plaintiffs' Claims Satisfy the Nexus Requirement .................................................. 14

B.  Plaintiffs' Claims Similarly Satisfy the Location Requirement ............................ 15

C.  A Finding of Admiralty Jurisdiction Would Be Consistent
    with Recent Supreme Court Pronouncements Expanding
    Maritime Jurisdiction and The Underlying Policy of
    Achieving Uniformity in the Maritime Industry ................................................... 18

POINT III

    THERE IS AN ALTERNATIVE BASIS FOR MARITIME
    JURISDICTION , BECAUSE THE CLAIMS INVOLVE
    BREACHES OF FIDUCIARY OBLIGATIONS WHICH
    SUPPORT JURISDICTION UNDER CONCEPTS OF TORT
    AND CONTRACT ................................................................................................... 19

POINT IV

    THE ALTER EGO CLAIMS AGAINST THE CORPORATE
    DEFENDANTS SHOULD STAND.  THE RECORD
    AMPLY DEMONSTRATES THEIR PARTICIPATION IN
    THE FRAUD AND ZIOGAS' UTTER DOMINATION AND
    CONTROL OF THEM ............................................................................................ 23

POINT V

    PLAINTIFFS HAVE PLED FRAUD WITH MORE
    THAN SUFFICIENT PARTICULARITY ............................................................... 26

POINT VI

    DISCOVERY ........................................................................................................... 27

CONCLUSION ................................................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**

A. Coker & Co. v. Nat'l Ship. Agency Corp., 1999 U.S.Dist. Lexis 7442 (E.D. La. May 18, 1999) ..................................................................................................................................25

Anderson v Abbott, 321 U.S. 349 (1944) ..................................................................................25

Antares Aircraft, L.P. v. Federal Rep. of Nigeria, 948 F.2d 90 (2d Cir. 1991) ..........................11

Carroll v. Protection Maritime Ins. Co., 512 F.2d 4 (1st Cir. 1975) ............................................16

Conn. Nat'l Bank v. Fluor, 808 F2d 957 (2d Cir. 1987) ..............................................................26

Doe v. Celebrity Cruises, 394 F.3d 891 (11th Cir. 2004) ...............................................13, 14 , 18

Elmwood Dry Dock v. H&A Trading Co., 1998 AMC 2681 (E.D. La. 1997) ................14, 17, 22

Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249 (1972) .....................................12

Exter Ship. v. Kilakos, 310 F.Supp. 2d 1301 (N.D. Ga. 2004) ..............................................14, 15

Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603 (1991) .....................................................21

Foremost Ins. Co., v. Richardson, 457 U.S. 668 (1982) ...............................................................13

FWF Inc. v. Detroit Diesel Corp., 494 F.Supp.2d 1342 (S.D. Fl. 2007) ......................................23

Ganino v. Citizens Util. Co., 228 F.3d 154 (2d Cir. 2000) ..........................................................26

Gartner v. Snyder, 607 F.2d 582 (2d Cir. 1979) ..........................................................................24

Gonzales v. U.S., 284 F.3d 281 (1st Cir. 2002) ...........................................................................11

Hadjipateras v. Pacifica, S.A., 290 F.2d 697 (5th Cir. 1961) .......................................................22

Harville v. Johns-Manville Prods. Corp., 731 F.2d 775 (11th Cir. 1984) .....................................15

Ingersoll Milling Mach. Co. v. M/V Bodena, 829 F.2d 293 (2d Cir. 1987) .................................21

Interocean Ship. Co. v. National Ship. and Trading Co., 523 F.2d 527 (2d Cir. 1975) ...............24

Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527 (1995) ..............13, 14

Kinnard v. Shoney's, Inc., 39 Fed. Appx. 313 (6th Cir. 2002) .....................................................20

Kirno Hill Corp. v. Holt, 618 F.2d 982 (2d Cir. 1980)............................................................14, 24

Linea Naviera de Cabotaje, C.A. v. Mar Caribe de Navegacion, C.A.,
    169 F.Supp.2d 1341(N.D. Fla. 2001) .........................................................................................11

Maersk, Inc. v. Neewra, Inc., 443 F.Supp.2d 519 (S.D.N.Y. 2006)......................................10, 11

Malaysia Int'l v. Sinochem, 436 F.3d 349 (3d Cir. 2006)............................................................16

Malmsteen v. Berdon, LLP, 477 F. Supp. 2d 655 (S.D.N.Y. 2007).............................................20

Manley v. Ambase Corp., 126 F.Supp.2d 743 (S.D.N.Y. 2001)...................................................20

Maritima Petroleo v. Ocean Rig 1 A.S., 78 F.Supp. 162 (S.D.N.Y. 1999)..................................13

Maryland Tuna Corp. v. MS Benares, 429 F.2d 307 (2d Cir. 1970).............................................27

Minturn v. Maynard, 58 U.S. 477 (1855).....................................................................................21

Misano di Navigazione SpA v. U.S., 968 F.2d 273 (2nd Cir. 1992 ..............................................23

Morewood v. Enequist, 62 U.S. 491 (1859)..................................................................................14

Norfolk S. Railway v. James N. Kirby, Pty. Ltd., 543 U.S. 14 (2004) .......................13, 18, 21, 22

Norlin Corp. v. Rooney, Pace Inc., 744 F.2d 255 (2d Cir. 1984)..................................................20

Pegram v. Herdrich, 530 U.S. 211 (2000).....................................................................................11

Peralta Ship. Corp. v. Smith & Johnson (Ship). Corp., 739 F.2d 798 (2d Cir. 1984,
    cert. denied, 470 U.S. 1031 (1985)...........................................................................................21

Phoenix Bulk Carriers Ltd. v. Unicarbon, 07-10404 (S.D.N.Y. February 13, 2008)..............23, 24

Rolls Royce Ind. Power (India) v. M.V. FRATZIS M, 1996 A.M.C. 390 (S.D.N.Y. 1995) ........28

S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp., 84 F3d 629 (2d Cir. 1996) ...................26

Sea-Terminals, Inc. v. Independent Container Line, Ltd., 1990 AMC 776 (D. Del. 1999)..........28

Sisson v. Ruby, 497 U.S. 358 (1990), vacated on other grounds, 505 U.S. 1215 (1992) .......12, 14

Solomon v. North Am. Life & Cas. Ins. Co., 151 F.3d 1132 (9th Cir. 1998)...............................20

The Plymouth, 70 U.S. 20 (1866)..................................................................................................12

Tide Line, Inc. v. Eastrade Commodities, Inc., 2007 AMC 252 (S.D.N.Y. 2006) .......................23

Ullisses Ship. Corp. v. FAL Shi. Co., 415 F.Supp.2d 318 (S.D.N.Y. 2006)..................................25

Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd., 475 F. Supp. 2d 275
    (S.D.N.Y. 2006)...................................................................................................................11, 25

Wight v. Bankamerica Corp., 219 F.3d 79 (2d Cir. 2000) ...........................................................27

William Wrigley Jr. v. Waters, 890 F.2d 594 (2d Cir. 1989)........................................................25

Wm. Passalacqua Builders v. Resnick Developers, 933 F.2d 131 (2d Cir. 1991) ........................25

## Other Authorities

1Benedict on Admiralty § 171 (7th ed. rev. by S. Friedel 1988) ....................................................19

Fed. R. Civ. P. 9(b)........................................................................................................................26

Fed.R.Civ.Proc. 15 ........................................................................................................................23

Fed.R.Civ.Proc. 12(b)....................................................................................................................11

Restatement (Second) of Contracts, §205 ....................................................................................23

Robert Force, Determining Admiralty Tort Jurisdiction: An Alternative Analytical Framework,
    21 J. Mar. L & Com. 1 (1990)...................................................................................................19

Thomas J. Schoenbaum, Admiralty & Maritime Law (4th ed. 2004) ...........................................15

## PRELIMINARY STATEMENT

This memorandum is submitted on behalf of Plaintiffs in opposition to Defendants' motion to vacate the attachment and dismiss the complaint. For the reasons outlined more fully below, the motion should be rejected in its entirety.

## INTRODUCTION AND SUMMARY OF ARGUMENT IN OPPOSITION

The primary focus of Defendants' motion is premised on a challenge to this Court's admiralty jurisdiction. Defendants argue that the claims pled are more in the nature of an accounting between two investors, and as such, do not provide a basis for maritime jurisdiction. In the absence of maritime jurisdiction, Defendants argue, the Rule B attachment should be vacated and the Complaint dismissed as well. The argument fails for two fundamental reasons.

First, Defendants misapprehend the nature of the claims pled by the vessel owning Plaintiffs. At its core, this is an action by the corporate vessel owning Plaintiffs against their former manager (Mr. Ziogas) for fraud and the breach of his fiduciary obligations as their managing director/agent in manipulating the charter party transactions entrusted to his control. It is very much a maritime claim, grounded in theories of tort and contract, and provides a solid base upon which to support the attachment.

Second, and even more fundamentally, the motion is flawed because it incorporates an effort by Defendants to re-shape the Complaint. To support their jurisdictional challenge, Defendants seek to recast the claims as a garden-variety accounting dispute between two investors – Messrs. Economou and Ziogas. From there, they argue that such accounting claims are not maritime. But Mr. Economou is not a plaintiff, and Defendants cannot insinuate him into the jurisdictional analysis to facilitate their re-characterization of the nature of this suit as an

1

action for an accounting. This is, at bottom, a maritime fraud case which also includes tort and contractual claims for breach of managerial obligations. It is not a suit for an accounting.

As outlined more fully below, Mr. Ziogas was given a position of responsibility by Plaintiffs to manage their vessels. In the performance of his duties, he was responsible, *inter alia*, for procuring from the charterers of Plaintiffs' vessels certain purchase options (on vessels other than Plaintiffs') in exchange for outstanding hire due from these charterers. These purchase options were, in effect, the remuneration (*i.e.* hire) earned by Plaintiffs' vessels for their performance of the IPL charters. In breach of his fiduciary obligations to Plaintiffs, and by outright fraud, Ziogas diverted these purchase options to himself.

Similarly, Defendants' ancillary challenges to the sufficiency of the fraud allegations and the adequacy of the identification of the corporate defendants (as alter egos of Ziogas) fail as well. The Complaint includes a comprehensive and clear recitation of factual and legal grounds, including the acts committed by the corporate defendants, in perpetration of the fraud. The Complaint also more than sufficiently outlines the extent to which Mr. Ziogas controlled the corporate defendants into whose names and through which he moved the stolen assets.

To fully appreciate the nature of the claims and the basis upon which they support admiralty jurisdiction, it is necessary to provide the Court with the background and events leading up to the fraud and breaches of fiduciary duty asserted in the Complaint. Defendants provide no meaningful discussion of the facts, but given the deplorable conduct exhibited by Mr. Ziogas, it is understandable why they would prefer to avoid that discussion.[1]

---

[1] Greater specifics about the parties, the history of the formation of the companies, the relationship and role played by Mr. Ziogas, etc. are contained in the accompanying Declaration of Mr. George Economou.

## SUMMARY OF THE FACTS

A.    **The Parties.**

    *(i)  Plaintiffs.*

Plaintiff Ocean Trade S.A. is a foreign corporation which was created for the purpose of the ownership and chartering of vessels engaged in world-wide trade. (*See* Verified Complaint at ¶2).[2] It was initially operated from the office of Cardiff Marine, a recognized and established ship management company, founded by Mr George Economou in about 1992. (*See* VC ¶¶ 3-4). Through its wholly-owned subsidiaries (*i.e.* the remaining plaintiffs, Panaport Shipping, Pillsbury Navigation and Sterling Navigation (the "Ocean Trade Owners" or "Owners")), Ocean Trade owned the vessels KOWHIA, OCEAN REYNA and OCEAN LEO. (*See* VC ¶¶ 6-7).[3]

    *(ii)  Defendants.*

The management and operation of these vessels were entrusted to Defendant Charalambos "Babis" Ziogas (hereinafter "Ziogas"). Ziogas, until his withdrawal in mid-2002 from Plaintiffs' operation, was charged with the day-to-day operation and control of Plaintiffs' three ships, the collection of the hire, the supervision of the chartering, etc. He held himself out as the Managing Director for Plaintiffs and routinely signed all the important documents for them.

The remaining corporate defendants, which were formed and controlled by Ziogas, were shells through which he conducted his business, each of which played a part in his scheme to appropriate the purchase options and later take possession of the vessels.

---

[2] Further references to the Verified Complaint will be identified with the letters "VC".

[3] The capital for the purchase of the three ships owned by Plaintiffs was provided by Mr. George Economou, who was the founder of Cardiff. (*See* VC ¶¶ 4-5).

**B.**   **The Beginning of the Ocean Trade Operation.**

In 1996, Ziogas approached Mr. Economou for assistance in re-establishing himself in the shipping industry. Ziogas knew Mr. Economou from when they both were working in the New York shipping industry in the 1980's. Ziogas' return to Greece and approach to Mr. Economou followed the failure of Ziogas' New York based shipowning venture, Bulk Ocean Services. (*See* VC ¶17). Ziogas' proposal was to seek out shipping business opportunities, put deals together, and then run the ventures on behalf of the participants. Mr. Economou agreed to provide Ziogas with a desk and access to the resources and support of the Cardiff offices, so that he could look for maritime-related business opportunities which could then be managed from there. (Economou Decl. ¶¶ 14-19).

One such business opportunity was the purchase of several vessels from a Japanese company called Inter-Pacific Lines ("IPL") and the charter of those vessels back to IPL (or its controlled subsidiaries) on a long-term basis. The prospects for this project appeared promising, so Plaintiff Ocean Trade arranged for the formation of several subsidiary entities (the Ocean Trade Owners), who purchased the vessels KOWHIA, OCEAN REYNA and OCEAN LEO (the Ocean Trade Vessels) from IPL and then let the vessels back out to IPL/IPL subsidiaries under long term charters (the IPL Charters). (Ex. 1 to VC: copies of individual charter parties for each of the three vessels re-let back to IPL).[4]

The negotiations for the purchase, the closings on the individual sales transactions and the charter back of the Ocean Trade Vessels were handled primarily by Ziogas. Indeed he was the signatory on the charter parties themselves and was, throughout all times material hereto, acting in the capacity as Managing Director and agent for Plaintiffs. (Ex. 1 to VC: the three

---

[4]There were additional vessels purchased and chartered back to IPL but for purposes of this case, only the three mentioned above are relevant.

NYDOCS1/301628.1                                         4

charter parties each signed by Ziogas; *see also*, Ex. 2 to VC pp 1-2: Ziogas' CV identifying himself as "Managing Director" of Ocean Trade).

The three vessels chartered to IPL (or IPL subsidiaries) were let out for significant periods of time, initially starting out as 30 months, but then stretching out to periods between 4 and 10 years. (VC ¶24; Economou Decl. ¶¶ 10-11). Ziogas was in charge of the management and day-to-day operations of the Ocean Trade business and the vessels were entrusted to him. He was, at this point in time, still operating out of the Cardiff offices, supervising the payments of hire, the insurance on the vessels, and virtually all aspects of their operation so far as Owners were concerned. (Economou Decl. ¶¶ 20-23).

**C.    Ziogas Sets Up His Own Office - Maritime Financial Services Corporation.**

Several years later, in about 2000, Ziogas opted to establish himself in a separate office under the banner "Maritime Financial Services" (later establishing Maritime Financial Services Corporation, now called MFS Shipmanagement – a defendant herein). (Economou Decl. ¶18). The geographic departure was amicable in the sense that Ziogas was still entrusted with the operation and management of the Ocean Trade operation, still maintained the role as Managing Director, and handled all the day-to-day aspects of the operation as described above.

**D.    IPL Charterers Fall Behind in Hire Payment.**

About the same time that Ziogas moved offices, the IPL charterers began to fall behind in their monthly charter hire obligations to the Ocean Trade Owners. Throughout 2001, the position grew steadily worse. By late 2001, the situation had become critical with the balance of hire due to Plaintiffs in excess of $2.5 million. (VC ¶¶ 31-34; Economou Decl. ¶¶ 24-29).

To make matters worse, the IPL charterers had also fallen behind in their payments to their technical and crewing managers. IPL had been using a Japanese company called Keymax

Maritime Company Ltd. ("Keymax") as technical and crewing managers, and Keymax claimed that it too was owed significant sums from IPL for dockage costs and various ship-operating expenses, which totaled more than $1.5 million. All told, therefore, there was in excess of $4 million which was owed from the IPL charterers to Ocean Trade and to Keymax, and the viability of those long-term charters was in jeopardy. (VC ¶¶ 31-37; Economou Decl. ¶¶ 23, 28-29).

E.    **Ziogas Initiates and Concludes Negotiations in relation to the Charter of the Ocean Trade Vessels to Include the Grant of Purchase Options on Other Vessels from the IPL/Keymax Fleet in Exchange for the Outstanding Hire.**

In an effort to avert a collapse of these long-term charters, Plaintiffs (represented by Ziogas), Keymax and IPL entered into a series of negotiations which ran for almost a year. The VC and accompanying Economou Declaration set forth in greater detail the nature and scope of these workout negotiations. (VC ¶¶ 41-61; Economou Decl.¶¶ 30-39). For the purposes of this discussion, it is necessary to focus on only one of the key elements in the workout – this being a proposal that IPL and Keymax provide options on several vessels in their fleet as compensation for the outstanding hire due to Plaintiffs and for IPL's failure to perform certain other obligations under the IPL charters. This was acceptable to Plaintiffs who agreed to accept, in effect, the payment of hire (*i.e.* compensation for the performance of the IPL charters) in the form of monetary payments and options to purchase the vessels OCEAN DAISY, OCEAN ELLIE, OCEAN SAMPAGUITA, OCEAN HARMONY, OCEAN PHOENIX and SOUTHERN ODYSSEY (the "Option Vessels"). (VC ¶¶ 54-57; Economou Decl. ¶¶ 35-39).

By the end of 2001, the negotiations had progressed to their final stages. Two documents were generated memorializing the terms on which it was agreed the charters of the Ocean Trade Vessels would operate going forward, entitled (i) the "Keymax Master Agreement" and (ii) the

"IPL Master Agreement".  (VC ¶¶ 60-61; Ex. 2 thereto at pp. 8-17; Economou Decl. ¶¶ 36-39).
These two documents set forth the specifics of the agreement, how future revenue earned by the
vessels would be allocated and utilized, and, significantly, the purchase options on the six vessels
mentioned above (the options were contained within the Keymax Master Agreement at Clause
7). (*See* Ex. 2 to VC pp.27-31).

Ziogas was the individual who handled all the negotiations for these transactions on
behalf of Plaintiffs, and in fact, signed both the Keymax and the IPL Master Agreements on
behalf of Plaintiffs in late December 2001, although Plaintiffs did not learn of the finalization
and execution of these contracts until years later.  (*See* VC ¶¶ 59-61; Ex. 2 at pp. 23-32;
Economou Decl. ¶¶ 41, 57-59).

**F.    Ziogas Conceals Execution of Keymax Master Agreement and the IPL Master
Agreement  from the Ocean Trade Owners.**

Despite the fact that the Keymax Master Agreement and the IPL Master Agreement had
been finalized and indeed executed in late December 2001, Ziogas did not accurately report back
to Plaintiffs what had transpired at the time, and later purposefully misled them with respect to
the status of those negotiations.  (Economou Decl. ¶¶ 42-44, 52-55, 59; VC ¶¶ 63, 66 & 67).
Although initially indicating that the agreements had been concluded, Ziogas subsequently
backtracked in his reports to Plaintiffs, maintaining that negotiations were still in play, they had
not been fully finalized and the purchase options never specifically provided.  In fact, during the
ensuing months of March – May 2002, Ziogas denied any agreement had ever been finalized or
executed, when in fact they had, and he had executed them for Plaintiffs.  (VC ¶¶ 70-71;
Economou Decl. ¶¶ 40-49, 52-55, 57-59; Ex. 2 to VC pp. 27-31).

G.    **Ziogas Fades to Black, but with the Purchase Options Tucked Neatly in his Vest Pocket.**

In the early summer of 2002, and under terms of a buyout worked out in the fall of 2001, Ziogas withdrew from any further involvement in the management and operation of Plaintiffs, for a cash payment of $75,000. (VC ¶64). Having been led to believe that the Keymax Master Agreement and the IPL Master Agreement were never fully finalized, Plaintiffs initiated legal action to recover the damages they suffered through IPL's breaches of the IPL charters, including the outstanding hire which was supposed to have been compensated by virtue of the purchase options in the workout. Those actions went nowhere when IPL eventually slipped into bankruptcy. (Economou Decl. ¶¶ 50-56). This brought to a close, or so it was thought, this rather sad financial chapter in Plaintiffs' ship-owning endeavor with their manager Mr. Ziogas.

H.    **Fast Forward to 2007.**

In July of 2007, Plaintiffs were provided with a series of documents which revealed the truth about what had occurred with the Keymax Master Agreement and the IPL Master Agreement at the end of 2001 and the manipulation of the purchase options which Ziogas had in fact concluded and maneuvered into the name of corporations he controlled.

Despite Ziogas' representations to Plaintiffs in the spring of 2002 that the Keymax Master Agreement was never finalized, the Keymax Master Agreement containing the options had in fact been executed but was kept secret from Plaintiffs to facilitate Ziogas' subsequent effort to transfer the purchase options into his private corporations.[5]

---

[5] Although he had in the interim (in approximately 2004) acknowledged that the IPL Master Agreement had been finalized (this confirmation being made in connection with one of the failed collection suits mentioned above), Ziogas had steadfastly maintained that the Keymax Master Agreement and the options which had originally been set forth therein were simply never concluded. (Economou Dec. ¶¶ 50-56).

NYDOCS1/301628.1

8

The details of the fraud are set forth in specific detail in the Verified Complaint and the Economou Declaration, so only a brief summary is needed here. Suffice it to say, the documents provided in 2007 show that the Keymax Master Agreement and the IPL Master Agreement were executed in December 2001 (*see* VC Ex. 2 at pp.23-33), and that Ziogas then orchestrated a transfer of the options out of the name of Plaintiffs and into his own corporations. He did this by first splitting the Keymax Master Agreement into two separate documents, a "Settlement Agreement" and an "Options Agreement", possibly explaining to Keymax that the Ocean Trade Owners wanted it this way to make the options more marketable. (*See* Economou Decl. ¶¶ 63-69; VC Ex. 2 at pp. 50-55). Ziogas then later changed the identification of the beneficiary of the Options Agreement from Plaintiff Ocean Trade to his own private corporation(s) and managed to shield Plaintiffs from any knowledge of this by manipulating what Keymax told Plaintiffs. He and his companies eventually reaped millions of dollars in profit when those options came due in 2005 and the vessels were worth many times more than the option price. (VC ¶¶ 96-103; Economou Decl. ¶¶ 70-87).

The purchase options were extended in specific recognition and in consideration for the substantial lost revenue/hire which had not been paid by the IPL charterers to the Ocean Trade Owners. By concealing the existence and execution of the Keymax Master Agreement from Plaintiffs and improperly utilizing his position as Managing Director to amend the terms of and parties to these agreements, Ziogas, with the use and aid of the Defendant companies each of which participated in the fraud, stole what was in effect the payment of the hire on the three vessels owned by Ocean Trade Owners and committed fraud and a breach of his contractual and tortious fiduciary obligations.

As noted above, more specific details regarding the manipulation of the Keymax Master Agreement are contained in the Economou Declaration and Declaration of Mr. Shepherd and the Court is respectfully referred to those declarations for a precise recitation of the dates, times and manner in which Ziogas and the corporate defendant orchestrated this fraud. The Declarations include a very careful analysis of the email exchanges between Ziogas and his contact at Keymax (Mr. Fordyce) and provide a window into the depth of the greed and fraudulent conduct under which Ziogas and the Defendant companies maneuvered the options for the benefit of Mr Ziogas. Some of the more remarkable exchanges include wholesale confirmations by Ziogas to Mr. Fordyce of the false information that he was providing to Plaintiffs and how Ziogas carefully manipulated the information which Keymax provided (even after he left as manager) to keep the subterfuge under wraps.

In the end, and as nearly as Plaintiffs can calculate, Ziogas and the defendant companies profited to the tune of about $94 million on his scheme. (*See* VC ¶¶ 102-121).[6]

## POINT I

## BURDENS IN A RULE E MOTION AND A MOTION TO DISMISS.

Defendants have moved for vacatur under Supplemental Rule E(4)(f). Such an application is a specialized maritime proceeding with the singular purpose of determining the on-going propriety of a maritime attachment under Supplemental Rule B. *Maersk, Inc. v. Neewra, Inc.*, 443 F.Supp.2d 519, 530 (S.D.N.Y. 2006). Such a proceeding is not, however, the vehicle

---

[6] Apart from the main fraud claim as described above, Ziogas also orchestrated several other diversions of hire in connection with his operation and management of the IPL charters, including false and inflated "commissions" and inflated "management" fees which were actually the means by which he diverted tens of thousands of additional dollars from the Ocean Trade Owners. These separate frauds and breaches of his fiduciary duties are detailed in the Verified Complaint and for that reason are not repeated herein, but they form two separate claims and provide independent grounds for the assertion of this Court's admiralty jurisdiction. (*See* VC ¶¶ 122-138 setting forth the bases for the additional claims for diversion of hire from Plaintiffs).

under which a motion to dismiss can be submitted, and a motion to vacate is <u>not</u> a motion to dismiss under Federal Rule of Civil Procedure 12(b). *Id.*

When a party seeks vacatur pursuant to Rule E, the plaintiff bears the burden to show that the attachment should not be vacated, but is not required to demonstrate its case with the same level of proof as required at trial. *Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 278 (S.D.N.Y. 2006). The standard to be met is a reasonable grounds or probable cause standard. *Maersk,* 443 F.Supp.2d at 527. The court's review of whether reasonable grounds exist for the attachment is not limited to the adequacy of the allegations in the Complaint, but rather, the court may consider any manner of evidence offered in the parties' papers or at the post-attachment hearing, which can include documents, affidavits, declarations, or testimony. *Id.* (citing *Linea Naviera de Cabotaje, C.A. v. Mar Caribe de Navegacion, C.A.,* 169 F.Supp.2d 1341, 1357-58 (N.D. Fla. 2001) ("Rule E does not restrict review [at the post attachment hearing] to the adequacy of the allegations in the complaint")).[7]

Plaintiffs recognize the burden they have in this Rule E application and for the reasons outlined in this submission, have more than adequately shouldered that burden.

---

[7] Even in the context of a motion to dismiss under Rule 12(b), the Court would nevertheless be free to consider other evidence outside the complaint. *See, e.g., Gonzales v. U.S.*, 284 F.3d 281, 287-88 (1st Cir. 2002) (court is free in Rule 12 context to examine documents referred to in complaint); *Pegram v. Herdrich,* 530 U.S. 211, 229, n.10 (2000) (opponent in Rule 12 motion can clarify allegations of pleading in briefs). Similarly so, when considering a motion to dismiss for lack of subject matter jurisdiction, the court is not confined to the complaint. It may consider evidence outside the pleadings, such as affidavits. *See Antares Aircraft, L.P. v. Federal Rep. of Nigeria*, 948 F.2d 90, 96 (2d Cir. 1991), *vacated on other grounds*, 505 U.S. 1215 (1992). The incorporation of a motion to dismiss in a Rule E setting, however, is inappropriate and thus the only application which is properly before the Court is the Rule E vacatur motion.

NYDOCS1/301628.1                              11

## POINT II

### THIS COURT HAS ADMIRALTY TORT JURISDICTION FOR THE FRAUDS COMMITTED BY ZIOGAS BECAUSE THEY RELATE TO HIS MANIPULATION AND DIVERSION OF THE VESSELS' EARNINGS.

Historically, jurisdiction over a maritime tort action was largely determined by application of a "locality" test. *See, generally, Sisson v. Ruby*, 497 U.S. 358, 360 (1990) (citing *The Plymouth*, 70 U.S. 20 (1866)). Under this test, the primary focus was whether the tort occurred on navigable waters. In *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1972), the Supreme Court moved away from a strict locality test and indicated that the emphasis should be placed on an analysis of whether the alleged wrong bore a significant relationship to traditional maritime activity.

> *Executive Jet* marked this Court's first clear departure from the strict locality test …. Noting "significant difficulties with the locality test", we refused to enter into a debate over whether the tort occurred where the plane had crashed and been destroyed (the navigable waters of Lake Erie) or where it had struck the sea gulls (over land). Rather, we held that jurisdiction was lacking because "the wrong [did not] bear a significant relationship to traditional maritime activity."

*Sisson*, 497 U.S. at 360-61 (discussing and quoting *Executive Jet's* introduction of a nexus component to the jurisdiction test) (internal citations omitted).

Subsequently, the Supreme Court clarified that the nexus requirement (*i.e.* wrong having relationship with maritime commerce) applies in all maritime cases and not just commercial maritime cases. *Foremost Ins. Co., v. Richardson*, 457 U.S. 668 (1982) (approving a broader interpretation of *Executive Jet*).

In the wake of these pronouncements, courts have since applied a two-part test in determining whether an exercise of admiralty tort jurisdiction is appropriate in a given circumstance. A party seeking to invoke federal admiralty jurisdiction in respect to a tort claim

is generally obliged to satisfy the following conditions: (a) connection with maritime activity (the "nexus" requirement) and (b) location. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995); *Doe v. Celebrity Cruises*, 394 F.3d 891, 900 (11th Cir. 2004). However, the more recent authority indicates that while locality is still considered, the real focus of the inquiry is trained on the question of whether the tort has a substantial relationship to some traditional maritime activity. *Doe*, 394 F.3d at 900; *Maritima Petroleo v. Ocean Rig 1 A.S.*, 78 F.Supp. 162 (S.D.N.Y. 1999) (whether the tort occurred on navigable waters is "not necessarily determinative").[8]

In the context of this case involving Plaintiffs' manager's diversion of the vessel's earnings, there can be no legitimate debate that this case provides a sufficient basis for the exercise of maritime tort jurisdiction under the above-referenced criteria. The Defendant Ziogas, in the position of Managing Director, had control of the vessels' earnings, and from that position of trust, stole hire from Plaintiffs in multiple schemes, including the theft of the purchase options (which were in effect the IPL charterers' remuneration for the outstanding hire at the end of 2001) and his separate thefts in the form of his diversion of the hire through inflated "management" fees and fake commissions.[9]

Turning to the specifics of the test for admiralty tort jurisdiction, Plaintiffs submit that the facts and circumstances giving rise to this claim clearly meet the criteria.

---

[8] Indeed, the Supreme Court's most recent pronouncement on maritime jurisdiction reflects an expansive view of the contours of admiralty jurisdiction stating that "the shore is now an artificial place to draw a line." *Norfolk Southern Railway v. James N. Kirby, Pty. Ltd.*, 543 U.S. 14, 25 (2004). Accordingly, and as explained below, the claims here satisfy both elements of the test.

[9] As noted above, the specific details regarding the thefts of hire in the form of the inflated commission and management fee are set forth at ¶¶ 122-138 of the VC.

A.    **Plaintiffs' Claims Satisfy The Nexus Requirement.**

The nexus requirement involves an analysis of two factors:  (1) whether the "general features of the type of incident involved" had a "potentially disruptive impact on maritime commerce", and (2) whether the "general character of the activity giving rise to the incident bears a substantial relationship to traditional maritime activity."  *Grubart*, 513 U.S. at 538 (emphasis added); *see also Sisson*, 497 U.S. at 363.

The jurisprudence addressing the nexus requirement indicates that the courts have little difficulty in finding satisfaction of the two elements whenever the underlying claim involves some activity relating to traditional shipping.  *See, e.g,*, *Doe*, 394 F.3d at 900 (first prong satisfied where claim involved activity by crewmember on cruise ship); *Exter Ship. v. Kilakos*, 310 F.Supp. 2d 1301, 1310 (N.D. Ga. 2004) (nexus exists because underlying misrepresentations affected movement of cargo and ships on high seas); *Elmwood Dry Dock v. H&A Trading Co.*, 1998 AMC 2681 (E.D. La. 1997) (nexus satisfied where alleged torts involved repair, maintenance and operation of ocean going vessel).

Applying these criteria to the instant case, there can be no reasonable debate that the activities by Ziogas involved traditional maritime conduct.  He was the manager in charge of three vessels, handled all the day-to-day aspects of that operation and from that position, manipulated what should have been the payment of hire to Plaintiffs.  There is no more fundamental a maritime activity than the charter and operation of ocean-going cargo ships. *Morewood v. Enequist*, 62 U.S. 491 (1859); *Kirno Hill Corp. v. Holt*, 618 F.2d 982 (2d Cir. 1980).  Fraud committed in that context therefore meets this aspect of the test.

**B.    Plaintiffs' Claims Similarly Satisfy The Location Requirement.**

As outlined above, the second element of the test for admiralty tort jurisdiction involves a

locality consideration.    While the test invites mechanical application in tort cases involving a

physical injury or accident, the analysis is not so mechanical or geographic in cases involving

intentional torts such as present here.    As outlined by Professor Schoenbaum,

> [I]n applying the locality rule to borderline situations, the courts hold that the
> tort occurs where the negligent or intentional act takes effect, not where the act
> occurred.    Thus, if shots are fired from the land at a boat on navigable waters,
> the resulting tort is within admiralty jurisdiction.    Intentional torts such as
> fraud, misrepresentation and fraudulent inducement to contract and defamation
> must have an effect on navigable waters to be within admiralty jurisdiction.

1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* p. 99 (4th ed. 2004); *see also Harville v.*

*Johns-Manville Prods. Corp.*, 731 F.2d 775, 782 (11th Cir. 1984) (under the locality test, the tort

is deemed to have occurred not where the tort took place, but rather where the tortious act took

effect).

In these types of situations, the courts have not drawn an artificial border at the shoreline

with respect to whether admiralty jurisdiction exists.    Obviously, to have done so would, of

necessity, have divested the courts of jurisdiction in virtually every maritime fraud case unless

the conspirators were in the same rowboat, so to speak, when they hatched their plan.    Instead,

the courts examine whether the tortious conduct had some impact on navigable waters or a vessel

engaged in traditional maritime activity.

By way of example, in *Exter Shipping*, 310 F.Supp.2d 1301 (N.D. Ga. 2004), the court

examined the issue of admiralty tort jurisdiction where the plaintiff alleged that the defendants

had misrepresented the financial wherewithal of a charterer to perform charter party contracts.

The defendants there (like here) perpetrated the fraud from their land-based offices but because

the impact of those torts involved the operations and chartering of vessels engaged in commerce, the locality criteria was satisfied.

> Certainly, the alleged misrepresentations regarding ownership and disposition of the cargo which ultimately controlled the movement of the ships, the discharge of their cargo, and their seizure by Metro Trading's creditors were injuries at sea. Therefore, the "situs" requirement has been met.

*Id.* at 1310.

The same can be said in this case. The fraud here deprived Plaintiffs of the revenue earned by the vessels while trading on the high seas. The IPL charterers owed hire to Plaintiffs and it was the diversion of that hire that gives rise to this claim. The theft of hire earned by vessels trading on the high seas certainly satisfies the locale requirement.

The First Circuit's decision in *Carroll v. Protection Maritime Ins. Co.*, 512 F.2d 4 (1st Cir. 1975), is also instructive. There, the plaintiff fishermen sued for tortious interference claiming that the defendant underwriters had blacklisted them based upon the fact that they had previously asserted personal injury claims. Plaintiffs alleged that as a consequence they lost their current jobs and were unable to secure other employment. With respect to the locale analysis, the First Circuit noted that the location of the blacklisting was irrelevant, noting that "admiralty jurisdiction depends not on the place where the injury is inflicted but on the nature of the service and its relationship to the operation of a vessel plying in navigable waters." *Id.* at 6. The court then concluded that interference with plaintiffs' shipping business, including handling of cargo and free operation of its vessels, as a consequence of the blacklisting, was sufficient to confer admiralty jurisdiction.[10]

---

[10] *See also Malaysia Int'l v. Sinochem*, 436 F.3d 349 (3d Cir. 2006) (location test easily met based upon the defendant's alleged land-based misrepresentations to the Chinese Admiralty Court).

The lesson of all these cases is simple: If tortious conduct has an effect on the management and operation of vessels at sea, an exercise of admiralty tort jurisdiction would be proper because the tort has an impact on and bears a relationship to traditional maritime activity occurring on navigable waters. In the context of a charter party, the sole basis for the operation of the vessel is for the purpose of the carriage of cargo in exchange for the payment of hire. Ziogas' fraud directly interfered with Plaintiffs' business and significantly impacted that trade by depriving them of the earnings from their vessels.

In a case very similar to this situation, the court in *Elmwood*, 1998 AMC 2681, addressed the circumstances of a vessel manager's tortious conduct. The plaintiffs in *Elmwood* alleged, *inter alia*, financial losses as a consequence of the defendant manager's conversion and misappropriation of funds which should have been used to operate and maintain a vessel. The court found that the conduct of the defendant manager in misappropriating the funds satisfied both aspects of the test for maritime tort jurisdiction because misappropriation had an effect on the vessel trading on navigable waters. "[E]very fact in this case [like the case at bar] and each alleged tort is connected to the vessel herself." 1998 AMC at 2692. Again, this decision supports an exercise of jurisdiction because the focus of the fraud was the theft of the vessel's earnings.

As noted at the outset of this brief, this is not a claim between two investors for an accounting. This is a suit between corporate vessel owners and their manager for his fraud in connection with the theft of the vessel's earnings. This is as salty as a maritime fraud case can get and it meets all the tort criteria for an exercise in admiralty jurisdiction. Defendants' effort to recast the Complaint as one for an accounting should be rejected and maritime tort jurisdiction confirmed.

C.    **A Finding of Admiralty Jurisdiction Would Be Consistent with Recent Supreme Court Pronouncements Expanding Maritime Jurisdiction and The Underlying Policy of Achieving Uniformity in the Maritime Industry.**

In *Norfolk S. Railway v. James N. Kirby, Pty. Ltd.*, 543 U.S. 14 (2004) (discussed below), the Supreme Court significantly expanded the scope of maritime contract jurisdiction.   In the wake of *Kirby*, a similar expansion has been witnessed in the maritime tort arena.   Such was the case in *Doe v. Celebrity Cruises Inc.*, 394 F.3d 891 (11th Cir. 2004), where the Eleventh Circuit – following the Supreme Court's lead in *Kirby* - undertook a more expansive view on the bounds of jurisdiction.   In *Doe*, admiralty tort jurisdiction existed even though the act (sexual assault by an off-duty crewmember against a passenger) occurred on shore.   The court noted that although there was a temptation to draw a bright line rule between activities which occur on land and at sea in the jurisdictional analysis, courts should follow the more expansive view recently espoused by the Supreme Court in *Kirby* and not draw the "shore [as] an artificial place to draw a line", when the overall situation is more "salty."   *Kirby*, 543 U.S at 8.

Commentators equally support the view as set forth in *Kirby* that the concept of admiralty jurisdiction is changing and that the locality requirement should not be emphasized but rather subsumed into the nexus requirement, especially where the maritime interest is so strong that adherence to a strict locality rule would impede the fundamental purposes of admiralty jurisdiction.

> Whether a tort occurs on the water should be one factor to be considered in determining whether the tort meets the nexus requirement.   The Admiralty Extension Act has helped by including damage done on land by vessels in navigable waters, and the courts have made an exception for seamen's claims arising out of their maritime status. As the courts are becoming accustomed to requiring a maritime nexus for tort claims as they have for contract claims, there seems to be no principled reason for excluding tort claims merely because they lack a maritime locale.

1*Benedict on Admiralty* § 171, pp. 11-30-11-31 (7th ed. rev. by S. Friedel 1988) (citations omitted). *See also* Robert Force, *Determining Admiralty Tort Jurisdiction: An Alternative Analytical Framework*, 21 J. Mar. L & Com. 1, 78-80 (1990); *see also* Bederman, D. and Wierwille, J., 31 Tul. Mar. L.J. 291, 295, 312 (2007) (recognizing that the courts have been expanding the boundaries of admiralty jurisdiction to provide recourse to justice to individuals participating in maritime commerce).

One of the rationales for the Rule B attachment procedure is to secure a claim in an international arena where assets can easily be moved out of a jurisdiction and hidden from creditors. It evens the playing field in securing claims so that a judgment on the merits will not prove to be meaningless. It is a remedy which, as a matter of public policy, should be generously afforded to victims of international frauds such as the type of conduct we see from Ziogas here. He was not only participating in but he was running the Ocean Trade Owners vessel and charter operations and a fraud flowing from that conduct should certainly provide a basis for admiralty tort jurisdiction.

## POINT III

### THERE IS AN ALTERNATIVE BASIS FOR MARITIME JURISDICTION, BECAUSE THE CLAIMS INVOLVE BREACHES OF FIDUCIARY OBLIGATIONS WHICH SUPPORT JURISDICTION UNDER CONCEPTS OF TORT AND CONTRACT.

As noted above, it is a mischaracterization on Defendants' part to suggest that this litigation involves an accounting between Messrs. Economou and Ziogas. This is an action by the vessel-owning Plaintiffs against their former agent and manager for his breach of his duties and that claim gives rise to both contractual and tort-based remedies.

It is a fundamental principle of law that a manager/agent owes fiduciary duties to his principal, which includes an obligation of good faith and the obligation not to engage in self-

dealing.[11]  Claims for breach of fiduciary duties owed by agents/managers are *quasi* contractual in nature and the basis of such claims can arise either in contract or tort.  *See, e.g,, Kinnard v. Shoney's, Inc.*, 39 Fed. Appx. 313, 317 (6th Cir. 2002) ("claims based on fiduciary breaches are quasi-contractual in nature"); *Solomon v. North Am. Life & Cas. Ins. Co.*, 151 F.3d 1132, 1137-1138 (9th Cir. 1998) (indicating that claims for breach of fiduciary duty lie in both contract and tort); *Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 667 (S.D.N.Y. 2007) (suggesting breach of fiduciary cause of action can be based on fraud or breach of contract).

In the instant case, the claims against Ziogas for his breach of fiduciary duties lies both in contract and/or tort, and the test for admiralty jurisdiction is met in both.[12]  Insofar as tort jurisdiction is concerned, there is no need to repeat the criteria under which the claim would be evaluated (*See* Point II(A), *supra*).  The result would be the same in respect to the tort claim for breach of fiduciary obligations.  The same events and conduct giving rise to the fraud claim support the tort claim for breach of fiduciary duties and meet the requisite nexus and locale requirements.

The test for an exercise of maritime contract jurisdiction differs from that for tort jurisdiction.  When confronting issues of admiralty jurisdiction with respect to contracts, courts must "look to the subject matter of the... contract and determine whether the services performed

---

[11]  *See, e.g., Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984) (director has fiduciary duty to exercise reasonable care, in the performance of his tasks and duty not to engage in self-dealing); *Manley v. Ambase Corp.*, 126 F.Supp.2d 743, 756 (S.D.N.Y. 2001) (corporate directors have fiduciary obligations and are bound to all rules of conscientious fairness, morality, and honesty. "They are held, in official action, to the extreme measure of candor, unselfishness, and good faith.*"*). These same principles are universal and are equally features of Greek law, to the extent they may supply the applicable law here. (*See* Declaration of George Pavlis ¶¶ 7-15).

[12]  The fact that there was no written document between Mr. Ziogas and Plaintiffs detailing his duties is irrelevant. Both U.S. law and Greek law (to the extent that may be applicable) provide that a writing is not required. (Pavlis Decl. ¶9). Thus, the absence of a written document does not mean there was no contractual relationship between Mr. Ziogas and Plaintiffs.

under the contract are maritime in nature." *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S.

603, 612 (1991). While "the precise categorization of the contracts that warrant invocation of

the federal courts' admiralty jurisdiction has proven particularly elusive," *Ingersoll Milling*

*Mach. Co. v. M/V Bodena*, 829 F.2d 293, 301 (2d Cir. 1987), the Supreme Court has instructed

that courts must look to the contract's "nature and character" to see "whether it has 'reference to

maritime service or maritime transactions.'" *Kirby, Pty. Ltd.*, 543 U.S. at 6.

Historically, maritime contracts relating to agents were somewhat circumscribed under

the Supreme Court's decision in *Minturn v. Maynard*, 58 U.S. 477 (1855). There, the Court held

that admiralty jurisdiction did not extend to what was essentially the demand of an agent for the

payment of sums owed by its principal. *Minturn* was subsequently interpreted by many courts,

including the Second Circuit, to mean that agency/management contracts were *per se* excluded

from admiralty jurisdiction. *See, e.g.*, *Peralta Ship. Corp. v. Smith & Johnson (Ship). Corp.*, 739

F.2d 798, 803 (2d Cir. 1984), *cert. denied*, 470 U.S. 1031 (1985).

In 1991, the Supreme Court overruled *Minturn* and eliminated the *per se* exclusion. *See*

*Exxon Corp.*, 500 U.S. at 608. In its opinion, the Court stated first that the "fundamental

interest" giving rise to admiralty jurisdiction is "the protection of maritime commerce." *Id.* at

608. The Court then examined the underpinnings of the rationale in *Minturn*, and in concluding

that *Minturn* was no longer good law, the Court noted that "the trend in modern admiralty case

law ...is to focus the jurisdictional inquiry upon whether the nature of the transaction was

maritime." *Id.* at 611. The Court expressed a preference for a "nature and subject-matter"

approach as being the "crucial consideration" in determining whether admiralty jurisdiction

exists. *Id.* at 611-12.

In *Kirby*, 543 U.S. 14, and as noted above, the Supreme Court further expanded the scope of maritime jurisdiction in the contract context. The case involved cargo being carried under a multimodal bill of lading contract of carriage which involved land and water transport. Although the injury complained of occurred during the land leg, the Court found maritime jurisdiction, noting that the key inquiry was whether the principal objective of the contract was maritime commerce. If so, maritime jurisdiction exists. *Kirby*, 543 U.S. at 27.

In light of this precedent, it is clear that agency/management agreements can be a basis for admiralty contract jurisdiction if the "nature and subject matter" of the agreement has as its principal objective maritime commerce. For instance, in *Elmwood*, 1998 AMC 2681, the court held that claims arising out of related shareholding and management agreements gave rise to admiralty jurisdiction, as the primary purpose of the agreements was the ownership, repair and operation of a vessel.

The *Elmwood* district court relied primarily on *Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697 (5th Cir. 1961), which determined that admiralty jurisdiction existed over a vessel management contract when the very subject of the underlying contract was the ship. Although decided before *Exxon*, *Hadjipateras* applied the nature and subject matter analysis which was later adopted by the Supreme Court in *Exxon*. The *Hadjipatera* court reasoned:

> To begin with, the contract is everything classically known as a maritime contract. It concerns a ship. It relates not only to the ship; its very purpose is to effectuate the physical, economic operation and employment of a vessel. And what is here in controversy are the fruits of such operation. The subject matter, in the sense of the thing, its purpose, and its result all center around the ship. It meets all of the tests both ancient and modern.

290 F.2d at 703.

As in *Elmwood* and *Hadjipateras*, the nature and subject matter of the agreement with Ziogas was clearly maritime as it concerned the management of the Ocean Trade Vessels.

Maritime contracts impose an obligation of good faith and fair dealing between the parties. *FWF Inc. v. Detroit Diesel Corp.*, 494 F.Supp.2d 1342, 1369 (S.D. Fl. 2007) (citing *Misano di Navigazione SpA v. U.S.,* 968 F.2d 273, 274-75 (2nd Cir. 1992) and *Restatement (Second) of Contracts*, §205)).

In the instant case, it is clear that this covenant of good faith and fair dealing has been breached by Ziogas. Plaintiffs suffered extensive losses as a result of his breaches, which are compensable and which provide an independent basis for the Court's exercise of admiralty contract jurisdiction. Thus, there is no basis upon which to vacate the attachment or dismiss the Complaint.

### POINT IV

### THE ALTER EGO CLAIMS AGAINST THE CORPORATE DEFENDANTS SHOULD STAND. THE RECORD AMPLY DEMONSTRATES THEIR PARTICIPATION IN THE FRAUD AND ZIOGAS' UTTER DOMINATION AND CONTROL OF THEM.

Defendants argue that the Complaint fails to specify why the corporate defendants are liable. It is difficult to reconcile the argument with the Complaint, since it does plead with precision the role each of the corporate defendants played in the fraud (*i.e.* either in orchestrating the fraud or receiving the stolen assets) and attaches the very documents which demonstrate their role. Moreover, the additional evidence adduced herein demonstrates sufficient overlap between Ziogas and the corporate defendants.[13]

---

[13] When a defendant challenges an attachment arguing that there are insufficient allegations to support alter ego liability, the court can consider evidence outside of the pleadings, and if there is sufficient evidence of an alter ego relationship, the attachment should be maintained. *See, e.g., Phoenix Bulk Carriers Ltd. v. Unicarbon*, 07-10404 (S.D.N.Y. February 13, 2008); *Tide Line, Inc. v. Eastrade Commodities, Inc.*, 2007 AMC 252 (S.D.N.Y. 2006). The rationale for doing so is that Rule B provides "a relatively broad maritime attachment rule", which includes an expansive concept of the type of property that can be attached, and the Federal Rules of Civil Procedure favor liberal amendment of pleadings. *See Aqua Stoli*, 460 F.3d at 443-45; *Winter Storm*, 310 F.3d at 276; *Phoenix Bulk Carriers*, 07-10404; Fed.R.Civ.Proc. 15.

There are two grounds upon which the corporate defendants are liable for the fraud. In the first instance, the law is clear that when a corporation is used by its shareholder to perpetrate a fraud, it is liable for the acts of the controlling individual/entity. In the second instance, corporate entities can be liable for the acts of their shareholder if he so dominated them that they primarily contracted his business. *See Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980) (noting that under maritime law, a corporate veil can be pierced if corporations are used to perpetuate a fraud or if they are so dominated by an individual that they primarily transacted his business); *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979); *Interocean Ship. Co. v. National Ship. and Trading Co.*, 523 F.2d 527, 539 (2d Cir. 1975).

Focusing first on the fraud aspects, and as noted below in Point V, the Complaint identifies the role played by each of the corporate defendants and how Ziogas used them to implement his scheme. Therefore, they are directly liable for the acts underlying this dispute.

Apart from this, the corporate defendants are liable because they were dominated and controlled by Ziogas and lacked true corporate independence. There is no set formula employed in determining when and under what circumstances an alter ego finding is appropriate, and each case turns on its facts and a review of a series of factors. *Wm. Passalacqua Builders v. Resnick Developers*, 933 F.2d 131, 139 (2d Cir. 1991).[14] At bottom, courts are concerned with reality,

---

Courts have even allowed a non-party's assets to remain frozen even though that party was not originally named in the complaint or order of attachment, because evidence extrinsic to the complaint reasonably demonstrated a possible close inter-relationship between the non-party and named defendant. *See, e.g., Phoenix Bulk Carriers Ltd., supra; Tide Line, Inc. v. Eastrade Commodities, Inc.*, 2007 AMC 252 (S.D.N.Y. 2006); *Linea Naviera*, 169 F.Supp.2d at 1355-60

[14] Factors utilized in determining whether to pierce a corporate veil include the following: (1) inadequate capital; (2) maintenance of inadequate capital during the life of the corporation; (3) non-compliance with corporate formalities and requirements; (4) lack of attention to the corporate form including stockholders' and directors' meetings; (5) no payment of dividends and little or no cash assets; (6) financial manipulation between the entities in the organization; (7) interconnected transactions with no ostensible consideration or basis; (8) reliance on loans or advances from members of the group; and (9) the

not simply the corporate form, and will review the operations of the corporation and conduct of the alleged alter egos *vis-à-vis* each other. *Wajilam Exports,* 475 F.Supp.2d at 282.

The sharing of offices, managers and employees is particularly indicative of an alter ego relationship, particularly when one entity pays the debts of another. For example, in *Ullisses Ship. Corp. v. FAL Shi. Co.*, 415 F.Supp.2d 318 (S.D.N.Y. 2006), Judge Scheindlin recognized that a plaintiff need not establish dominion and control definitively but must convince the court there are reasonable grounds for piercing the corporate veil. There, all of the defendants were privately owned and controlled by one individual and his family, and shared the same legal address, offices, telephone and facsimile numbers, employees and general manager. Although the entities had been separately registered and maintained separate books and records, the evidence of overlapping ownership, management and purposes, combined with evidence that one defendant paid another defendant's debts, was sufficient to maintain an attachment on alter ego grounds. *See also A. Coker & Co. v. Nat'l Ship. Agency Corp.*, 1999 U.S.Dist. Lexis 7442 (E.D. La. May 18, 1999) (evidence of affiliation between entities, low capital of alleged alter ego and sharing of corporate offices sufficient to maintain attachment).

Here, Ziogas appears as the controlling individual in every aspect of the corporate defendants' formation and conduct. It is clear that his operating entity, MFS, had no capital because it could make no contribution to the Ocean Trade operation. (VC ¶39). All the corporations were formed by Ziogas and he executed the key documents for them. They operated from the same location, they engaged in cross-collateralization without sufficient indicia of corporate separateness, and the corporate defendants were formed to receive title to the

---

incorporation of the subsidiary caused by the parent or principal. *Anderson v Abbott*, 321 U.S. 349 (1944); *Wm. Passalacqua Builders*, 933 F.2d 131; *William Wrigley Jr. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989).

stolen assets. (*See also* VC Ex. 2 at pp. 200-211; Declaration of Nicholas Jeremy Shepherd).

This is a classic alter ego situation warranting piercing.

**POINT V**

**PLAINTIFFS HAVE PLED FRAUD WITH
MORE THAN SUFFICIENT PARTICULARITY**

At pages 18-19 of their brief, Defendants argue that Plaintiffs have failed to plead fraud

with particularity. In point of fact, the Complaint provides, in significant detail, the precise facts,

dates and circumstances surrounding Ziogas' fraud. In addition, and with respect to his

corporate entities, the Complaint sets forth with precision the involvement of each of those

corporations in respect to their active participation in the fraud and their use as the corporate

vehicles through which the fraud was initiated and through which to pass the assets fraudulently

garnered.

"In alleging fraud or mistake, a party must state with particularity the circumstances

constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a plaintiff must

"specifically plead those events which give rise to a strong inference that the defendants had an

intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Conn. Nat'l

Bank v. Fluor*, 808 F2d 957, 962 (2d Cir. 1987); *see also S.Q.K.F.C., Inc. v. Bell Atlantic TriCon

Leasing Corp.*, 84 F3d 629, 634 (2d Cir. 1996) (a fraud claim "must allege facts that give rise to

a strong inference of fraudulent intent"). "Such intent can be established either (a) by alleging

facts to show that defendants had both motive and opportunity to commit fraud, or (b) by

alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness." *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000).

However, allegations regarding the knowledge of the participants and their roles and the

state of mind of the participants can be alleged generally. *See* Fed. R. Civ. P. 9(b) ("Malice,

intent, knowledge, and other conditions of a person's mind may be alleged generally."). "Thus, while the actual ...fraud alleged must be stated with particularity ...the requisite intent of the alleged [perpetrator of the fraud] need not be alleged with great specificity.... We apply the more general standard of scienter for the simple reason that a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Wight v. Bankamerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000).

Under the pleading requirements as set forth above, the allegations in the Complaint clearly meet the threshold specificity. Indeed, not only does the Complaint accurately and succinctly describe the fraud, but the exhibits thereto include admissions and concessions by Ziogas himself which confirm both the predicate acts and the intent. This case presents an unusual situation where the documents available at the time of filing tell the story. The same holds true with respect to the corporate defendants whose individual roles are accurately described. Ziogas perpetrated the fraud through his corporate shell management entities, and he distributed the proceeds through his remaining corporate entities.

Defendants' suggestion that the Court's review of the fraud allegations should be limited to Paragraph 13 of the Complaint ignores the balance of this well-pled Complaint. The application to dismiss for failure to plead with particularity should be rejected.

## POINT VI

## DISCOVERY

Plaintiff respectfully requests that if the Court is inclined to entertain Mr. Ziogas' suggestion that the corporate defendants are unrelated to him, Plaintiff should nevertheless be permitted to conduct discovery regarding the relationship of these entities. *See Maryland Tuna Corp. v. MS Benares*, 429 F.2d 307, 322 (2d Cir. 1970) (discovery permitted regarding allegation

that assets owned by one corporation should be considered an asset of a related corporation);

*Rolls Royce Ind. Power (India) v. M.V. FRATZIS M*, 1996 A.M.C. 390, 392 (S.D.N.Y. 1995)

(Haight, J.) (discovery allowed on motion to vacate attachment to determine whether attachment

reached assets of the named defendant).

In *Sea-Terminals, Inc. v. Independent Container Line, Ltd.,* 1990 AMC 776 (D. Del.

1999), the court upheld an attachment based upon, among other things, alter-ego allegations until

further facts could be flushed out after discovery. The plaintiff had filed its complaint against a

Bahamian corporation which transported goods from the U.S. and also alleged an alter-ego

relationship with a different company. The alter ego allegations were challenged in a motion to

vacate the Rule B attachment.    In denying the motion to vacate, the district court stated:

> The complaint, following "notice pleading" of the Fed. R. Civ. P., alleges that
> its claims against Independent are for stevedoring and related maritime claims.
> It also alleges three different and interrelated theories why Independent is
> liable for the obligations incurred by Caribbean. Independent, of course, in its
> counter-affidavit denies that these claims are maritime in nature or that it is
> liable to Sea-Terminals under any of the three theories for the obligations of
> Caribbean. Caribbean, it contends, is a totally separate and unrelated company
> to Independent. This, of course, may or may not be so, but it is too early to
> decide these issues until the facts are fully flushed out after discovery.

In much the same way, Mr. Ziogas' Declaration raises more questions than answers and

begs for a further flushing out of the facts. For instance, he admits that he is a director of six of

the corporate defendants and states in conclusory fashion that each are "separate and distinct."

He does not identify the other directors of each, the shareholders of each, the office addresses of

each, etc. These omissions, coupled with the other evidence which shows the relationship of

these entities and their use in Mr. Ziogas' breaches of duty and fraud, warrant giving Plaintiffs an

opportunity to conduct discovery into facts which only Defendants could have access to, before

the motion is decided.

NYDOCS1/301628.1                                28

If someone in Mr. Ziogas' shoes could simply come into the Court with his own self-serving declaration and secure vacatur of attachment on the basis of his version of the story, every attachment would be vacated. The Second Circuit made clear in *Maryland Tuna* that this would be inappropriate, and therefore discovery should be allowed to test Mr. Ziogas' position about the relationship of Defendants. Further, and at a minimum, Plaintiffs should be granted leave for expedited discovery of Ziogas to examine the most recent sales of two of the Option Vessels in which he is attempting to distance himself for purposes of avoiding posting security.

## CONCLUSION

For the reasons set forth above, Defendants' motion should be denied in its entirety.

Dated: New York, New York
       March 31, 2008

Respectfully submitted,

Peter J. Gutowski (PG 2200)
Gina M. Venezia (GV1551)
FREEHILL HOGAN & MAHAR, LLP
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, PETER J. GUTOWSKI, certify that I am counsel of record for Plaintiffs.   On March 31, 2008, the within memorandum of law in opposition to motion to vacate was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

Additionally, I served by email a true and correct copy of same upon the following counsel:

> Peter Skoufalos
> Brown Gavalas & Fromm LLP
> 355 Lexington Avenue
> New York, NY 10017

Peter J. Gutowski

Dated: March 31, 2008